## MICHAEL C. SKAKEL v. STATE OF CONNECTICUT
### (SC 18158)

Katz, Palmer, Vertefeuille, Zarella and McLachlan, Js.*

* This case was argued prior to the implementation of the policy of this court to hear all cases en banc.

Argued March 26, 2009—officially released April 20, 2010

*Hubert J. Santos*, with whom were *Hope C. Seeley* and *Benjamin B. Adams*, for the appellant (petitioner).

*Susann E. Gill*, senior assistant state's attorney, with whom was *Jonathan C. Benedict*, former state's attorney, for the appellee (respondent).

*Opinion*

KATZ, J. Following his 2002 conviction, after a jury trial, for the 1975 murder of his fifteen year old neighbor, Martha Moxley (victim), the petitioner, Michael C. Skakel, appealed.[1] In accordance with the three year limitations period under General Statutes § 52-582,[2] in 2005, while a decision on that appeal was pending, the petitioner filed a petition for a new trial, pursuant to General Statutes § 52-270 (a),[3] on the ground of newly discovered evidence. This court thereafter affirmed the judgment of conviction. See *State* v. *Skakel*, 276 Conn. 633, 888 A.2d 985, cert. denied, 549 U.S. 1030, 127 S. Ct. 578, 166 L. Ed. 2d 428 (2006).[4] The trial court, *Karazin, J.,*

[1] The petitioner appealed to the Appellate Court, rather than directly to this court as directed by General Statutes § 51-199 (b) (3). Therefore, the appeal was transferred to this court pursuant to Practice Book § 65-4.

[2] General Statutes § 52-582 provides: "No petition for a new trial in any civil or criminal proceeding shall be brought but within three years next after the rendition of the judgment or decree complained of, except that a petition based on DNA (deoxyribonucleic acid) evidence that was not discoverable or available at the time of the original trial may be brought at any time after the discovery or availability of such new evidence."

[3] General Statutes § 52-270 (a) provides: "The Superior Court may grant a new trial of any action that may come before it, for mispleading, the discovery of new evidence or want of actual notice of the action to any defendant or of a reasonable opportunity to appear and defend, when a just defense in whole or part existed, or the want of actual notice to any plaintiff of the entry of a nonsuit for failure to appear at trial or dismissal for failure to prosecute with reasonable diligence, or for other reasonable cause, according to the usual rules in such cases. The judges of the Superior Court may in addition provide by rule for the granting of new trials upon prompt request in cases where the parties or their counsel have not adequately protected their rights during the original trial of an action." Under Practice Book § 42-55, "[t]he judicial authority may grant the petition even though an appeal is pending."

[4] The petitioner, who was fifteen years old at the time of the murder but thirty-nine years old at the time of his arrest, raised the following claims in his appeal from the judgment of conviction, each of which we rejected: "(1) his case improperly was transferred from the docket for juvenile matters to the regular criminal docket of the Superior Court; (2) his prosecution was time barred by the five year statute of limitations for felonies that was in effect when the victim was murdered in 1975; (3) the state failed to disclose certain exculpatory evidence in violation of *Brady* v. *Maryland*,

subsequently denied the petitioner's revised substitute petition for a new trial (petition), and this appeal followed.[5] The petitioner contends that the trial court improperly concluded that his third party culpability, exculpatory and impeachment evidence was either not newly discovered, not credible or not likely to produce a different result in a new trial even if credible. We conclude that the trial court did not abuse its discretion in concluding that the petitioner had not satisfied the prerequisites for a new trial, and, accordingly, we affirm its judgment denying the petition.

The following facts that the jury reasonably could have found on the basis of evidence adduced at the petitioner's criminal trial, as well as the theories the petitioner raised in his defense at trial, were set forth in great detail by this court in our resolution of the petitioner's appeal from the judgment of conviction. The unusual circumstances of this case, its lengthy history, the number of persons involved, the nature of the claims in this appeal and the standard of review applied to claims of newly discovered evidence necessitate their repeating. "Sometime between 6:30 and 7:30 p.m. on the evening of Thursday, October 30, 1975, the victim

373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), thereby depriving [the petitioner] of his right to a fair trial; (4) the state's attorney engaged in pervasive misconduct during closing argument in violation of the [the petitioner's] right to a fair trial; (5) the trial court improperly permitted the state to introduce into evidence the prior sworn testimony of a certain witness in violation of the [petitioner's] constitutionally protected right of confrontation; and (6) the trial court improperly permitted the state to present evidence of several incriminating statements that the [petitioner] made while a resident at a school for troubled adolescents in Maine." *State* v. *Skakel*, supra, 276 Conn. 639–40. We also rejected the petitioner's challenges to the propriety of several other evidentiary rulings of the trial court. Id., 640.

[5] After the trial court denied the petition, the petitioner filed a motion for certification to appeal, pursuant to General Statutes § 54-95 (a), which the trial court granted. The petitioner then appealed from the judgment to the Appellate Court, and we subsequently transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2.

left her home on Walsh Lane, located in the Belle Haven section of [the town of] Greenwich, with a friend, Helen Ix, to play and socialize in and around the neighborhood. It was the night before Halloween, commonly referred to as 'mischief night,' an evening when the neighborhood children were known to engage in playful mischief. The victim and Ix soon were accompanied by other friends who lived nearby. Several times that night, the group stopped by the Skakel home, which was located on Otter Rock Drive.[6] The first time they did so, the [petitioner] was dining at the Belle Haven Club with his siblings, Rushton Skakel, Jr., Julie Skakel, Thomas Skakel, John Skakel, David Skakel and Stephen Skakel, their cousin James Dowdle,[7] their tutor Kenneth Littleton, and Julie Skakel's friend Andrea Shakespeare. The Skakel group arrived home from dinner before 9 p.m., at which time the victim and her friends again visited the [petitioner's] house.

"Shortly thereafter, the [petitioner], joined by the victim, Ix and [Geoffrey] Byrne, a friend of the victim, entered one of the Skakel family vehicles, a Lincoln Continental, which was parked on the Skakels' side driveway, to talk and listen to music. Thomas Skakel, the [petitioner's] then seventeen year old brother, soon joined the group. Sometime before 9:30 p.m., the group was interrupted by Rushton Skakel, Jr., and John Skakel, who needed to use the Lincoln Continental to drive Dowdle home, where they planned to watch a television program scheduled to air at 10 p.m. Consequently, Thomas Skakel, Ix, Byrne and the victim exited the car. As Ix began to leave the Skakel property with Byrne, she observed Thomas Skakel and the victim engaging

---

[6] "The victim's home was located on Walsh Lane, diagonally across the street from the [petitioner's] home, which faced Otter Rock Drive." *State* v. *Skakel*, supra, 276 Conn. 640 n.4.

[7] "Dowdle also was known as James Terrien." *State* v. *Skakel*, supra, 276 Conn. 640 n.5. References to him in this opinion are to Dowdle.

in flirtatious horseplay at the other end of the driveway. Feeling 'a bit embarrassed by the flirting,' Ix left to go home.[8]

"The victim's mother, Dorothy Moxley, expected that the victim would be home that evening by 10:30 or 11 p.m. At about 1:30 or 2 a.m., upon discovering that her daughter had not returned home, she sent the victim's brother, John Moxley, out to look for her. Dorothy Moxley thereafter telephoned anyone who she thought might know the victim's whereabouts, including the [petitioner's] family, whom Dorothy Moxley called several times. Dorothy Moxley's efforts to locate the victim were unsuccessful, and she eventually contacted the Greenwich police department, which dispatched an officer to the Moxley home. The officer made a missing persons report and briefly searched the surrounding area. The next morning, at about 8:30 a.m., Dorothy Moxley, believing that the victim may have fallen asleep in the Skakel family motor home that usually was parked in the Skakels' driveway, went to the [petitioner's] house. The [petitioner] answered the door, appearing 'hungover' and dressed in jeans and a T-shirt. The [petitioner] informed Dorothy Moxley that the victim was not at his home, and an inspection of the motor home by a Skakel employee confirmed that she was not there either.

"Later that day, at about noon, a neighborhood friend discovered the victim's dead body under a large pine

_____

[8] "The trial testimony was less than definitive as to whether the [petitioner] had accompanied his brothers when they drove Dowdle home or whether he had stayed behind with the victim and the others. For example, Shakespeare testified that the [petitioner] had stayed behind and did not accompany his brothers to Dowdle's home that night. Shakespeare, however, was unable to articulate the basis of her recollection and conceded that she had no specific memory either of the Lincoln Continental leaving without the [petitioner] or seeing the [petitioner] in the house after the car had departed for Dowdle's home. Rushton Skakel, Jr., John Skakel and Dowdle all testified that the [petitioner] had accompanied them to Dowdle's home that evening." *State* v. *Skakel*, supra, 276 Conn. 641 n.6.

tree in a wooded area on the Moxley property. The victim was lying facedown, with her pants and panties pulled down around her ankles. Forensic tests revealed that the victim had died from multiple blunt force traumatic head injuries. A large quantity of blood was discovered in two areas in a grassy region approximately seventy feet from the victim's body, with a distinct drag path leading from the pools of blood to the location where the victim's body was found. The victim likely was assaulted at or near the farther end of her circular driveway and then dragged approximately eighty feet to the pine tree under which her body subsequently was discovered. Remnants of the murder weapon, a Toney Penna six iron golf club, also were found at the crime scene. The head of the golf club and an eight inch section of its shaft were found on the circular driveway, approximately 116 feet from the area where the large accumulation of the victim's blood was found. Another piece of the shaft was discovered on the grassy area near the two large pools of blood. The remaining part of the shaft attached to the club handle never was found.

"Harold Wayne Carver II, a forensic pathologist and the state's chief medical examiner, testified regarding the findings of the original autopsy performed by then chief medical examiner Elliot M. Gross, also a forensic pathologist. Carver stated that the victim's injuries appeared consistent with having been inflicted by a golf club. In addition to the fatal head injuries, the victim had been stabbed in the neck with a piece of the golf club shaft. According to Carver, Gross had used an ultraviolet light to detect the presence of semen on the victim's pubic region and also had taken vaginal and anal swabs. No semen was found in those areas, however. Nothing in the autopsy report indicated that the ultraviolet light had been applied to the victim's buttocks or to other parts of the victim's body. With respect

to the time of death, Carver testified that the victim had been dead for some time before her body was found. He further opined that the time of death more likely was closer to 9:30 p.m. on October 30, 1975, when she was last seen alive, rather than noon the following day, when her body was discovered. Because the autopsy was conducted twenty-four hours after the discovery of the victim's body, a more precise time of death could not be ascertained.

"Henry Lee, a forensic scientist and the former state chief criminalist, reviewed the documents, photographs and physical evidence compiled by the investigators and performed a partial reconstruction of the crime scene. On the basis of his investigation, Lee testified as to the likely nature and sequence of events leading up to the victim's death. In particular, he indicated that the golf club that was used to assault and kill the victim probably had broken into pieces from the force with which the victim had been struck. This force, according to Lee, likely propelled the head of the golf club, and a piece of its shaft, over seventy feet, from the location of the fatal assault to the location inside the circular driveway where those pieces subsequently were discovered. According to Lee, the remaining piece of the golf club shaft then was used as a sharp weapon to stab the victim. Lee further testified that, in light of the amount of blood found on the inside of the victim's jeans and panties, those garments likely were pulled down before the assault occurred. Lee also stated that the absence of vertical blood drippings on the victim's shoes and jeans indicated that the victim was lying on the ground when the perpetrator inflicted the injuries to her head and neck.

"James Lunney, a detective with the Greenwich police department in 1975, testified that, on the day that the victim's body was discovered, he briefly visited the [petitioner's] home and noticed a barrel containing

several items, including golf clubs, in a hallway near the rear of the home. Lunney testified that one of the golf clubs, a Toney Penna four iron, later was seized from the property with the written consent of the [petitioner's] father. Thomas G. Keegan, a captain in the detective division of the Greenwich police department in 1975, testified that an examination of the seized golf club and the golf club parts found at the crime scene revealed that the murder weapon came from the [petitioner's] home.

"In the days and months following the victim's murder, the Greenwich police conducted numerous interviews in furtherance of its criminal investigation into the victim's death. The [petitioner] and his siblings were among those interviewed in the early stages of that investigation. On November 15, 1975, the [petitioner], who was accompanied by his father, gave a tape-recorded interview to the Greenwich police at the police station. Responding to inquiries concerning his whereabouts on the night of the murder, the [petitioner] explained that he had accompanied his brothers and Dowdle to Dowdle's home, which was about twenty minutes away, and watched the television show 'Monty Python's Flying Circus.' According to the [petitioner], he returned to his home around 10:30 or 11 p.m.,[9] and went to bed about fifteen minutes later. When asked specifically about whether he left the house after he went to his bedroom that night, the [petitioner] responded, 'no.' The [petitioner] acknowledged, however, that, on other occasions, he had left his home after ostensibly retiring to his room for the night.

"In 1977, two years following the victim's murder, the [petitioner] revealed certain feelings of guilt and

_____

[9] "Dowdle and Rushton Skakel, Jr., corroborated the [petitioner's] statement that he had spent part of that evening at Dowdle's home watching television. Shakespeare, however, recalled seeing the [petitioner] at his home after Dowdle and Rushton Skakel, Jr., departed for Dowdle's home in the Lincoln Continental." *State* v. *Skakel*, supra, 276 Conn. 645 n.9.

458

remorse to Larry Zicarelli, who then was employed by the [petitioner's] family as a driver and general handyman. While being driven by Zicarelli to an appointment in New York City, the [petitioner], distraught from an earlier altercation with his father, told Zicarelli that he 'had done something very bad' and that he 'either had to kill himself or get out of the country.' On another occasion, Zicarelli and the [petitioner] were stopped in traffic on the Triborough Bridge in New York on their way home when the [petitioner] 'opened the [car] door, started to jump out of the car and ran to the side . . . of the bridge.' Zicarelli ran after the [petitioner] and forced him back into the car. As Zicarelli was proceeding to the driver's side door, the [petitioner] again exited the car and ran toward the other side of the bridge. Zicarelli once again hurried toward the [petitioner] and forced him back into the car. Just before Zicarelli and the [petitioner] arrived at the Skakel home, Zicarelli asked the [petitioner], '[W]hy would [you] want to do what [you were] trying to do?' The [petitioner] responded that, 'if [you] knew what [I] had done, [you] would never talk to [me] again.'[10] Immediately following this incident, Zicarelli terminated his employment with the Skakels.[11]

---

[10] "On cross-examination, defense counsel asked Zicarelli whether he was aware that, on the night before this incident, the [petitioner] 'had slept in his dead mother's dress and felt bad about it . . . .' Zicarelli responded that he had been unaware of any such incident. Julie Skakel testified that the [petitioner] had contemplated jumping off the Triborough Bridge because he felt guilty about having slept in his deceased mother's dress." *State* v. *Skakel,* supra, 276 Conn. 646 n.10.

[11] "The state also introduced the testimony of Matthew Tucharoni, who stated that, in the spring of 1976, the [petitioner], accompanied by Rushton Skakel, Jr., and Julie Skakel, came to the barbershop in Greenwich where Tucharoni then was employed and inquired about a haircut. Tucharoni testified that while he was preparing to cut the [petitioner's] hair, he overheard the [petitioner] say, 'I am going to kill him.' According to Tucharoni, Julie Skakel responded, 'you can't do that,' and the [petitioner] replied, 'Why not? I did it before . . . .'" *State* v. *Skakel,* supra, 276 Conn. 646 n.11.

"From 1978 to 1980, the [petitioner] was a resident at the Elan School [Elan], a residential facility for troubled adolescents located in [Poland], Maine. Several former Elan residents testified about the deplorable conditions at the institution, which employed a behavioral modification approach predicated on controversial techniques of intimidation, confrontation and humiliation of its residents. As a result, Elan residents regularly endured mental and physical abuse at the hands of their peers and Elan staff members. While a resident at Elan, the [petitioner] frequently was confronted and interrogated about his involvement in the victim's murder. For example, Charles Seigen, who was enrolled at Elan with the [petitioner] from 1978 to 1979, testified that he recalled attending two or three group therapy sessions, supervised by a staff member and typically attended by eight residents, during which the [petitioner] was confronted about the victim's murder. According to Seigen, the [petitioner] sometimes responded to such probing with annoyance. On other occasions, however, the [petitioner] became very upset, cried and stated that he did not know if he had done it. The [petitioner] also stated in these group sessions that, on the night of the victim's murder, he was 'blind drunk' and 'stumbling.'[12]

[12] "Seigen also described the nature of the 'general meetings' at Elan, which were convened to confront residents about specific issues. According to Seigen, '[a] general meeting was probably the scariest word that you would hear when you were at Elan.' A typical general meeting, which was attended by 100 or more Elan residents and staff, focused on one or two residents who were singled out for violating Elan rules. Seigen recalled that the [petitioner] was the subject of a general meeting as a result of his failed attempt to run away from the facility. Seigen stated that he first learned of the [petitioner's] possible involvement in the victim's murder when it was announced at a general meeting by Joseph Ricci, Elan's executive director. Elizabeth Arnold, another former Elan resident, testified that, at that particular general meeting, which lasted approximately three hours, Ricci continuously had confronted the [petitioner] about various issues and that four or five Elan residents 'brutalized' the [petitioner] in a boxing ring. Other former residents of Elan also testified about the details of the torment that the [petitioner] had endured at this meeting, including accusations leveled against the [petitioner] that he had killed the victim. The [petitioner's] initial

"Dorothy Rogers, another former resident of Elan, testified that, on one occasion, when she and the [petitioner] were talking at an Elan social function, the [petitioner] told her that he had been drinking on the night of the murder and that he could not recall whether he was involved in the victim's death. The [petitioner] further explained to Rogers that his family had enrolled him at Elan because they feared that he may have murdered the victim and wanted him in a location far removed from the investigating officers. Gregory Coleman, a resident at Elan from 1978 to 1980, testified about an exchange that he had had with the [petitioner] while Coleman stood 'guard' over the [petitioner] following the [petitioner's] failed escape attempt from Elan. During this conversation, the [petitioner] confided in Coleman about murdering a girl who had rejected his advances. According to Coleman, the [petitioner] had admitted killing the girl with a golf club in a wooded area, that the force with which he had hit her had caused the golf club to break in half, and that he had returned to the body two days later and masturbated on it. John Higgins, another former resident of Elan, recounted certain emotional admissions that the [petitioner] had made to him while the two were on guard duty one night on the porch of the men's dormitory at Elan. In particular, Higgins testified that the [petitioner] had told him that, on the night of the murder, there was a 'party of some kind or another' at the [petitioner's] home. The [petitioner] also told Higgins that he remembered rummaging through his garage looking for a golf club,

response to this interrogation was to deny his involvement in the murder. After several rounds in the boxing ring, however, the [petitioner] stated, 'I don't know' or 'I don't remember' in response to questioning regarding his involvement in the murder. During the course of his enrollment at Elan, the [petitioner] also was forced to wear a large cardboard sign around his neck, another form of punishment at Elan. The sign read, 'Confront me on why I murdered Martha Moxley,' or words to that effect." *State* v. *Skakel*, supra, 276 Conn. 647 n.12.

running through the woods with the club and seeing pine trees. Higgins further stated that, as the conversation continued, the [petitioner's] acknowledgment of his culpability in the victim's murder progressed from 'he didn't know whether he did it' to 'he may have done it' to 'he must have done it,' and finally to 'I did it.'

"Elizabeth Arnold and Alice Dunn, both of whom had attended Elan during the [petitioner's] stay at the facility, also testified about certain inculpatory statements that the [petitioner] had made to them. Both testified that the [petitioner] had expressed uncertainty as to whether he or his brother had murdered the victim. Arnold also recalled a group therapy session in which the [petitioner], upon being questioned about the victim's murder, stated that '[h]e was very drunk and had some sort of a blackout' that night, that his brother had 'fool[ed] around' with his 'girlfriend,' and that his brother had stolen her from him. Dunn, who graduated from Elan in 1978 and subsequently became a staff member there, testified that while she was employed at Elan, the [petitioner] stated that he was not in 'his normal state' on the night of the murder.

"Thereafter, in the summer of 1987, the [petitioner] told Michael Meredith, a former Elan resident who was staying temporarily in the [petitioner's] home, that, on the night of the victim's murder, he had climbed a tree on the Moxley property and masturbated in the tree while watching the victim through her window. According to Meredith, he first learned of the victim's murder in this conversation. The [petitioner] also told Meredith that while he was in the tree, he saw his brother Thomas Skakel walk across the Moxley property toward the victim's home but that Thomas Skakel had not seen him in the tree. The [petitioner] related a similar story to Andrew Pugh, a close childhood friend, when the two saw one another in 1991. The [petitioner] had expressed a desire to renew their friendship, which

gradually had faded following the victim's murder. In an effort to ease Pugh's concerns about the [petitioner's] involvement in the victim's death, the [petitioner] assured Pugh that he did not kill the victim but mentioned that he had masturbated in a tree on the night that she was murdered. Pugh understood that the tree to which the [petitioner] referred was the tree under which the victim's body was discovered.

"The most descriptive account of the [petitioner's] activities on the night of the murder came in 1997 from [a tape-recorded] conversation between the [petitioner] and Richard Hoffman, a writer who was collaborating with the [petitioner] on a book about the [petitioner's] life. On that tape [recording], the [petitioner] explained to Hoffman that, earlier in the evening of the victim's murder, he had invited the victim, who was seated with the [petitioner] in his father's car, to accompany him to his cousin's house to watch the Monty Python Flying Circus television show. The victim declined the invitation because of her curfew, and the two instead made plans to go 'trick or treating' the next night. The [petitioner] thereafter left for Dowdle's home with his brothers Rushton Skakel, Jr., and John Skakel, as well as Dowdle.

"The [petitioner] told Hoffman that, after returning to his own home from Dowdle's house, he had walked through the house in search of various people. Upon observing that the door to his sister's room was closed, he had 'remember[ed] that [his sister's friend, Shakespeare] had gone home . . . .' He then indicated that he had gone into 'the master bedroom [but] there was nobody there, the [television] was on but nobody was there.' The [petitioner] went upstairs to bed shortly thereafter, but he became 'horny' and decided to spy on a 'lady' who lived on Walsh Lane. The [petitioner] then 'snuck out' of his house and went to this person's home, hoping to see her through her window. Unsuc-

cessful in that endeavor, he thought, '[f]uck this . . . Martha likes me, I'll go, I'll go get a kiss from Martha.' . . . The [petitioner] then proceeded to the victim's home, climbed a tree near the victim's front door and masturbated in the tree for about thirty seconds. Shortly thereafter, 'a moment of clarity came into [his] head,' and the [petitioner] climbed down from the tree and walked back home. On his way home, he threw rocks into the dark, repeatedly yelling, 'Who's in there?' He and his friends previously had done this while shooting BB guns into the dark. The next morning, the [petitioner] awoke to '[Dorothy] Moxley saying "Michael . . . have you seen Martha?" ' The [petitioner] thought to himself, 'Oh my God, did they see me last night?' At that moment, the [petitioner] told Hoffman, he 'remember[ed] just having a feeling of panic.'

"The state also adduced evidence establishing that the [petitioner], who was infatuated with the victim, had grown resentful of her flirtatious friendship with his older brother, Thomas Skakel, whom he considered his nemesis. According to Pugh, who in 1975 was friendly with the victim and the [petitioner], the [petitioner] had 'told [Pugh] that he liked Martha quite a bit and had a crush on her.' Pugh also testified that the [petitioner] had told him that 'he would have liked to have a relationship with her.' Pugh testified that he had observed the [petitioner] and the victim engage in 'horseplay, roughhousing, fooling around . . . [and] kissing one time in the [Skakel family motor home].' With respect to Thomas Skakel's relationship with the victim, Jacqueline Wettenhall O'Hara, a neighborhood friend of the victim, recounted observing flirtatious conduct between the victim and Thomas Skakel in the months leading up to the victim's death. Entries recorded in the victim's diary in the two months preceding her murder disclosed the victim's friendship with the [petitioner] and Thomas Skakel, and also revealed

the sometimes flirtatious nature of her relationship with Thomas Skakel. In addition, [the victim's friend] Ix testified that she had observed the victim and Thomas Skakel engaging in flirtatious horseplay the last time she saw the victim alive. Moreover, one of the sneakers that the victim was wearing when her body was recovered had the name 'Tom' written on it.

"The [petitioner] raised an alibi defense at trial. In particular, he claimed that the victim had been murdered at approximately 10 p.m. on October 30, 1975,[13] and that he was at Dowdle's home, some twenty minutes away from the murder scene, at that time. The [petitioner] also raised a third party culpability defense, pointing to Littleton as a likely perpetrator of the victim's murder. In fact, Littleton, who had been hired as a part-time tutor by the Skakel family, had taken up residence at the Skakel home on October 30, 1975, the day that the victim was last seen alive, and had slept there with the Skakel children that night. Littleton testified that, after returning home from dinner at 9 p.m., he remained at the house all night, stepping outside briefly at approximately 9:30 p.m. only to investigate a disturbance.[14] In addition, testimony adduced by the [petitioner] revealed that Littleton, who began to manifest serious psychiatric and behavioral problems in the years following the murder, may have made a statement, several years after the killing, in which he implicated himself in the crime. Littleton emphatically denied that he had had anything to do with the victim's death, how-

---

[13] "[The petitioner's] counsel adduced testimony from Joseph Alexander Jachimczyk, a forensic pathologist from Houston, Texas, who concluded that the time of the victim's death most likely was around 10 p.m. on October 30, 1975. Jachimczyk's testimony was bolstered by the testimony of several people, including Dorothy Moxley, Ix and David Skakel, that they had heard dogs barking in the vicinity of the crime scene at approximately that time." *State* v. *Skakel,* supra, 276 Conn. 652 n.14.

[14] "According to Littleton, he was unable to discern the cause of the disturbance." *State* v. *Skakel,* supra, 276 Conn. 653 n.15.

ever." *State* v. *Skakel*, supra, 276 Conn. 640–53. The jury rejected the petitioner's theories, returning a guilty verdict on the charge of murder, and the trial court, *Kavanewsky, J.*, rendered judgment in accordance with the verdict.[15] Id., 639.

Following this court's decision affirming the judgment of conviction; id., 770; evidentiary hearings were held on the petitioner's petition for a new trial. Although the petition had set forth nine counts, the petitioner proceeded on only four of those counts. The trial court, *Karazin, J.*, construed those counts as follows. Count one alleged newly discovered evidence of third party culpability, specifically, statements from Gitano "Tony" Bryant implicating two of Bryant's former high school classmates, Adolph Hasbrouck and Burton Tinsley, in the victim's murder. Count two alleged newly discovered evidence of witnesses who directly contradicted Coleman's testimony that the petitioner had confessed to killing the victim. Count six alleged newly discovered exculpatory evidence that the state had failed to disclose, specifically, a composite drawing of a person seen in Belle Haven on the night of the murder whom the petitioner claims resembles Littleton,[16] police suspect profile reports on Thomas Skakel and Littleton, and "time lapse data" chronicling Littleton's actions, including charged and uncharged criminal conduct, before and after the victim's murder. Count nine alleged newly discovered evidence relating to a "secret pact and book deal between the state's lead investigator, Frank Garr, and author Leonard Levitt."[17] The state filed an answer,

---

[15] The trial court sentenced the petitioner to a period of incarceration of twenty years to life.

[16] Count five of the petition set forth allegations regarding the composite drawing. The petitioner subsequently withdrew that count, but, because he had offered evidence regarding the drawing in connection with his claim of a pattern of nondisclosure by the state under count six of the petition, the court addressed this evidence as part of that count.

[17] Count nine of the petition did not set forth any specific allegations relating to Garr, Levitt or the book deal, but instead realleged all of the

essentially denying all of the material allegations. After a hearing and review of all of the evidence adduced in relation to the petition, the trial court denied the request for a new trial as to each count.

On appeal, the petitioner challenges the trial court's denial of his petition for a new trial on each of the grounds previously raised. We conclude that the trial court did not abuse its discretion and, therefore, we affirm the judgment. Additional facts will be set forth as necessary.

We begin with the general legal principles that govern our resolution of the petitioner's claims. Pursuant to § 52-270, a convicted criminal defendant may petition the Superior Court for a new trial on the basis of newly discovered evidence. See Practice Book § 42-55. A trial court's decision on that ground is governed by the standard set forth in *Asherman* v. *State*, 202 Conn. 429, 434, 521 A.2d 578 (1987), and further refined in *Shabazz* v. *State*, 259 Conn. 811, 827–28, 792 A.2d 797 (2002). Under the *Asherman* standard, a court is justified in granting a petition for a new trial when the petitioner demonstrates that the evidence offered in support thereof: (1) is newly discovered such that it could not have been

allegations in the preceding eight counts. Limited aspects of Garr's involvement in the investigation were referenced in counts three and five of the petition; there were no references in any counts to either Levitt or the book deal. Nonetheless, because the trial court concluded that "[i]t became clear as the petition for a new trial evolved, that [count nine] was primarily focused on . . . Garr, the book and Garr's conduct," over the state's objection, the court construed that count to be sufficiently broadly drafted to allow it to consider evidence adduced as to the book deal. The state has raised as an alternate ground for affirming the trial court's denial of the petition with respect to this evidence that the petitioner's allegations relating to the book deal should not have been considered because they were not pleaded in the revised petition and did not relate back to allegations actually pleaded to satisfy the statute of limitations. We decline to address this alternate ground, however, in light of our conclusion in part II of this opinion that the trial court properly concluded that the book deal was not newly discovered evidence.

discovered previously despite the exercise of due diligence; (2) would be material to the issues on a new trial; (3) is not cumulative; and (4) is likely to produce a different result in the event of a new trial. *Asherman* v. *State*, supra, 434. "This strict standard is meant to effectuate the underlying equitable principle that once a judgment is rendered it is to be considered final, and should not be disturbed by posttrial motions except for a compelling reason." (Internal quotation marks omitted.) Id.

"The roots of this test can be traced back as far as 1850, when this court first stated that a petition for a new trial will not be granted if the newly discovered evidence could have been known before the trial, by great diligence or if the evidence is merely cumulative . . . . *Waller* v. *Graves*, 20 Conn. 305, 310 (1850). In *Parsons* v. *Platt*, 37 Conn. 563, 564 (1871), we added the requirements that the evidence, in fact, be newly discovered; that it be material; and that, if a new trial were granted a different result would be produced. . . . Id., 565. Finally, in *Hamlin* v. *State*, 48 Conn. 92, 93–94 (1880), we articulated the test in terms virtually identical to that which we later adopted in *Asherman*. See also *Smith* v. *State*, 141 Conn. 202, 208, 104 A.2d 761 (1954); *Taborsky* v. *State*, 142 Conn. 619, 623, 116 A.2d 433 (1955); *Turner* v. *Scanlon*, 146 Conn. 149, 163, 148 A.2d 334 (1959); *Lombardo* v. *State*, 172 Conn. 385, 391, 374 A.2d 1065 (1977); *Burr* v. *Lichtenheim*, 190 Conn. 351, 355, 460 A.2d 1290 (1983)." (Internal quotation marks omitted.) *Shabazz* v. *State*, supra, 259 Conn. 821.

We further explained in *Shabazz* that, in determining whether a different result would be produced in a new trial, a trial court necessarily must engage in some form of credibility analysis. Id., 827. "The trial court must always consider the newly discovered evidence in the context of the evidence presented in the original trial. . . . [Thus, if] the trial court determines that the evi-

dence is sufficiently credible so that, if a second jury were to consider it together with all of the original trial evidence, it probably would yield a different result or otherwise avoid an injustice,[18] the fourth element of the *Asherman* test would be satisfied." (Citation omitted.) Id., 827–28. By a "different result," we mean that the new evidence would be likely to result in acquittal of the petitioner, not merely that it might cause one or more jurors to have a reasonable doubt about the petitioner's guilt. Id., 823 ("it must be evidence which persuades the judge that a jury would find him not guilty" [internal quotation marks omitted]); *Lombardo* v. *State*, supra, 172 Conn. 391 (same); see also *Asherman* v. *State*, supra, 202 Conn. 434, 436 (considering whether admission probably would have led to petitioner's acquittal). Finally and significantly, it is well settled that whether the evidence satisfies the aforementioned standard is within the trial court's sole discretion, and the judgment of the trial court will be set aside on appeal only if it reflects a clear abuse of discretion. *Asherman* v. *State*, supra, 434; *Ridolfi* v. *Ridolfi*, 178 Conn. 377, 379, 423 A.2d 85 (1979).

I

We first turn to the petitioner's claim that the trial court improperly concluded that he is not entitled to a new trial on the basis of Bryant's statements inculpating two other persons in the victim's murder. The petitioner contends that Bryant's account of the events of October 30, 1975, credibly establishes the motive, opportunity and means for two of Bryant's former schoolmates, Hasbrouck and Tinsley, to have committed the murder. We disagree.

---

[18] To the extent that the petitioner relies on the phrase "otherwise avoid an injustice" from *Shabazz* v. *State*, supra, 259 Conn. 828, as an independent ground for a new trial, see footnote 41 of this opinion in which we address that contention.

A

The record discloses the following additional undisputed facts and procedural history. After the petitioner was convicted, Crawford Mills, Bryant's former Greenwich schoolmate, contacted the petitioner's cousin, Robert F. Kennedy, Jr., with the following information regarding the victim's homicide. According to Mills, Bryant had said that he knew who had killed the victim, and that it was not the petitioner, but, rather, it was Hasbrouck and Tinsley. Bryant reluctantly had agreed to allow Mills to relay his account to others but told Mills that he did not want his name disclosed and would not come forward with the information himself. Mills initially did not disclose Bryant's identity, but ultimately decided to do so when no one would credit the information without knowing the source. Kennedy then contacted Bryant and, following several telephone conversations, Bryant agreed to submit to a videotaped interview. On August 24, 2003, Vito Colucci, a private investigator the petitioner had hired, conducted the interview. When Bryant was deposed pursuant to a subpoena on August 25, 2006, however, he invoked his fifth amendment right not to incriminate himself in response to every question relating even tangentially to the events of October 30, 1975. Although Hasbrouck and Tinsley initially had spoken willingly with Kennedy and Colucci on several occasions, after they became aware that Bryant had implicated them in the murder, they too invoked their fifth amendment right not to testify at their depositions.[19]

---

[19] Accordingly, neither Bryant, Tinsley nor Hasbrouck were subject to cross-examination, nor were they available to testify at the hearing on the petition for a new trial. In response to a question at oral argument before this court as to why the state had not offered Bryant immunity in order to compel him to testify, the state's attorney explained that it is not the state's practice to provide such immunity when it deems a witness' account to be wholly incredible.

Prior to the hearing on the petition for a new trial, the state filed a motion in limine seeking to preclude admission of Bryant's videotaped statements on the ground that they were hearsay and did not qualify for admission under any exception to the hearsay rule. The parties agreed that the issue of the admissibility of the statements would be reserved until after the court's review of the videotape at the hearing on the petition. Thereafter, the trial court reviewed the August 24, 2003 videotaped interview of Bryant, heard testimony from various witnesses and reviewed documentary evidence relating to Bryant's account before issuing any rulings.

In the videotaped interview, Bryant offered the following account of the events leading up to and following the evening of October 30, 1975. At the time of the murder, Bryant was fourteen years old and living in New York City, where he attended Hughes High School. For the previous three school years, however, he had attended Brunswick School (Brunswick), a private school in Greenwich, and lived with a family friend in Greenwich. The petitioner and Bryant had been classmates at Brunswick, but the two were not friends. After Bryant moved to New York, he continued to socialize with many of the young people around Belle Haven and other Greenwich enclaves, in particular, Neal Walker and Byrne.

Hasbrouck and Tinsley were friends of Bryant's who also attended Hughes High School, although they were about a year older than Bryant. The two accompanied Bryant to Belle Haven four or five times between mid-September and October 30, 1975. Bryant was acquainted with the victim from his time living in Greenwich, but Hasbrouck and Tinsley first met her in mid-September at a street fair in Greenwich. Although Hasbrouck never made any direct overtures to the victim, he became "obsessed" with her. He would make comments to Bryant and others that "[s]omeday [he was] going to have

her," as well as more vulgar variations of that comment, and, on several occasions, stated that he wanted "to go caveman on her," which meant to Bryant that Hasbrouck would drag her away by the hair and sexually assault her.

On October 30, 1975, the night of the victim's murder, Bryant took the train to Greenwich with Hasbrouck and Tinsley, heading into Belle Haven somewhere between 6 and 6:20 p.m. They stopped by Walker's house at approximately 6:30 or 6:40 p.m., but Walker was not able to leave at that time and he told them to come back later. Bryant, Hasbrouck and Tinsley then walked to the house next door, went inside, helped themselves to several six packs of beer in the refrigerator and proceeded to Byrne's house. Byrne then accompanied the three others as they walked about the neighborhood engaging in various acts of mischief, such as smashing pumpkins. As they walked, they saw other teenagers out in the neighborhood, including Ix and Lisa Rader Edwards.

Bryant and the rest of the group walked behind the Skakel residence, where they found some golf clubs strewn about that each of them handled. Thereafter, Hasbrouck and Tinsley walked around Belle Haven carrying the golf clubs as walking sticks. Bryant and the others proceeded to a large meadow, located behind the Skakel property, where young people in the neighborhood commonly congregated to smoke and drink without being seen by the Belle Haven security guard. Bryant and the others drank several six packs of beer and smoked marijuana. At approximately 8:30 to 8:45 p.m., Bryant saw the victim, as well as the petitioner, at the meadow. Thomas Skakel also came and went, and Bryant waved to Julie Skakel, who, per her usual practice, did not stay at the meadow to socialize. By about 9 p.m., a group of ten to fifteen teenagers, including Bryant, Tinsley and Hasbrouck, had congregated

together in a circle at the meadow. Tinsley and Has-
brouck made comments and sexual overtures to some
of the girls there, which made things uncomfortable.
The victim was there around that time, but became "fed
up" with what was going on, left the meadow and went
over to a group that was standing by the Skakel resi-
dence and included at various points the petitioner and
Thomas Skakel.

Bryant decided to leave for two reasons. First, he
had told his mother that he would catch the last train
home, which left at 9:35 or 9:40 p.m. Second, Tinsley
and Hasbrouck had gotten "out of control," making
comments that made Bryant uncomfortable, such as:
"Where are the bitches?"; "We've just got to get into
something . . . I'm not going out of here unsatisfied";
"I'm going to get me a girl"; and "I've got my caveman
club . . . and I'm going to grab somebody and pull
them by the hair and do what cavemen do." While mak-
ing these comments, Tinsley and Hasbrouck had the
golf clubs in hand that they had taken from the Skakel
property. Bryant feared that, with the combination of
the alcohol, drugs and the personality types of his two
friends, anything was possible. Bryant left the group,
hitchhiked and caught a ride to the train station from
a person whom he knew to be from Belle Haven, but
could not identify, and went home. Tinsley and Has-
brouck stayed the night at Byrne's house.

When Bryant saw Hasbrouck and Tinsley the Monday
following the murder, they told him, "We did it. We
achieved the caveman." Although neither mentioned
the victim by name, Bryant knew that they were talking
about her, given both Hasbrouck's infatuation with her,
as well as the New York Times article Bryant's mother
had shown him about the murder. In the days that
followed, Hasbrouck and Tinsley continued to brag
about having achieved their fantasy of taking a girl

"caveman style," meaning with a club, without expressly mentioning the victim's name.

In its memorandum of decision denying the petition for a new trial, the trial court first addressed the issue of whether Bryant's statements were admissible. The trial court determined, in accordance with the factors set forth under the rules of evidence, that "[a] complete analysis of both the time that the statements were made and the people to whom they were made, considered in the context of the unique circumstances of the present case, meets the *minimum* threshold of trustworthiness to warrant the admission of Bryant's statements as a statement against penal interest." (Emphasis added.) See Conn. Code Evid. § 8-6 (4).[20]

With respect to the timing of the statements, the trial court noted that Tinsley and Hasbrouck had made their alleged statements to Bryant immediately after the crime, which supported the trustworthiness of those statements. Although Bryant's recounting of those statements to Mills had been more than twenty-five years later, the court determined that, "[b]ecause of the length of the state's investigation . . . Bryant had an incentive to keep himself out of a case that he reasonably thought would never be solved. . . . [E]ven after the petitioner was arrested and brought to trial, [Bryant] still refused to come forward because he thought there

---

[20] Section 8-6 of the Connecticut Code of Evidence provides in relevant part: "The following are not excluded by the hearsay rule if the declarant is unavailable as a witness . . .

"(4) Statement against penal interest. A trustworthy statement against penal interest that, at the time of its making, so far tended to subject the declarant to criminal liability that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true. In determining the trustworthiness of a statement against penal interest, the court shall consider (A) the time the statement was made and the person to whom the statement was made, (B) the existence of corroborating evidence in the case, and (C) the extent to which the statement was against the declarant's penal interest. . . ."

was no way that [the petitioner] would be convicted. . . . Bryant was a fourteen year old black male who was suddenly faced with information that, by his own admission, was clearly against his penal interest . . . ." For all of these reasons, combined with Bryant's knowledge that there is no statute of limitations on murder,[21] the court concluded that his reluctance to tell his story was reasonable.

The court then focused on the person to whom Bryant initially had related his story. The court concluded that, because Bryant had made his first disclosure regarding the details of his whereabouts on October 30, 1975, to Mills, with whom he "shared a connection to the facts of this case, dating back to their shared experiences at Belle Haven during the time leading up to the murder," and then to Kennedy and Colucci, the statements were trustworthy. As further support for the minimum threshold of trustworthiness to warrant admission of Bryant's statement, the court also noted that Colucci had informed Bryant that he was being sought in connection with a court proceeding, that Bryant was aware that his statements were being videotaped and that it was clear that the recording was being made in anticipation of having it presented in court.

Next, the court examined the extent to which Bryant's statements were corroborated by other evidence. The court highlighted the following facts: "Bryant went to the Brunswick School, and was classmates with the children in the Belle Haven neighborhood. Several witnesses, including [Mills] and [Walker], confirm[ed] that Bryant socialized at Belle Haven. At the hearing, witnesses confirm[ed] that *Bryant* indicated that he was present in Belle Haven on the night of the murder. One

---

[21] Bryant told Kennedy that he had graduated from law school, but never had taken the bar examination or practiced law. Bryant's mother confirmed that he had graduated from law school.

witness recall[ed] seeing [Hasbrouck] and [Tinsley] in Belle Haven with Bryant during the fall of 1975. Both Hasbrouck and Tinsley admitted to [Kennedy] that they had been in Belle Haven with Bryant on several occasions. Bryant also provide[d] detailed descriptions of the layout of Belle Haven, including accurate recitations of where people in the neighborhood lived.

"According to Bryant, Hasbrouck was [six feet, two inches tall], at least 200 pounds on the date of the homicide, and 'very strong.' Bryant stated that [Hasbrouck] was obsessed with [the victim], and 'wanted to go caveman on her,' meaning that he would club her, drag her away by the hair and sexually assault her. On the night of the murder, Bryant stated that he, Hasbrouck and Tinsley walked around Belle Haven with golf clubs from the Skakel residence, with Hasbrouck stating that he had his 'caveman club' and that he would not leave Belle Haven unsatisfied. The victim had suffered multiple and severe injuries to her head and stab wounds to her neck which were consistent with being caused by a piece of golf club shaft. Pieces of the golf club found near the victim's body were the same brand of golf club found at the Skakel residence. Evidence presented at the petitioner's criminal trial shows that these clubs were commonly left about the Skakel property.

"Corroboration of Bryant's statements can be found in the very reason that he is unavailable to testify. In the present case, Bryant, Hasbrouck and Tinsley have all invoked their fifth amendment right not to incriminate themselves after being served with subpoenas to testify at a deposition." (Emphasis added.)

Finally, the trial court turned to whether Bryant's statements were against his penal interest. Because Bryant had placed himself in Belle Haven on the night of the murder, in the company of the victim, discussed

assaulting the victim with Hasbrouck and Tinsley, and had been in possession of golf clubs belonging to the Skakel family, the trial court concluded that Bryant's statements were against his penal interest. In light of these conclusions, the court ruled that the statements "are admitted into evidence, and his self-serving statements go to their weight," not their admissibility.

The trial court then turned to the issue of whether the petitioner was entitled to a new trial on the basis of this evidence. Specifically, the court focused on whether the statements were evidence that, under the fourth prong of *Asherman,* probably would produce a different result upon retrial. The court noted that there was a "substantial difference" between the standard it had applied to the admissibility question, which it viewed as a "close call," and the standard to be applied under *Asherman.* The court further noted that, in accordance with *Shabazz* v. *State,* supra, 259 Conn. 825–28, the latter standard required the court to engage in a threshold credibility determination. Ultimately, the court concluded that Bryant's statements, although admissible, were not credible.

The court explained its conclusion as follows: "On analysis, [Bryant's statements] are merely claims of information of a crime accompanied by [Bryant's] alibi. The statements appear to be minimally against his interest. Under the *Shabazz* review, the statements were made to two former junior high school classmates with whom Bryant maintained only casual contact over the years. Although Bryant acquired his information within days of the offense, he, as a trained lawyer, kept it to himself for over one quarter of a century. On finally disclosing, he insisted upon anonymity. He did not come forward voluntarily, rather, it only happened when [Mills] informed [Kennedy] of this information.

"*The corroboration for Bryant's claim is minimal.* There was some indication of the knowledge of the

geography of Belle Haven, but it is clear that he was there before. Of all the persons in Bryant's circle of Greenwich acquaintances at the time, none of them other than Walker and Mills recalled his two companions. Not even [the victim's] closest friends have any recollection of any association between [the victim] and Bryant, Hasbrouck and Tinsley. *No one puts [the victim] in the company of Bryant and his companions on the night of October 30, 1975.* There is no testimony that the three were in her company on any other occasion. *Importantly, witnesses testify as to [the victim's] activities until 9:30 p.m. No one has any recall of ever seeing Bryant and his companions in Belle Haven on the night of the murder.*

"The claim that Hasbrouck and Tinsley went 'caveman style' is not supported by the evidence. There was no evidence of the victim being dragged by the hair. Missing from Bryant's statement is anything concerning the breaking of the [golf] club or the stabbing of the victim. The testimony of Bryant is absent any *genuine* corroboration. *It lacks credibility, and therefore, would not produce a different result in a new trial.*" (Emphasis added.)

### B

With these facts in mind, we now turn to the specific contentions made by the petitioner in support of his claim that the trial court improperly denied his petition for a new trial on the basis of Bryant's statements of third party culpability. The petitioner contends that the trial court's conclusion that Bryant's statements were sufficiently trustworthy to be admitted under the hearsay exception for declarations against penal interest is inconsistent with its conclusion that the statements were not credible. Although he acknowledges that the trial court may make a minimum credibility determination under *Shabazz* v. *State,* supra, 259 Conn. 827–28,

the petitioner contends that, when the court concluded that Bryant's statements were admissible under this hearsay exception, it necessarily determined that his statements satisfied this credibility threshold. He further contends that the trial court's favorable findings regarding the factors relevant to the question of admissibility—corroboration, and against his penal interest—improperly were contradicted by the court's unfavorable findings on those same factors when deciding whether the *Asherman* test for a new trial had been met. We disagree.

We note that the parties' dispute as to this evidence focuses solely on the fourth prong of the *Asherman* test, as the state does not dispute that this evidence is newly discovered, noncumulative and would be material if credible. The standard under which we review the petitioner's claim is twofold. With respect to his claim that the trial court properly could not engage in a credibility assessment once it determined that the evidence was sufficiently trustworthy to be admissible, his challenge is to the legal standard applied and, therefore, our review is plenary. *Shabazz* v. *State*, supra, 259 Conn. 820; *Kubeck* v. *Foremost Foods Co.*, 190 Conn. 667, 669–70, 461 A.2d 1380 (1983). With respect to his challenge to the trial court's ultimate conclusion that Bryant's statements were not credible, that conclusion is reviewed for an abuse of discretion. *Shabazz* v. *State*, supra, 820.

1

The question of whether, after concluding that Bryant's statements were sufficiently trustworthy to be admitted into evidence, the trial court properly could engage in a credibility analysis is resolved by examining the roles that the trial court played in making each determination. When the trial court determined that Bryant's statements were admissible, it was engaging

in a gatekeeping function. See *State* v. *Schiappa*, 248 Conn. 132, 163 n.39, 728 A.2d 466, cert. denied, 528 U.S. 862, 120 S. Ct. 152, 145 L. Ed. 2d 129 (1999); *State* v. *Gordon*, 84 Conn. App. 519, 529–30, 854 A.2d 74, cert. denied, 271 Conn. 941, 861 A.2d 516 (2004). The trial court simply determined that the evidence met the threshold that would allow the jury to *consider* the evidence. It was not acting as the trier of fact to determine whether the jury would find the evidence credible.[22] See *State* v. *Schiappa*, supra, 154 n.26 ("[i]n determining whether the threshold level of trustworthiness [is] satisfied [for the admissibility of a statement against penal interest offered to exculpate a defendant] the trial court does not have to find it to be absolutely trustworthy because if this were so, the province of the jury as the finder of fact and weigher of credibility would be entirely invaded" [internal quotation marks omitted]); *State* v. *Bryant*, 202 Conn. 676, 696–97, 523 A.2d 451 (1987) ("where the disserving parts of a statement [against penal interest] are intertwined with self-serving parts, it is more prudential to admit the entire statement and let the trier of fact assess its evidentiary quality in the complete context").

---

[22] This conclusion is not contrary to the proposition that "[c]ourts have generally subscribed to the view that admissions against penal interest by an informant carry their own indicia of credibility—sufficient at least to support a finding of probable cause. *United States* v. *Harris*, 403 U.S. 573, 583, 91 S. Ct. 2075, 29 L. Ed. 2d 723 (1971); 1 [W.] LaFave, Search and Seizure [1978] § 3.3, p. 523. This principle has been applied by this court to find adequate verification of the reliability of an informant's naming of other participants in a *crime where at least some significant details of his account of the crime itself have been corroborated independently* . . . ." (Emphasis added; internal quotation marks omitted.) *State* v. *Velez*, 215 Conn. 667, 674, 577 A.2d 1043 (1990). "The existence of probable cause does not . . . turn on whether the defendant could have been convicted on the same available evidence. . . . [P]roof of probable cause requires less than proof by a preponderance of the evidence." (Internal quotation marks omitted.) *State* v. *James*, 261 Conn. 395, 415, 802 A.2d 820 (2002); accord *State* v. *Marra*, 222 Conn. 506, 513, 610 A.2d 1113 (1992) ("[t]he quantum of evidence necessary to establish probable cause exceeds mere suspicion, but is substantially less than that required for conviction" [internal quotation marks omitted]).

We previously have explained that, like other hearsay exceptions for unavailable witnesses, a determination that a third party declaration against penal interest is sufficiently trustworthy to be admitted simply means "that safeguards *reasonably equivalent to the oath and the test of cross-examination* exist." (Emphasis added; internal quotation marks omitted.) *State* v. *Lopez*, 254 Conn. 309, 316, 757 A.2d 542 (2000); accord *Ferguson* v. *Smazer*, 151 Conn. 226, 232, 196 A.2d 432 (1963) (third party declaration against pecuniary interest). Neither this court nor any other authority of which we are aware supports the proposition that the mere fact that a witness is under oath and subject to cross-examination would require the jury to find that the witness has even a modicum of credibility. Nor does the fact that a different or more stringent test applies to declarations against penal interest than other hearsay exceptions. The more stringent test simply counterbalances the greater risk of fabrication for such statements to ensure that they have the same equivalent safeguards as other hearsay statements when admitted for the fact finder's consideration. See *State* v. *Lopez*, supra, 319 ("[t]hird party statements that exculpate an accused are suspect because of the danger of fabrication"); *State* v. *Rivera*, 221 Conn. 58, 71, 602 A.2d 571 (1992) (requirement of corroboration is for "purpose of circumventing fabrication"); *State* v. *DeFreitas*, 179 Conn. 431, 452 n.9, 426 A.2d 799 (1980) (admissibility test for third party declarations is designed "[t]o circumscribe fabrication and ensure the [statement's] reliability"); *State* v. *Lynch*, 21 Conn. App. 386, 395, 574 A.2d 230 (admissibility test for third party declarations exculpating accused is based on "concern[s] about the dangers of collusion and fabrication"), cert. denied, 216 Conn. 806, 580 A.2d 63 (1990).

Thus, when determining admissibility, the trial court makes no determination as to what weight, if any, a jury might give this evidence. Indeed, to the extent that

the statements most clearly against penal interest are those that Bryant attributes to Tinsley and Hasbrouck before and after the murder, it is well settled that, when a witness testifies as to declarations against interest by a third party, "a trial court may not consider the credibility of the testifying witness in determining the trustworthiness of a declaration against penal interest." *State* v. *Rivera*, 268 Conn. 351, 372, 844 A.2d 191 (2004); accord *State* v. *Hernandez*, 204 Conn. 377, 391, 528 A.2d 794 (1987).

By contrast, the trial court's role in applying the fourth prong of the *Asherman* test is from a different vantage point. In *Shabazz* v. *State*, supra, 259 Conn. 822–24, this court explained: "Prior case law confirms that a trial court must engage in some form of credibility analysis in order to determine, under *Asherman*, whether the newly discovered evidence offered in support of a petition is likely to produce a different result on retrial. . . .

"[W]hether a new trial should be granted *does not turn on whether the evidence is such that the jury could extend credibility to it.* . . . The [petitioner] must persuade the court that the new evidence he submits will probably, not merely possibly, result in a different verdict at a new trial . . . . It is not sufficient for him to bring in new evidence from which a jury could find him not guilty—it *must be evidence which persuades the judge that a jury [probably] would find him not guilty.* . . . This articulation of the petitioner's burden of proof assigns to the trial court, in the first instance, the responsibility of evaluating the credibility of the evidence in order to decide properly whether a new trial would produce a different result. In elaborating on this point, we explicitly [have] approved of Judge Cardozo's concurring opinion in *People* v. *Shilitano*, 218 N.Y. 161, 180, 112 N.E. 733 (1916), wherein he stated that a judge, faced with conflicting stories [on a petition

for a new trial], should [not] abandon the search for truth and turn it over to a jury. . . . [Rather] it [is] the duty of the trial judge to try the facts, and determine as best he [can] where the likelihood of the truth lay. . . . He [is] not at liberty to shift upon the shoulders of another jury his own responsibility." (Citations omitted; emphasis in original; internal quotation marks omitted.)

The court in *Shabazz* went on to state: "Although . . . we previously have established that a credibility determination is a necessary part of a trial court's analysis under the fourth prong of *Asherman*, we never have defined the proper parameters of such a determination. In this regard, we note that the extent to which a trial court properly assesses the credibility of the newly discovered evidence is informed, in large part, by two well-defined and, often, competing interests. First, the state has a general interest in preserving final judgments of conviction that have been fairly obtained and in ensuring that appropriate deference is given to the original trial as the forum for deciding the question of guilt or innocence within the limits of human fallibility . . . . Second, the petitioner has an interest, shared by the state and the judiciary, in ensuring that a wrongful conviction does not stand. . . .

"Our formulation of the trial judge's role in passing on the credibility of newly discovered evidence must strike the appropriate balance between these two interests. *If, on the one hand, we were to limit the trial court solely to a determination of whether the newly discovered evidence would be admissible in a new trial and whether it might result in a different verdict, the trial court would be stripped of its legitimate fact-finding function on the petition and [would] be relegated to the role of gatekeeper of the evidence. Such a result would render judgments of conviction unduly susceptible to collateral attacks, thereby giving insufficient weight to the state's legitimate interest in final-*

*ity.* Alternatively, were we to hold that the trial court always acts as the final and sole arbiter of credibility in evaluating the evidence alleged to justify a new trial, we would be impeding the petitioner's legitimate interest in establishing that a wrongful conviction does not stand. . . .

"We therefore conclude that, in order to give due weight and consideration to these important interests, and in order to provide sufficient flexibility to accommodate the wide variety of types of newly discovered evidence that may be offered in support of a petition for a new trial, trial courts should utilize the following approach when applying the fourth element of the *Asherman* test. The trial court must always consider the newly discovered evidence in the context of the evidence presented in the original trial. *In so doing, it must determine, first, that the evidence passes a minimum credibility threshold. That is, if, in the trial court's opinion, the newly discovered evidence simply is not credible, it may legitimately determine that, even if presented to a new jury in a second trial, it probably would not yield a different result and may deny the petition on that basis.* . . . If, however, the trial court determines that the evidence is sufficiently credible so that, if a second jury were to consider it together with all of the original trial evidence, it probably would yield a different result or otherwise avoid an injustice, the fourth element of the *Asherman* test would be satisfied." (Citations omitted; emphasis altered; internal quotation marks omitted.) *Shabazz* v. *State*, supra, 259 Conn. 825–28.

Consistent with *Shabazz*, we conclude that the trial court was not divested of its authority, and indeed responsibility, to examine the credibility of Bryant's statements following its conclusion that the statements satisfied the minimum threshold for admission as declarations against penal interest. Indeed, in *Shabazz*, this

court stated that, "because the interests implicated in a petition for a new trial remain the same irrespective of the nature of the newly discovered evidence at issue, we can conceive of no principled basis for maintaining two different tests [for different types of evidence]." Id., 829–30. The court underscored that the failure to apply a credibility analysis in certain cases improperly would "relegate the trial court to the role of evidentiary gatekeeper . . . ." Id., 831 n.14.

We also reject the contention advanced by the petitioner that, when doing so, the trial court was precluded from considering any evidence regarding corroboration, or lack thereof, because the court previously had considered whether some aspects of Bryant's statements were corroborated when determining whether the threshold for admissibility had been met.[23] In its admissibility determination, the trial court appears to have relied on corroboration for principally peripheral facts in Bryant's account, such as his visits to Belle

---

[23] We note that the state disagreed with the trial court's determination that Bryant's statements qualified as statements against penal interest, renewed its objection to that evidence in its posttrial briefs, and asserts in this appeal, essentially as an alternate ground for affirmance, that, because this evidence would be inadmissible in a retrial, it cannot provide the impetus for affording a new trial. We acknowledge that the trial court's statement when considering whether the evidence probably would result in a different verdict in a new trial, namely, that Bryant's statements are "absent any genuine corroboration," appears to fall short of the standard for admission of a statement against penal interest. See *State* v. *Lopez*, supra, 254 Conn. 319 ("We previously have emphasized that [t]he corroboration requirement for the admission of a third party statement against penal interest is significant and *goes beyond minimal corroboration.* . . . Third party statements that exculpate an accused are suspect because of the danger of fabrication. . . . Therefore, the statement must be accompanied by corroborating circumstances that *clearly indicate* the statement's trustworthiness." [Citations omitted; emphasis in original; internal quotation marks omitted.]). Because we reject the petitioner's claim, however, that the trial court improperly determined that the petitioner had failed to persuade it that Bryant's statement probably would result in a different verdict at a new trial, we need not examine the state's alternative ground for affirmance regarding the court's admissibility determination.

Haven with or without Hasbrouck and Tinsley *prior* to the night of the murder, whereas, in its credibility determination, discussed in part I B 2 of this opinion, the court appears to have focused on the lack of corroboration for material facts relating to the night of the murder. Although the trial court *could* have considered all evidence relating to corroboration when addressing the admissibility question, its bifurcation of the corroboration evidence was not improper.[24] Corroboration is only one of several factors that determines the trustworthiness of third party declarations against penal interest, and we have instructed the trial courts to consider the totality of the circumstances rather than to view each factor as necessarily conclusive. See *State* v. *Lopez*, supra, 254 Conn. 316 ("We previously have emphasized . . . that no single factor in the test we adopt for determining the trustworthiness of third party declarations against penal interest is necessarily conclusive . . . . Thus, it is not necessary that the trial court find that all of the factors support the trustworthiness of the statement. The trial court should consider all of the factors and determine whether the totality of the circumstances supports the trustworthiness of the statement." [Citations omitted; internal quotation marks omitted.]).

In the present case, the trial court considered some of the corroboration evidence and determined that this evidence, considered as part of the totality of circumstances, was sufficient to admit Bryant's statements

[24] We note, moreover, that a contrary conclusion, namely, that the trial court was required to consider all evidence relating to corroboration when making its admissibility determination, would not advance the petitioner's cause. We then would have to look to the only express statements wherein the trial court quantified the extent to which Bryant's account was corroborated, in which the court found the corroboration "minimal" and "absent any genuine corroboration." That assessment would compel the result that the petitioner did not meet the corroboration factor for declarations against penal interest.

as declarations against penal interest. The petitioner's approach would not only be contrary to *Shabazz*, but also would force trial courts to apply a higher threshold for admissibility so as not to abdicate their right to review all pertinent evidence when making their determination as to whether the proffered evidence probably would yield a different result on retrial. We cannot sanction such an approach.

2

In light of our conclusion that the trial court properly considered the credibility of Bryant's statements, we turn to the question of whether its conclusion that this evidence "is absent any genuine corroboration . . . lacks credibility, and therefore, would not produce a different result in a new trial" constituted an abuse of discretion. In so doing, we are mindful that evidence of third party culpability, if credible, undoubtedly would be of great significance in a retrial. We also are mindful, however, that, "when reviewing the action of a trial court under an abuse of discretion standard, we should read the record to support, rather than contradict, [the trial court's ruling]." (Internal quotation marks omitted.) *State* v. *Lugo*, 266 Conn. 674, 692 n.16, 835 A.2d 451 (2003); accord *State* v. *Orr*, 291 Conn. 642, 667, 969 A.2d 750 (2009) ("[i]n determining whether there has been an abuse of discretion, the ultimate issue is whether the court could reasonably conclude as it did" [internal quotation marks omitted]); *State* v. *Skakel*, supra, 276 Conn. 724 ("[i]n determining whether there has been an abuse of discretion, every reasonable presumption should be made in favor of the correctness of the trial court's ruling, and we will upset that ruling only for a manifest abuse of discretion" [internal quotation marks omitted]). We, therefore, have scrutinized carefully all of the evidence presented at the hearing on the petition that bears on this issue, and we conclude that the lack of corroboration, as well as the circum-

stances under which Bryant's allegations emerged, fully support the trial court's conclusion.[25]

The documentary and testimonial evidence presented to the trial court on the petition for a new trial reveals

[25] The dissent acknowledges in footnote 9 of its opinion that, as a general matter, "a trial court reasonably could find that, although a newly discovered third party statement against penal interest is sufficiently trustworthy to be admissible at a second trial, the statement nevertheless is otherwise so unworthy of belief that it fails to meet the minimum credibility threshold [under] . . . *Shabazz*, thereby obviating any need for the court to consider the statement in the context of the original trial evidence." The dissent further acknowledges that the abuse of discretion standard applies to our review of a trial court's decision whether to grant a petition for a new trial. As to those statements, we are in agreement. The dissent, however, fails to apply this standard of review. Specifically, the dissent reads the evidence in the light least favorable to supporting the trial court's conclusion, ignores evidence that supports the trial court's conclusion, and hypothesizes theories never advanced and founded on the slimmest of evidentiary reeds.

The dissent's approach is unprecedented in our case law. For more than one century, it has been settled law that an abuse of discretion standard applies not only to the trial court's ultimate decision whether to grant the petition for a new trial, but also to its subsidiary determinations in support of that decision. See, e.g., *Adams* v. *State*, 259 Conn. 831, 837, 792 A.2d 809 (2002); *Shabazz* v. *State*, supra, 259 Conn. 820; *Seebeck* v. *State*, 246 Conn. 514, 536, 717 A.2d 1161 (1998); *State* v. *Raguseo*, 225 Conn. 114, 139, 622 A.2d 519 (1993); *Asherman* v. *State*, supra, 202 Conn. 434; *Lombardo* v. *State*, 172 Conn. 385, 389–93, 374 A.2d 1065 (1977); *Smith* v. *State*, 141 Conn. 202, 207, 104 A.2d 761 (1954); *Gannon* v. *State*, 75 Conn. 576, 578, 54 A. 199 (1903). As we previously have noted, under the abuse of discretion standard, "every reasonable presumption should be made *in favor of the correctness* of the trial court's ruling . . . ." (Emphasis added; internal quotation marks omitted.) *State* v. *Skakel*, supra, 276 Conn. 724. This court also squarely has rejected the proposition that a less deferential standard than abuse of discretion should apply to review of decisions pertaining to evidence that is not predicated on an assessment of the witness' demeanor. See *State* v. *Lawrence*, 282 Conn. 141, 156–57, 920 A.2d 236 (2007) ("[T]he defendant misapprehends the fundamental distinction between the function of the fact finder, which is to make credibility determinations and to find facts, and the function of the appellate tribunal, which is to review, and not to retry, the proceedings of the trial court. . . . In light of our limited function, it would be improper for this court to supplant its credibility determinations for those of the fact finder, regardless of whether the fact finder relied on the cold printed record to make those determinations." [Citation omitted; internal quotation marks omitted.]); *Besade* v. *Interstate Security Services*, 212 Conn. 441, 448–49, 562 A.2d 1086 (1989) ("To the extent that the [workers' compensation] commissioner's assessment of the evidence before him did not rest on a personal appraisal of the demeanor and credibility of the witnesses before him, [the defendants] urge us to hold that such deference is inappropriate and to engage in a broader appellate scrutiny. . . . We

the following evidence relating to whether Bryant's account was credible. As the trial court noted, not a *single* witness who Bryant claimed to have seen or with whom he claimed to have spoken, including his close friend Walker, or anyone who was out in the neighborhood that night recalled Bryant's presence or that of Hasbrouck and Tinsley. Perhaps most significantly, none of the girls who Bryant claims were in the meadow when Tinsley and Hasbrouck supposedly made comments and sexual overtures that created an "uncomfortable" situation reported their presence or this incident—an incident that would seem highly relevant following the discovery the next day of the half naked, brutalized teenage female victim who allegedly was in the meadow when these comments were made. Bryant's description of his companions also suggests that they would have been noticed had they been there. Although Tinsley and Hasbrouck had been to Belle Haven on a few occasions, Bryant described them as "outsiders." He also described them both as approximately six feet, two inches tall and 200 pounds, Hasbrouck as African-American and Tinsley as mixed race. Bryant also is African-American and was six feet tall, and 160 to 170 pounds at the time of the murder. These three young men did not look like the average fourteen or fifteen year olds who would have blended into the crowd,[26]

---

have not heretofore distinguished between documentary and testimonial evidence in defining the role of appellate tribunals in reviewing findings of fact . . . and we are not prepared to introduce such a distinction into administrative proceedings." [Citations omitted.]). Moreover, if the trial court improperly had failed to weigh Bryant's statement against the evidence at the criminal trial, the proper remedy would be to remand the case to the trial court, not for this court to engage in that weighing process, as the dissent does.

[26] The petitioner attempts to explain the fact that no one mentioned seeing Bryant or his friends following the murder by positing that the police investigation was limited to an inquiry as to whether anyone had seen any "strangers" in Belle Haven, which, in the petitioner's view, would not have yielded an identification of Bryant, who was known to people there, or his friends, who had been there previously. Testimony and police records, as well as common sense, however, indicate otherwise. Ix, Edwards and O'Hara all testified that they did not know Tinsley or Hasbrouck. Thus, these young

particularly not in an area that was described by one witness as "a fairly lily-white community."[27] We also note that one person who Bryant claimed to have seen walking about the neighborhood that night, Edwards, unequivocally stated that she was not even out in the neighborhood that night.

men would have been strangers to them. Indeed, Bryant himself characterized Tinsley and Hasbrouck as "outsiders." The evidence also indicates that the police questioning was not limited simply to the question of whether people had seen strangers.

The dissent's rationalization that no one saw Bryant and his two friends because of the darkness and the cold also reasonably would have been rejected by the trial court. Bryant did not claim that his group was lurking in the bushes throughout the evening. Rather, he claimed to have spoken with friends like Walker face-to-face and to have congregated with a group of neighborhood teenagers for some period of time. Unless Bryant and his friends wore face masks to ward off the cold, the teenagers would have been able to identify features of persons they encountered face-to-face.

The petitioner also attempts to explain the current inability of witnesses to recall Bryant's presence that night partly by the fact that this incident occurred approximately thirty years ago. For the reasons stated in this opinion, however, the facts suggest that someone would have recalled Bryant's presence. To the petitioner's point, however, it is striking that, while other witnesses had difficulty piecing together a comprehensive and coherent account of the events of October 30, 1975, Bryant was able to provide an incredibly detailed timeline of the events of that evening, recalling times, places, people seen and exact comments made, not to mention such innocuous details as having waved to Julie Skakel. His ability to recount with such clarity the events of almost thirty years past is all the more remarkable given that, by his own admission, he had smoked marijuana and drank a sufficient amount of beer that he described his condition as "a good buzz. Not slightly buzzed, I would say lightly drunk." Indeed, unlike other witnesses who had memorialized accounts of their actions in numerous police interviews, grand jury testimony and trial testimony that would have aided their recall, Bryant had no such occasion to commit these events to memory.

[27] It appears that there was only one African-American family living in Belle Haven, the Jones family. Ethel Jones worked as a cook for the Skakels and resided with her husband and son in a house at the foot of the Skakel property. Bryant told Kennedy that he was "the only black kid living in Greenwich for a couple of years." Mills testified that there were only two African-American students at Brunswick in 1975. At his deposition, Charles Morganti, the Belle Haven security guard who was on duty the night of the murder and stated that he had observed a group of five to six youngsters around the Skakel yard, provided the following testimony in response to questions posed by the state's attorney:

"Q. At any occasion while working that night did you notice any tall, young, black teenage males?

"A. No.

"Q. Did you observe any black males in Belle Haven that night?

The evidence also contradicts Bryant's account of the location of the principal parties to the events of that evening. Bryant claimed that the victim had been with his group in the meadow in the latter part of the evening, yet other people who undeniably had been with the victim accounted for her whereabouts throughout the entire evening at other locations. Bryant also claimed that Byrne, who had died in 1980 and was only eleven or twelve years old at the time of the homicide, had been with Bryant and his two friends that evening, had been a witness to the murder and had allowed Hasbrouck and Tinsley to spend the night at Byrne's house. Several witnesses, however, placed Byrne with the victim and other friends at various times that night, and all of this testimony placed him with the victim and her friends by no later than approximately 9 p.m. In his police interviews, Byrne never stated that Bryant, Hasbrouck or Tinsley had been with him that night, but instead told the police that he had been at the Skakel house with the victim and others and had gone home after dropping Ix off at her house around 9:30 p.m.[28] Significantly, Byrne's sister stated in a tape-recorded

"A. A black male in Belle Haven would have been very, very obvious. There was none there."

[28] The police interview report dated November 1, 1975, contained the following account of Byrne's initial statement to police: "[Byrne] stated that he was with [Ix, the victim and O'Hara] and stated the same as [Ix], that they went to the [neighboring] Mouakad residence and stayed until about 9:10 p.m. . . . They then left the Mouakad house and were enroute to the Skakel home. After remaining at the [Skakels'] until about 9:20 p.m., he and [Ix] left to go home.

"After he left [Ix], and was walking home by himself, he heard footsteps following him. When he stopped to listen the footsteps kept coming. He then started to run and ran all the way to his house. [Byrne] further stated that the footsteps ran after him all the way home and that he did not look back to see who was following him."

The dissent offers the novel proposition that "the fact that [Byrne's] whereabouts for most of the evening remain unaccounted for *supports* Bryant's version of the facts [placing Byrne with Bryant's group]." (Emphasis added.) Although the inability to account for Byrne's whereabouts may not be *inconsistent* with Bryant's account, that is hardly the same as *corroborating* that account.

interview that their father had been on the porch when Byrne came home at 9:30 p.m., and that their mother had told her that she had seen Byrne *in his bed at 10 p.m. that night.*[29] Thus, at the very point in time when the petitioner claims the victim was murdered, a murder to which Bryant claims Byrne bore witness, Byrne's mother saw him in his bed. Byrne's sister further indicated that their mother was certain that Tinsley and Hasbrouck were not at the Byrnes' house that night, and Byrne's brother stated that he had arrived at the Byrne house at 8 a.m. on the morning of October 31, had seen Byrne several times around the house that morning, and did not see Tinsley or Hasbrouck.

The record also reflects no corroboration for the alleged motive for the murder, namely, Hasbrouck's supposed obsession with the victim. Bryant claimed with certainty that, prior to October 30, 1975, Walker and Mills both had heard Hasbrouck make comments about wanting to go "caveman" on the victim. Neither Walker nor Mills, however, had any recollection of such comments or even that Hasbrouck had an "obsession" with the victim. Significantly, Walker testified that, if he ever had heard either Tinsley or Hasbrouck make the "caveman" or other graphic comments about the victim that Bryant attributed to them, he would have informed the police. As there is no record of any such report, presumably no such comments were made in Walker's presence.

---

[29] Bryant claimed to know "for a fact" that Tinsley and Hasbrouck had spent the night at Byrne's house. He immediately followed that assertion, however, with statements that, "You could stay at their house and they would never know, though. . . . The Byrnes would never know. It was a huge house." Bryant stated that both Tinsley and Hasbrouck, as well as Byrne, had told Bryant that they spent the night at Byrne's house. In conversations with Kennedy, both Tinsley and Hasbrouck acknowledged that they had been to Byrne's house on several occasions, but denied ever having spent the night in Belle Haven.

Similarly, Bryant's account of when Hasbrouck and Tinsley obtained the murder weapon is not corroborated by the record. Bryant stated in his interview with Colucci: "Everybody in Belle Haven touched those clubs. We used to hit balls behind the house." Bryant indicated that they would find the golf clubs on the "back porch," which Bryant described as an "extension of [the Skakels'] yard," "just laying around." Bryant then recounted that, on the night of the murder, "I picked up one. [Tinsley] picked up one. [Hasbrouck] picked up one. [Byrne] picked up one. And we were, like, goofing around. . . . I had swung it and put mine down. I didn't even put it down, I swung it back to where the bag—there was like a bag that was sort of laying there and so I swung it back toward the bag. . . . [Tinsley and Hasbrouck] were using them as sort of like walking sticks." Although, as the trial court noted, there was testimony at the criminal trial that golf clubs commonly were left around the Skakel yard and thus Bryant's account of handling the clubs *prior to* the night of the murder was corroborated to some extent by that evidence, the evidence adduced at that trial did not corroborate his account with respect to the night of the murder. As we noted in *State* v. *Skakel,* supra, 276 Conn. 644, on the day that the victim's body was discovered, Detective James Lunney of the Greenwich police department found golf clubs *inside* the Skakel house, in a barrel in the mudroom.[30] Lunney made that discovery in the course of a neighborhood canvass for golf clubs that might be mates to the murder weapon, after he and another police officer walked from the crime scene *through the Skakel backyard* and into the back door of the Skakel house. The evidence at trial also indicated that, although numerous people had

---

[30] In *State* v. *Skakel,* supra, 276 Conn. 644, we described the room as a back "hallway" because police described it as such based on its long narrow shape, but the Skakel family and others familiar with the house referred to it, in accordance with its use, as a mudroom.

spent time in or walked through the Skakel backyard on the night of the murder, no one reported observing any golf clubs or a golf bag lying about the yard, despite the fact that it was well known in Belle Haven and the surrounding neighborhoods that the police were looking for golf clubs and the missing section to the murder weapon.[31] Indeed, the petitioner's family had every incentive to bring a witness forward who could place the golf clubs outside the house that night, but could not produce any such witness. Police records indicate that Franz Wittine, the Skakels' chauffeur and handyman, gave a statement reporting that, on the day of the murder, "I was working about the Skakel property for most of the day and during this time didn't observe any golf clubs lying about the property, nor adjacent to the house, nor did I find any golf clubs lying about the property for the past couple of weeks." Thus, all of the evidence points to the conclusion that there were no golf clubs in the Skakel yard before, during, or after the time period when Bryant claims that he and his friends allegedly were there handling the clubs.

In sum, there is no evidence, *independent of Bryant*, to corroborate any significant aspect of his account of the events of the night of October 30, 1975, whereas there is a plethora of evidence to contradict his

---

[31] Andrew Pugh, the petitioner's close childhood friend, testified at the criminal trial that he was with a group of ten to twelve neighborhood teenagers playing in the Skakel backyard from approximately 6 to 7:30 p.m., which is at or near the time that Bryant claims to have been in the yard. Ix gave a statement to the police indicating that she and Byrne had left the Skakel residence through the backyard around 9:30 p.m. Keegan, a captain in the detective division of the Greenwich police department in 1975, testified that the police had considered and pursued, to no avail, the possibility that someone had picked up a golf club on the Skakel property. The search for other golf clubs included a November 2, 1975 check of many of the neighborhood properties, including the Skakels', with a metal detector. Residents of Belle Haven and nearby areas assisted the police in this search, and the police received numerous telephone calls in the days after the murder about missing or found golf clubs.

account.[32] Contrary to the approach advocated by the petitioner, the mere fact that one could hypothesize explanations for the lack of corroboration as to particular facts does not render improper the trial court's conclusion that Bryant's statements lack "any genuine corroboration."

The petitioner contends, however, that the trial court improperly failed to credit certain statements that he claims corroborate the fact that Bryant, Tinsley and Hasbrouck were in Belle Haven on the night of the murder. We note that the trial court's memorandum of decision does not address these statements, and, therefore, we do not know whether the trial court found the testimony not to be credible, noncorroborative or irrelevant. Even if we were to assume that the trial court found the statements credible, our review of these statements, read in the full context of the witnesses' testimony and the record, indicate that these statements were explained in a manner fully consistent with a

---

[32] The petitioner points to testimony by Esme Dick, with whose family Bryant had lived while attending Brunswick, as corroborative. Dick testified that, during a dinner conversation in 1976 at which Bryant had joined her family, the group was speculating as to who could have committed the victim's murder. According to Dick, Bryant stated that "he did not think [the petitioner] could have done it." This statement reflects an opinion, not a fact based on personal knowledge, and indeed was an opinion likely shared by other people who lived in Greenwich in 1976. Dick also testified that Bryant had stated that he was in Belle Haven on the night of the murder, but she could not recall whether Bryant had made that statement during the same dinner conversation or in the course of another conversation near that time period. Notably, Bryant did not indicate in his statement that Hasbrouck or Tinsley were with him, nor did he provide any information to Dick to indicate that he had any personal knowledge about the crime. Therefore, in light of these significant omissions and the fact that Bryant was the source of this information, the trial court was well within its discretion to discount his statement to Dick. Cf. *Shabazz* v. *State*, supra, 259 Conn. 818–20 (concluding that trial court did not abuse its discretion in finding statement of newly discovered eyewitness lacking in credibility despite fact that witness' substance abuse counselor testified at hearing on petition for new trial that, after petitioner's criminal trial, witness had confided in counselor that he had witnessed encounter between petitioner and victim).

conclusion that they were not materially corroborative of Bryant's rendition of the facts. Under the abuse of discretion standard, we do not selectively isolate those parts of a witness' testimony that undermine the trial court's conclusion to the exclusion of other evidence that supports its conclusion. Rather, "every reasonable presumption should be made in favor of the correctness of the trial court's ruling . . . ." (Internal quotation marks omitted.) *State* v. *Skakel*, supra, 276 Conn. 724.

Specifically, the petitioner points to Colucci's testimony stating that Hasbrouck and Tinsley had admitted to him that they were in Belle Haven on October 30, 1975. Even if we were to assume, arguendo, that the trial court credited Colucci's testimony, despite the questionable circumstances under which these alleged admissions were made, the complete record indicates that Hasbrouck and Tinsley initially recalled not being in Belle Haven that night, indicated in later conversations that they had been there, but, upon checking their calendars, subsequently confirmed that they had not been there that night.[33] The trial court reasonably could

---

[33] In their initial discussions with Kennedy, which were tape-recorded without their knowledge, Hasbrouck and Tinsley had indicated that they were not in Belle Haven on the night the victim was killed, although Tinsley's recollection was somewhat more equivocal because the question related to events that occurred thirty years previous. Colucci testified, however, that, in subsequent conversations with him, which were not recorded, both men had admitted to being in Belle Haven on October 30, 1975. According to Colucci, Hasbrouck admitted to being in Belle Haven that day and had given three different times for his departure (noon, 6 to 6:30 p.m., and 9 to 9:30 p.m.), none of which, coincidentally, match Bryant's account. Colucci testified that Tinsley had told him that he had been in Belle Haven that day, but was shaky on the details and could provide no time for his departure. On cross-examination, Colucci acknowledged that these admissions were not reflected in notes taken of those conversations by the investigator who had accompanied Colucci and only later were added, upon Colucci's instruction, to a second set of notes, a curious omission given the significance of the alleged admissions. Colucci further admitted on cross-examination that, in a follow-up call that the investigators made, the two men had confirmed that, after checking their calendars, they were certain that they had not been in Belle Haven on the night of October 30, 1975. In fact, Colucci

have concluded that Tinsley and Hasbrouck simply were unclear in their recollection of whether they had been in Belle Haven on that date thirty years ago, having been there on previous occasions near that time, until they checked the day of the week on which October 30, 1975, fell and realized that they would not have been there that night because it was a Thursday and, hence, a school night. Indeed, the trial court reasonably could have taken into account the unlikelihood that Tinsley and Hasbrouck would have willingly and repeatedly discussed past visits to Belle Haven and their whereabouts on the night of the murder if indeed they had committed the murder.[34]

The petitioner also relies on a statement made by Bryant's mother, Barbara Bryant, to two private investigators hired by the petitioner, that her son, Tinsley and Hasbrouck had been in Belle Haven that night, as well as her deposition testimony that he had been in Connecticut earlier that day. Barbara Bryant's full testimony reveals, however, that she repeatedly stated that her son had arrived home well before dark on October 30, 1975, that she offered evidence in support of that fact and that her statement to the contrary to the investigators was simply a repetition of what her son had told her *after* his account had become public knowledge.[35]

acknowledged that the investigators' notes reflect that Hasbrouck said he never had spent the night in Belle Haven, that his mother would have "tanned his hide" if he had done so and that she never would have let him stay out on a school night.

[34] Until they were made aware that Bryant had implicated them in the crime, Tinsley and Hasbrouck voluntarily engaged in numerous and lengthy conversations with Kennedy initially, and Colucci later, recounting details of several visits to Belle Haven prior to the murder. In fact, it was Hasbrouck who provided Kennedy with a telephone number for Tinsley, whom Hasbrouck described as having "a far better memory of events around that time period."

[35] In her deposition, taken pursuant to a subpoena, Barbara Bryant recalled her son being in Connecticut during the *day* of October 30, 1975, but repeatedly stated that he had returned home by "early in the afternoon," or at least while it was still light out. She further recalled that, because he was under a curfew at the time, he would not have been allowed to go to

Thus, accepting as true the part of Barbara Bryant's testimony based on personal knowledge, the best that can be said is that it gives rise to the possibility of a grain of truth in her son's elaborate story, namely, that he may have been in Greenwich on the afternoon of October 30, 1975. Therefore, we cannot conclude that it was an abuse of discretion for the trial court not to credit the statements of Barbara Bryant upon which the petitioner relies.

The petitioner also points to certain physical evidence from the crime scene that he claims corroborates the involvement of Hasbrouck and Tinsley. Specifically, two human hairs were found on a sheet used to cover the victim's body, one with "[n]egroid" characteristics

Connecticut on a school night without her permission. Barbara Bryant recounted an incident in which a group of women were gathered at her home shortly after the murder and, upon seeing the newspaper account of the victim's murder, made a statement to her son to the effect that "aren't you glad you had your black butt home because you certainly would have been accused of this." Barbara Bryant did not have a conversation with her son at that time regarding his whereabouts on the night of the murder, because she knew where he was, namely, at home. She had no personal knowledge of her son going to Greenwich accompanied by Hasbrouck, whom she described as shy, friendly and respectful, and Tinsley, whom she described as attractive and friendly. Notably, Barbara Bryant admitted the possibility that she had discussed the victim's murder with her son *after* she saw an article reporting that he had implicated other persons in the murder. She recalled being approached on the street by two private investigators whom the petitioner had hired and acknowledged the possibility that she may have told them that *her son had told her* that Tinsley and Hasbrouck had spent the night in Belle Haven on the night of the murder.

Thus, the trial court reasonably could have concluded that Barbara Bryant's statements that were consistent with her son's account were noncorroborative because he was the source of that information and he had given her that information many years after the murder, only after his account became public knowledge. The trial court also may have taken into account the fact that medications appeared to impair Barbara Bryant's memory. Barbara Bryant testified while on several medications that she described as making her "foggy" and "not always clear," and expressed confusion about the time frame of events. She also stated that, at the time the petitioner's investigators approached her on the street, she had been on another medication that made her feel "sick and confused."

and the other "possibly" having an Asian DNA profile.[36] Close examination of that evidence, however, reveals the de minimis nature of that supposed corroboration. Although it was undisputed that Hasbrouck is African-American,[37] there is no clear evidence as to Tinsley's race. Bryant's mother recalled him as white, Mills recalled him as African-American, and only Bryant described Tinsley as being of "mixed race" and possibly part Asian. It is clear that the sheet was placed over the victim after the discovery of her body, but there was no evidence presented to the trial court to establish where it had come from or who had placed it there. At the criminal trial, Henry Lee, one of the state's forensic experts, had testified about the limited value of hair as an identifier. Lee also had described the concept of secondary hair transfer, explaining that the hair could have fallen on the sheet at any time. Given these factors,

[36] The dissent also has hypothesized a two perpetrator, two golf club theory as corroboration for Bryant's account. In support of this theory, the dissent points to statements in a letter by Keegan, then a Greenwich police captain, to a forensic expert in which Keegan discussed the conclusions that the police investigators had drawn as to the likely sequence of events in the attack of the victim. In our view, the dissent's theory is too speculative to corroborate Bryant's account in light of the facts that the expert forensic testimony on which both parties relied at the criminal trial to establish the likely sequence of events reached a different conclusion, neither party offered Keegan or any other Greenwich police officer as an expert on this matter, there is nothing to indicate that Keegan was qualified as an expert in such matters, and the letter does not state who made the determinations referred to and on what basis. Therefore, in the absence of any indication that a competent expert would offer an opinion that the evidence indicated that there were two perpetrators, such speculation cannot corroborate Bryant's account. We further note that, even if such evidence did exist, the other evidence overwhelmingly contradicting Bryant's account would inexorably lead to the conclusion that Hasbrouck and Tinsley were not the perpetrators.

[37] The hair with negroid characteristics was tested against, but found dissimilar to, samples taken from Thomas Skakel, Larry Jones, the teenage son of the Skakels' cook, Ethel Jones; see footnote 27 of this opinion; and Daniel Hickman, a police officer who was at the crime scene. Larry Jones and Hickman are both African-American. There is no indication that hair samples from Ethel Jones or her husband were tested to rule them out as possible sources of the hair found on the sheet.

the trial court did not abuse its discretion in rejecting this evidence. Indeed, with respect to other physical evidence, contrary to Bryant's understanding of what the alleged "achieved the caveman" comments meant, there was no evidence that the victim had been pulled by her hair. Nor was there any evidence of semen to corroborate the allegedly completed sexual assault.[38]

In addition to the lack of corroboration, the trial court found reason to question the credibility of Bryant's account in light of the particular circumstances under which he had disclosed this account so many years after the events in question. We agree. Specifically, Mills testified that he and Bryant had had infrequent contact with each other after Bryant left Brunswick. During a telephone conversation in late 2001, well after the petitioner's January, 2000 arrest warrant had been issued and while his criminal trial was pending, Bryant asked Mills about "Little Martha," a screenplay that Mills had been working on for many years that included a fictionalized account of the victim's murder.[39] Bryant suggested that he and Mills collaborate on the screenplay. It was only after Bryant reviewed the screenplay, in which Mills had used composite characters to represent the petitioner, Thomas Skakel and Littleton as suspects, that Bryant named Hasbrouck and Tinsley as the "real" perpetrators of the crime.

The fact that Bryant relayed this account directly in connection with his offer to assist in the development

[38] Although nothing in the victim's autopsy report indicated whether any attempt had been made to determine whether semen was present on external areas of the victim's body other than her pubic region, the tests performed on that region, as well as vaginal and anal swabs, revealed no traces of semen. *State* v. *Skakel*, supra, 276 Conn. 643.

[39] We note that the testimony from Bryant and Mills indicates that Bryant initiated the conversation to check on Mills' well-being after the September 11, 2001 attacks in New York City, where Mills lived. The trial court neither credited nor discredited this reason as the actual or exclusive motive for Bryant having initiated the conversation.

of a screenplay provided an additional reasonable basis for the trial court to question the veracity of the account. Indeed, at the time he relayed this account, Bryant never asked Mills to provide this information to others who could aid the petitioner or who could bring charges against the two men who Bryant claimed had committed the murder and who he claimed should be punished. Logic would dictate that, if Bryant's motivation actually had been to make this information known both to aid the petitioner but to do so *without disclosing his identity*, he would not have told a friend with whom he had had only limited contact since high school, but, rather, would have made an anonymous telephone call or sent an anonymous letter to the petitioner's attorney or to the state's attorney. Mills had no knowledge to substantiate Bryant's account. Furthermore, we note that the record indicates that Bryant's account to Mills, and later to Walker, may not have been the only time that Bryant lied to or misled these friends.[40]

Finally, like the trial court, we decline to speculate as to why Bryant invoked his fifth amendment right not to testify. It is not surprising that counsel advised Bryant, Tinsley and Hasbrouck to remain silent when they had nothing personally to gain by coming forward and the state already had convicted someone else of the crime. The sole question we must answer is whether the trial court abused its discretion in concluding that Bryant's account, while sufficiently trustworthy to be admissible, "is absent any genuine corroboration . . . lacks credibility, and therefore, would not produce a

---

[40] According to Mills, when Bryant offered his help on the screenplay, he had stated that "he either was an entertainment lawyer or had experience as an entertainment lawyer, and had worked in Hollywood, and also had done some writing for television." Bryant had given Walker a similar impression, namely, that he was either an entertainment attorney or a sports and entertainment attorney. Bryant admitted to Kennedy, however, that, although he had graduated from law school, he never has been licensed to practice law, let alone taken the bar examination. See footnote 21 of this opinion.

different result in a new trial." Given the weight of evidence in the record to amply support this conclusion, we conclude that the trial court did not abuse its discretion in denying the petition for a new trial on the basis of Bryant's statements.[41]

## II

The petitioner also claims that he is entitled to a new trial on the basis of evidence that, prior to his criminal trial, Garr, who had worked first as a police detective

---

[41] We note that the petitioner also has claimed that the trial court abused its discretion by failing to consider his separate claim that it would cause an injustice not to submit this evidence to a jury. To the extent that the petitioner believes that this court's isolated references to "avoid an injustice" means that injustice is an independent basis on which to grant a new trial, he is mistaken. To order a new trial on the basis of newly discovered evidence that *fails* to meet the *Asherman* factors but meets an amorphous and less stringent injustice standard is contrary to our case law and common sense. Review of the cases from which this injustice language originates indicates that the factors that ultimately became the *Asherman* test were the means by which the court determined whether an injustice has occurred. See *Gannon* v. *State*, 75 Conn. 576, 578, 54 A. 199 (1903); *Salinardi* v. *State*, 124 Conn. 670, 672, 2 A.2d 212 (1938); *Smith* v. *State*, 139 Conn. 249, 253, 93 A.2d 296 (1952). There is not a single instance in the case law dating back more than one century in which this court has granted a new trial on the ground that such a result is necessary "to avoid an injustice," without application of the *Asherman* factors. Indeed, to read our isolated use of the phrase "avoid an injustice" as an independent ground for granting a new trial would allow a petitioner to avoid satisfying factors other than the credibility element of the *Asherman* test. Thus, a petitioner could circumvent the habeas process for claims of ineffective assistance of counsel despite the fact that the evidence is not newly discovered by asserting that the evidence is so material that a new trial must be ordered to avoid an injustice. For all of the foregoing reasons, therefore, we decline to adopt the approach suggested by the petitioner to his claim under a broad injustice standard untethered to the *Asherman* factors. We are mindful, however, that we left open the possibility in *Shabazz* v. *State*, supra, 259 Conn. 827, that "there may be cases in which the trial court is justified in determining that the newly discovered evidence is sufficiently credible and of such a nature that, in order to avoid an injustice, a second jury, rather than the trial court itself, should make the ultimate assessment of its credibility." For the reasons we previously have set forth, we conclude that the trial court did not abuse its discretion in concluding that this is not such a case.

on the victim's murder case when the investigation was reopened in 1991 and later as lead investigator in the state's attorney's office in 1994, had engaged in a "secret pact" and book deal with Levitt about the petitioner's criminal case.[42] In the foreword to a book Levitt wrote that was published in 2004, he referred to his relationship with Garr and noted: "At our lowest ebb, we made a pact to tell our story. Here it is." L. Levitt, Conviction: Solving the Moxley Murder: A Reporter and a Detective's Twenty Year Search for Justice (Regan Books 2004), forward, p. x. According to the petitioner, Levitt and Garr had a secret arrangement to write a book about the case that caused Garr to have a "particularly unique bias" against the petitioner that "undermin[ed] Garr's credibility in his selection, investigation and use of . . . witnesses, and . . . dilutes the already tenuous probative value and effect of the circumstantial evidence" on which the petitioner had been convicted. As evidence of the effect of this bias, the petitioner points to statements in Levitt's book indicating that Garr had "threatened witnesses leading up to and during the petitioner's trial." The petitioner contends that the trial court improperly concluded that this evidence was not newly discovered and that, had this evidence been disclosed to the jury at his criminal trial, it would not have impacted the outcome of the case.

The state requests that we affirm the trial court's decision on the alternate ground that, because the peti-

---

[42] Although the petitioner also contends in his brief to this court that Garr "threatened witnesses in the time leading up to and during the petitioner's trial," his brief focuses on Garr's secret pact and book deal with Levitt. The only further discussion of these alleged threats is the following quote from Levitt's book, as emphasized by the petitioner in his brief: "[T]he case was all [Garr's]. He had found all the witnesses. Many hadn't wanted to testify. [*Garr*], *they related, had pursued, cajoled, harassed, or threatened them.*" (Emphasis added.) We, therefore, construe the petitioner's claim to be that these alleged threats were evidence of Garr's bias because of his pact to write a book and his book deal and do not address these alleged threats independently from our discussion of that deal.

tioner had failed to plead this claim properly and it was time barred, the trial court should not have considered it. See footnote 16 of this opinion. Should this court reach the merits, the state claims that: (1) the petitioner failed to establish that this evidence was unknown or undiscoverable through the exercise of due diligence at or prior to trial because the petitioner's trial counsel had heard rumors about the book deal, could have called as witnesses the sources of these rumors and chose not to question Garr himself about the book; and (2) even had the rumors been explored or Garr been questioned in the criminal trial, such testimony would not have produced a different result. We conclude that, even if we were to assume without deciding that the petitioner properly had pleaded this claim and that this evidence was newly discovered, the trial court did not abuse its discretion in determining that the petitioner was not entitled to a new trial because of the petitioner's failure to prove that this evidence probably would result in an acquittal on retrial.

The record discloses the following additional undisputed facts. On or about May 21, 2001, the petitioner's criminal trial attorney, Michael Sherman, filed a motion for discovery and inspection, requesting, inter alia, disclosure of evidence that any agent of the state had a "pecuniary or other interest in the development and/or outcome of this case, including, but not limited to, any contract, agreement, or on-going negotiations, which relate to the preparation of any book . . . ." The trial court, *Kavanewsky, J.*, denied the request as written, but granted it limited to the state's witnesses. The petitioner received no evidence from the state in response to this request prior to trial. During the course of the criminal trial, Garr testified outside the presence of the jury. When Garr was asked by Sherman whether he had a book deal, the state objected on relevancy grounds. Sherman did not challenge that objection.

At the hearing on the petition for a new trial, the petitioner presented three witnesses, Levitt, Garr and Sherman, to testify in connection with this claim. In its decision rejecting the claim, the trial court, *Karazin, J.*, recited the following testimony. Levitt testified that he began covering the victim's murder case as a reporter in 1982. In 1995, he published an article in Newsday recounting the findings of Sutton Associates, a private investigation firm hired by the petitioner's father, Rushton Skakel, Sr., that disclosed that Thomas Skakel and the petitioner had given the firm different accounts of their activities on the night of the murder than they had given to the police in 1975. Shortly after the article was published, Garr contacted Levitt, expressed interest in the information that Levitt had obtained, which had not been available to Garr, and the two men became friends. Levitt had been thinking of writing a book about the homicide and had made inquiries prior to the grand jury convening in 1998. Levitt expressed his interest to Garr and even sought his help in this endeavor, but, according to Levitt, Garr consistently had refused, stating that he would not help Levitt until the case concluded. Although Levitt stated in the book that he and Garr had made a "pact" to tell their story, Levitt testified that there had been no conversations regarding compensation at that time. It was only after the petitioner's conviction that Levitt concluded that it seemed only fair to split the book profits with Garr, and, in February, 2003, he entered into an agreement to do so. The lowest ebb to which Levitt also had referred in the book's foreword was the period after the publication of Mark Fuhrman's book about the victim's murder case, in which Fuhrman, and later others, had made disparaging remarks about the Greenwich police department's investigation into the victim's homicide.[43] Levitt further

---

[43] Fuhrman's book, entitled "Murder in Greenwich: Who Killed Martha Moxley?," was published in 1998. Sherman testified that, in his book, Fuhrman had indicated that he sought Garr's help when writing his book, but that Garr refused because he said that he was writing his own book. Sherman

testified that it was only after the case had concluded and he knew the "end" of the story that he began working on the book. Additionally, Levitt explained that, although he had stated in the book that reluctant witnesses had related that Garr "cajoled, harassed, or threatened them," he simply meant that Garr had told witnesses that, if they did not come forward voluntarily, he would subpoena them. Garr testified that, although he had met with Levitt and reviewed drafts of the book, his role was limited to pointing out inaccuracies; he had no role in drafting and provided no access to evidence.

Sherman testified that, prior to trial, he had received " 'pretty good information' " that Garr had a book deal. Although Levitt never had made such an assertion, Sherman identified three persons as his sources regarding the alleged deal—Fuhrman, Tim Dumas and Dominick Dunne—all of whom had written about the victim's murder case. Sherman testified that it was because of these rumors about Garr having a "book deal" that he had filed the aforementioned motion for discovery. Sherman claimed that, if he had known about the alleged pact Levitt mentioned in *his* book, he would have made Garr's financial motive a central theme of the petitioner's defense. Finally, Sherman testified that he had spoken to the state's witnesses prior to trial and concluded that Garr had been "heavy-handed" in his treatment of them.

On the basis of this testimony, the trial court then essentially made two determinations before denying the petitioner's claim in connection with this evidence. First, the trial court turned to the issue of whether the evidence offered in support of the petitioner's claim for a new trial was newly discovered, meaning that it could not have been discovered previously despite the exer-

conceded that the publication of Fuhrman's book preceded or coincided with the grand jury proceedings in the petitioner's case.

cise of due diligence. The court determined that the petitioner had not established that "any evidence regarding Garr and Levitt was unknown or undiscoverable through the exercise of due diligence at or prior to trial." It reasoned that Sherman had heard rumors of a book deal involving Garr and should have pursued them. Specifically, all three of the sources of these rumors—Fuhrman, Dumas and Dunne—had attended the petitioner's criminal trial in 2002, and "[n]othing prevented Sherman from inquiring further to see if any of those persons had information regarding an alleged book deal." Additionally, in light of Judge Kavanewsky's ruling granting the petitioner's discovery request for information of potential pecuniary gain by the state's witnesses, the trial court concluded that it was apparent that, had Sherman "requested a ruling from the court when he asked Garr about a book deal, the court would have overruled the state's objection." Next, the trial court examined whether the evidence, even if newly discovered, was likely to produce a different result in the event of a new trial. Second, the court concluded that, even "[i]f [the] petitioner had presented this evidence . . . that [Garr] told his friend [that] if he wrote a book he would try to help him, but he could not do anything until the case was over, [it] is not evidence that would have swayed the jury as to lead it to acquit."

Whether trial counsel has fulfilled his or her duty to conduct a reasonable investigation forms the linchpin issue in a petition for a new trial made on the basis of newly discovered evidence. "[T]o entitle a party to a new trial for newly-discovered evidence, it is indispensable that he should have been diligent in his efforts fully to prepare his cause for trial; and if the new evidence relied upon could have been known with reasonable diligence, a new trial will not be granted." (Internal quotation marks omitted.) *Terracino* v. *Fairway Asset*

*Management, Inc.*, 75 Conn. App. 63, 77, 815 A.2d 157, cert. denied, 263 Conn. 920, 822 A.2d 245 (2003). Therefore, "[t]he [petitioner] has the burden of proving that the evidence . . . could not have been discovered and produced [in] the former trial by the exercise of due diligence . . . ." *Kubeck* v. *Foremost Foods Co.*, supra, 190 Conn. 670; accord *Asherman* v. *State*, supra, 202 Conn. 434. "Due diligence does not require omniscience. Due diligence means doing everything reasonable, not everything possible. . . . The question which must be answered is not what evidence might have been discovered, but rather what evidence would have been discovered by a reasonable plaintiff by persevering application, [and] untiring efforts in good earnest." (Citation omitted; internal quotation marks omitted.) *Kubeck* v. *Foremost Foods Co.*, supra, 672.

We recognize that, with due diligence and reasonable effort at or prior to the criminal trial, the petitioner *might* have been able to pursue further the "rumors" of a book deal because Dumas, Dunne and Fuhrman had attended the criminal trial in 2002 and clearly were available to be called as witnesses at that time. Additionally, in light of Judge Kavanewsky's ruling on the petitioner's discovery request, the petitioner *might* have been given permission to question Garr about the book, any expectation of financial gain or his meetings or sharing of information with Levitt, despite the "look" the trial court gave to Sherman after he had asked a question about the book deal. Therefore, we are hesitant to conclude that the trial court improperly determined that the evidence was not newly discovered. On the other hand, we are hesitant to suggest that the state can avoid the deleterious impact of any failure to comply fully with its obligations under *Brady* v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), simply because one of its investigators has not been forthcoming about information relevant to a discovery

request filed with the specific purpose of obtaining that particular information. See *State* v. *White*, 229 Conn. 125, 135, 640 A.2d 572 (1994) ("nondisclosure of the reports and statements constitutes suppression by the prosecution even if, at the time of the hearing on probable cause, the reports and statements were in the police files rather than the prosecutor's files"); but see *State* v. *Rasmussen*, 225 Conn. 55, 91, 621 A.2d 728 (1993) ("[e]vidence known to the defendant or his counsel, or that is disclosed, even if during trial, is not considered suppressed as that term is used in *Brady*" [internal quotation marks omitted]).

Accordingly, we conclude that, even if we were to determine that the evidence was newly discovered, the petitioner has failed to demonstrate that the trial court abused its discretion in concluding that this evidence likely would not result in an acquittal upon retrial. The petitioner has made vague claims of witness intimidation, but has pointed to no witness whose testimony was affected by Garr's conduct, and the petitioner has pointed to no evidence that was suppressed by Garr such that the petitioner was prevented from preparing his defense. Although the petitioner argues in his brief that Garr failed to investigate Coleman's testimony, as we explain in greater detail in part III of this opinion, the petitioner had equal access to evidence that could corroborate or discredit Coleman's testimony. Thus, we are unable to conclude that the trial court abused its discretion in concluding that the petitioner was not entitled to a new trial on the basis of the evidence regarding Garr's agreement to assist Levitt with the writing of Levitt's book.[44]

---

[44] We note, however, that, although we see no direct evidence in the record that Garr engaged in improper conduct during the course of the investigation to advance his interest in the publication of Levitt's book and indeed Garr's singular focus on the petitioner may well have been predicated on the fact that the evidence kept pointing in that direction, Garr's acceptance of a share in the book's profits creates, at the very least, an appearance of a conflict of interest. We further note that the evidence in the record indicates

## III

We next turn to the petitioner's claim that the trial court improperly denied his petition for a new trial on the basis of testimony from former Elan residents that would contradict the testimony of Coleman, the state's only witness to attest unequivocally that the petitioner had confessed to killing the victim. The petitioner contends that, despite reasonable efforts, these witnesses whom Coleman had named as possibly having overheard the confession could not be located prior to trial. He further contends that, only after trial and exerting *extraordinary* efforts was he able locate these witnesses, who would testify that they never had heard the petitioner make such a confession and would cast doubt on Coleman's credibility generally. The petitioner, therefore, claims that the trial court improperly concluded that: (1) these witnesses could have been discovered prior to trial with due diligence; and (2) their testimony was largely cumulative of other former

that the state's attorney had no knowledge of Garr's agreement to assist Levitt prior to receiving a letter from the petitioner's appellate counsel raising that issue, and in fact that Garr never informed the state's attorney that he was receiving a share of the profits from the book even after the state's attorney inquired about the book deal upon receiving that letter. Nonetheless, Garr's conduct undermines the public's confidence in the office of the state's attorney and we, therefore, express our strong disapproval.

Despite our criticism, we decline the petitioner's invitation, raised for the first time at oral argument, to order a new trial under our supervisory authority over the administration of justice because of what he characterizes as Garr's unprecedented breach of the code of ethics. Specifically, the petitioner contends that Garr violated General Statutes § 1-84 by disclosing to Levitt confidential information that Garr had obtained through his employment with the state. In addition to the fact that the testimony credited by the trial court does not support the factual predicate for the petitioner's claim, there is no persuasive justification for using the court's inherent authority to order a new trial. The code of ethics sets forth its own remedial measures, which are directed at the violator personally. See General Statutes § 1-88 (a). The alleged situation in the present case is not akin to circumstances in which the courts have deemed it necessary to craft their own remedial measure to act as a prophylactic measure against future abuses, such as the exclusionary rule to address fourth amendment violations.

Elan residents who never had heard the petitioner confess, was not material and was unlikely to result in an acquittal upon retrial. We conclude that the trial court did not abuse its discretion in concluding that the petitioner had failed to meet his burden of proving that this evidence was newly discovered.

The record reveals the following additional undisputed facts and procedural history. Coleman testified before the grand jury in 1999, and at the petitioner's probable cause hearing, but, because he died in 2001, his probable cause testimony was read into the record at trial. As we previously have noted in our discussion of the evidence at the petitioner's criminal trial, Coleman testified that, one night, while he was guarding the petitioner in the Elan dining hall after the petitioner's unsuccessful escape from the facility, the petitioner had said "I am going to get away with murder because I am a Kennedy." According to Coleman, the petitioner then stated "how he had made advances to this girl where he lives and that she spurned his advances and that he drove her skull in with a golf club." The petitioner told Coleman that this had happened in "a wooded area" and that "he had hit her so hard that the golf club had broken in half." Coleman acknowledged that, in his grand jury testimony, he had testified that another Elan resident—either John Simpson, Cliff "Reubin" or Everette James—was working with him in the dining hall that night and could have overheard the petitioner make this confession. None of these witnesses testified at trial.

At the hearing on the petition for a new trial, the petitioner offered testimony from Cliff *Grubin*—not Reubin, as misstated by Coleman, James, whose full name is Alton Everette James III, and Simpson. Grubin, whom the petitioner had located in Ibiza, Spain, testified that he never had guarded the petitioner at Elan and never had heard him confess to killing the victim.

Grubin further testified that Coleman once had stated that he "was a very good liar." James, whom the petitioner had located in Virginia, recalled guarding the petitioner on more than one occasion, but stated that he never had heard the petitioner confess to killing the victim on those or any other occasions. Simpson, whom the petitioner located in Florida, recalled guarding the petitioner on one occasion in which Coleman suddenly had stated that the petitioner "just admitted that he killed this girl," but Simpson explained that it had become evident upon his questioning of the petitioner that he had made no such admission, and Simpson never heard such an admission at any other time.[45]

The petitioner also presented testimony from Sherman, Colucci and Keith Weeks, a private investigator, regarding the steps they had taken to procure the testimony of these three witnesses. Sherman testified that, prior to trial, he had told Colucci to do what he could to locate these witnesses and "see if we can get them on the phone." Colucci testified, however, that the young attorney at Sherman's office to whom Colucci actually reported only had directed him to look for James and that no one in Sherman's office ever had told him to

---

[45] The following exchange took place between Simpson and the petitioner's counsel after Simpson was asked whether he recalled a particular incident at Elan:

"A. [Coleman] and I were watching [the petitioner]. . . . And [Coleman] and [the petitioner] were to my left, and all of the sudden [Coleman] just went, 'I can't believe it.' And I said, 'What?' [Coleman] goes, 'He just admitted that he killed this girl.'

"Q. And what did you say?

"A. Well, I just—I looked at [the petitioner], and I said, 'Did you just tell him that you killed this girl?' And [the petitioner] said, 'No.' And so I looked back at [Coleman], and I said, 'Greg, what are you talking about? He just said he didn't say that he killed this girl?' [Coleman] goes, 'Well, he didn't answer yes or no, but he gave one of those'—and, for lack of a better term, [the petitioner] used to have this shit-eating grin on his face sometimes, and [Coleman] said that's what he had. . . . And [Coleman] said, 'Well it was his reaction, the fact that he didn't say no.' "

look for Simpson or Grubin. Although testimony and documentary evidence established that Colucci had found an address for James in April, 2002, and subsequently a telephone number, Sherman stated, "we just . . . couldn't connect on the phone with him." Sherman acknowledged that he never directed Colucci to see whether any of the Elan residents whose contact information they did have knew the whereabouts of any of the three witnesses. Colucci eventually spoke to James in 2004, after he had been hired by the petitioner's appellate counsel.

Weeks testified that he had been hired by the petitioner's appellate counsel in May, 2005, to locate Simpson and Cliff "Reubin." Weeks only knew their names and the time frame during which they had resided at Elan. Weeks ran several unsuccessful computer searches, but then found a posting on an Internet message board set up by former Elan students from a Cliff "Grubin," who listed his attendance at Elan from 1978 to 1980. The posting listed a city and state of residence and an e-mail address. Weeks unsuccessfully attempted to track Grubin down through his place of residence, but eventually sent Grubin an e-mail at the address provided on the message board. Grubin responded seven days later, and Weeks interviewed him shortly thereafter. Weeks found Simpson through information that Weeks had acquired from various former Elan residents and eventually pieced together to obtain contact information. Weeks stated that it took him approximately one month to locate Simpson, whom Weeks referred to as "the most difficult person I have ever had to locate."[46]

---

[46] In what we assume is an attempt to bolster the extraordinary nature of Weeks' efforts, the petitioner characterizes Weeks as "an investigator who specializes in locating hard-to-find people." Weeks' testimony indicated merely that he had worked on locating missing persons and witnesses and also had lectured on those topics. We do not equate "missing" with "hard to locate" and we therefore do not assume a specialized expertise on Weeks' part.

The trial court concluded that efforts to locate the three witnesses prior to and during trial did not satisfy due diligence. The court further concluded that these witnesses could have been located using the same methods that ultimately were used after trial to locate them. Therefore, the court concluded that the evidence was not newly discovered within the meaning of § 52-270. We agree.

It is highly significant that this evidence is not newly discovered in the sense that the petitioner did not know of the existence of these witnesses prior to trial. Coleman had identified these witnesses *years* before trial. Moreover, the petitioner should have known that Coleman's testimony, if credited, could be a key piece of evidence in the state's case. Sherman apparently concluded, however, that cross-examination of Coleman at trial would be sufficient to discredit him, as he justified his lack of direction to Colucci about locating these witnesses by the fact that he "didn't anticipate that . . . Coleman would be dead at the [time of] trial . . . [and] believed that the jury would see [him]." Sherman had James' contact information in the spring of 2002, but could not "connect" with him. *No* effort was made to locate Simpson or Grubin prior to or during the trial. Therefore, we fully agree with the trial court's conclusion that Sherman had failed to exercise due diligence to locate the three witnesses.

The petitioner contends that these witnesses could not have been located prior to trial because the state was unable to locate them, despite reasonable efforts to do so. Although that fact *might* demonstrate that these witnesses similarly could not have been discovered by the petitioner before trial with the exercise of due diligence, the testimony to which the petitioner draws our attention does not establish such efforts by the state. Garr indicated that he had a vague recollection of "possibly" attempting to contact Simpson and

thought that the state had made "some attempts" to find another witness who possibly lived abroad, to no avail. He never stated what efforts had been made to locate these witnesses, and, therefore, the state's efforts in this regard cannot demonstrate that the witnesses could not have been discovered with the exercise of due diligence. Garr also testified that he believed that he had spoken with James, but that James was uncomfortable talking about his experiences at Elan and had no information. We disagree with the petitioner that this testimony establishes that the petitioner's efforts would have been thwarted had he approached James during the same time period. James willingly submitted to a deposition when he ultimately was approached on behalf of the petitioner, and there is no indication in the record that James would not have cooperated had he been approached by the petitioner prior to or during the trial.

The petitioner also contends that it was improper for the trial court to presume that the methods that ultimately were successful in locating Simpson and Grubin in 2005 similarly would have been successful had they been applied in 2002 or earlier. He further contends that, even if we were to assume that the methods used to find Grubin and Simpson *after* trial would have enabled the petitioner to contact them *prior* to or *during* the trial, his posttrial efforts were so extraordinary that they exceeded what is required to meet the due diligence standard. In essence, the petitioner's claim is that due diligence prior to or during the trial would not have yielded the location of these witnesses so he should not be penalized for failing to exercise such diligence. We are not persuaded.

It is the *petitioner's* burden to prove that the efforts used to find these witnesses would not have yielded the same result had they been applied earlier. *Asherman* v. *State*, supra, 202 Conn. 434 ("[t]he petitioner must

demonstrate, by a preponderance of the evidence, that . . . the proffered evidence is newly discovered, such that it could not have been discovered earlier by the exercise of due diligence"); *Terracino* v. *Fairway Asset Management, Inc.*, supra, 75 Conn. App. 75 ("[t]he burden of showing due diligence [rests] solely and throughout on the [petitioner]" [internal quotation marks omitted]); see also *Seebeck* v. *State*, 246 Conn. 514, 545, 717 A.2d 1161 (1998) ("[A] petition for a new trial is a civil action . . . . In this civil action, the petitioner is just that, a petitioner, and, therefore, in the trial court he bore the burden of proving, by a preponderance of the evidence, that newly discovered evidence warranted the granting of a new trial." [Internal quotation marks omitted.]). The trial court was not required to infer that the petitioner had met his burden of proof from the evidence demonstrating no actual effort to locate these witnesses prior to trial and from the *absence* of evidence as to whether pretrial efforts would have been successful. The petitioner has not drawn our attention to any testimony adduced from these witnesses as to their accessibility during the pretrial period in relation to the methods used to locate them after the trial. For example, Grubin was not asked whether his 2005 posting to the Elan message board was his first to that site or any other comparable site. We note, however, that the record does reflect that Grubin was living in the United States prior to and during the trial, from 2000 to 2003, a fact that may have made him easier to locate at that time.

We also are not persuaded that the trial court abused its discretion by failing to find that the petitioner's post-trial efforts were so extraordinary so as to exceed the bounds of due diligence. Although we are mindful that Coleman misstated Grubin's last name, Weeks adduced without undue difficulty based on the years of attendance listed on the posting on the Elan message board

from Cliff Grubin that he was the person Weeks had been seeking. Moreover, Weeks readily could have pursued Grubin via the e-mail address provided on the Elan message board while simultaneously pursuing his location by way of the place of residence listed. With respect to Simpson, although it did take Weeks almost one month to piece together all of the information from Elan alumni that led to Simpson's contact information, the alumni, and in turn the information they provided, were accessible without undue effort. In sum, in light of the fact that several years had lapsed between Coleman's identification of these witnesses and the time of the trial and the potential significance of Coleman's testimony, the petitioner's efforts to locate these witnesses does not go beyond the bounds of "persevering application, [and] untiring efforts in good earnest." (Internal quotation marks omitted.) *Kubeck* v. *Foremost Foods Co.*, supra, 190 Conn. 672; cf. *State* v. *Wright*, 107 Conn. App. 85, 90–91, 943 A.2d 1159 (rejecting claim that due diligence standard was not met to establish unavailability of witness to testify *at trial* when state spent nine days trying to locate witness, searched numerous databases, made numerous calls, visited various locations and attempted to locate witness' family members), cert. denied, 287 Conn. 914, 950 A.2d 1291 (2008). Therefore, we conclude that the trial court did not abuse its discretion in denying the petition for a new trial on the ground that the petitioner had failed to meet his burden of proving that the evidence provided by these witnesses was newly discovered.

## IV

Finally, we turn to the petitioner's claim that he should have been granted a new trial because of the state's pattern of failing to disclose exculpatory evidence. The petitioner points to the following pieces of evidence: a composite drawing of a person seen by Charles Morganti, a Belle Haven security guard on Octo-

ber 30, 1975, at approximately 10 p.m., whom the petitioner claims resembles Littleton but clearly does not resemble the petitioner; reports prepared by a state investigator that profile Littleton and Thomas Skakel as potential suspects and that state as an established fact that the petitioner had left his home at around 9:30 p.m. to go to his cousin's house (profile reports); and "time lapse data" that sets forth a chronological account of Littleton's actions prior to, during and after the murder that included charged and uncharged misconduct, as well as listings of crimes against female victims in areas Littleton had frequented. The petitioner claims that the trial court improperly failed to grant the petition for a new trial on the ground of reasonable cause due to the state's pattern of suppression and nondisclosure of this evidence in violation of *Brady* v. *Maryland,* supra, 373 U.S. 83. He also claims that the trial court abused its discretion in denying the petition on the ground of newly discovered evidence.

The state contends that we should not consider the petitioner's reasonable cause argument because he declined to pursue it as an independent basis for a new trial, asserting only the ground of newly discovered evidence. The state also contends that the trial court properly relied on this court's decision in the petitioner's direct appeal from his judgment of conviction to conclude that this evidence was not newly discovered. It further contends there was no *Brady* violation with regard to the profile reports and time lapse data because the state had given the petitioner the raw data. The state simply did not produce the *conclusion* of the investigator who had prepared the profile reports, which it claims would have been inadmissible and of little value, or the state's *compilation* of the raw data. We agree with the state.

We note that, although, at the outset of its decision, the trial court referenced the time lapse data as part

of the petitioner's claim of a pattern of nondisclosure of exculpatory evidence, the court did not specifically address that evidence in its analysis or make any findings in relation thereto. In his brief to this court, the petitioner asserts that John F. Solomon prepared the time lapse data concurrently with the profile reports and that "much of its data is incorporated by reference into the Littleton profile report" or that the profile reports "include" the time lapse data. Therefore, for purposes of our analysis, we consider the time lapse data as part of the Littleton profile report and do not address it separately.

The petitioner's claims are to a large degree resolved by our decision in his prior appeal from the judgment of conviction. In *State* v. *Skakel*, supra, 276 Conn. 693–94, the petitioner claimed that he was entitled to a new trial because the state improperly had withheld certain exculpatory evidence, specifically, the composite drawing and the two suspect profile reports. The petitioner further claimed that the state's failure to disclose that evidence had deprived him of his right to a fair trial in violation of *Brady* v. *Maryland*, supra, 373 U.S. 83. *State* v. *Skakel*, supra, 694. We rejected his claims as to both the drawing and the profile reports. Id.

With respect to the composite drawing, we concluded that, although the state improperly had failed to produce the drawing in response to the petitioner's pretrial general discovery request,[47] there was no *Brady* violation because the petitioner had had actual notice of the existence of the drawing. Id., 703. Specifically, the state had mentioned the preparation of this drawing in its

---

[47] The petitioner had filed a pretrial motion for disclosure and production, "requesting, inter alia, that the state disclose any '[i]nformation and/or material which is exculpatory in nature,' including '[p]hotographs, composite sketches or other media replications that depict the likeness or physical attributes of [any] alleged perpetrator of this crime.' " *State* v. *Skakel*, supra, 276 Conn. 694.

investigative reports, those reports were turned over to the petitioner, and the petitioner's trial counsel had acknowledged that he was aware of these reports. Id. We further noted that the petitioner had known of Morganti's potential significance as a witness and had the ability to explore this issue directly with him. Id. Finally, we rejected the petitioner's argument that he had not had actual notice because he did not know the exculpatory nature of the drawing until he actually had seen it. Id., 704–705. We concluded that it was sufficient for the petitioner to have known that the drawing potentially could be exculpatory. Id., 705. Because the petitioner had actual notice of this evidence, we concluded that, in the absence of a specific request for the drawing to supplement the general discovery request, there was no *Brady* violation. Id., 707.

With respect to the suspect profile reports, we noted the following facts. "Solomon, a former supervisory inspector with the office of the state's attorney in the judicial district of Fairfield, testified outside the presence of the jury concerning issues that were raised in a motion then pending before the court. During his testimony, Solomon referred to a copy of a report that he had prepared in connection with the investigation of the victim's murder. Solomon characterized that report, which he wrote in 1992, as a profile of Littleton summarizing why, at the time the report was written, Littleton was considered a suspect. Immediately after Solomon referred to the report, the [petitioner's] trial counsel requested a copy, to which the court responded: 'Not right now. You are talking about examining the witness.' At that same proceeding, the state elicited testimony from Solomon indicating that he had prepared a similar profile of Thomas Skakel, who, at one time, also was a suspect in the victim's murder. The [petitioner] failed to renew his request for those reports before the conclusion of the trial, and his original motion for a new trial,

which was timely filed on June 12, 2002, did not refer to the two reports." Id., 707–708.

We concluded that "the trial court acted within its discretion in rejecting the [petitioner's] claim on the ground that the [petitioner] had failed to raise it in a timely manner under Practice Book § 42-54. *Even though the [petitioner] became aware of the two reports during trial,* he did not raise a *Brady* challenge to the state's failure to provide him with the reports until two and one-half months after the five day limitation period [for filing a motion for a new trial under] . . . § 42-54 had expired." (Emphasis added.) Id., 710.

In addition to the aforementioned facts and conclusions set forth in *Skakel,* the trial court in the present case pointed to the following testimony. Garr had offered testimony to establish that the composite drawing had been in the state's files, which always were accessible to the petitioner. Sherman admitted that, shortly before trial, Solomon had told him about the profile reports.[48] Although Sherman had filed a discovery request almost one year before trial, he acknowledged that he had not renewed this discovery request specifically to request the profile reports.

In light of this testimony and this court's conclusions in the petitioner's previous appeal, we conclude that the trial court did not abuse its discretion in concluding that this evidence was not newly discovered. Although the petitioner contends that this court's statement in *State* v. *Skakel,* supra, 276 Conn. 710, that "the [petitioner] became aware of the two reports during trial" was dicta because the court's holding was directed at the timeliness of the *Brady* challenge, it is clear that this statement was predicated on facts established by the evidence. The petitioner also contends that his May,

---

[48] Sherman also acknowledged that he had seen both profile reports in the possession of a state's witness during the criminal trial.

2001 discovery motion sought documents that would have included these reports, which were prepared in 1991 or 1992. Although we would agree that the reports would have fallen within the scope of this request,[49] this fact would not negate the knowledge that the petitioner subsequently obtained prior to and during trial that the profile reports existed. The petitioner did not exercise due diligence to obtain these reports once he knew of their specific existence. Indeed, neither the *Brady* doctrine nor our rules of discovery are intended either to relieve the defense of its obligation diligently to seek evidence favorable to it or to permit the defense to close its eyes to information likely to lead to the discovery of such evidence. In light of these facts, the trial court did not abuse its discretion in concluding that the evidence was not newly discovered.

With respect to the petitioner's reasonable cause and *Brady* claims, we decline to address them for several reasons. First, the trial court did not address these arguments. The petitioner does not claim that he sought an articulation to obtain a ruling on these claims; see *State* v. *Smith*, 289 Conn. 598, 613, 960 A.2d 993 (2008); nor has he sought *Golding* review. See *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). Moreover, the petitioner extends the bounds of reasonable cause beyond its limits. "Although [§] 52-270 permits the court to grant a new trial upon proof of reasonable cause, the circumstances in which reasonable cause may be found are limited." (Internal quotation marks omitted.)

---

[49] The discovery motion, filed May 21, 2001, requested, inter alia: "The names, addresses and criminal records of all persons, other than the [petitioner], who were at any time considered suspects, or who were detained, questioned, and/or arrested in relation to this case, together with any materials and information which caused them to be suspected, including, but not limited to, any oral and/or written statement, report, narrative, affidavit in support of a warrant, or any other document. This request would include information and/or evidence that someone other than the [petitioner] was the focus and/or target of the state's investigation, in particular, Ken Littleton, Frank Wittine, Thomas Skakel, and/or Edward Hammond."

*Bleidner* v. *Searles,* 19 Conn. App. 76, 78, 561 A.2d 954 (1989). "[T]he basic test of 'reasonable cause' is whether a litigant, *despite the exercise of due diligence,* has been deprived of a fair opportunity to have a case heard on appeal. *Black* v. *Universal C. I. T. Credit Corporation,* 150 Conn. 188, 194, 187 A.2d 243 (1962); *Wojculewicz* v. *State,* 142 Conn. 676, 678, 117 A.2d 439 (1955); *Dudley* v. *Hull,* 105 Conn. 710, 719, 136 A. 575 (1927)." (Emphasis added.) *Wetzel* v. *Thorne,* 202 Conn. 561, 565, 522 A.2d 288 (1987). Accordingly, the trial court did not abuse its discretion in denying the petition for a new trial on the basis of this evidence.

We are mindful that we have disposed of two of the petitioner's claims solely on the ground that the trial court did not abuse its discretion in concluding that the evidence was not newly discovered because the petitioner did not meet his burden of proving that this evidence would not have been available for use at trial if due diligence had been exercised. Because this conclusion is dispositive of those claims; *Costello* v. *Costello,* 139 Conn. 690, 695, 96 A.2d 755 (1953); *Terracino* v. *Fairway Asset Management, Inc.,* supra, 75 Conn. App. 80; we express no opinion on the possible effect that this evidence could have in a new trial. Undoubtedly, the prerequisites for obtaining a new trial at this stage are stringent. "This strict standard is meant to effectuate the underlying 'equitable principle that once a judgment is rendered it is to be considered final,' and should not be disturbed by posttrial motions except for a compelling reason." *Asherman* v. *State,* supra, 202 Conn. 434. To the extent, however, that the petitioner believes that this evidence would have changed the outcome of his trial, habeas relief is the appropriate avenue to pursue such a claim.

The judgment is affirmed.

In this opinion VERTEFEUILLE, J., concurred, and ZARELLA and McLACHLAN, Js., concurred in parts II, III and IV and in the result.

ZARELLA, J., with whom McLACHLAN, J., joins, concurring. I agree with and join parts II, III and IV of the majority opinion. I also agree with the result that the majority reaches in part I of its opinion, in which it upholds the trial court's denial of the petition for a new trial filed by the petitioner, Michael C. Skakel, on the basis of newly discovered hearsay statements made by Gitano "Tony" Bryant. I write separately, however, because the majority has failed to address the threshold issue in the present case—the admissibility of the Bryant evidence at a new trial—which, in my view, is dispositive of the petitioner's claim.[1] The Bryant evidence constitutes inadmissible hearsay that does not satisfy the definition of a statement against penal interest within the meaning of § 8-6 (4) of the Connecticut Code of Evidence. In addition, the Bryant evidence fails to satisfy any of the trustworthiness factors set forth in Conn. Code Evid. § 8-6 (4). Finally, even if I were to assume, arguendo, that portions of the Bryant evidence are against Bryant's penal interest and satisfy the trustworthiness factors, *only those portions* would be admissible because (1) in the present case, Bryant's self-inculpatory statements are severable from his self-serving statements, and (2) the United States Supreme Court, in *Williamson* v. *United States*, 512 U.S. 594, 114 S. Ct. 2431, 129 L. Ed. 2d 476 (1994), held that the federal hearsay exception for statements against penal interest; see Fed. R. Evid. 804 (b) (3); on which Conn.

[1] The majority acknowledges that the state raised the issue of admissibility of the Bryant evidence before the trial court and in this appeal, yet the majority concludes that it "need not examine" that issue in light of its resolution of the secondary issue concerning the trial court's application of the test set forth in *Shabazz* v. *State*, 259 Conn. 811, 820–21, 792 A.2d 797 (2002), for granting new trials on the basis of newly discovered evidence. Footnote 22 of the majority opinion.

Code Evid. § 8-6 (4)[2] is patterned, permits only the admission of self-inculpatory statements and not collateral statements, "even if they are made within a broader narrative that is generally self-inculpatory." *Williamson* v. *United States*, supra, 600–601. The statements that Bryant made that are most relevant to the issue of whether the petitioner is entitled to a new trial are those that exculpate Bryant and the petitioner and inculpate two of Bryant's former classmates, Adolph Hasbrouck and Burton Tinsley. These statements are not admissible, either under our current jurisprudence or the rule set forth in *Williamson*. Accordingly, I conclude that the petitioner is not entitled to a new trial because none of Bryant's statements that exculpate the petitioner would be admissible, and, therefore, the Bryant evidence could not produce a different result at a new trial.

Under Connecticut law, the statement against penal interest hearsay exception has its roots in our decision in *State* v. *DeFreitas*, 179 Conn. 431, 449–52, 426 A.2d 799 (1980). In *DeFreitas*, "we adopted a rule, consistent with *Chambers* v. *Mississippi*, [410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973)], and in accord with rule 804 (b) (3) of the Federal Rules of Evidence,[3] which

---

[2] I note that, although § 8-6 of the Connecticut Code of Evidence has been amended in recent years, subdivision (4), the subdivision at issue in the present case, has not been amended since its inception in 2000. Hereinafter, all references and citations to § 8-6 (4) of the Connecticut Code of Evidence are to the current edition.

[3] Rule 804 (b) of the Federal Rules of Evidence provides in relevant part: "Hearsay exceptions.—The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

\* \* \*

"(3) Statement against interest.—A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement. . . ."

provides that trustworthy third party statements against penal interest [that] are exculpatory to the defendant, are admissible if the declarant is unavailable." (Citations omitted; internal quotation marks omitted.) *State* v. *Payne*, 219 Conn. 93, 114, 591 A.2d 1246 (1991). Section 8-6 (4) of the Connecticut Code of Evidence embodies the hearsay exception recognized in *DeFreitas* and affirmed in its progeny. See, e.g., *State* v. *Lopez*, 239 Conn. 56, 70–71, 681 A.2d 950 (1996); *State* v. *Mayette*, 204 Conn. 571, 576–77, 529 A.2d 673 (1987). Section 8-6 (4) of the Connecticut Code of Evidence provides that "[a] trustworthy statement against penal interest that, at the time of its making, so far tended to subject the declarant to criminal liability that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true" is admissible as an exception to the hearsay rule when the declarant is unavailable as a witness. Section 8-6 (4) further provides that, "[i]n determining the trustworthiness of a statement against penal interest, the court shall consider (A) the time the statement was made and the person to whom the statement was made, (B) the existence of corroborating evidence in the case, and (C) the extent to which the statement was against the declarant's penal interest."

In determining whether a statement is admissible under the hearsay exception for declarations against penal interest, the trial court must engage in a two step analysis. See, e.g., *State* v. *Savage*, 34 Conn. App. 166, 172, 640 A.2d 637, cert. denied, 229 Conn. 922, 642 A.2d 1216 (1994); see also *United States* v. *Barrett*, 539 F.2d 244, 251 (1st Cir. 1976) (applying two step analysis under Fed. R. Evid. 804 [b] [3]); *United States* v. *Bagley*, 537 F.2d 162, 165 (5th Cir. 1976) (same), cert. denied, 429 U.S. 1075, 97 S. Ct. 816, 50 L. Ed. 2d 794 (1977). First, the court must determine whether the statement at issue is actually against the declarant's penal interest.

See, e.g., *United States* v. *Brainard*, 690 F.2d 1117, 1124 (4th Cir. 1982) (whether statement is against penal interest is threshold inquiry). If the court concludes that it is, then the court proceeds to the second step under which it must determine the trustworthiness of the statement by "consider[ing] all of the relevant factors and determin[ing] whether the statement presents sufficient indicia of reliability to justify its admission." *State* v. *Smith*, 289 Conn. 598, 631, 960 A.2d 993 (2008).

In *State* v. *Gold*, 180 Conn. 619, 431 A.2d 501, cert. denied, 449 U.S. 920, 101 S. Ct. 320, 66 L. Ed. 2d 148 (1980), we formally adopted the definition of statement against penal interest contained in rule 804 (b) (3) of the Federal Rules of Evidence, stating: "We are persuaded of the logic and soundness of [rule 804 (b) (3)] and the trend to reject a narrow and inflexible definition of a statement against penal interest in favor of a definition which includes not only confessions, but other remarks which would tend to incriminate the declarant were he or she the individual charged with the crime." Id., 642. Under this definition, statements that are "*exceedingly inculpatory*, but [fall] short of being a confession," may qualify for admission. (Emphasis added.) Id., 642–43. In addition, statements that strengthen the impression that the declarant has an "insider's knowledge of the crime" may be admissible, as are other statements that strongly imply the declarant's personal participation in a crime. See *United States* v. *Barrett*, supra, 539 F.2d 249 (declarant's statement that he was "going to have some trouble from the people from California" with respect to alleged stamp theft and that "[the defendant] wasn't involved," but that "it was [another party]," evidenced insider's knowledge of crime and was therefore admissible [internal quotation marks omitted]); *United States* v. *Alvarez*, 584 F.2d 694, 699–700 (5th Cir. 1978) (declarant's statement that he was calling defendant to set up drug trans-

action constituted statement against penal interest). Although our definition of "against penal interest" encompasses more than confessions to crimes, it is not without limits and "does not provide that any statement which 'possibly could' or 'maybe might' lead to criminal liability is admissible; on the contrary, only those statements that 'so far tend to subject' the declarant to criminal liability, such that 'a reasonable person would not have made it unless it were true' are admissible." *United States* v. *Butler*, 71 F.3d 243, 253 (7th Cir. 1995); see also Conn. Code Evid. § 8-6 (4). In determining whether this standard is met, the statement must be examined "in light of all the surrounding circumstances." *Williamson* v. *United States*, supra, 512 U.S. 604; see also *State* v. *Lopez*, 254 Conn. 309, 316, 757 A.2d 542 (2000).

In the present case, the trial court concluded that Bryant's statements were "clearly against his penal interest." Specifically, the trial court stated: "Bryant places himself in Belle Haven, on the night of the murder, in the company of [the victim], discussing assaulting [the victim] with Hasbrouck and Tinsley and in possession of golf clubs belonging to the Skakel family. Efforts to explain away possible physical evidence indicate a consciousness of guilt. . . . Bryant attempts to explain away the possibility that his fingerprints might be found on the murder weapon or another golf club nearby. . . .

"Considered with the fact that Bryant has asserted his [privilege against self-incrimination] after being served with a subpoena to testify at a deposition, the totality of circumstances indicates that . . . Bryant's story is against his penal interest."

I

The first issue is whether the trial court abused its discretion in concluding that Bryant's statements were "against [his] penal interest" within the meaning of

Conn. Code Evid. § 8-6 (4). As a preliminary matter, I note that it is undisputed that Hasbrouck's and Tinsley's alleged statements to Bryant are against their penal interests. Because Hasbrouck and Tinsley have invoked the privilege against self-incrimination and, thus, are unavailable as witnesses, those statements would be admissible if Bryant were to testify to them, as long as the statements satisfied the requirement of trustworthiness set forth in Conn. Code Evid. § 8-6 (4). Bryant, however, also has asserted his privilege against self-incrimination and refuses to testify in the present case. Thus, all we have before us is Bryant's unsworn statements made to various individuals and those contained in video recordings, all of which constitute hearsay. Therefore, Bryant's statements regarding Hasbrouck's and Tinsley's alleged statements to him constitute hearsay within hearsay, or double hearsay. "Hearsay within hearsay is admissible only if each part of the combined statements is independently admissible under a hearsay exception." Conn. Code Evid. § 8-7; see also *State* v. *Lewis*, 245 Conn. 779, 802, 717 A.2d 1140 (1998) ("[w]hen a statement is offered that contains hearsay within hearsay, each level of hearsay must itself be supported by an exception to the hearsay rule in order for that level of hearsay to be admissible"). Accordingly, the admissibility of any of Bryant's statements turns on whether they are against Bryant's penal interest.

Our standard of review is well settled. On appeal, "[w]e review the trial court's decision to admit evidence, if premised on a correct view of the law . . . for an abuse of discretion." *State* v. *Saucier*, 283 Conn. 207, 218, 926 A.2d 633 (2007). "The trial court has wide discretion to determine the relevancy [and admissibility] of evidence . . . ." (Internal quotation marks omitted.) *State* v. *Cecil J.*, 291 Conn. 813, 818, 970 A.2d 710 (2009). As such, "[w]e will make every reasonable presumption in favor of upholding the trial court's ruling

. . . ." (Internal quotation marks omitted.) Id. "In determining whether there has been an abuse of discretion, the ultimate issue is whether the court could reasonably conclude as it did." *State* v. *Orr*, 291 Conn. 642, 667, 969 A.2d 750 (2009).

In my view, the trial court abused its discretion in concluding that Bryant's statements were against his penal interest within the meaning of Conn. Code Evid. § 8-6 (4). A review of the Bryant evidence reveals that *none* of his statements "*so far* tend[ed] to subject" him to criminal liability. (Emphasis added; internal quotation marks omitted.) *United States* v. *Butler*, supra, 71 F.3d 253. Indeed, it is doubtful that Bryant's statements even "possibly could" or "might maybe" lead to criminal liability. (Internal quotation marks omitted.) Id. As the trial court aptly stated, Bryant's statements "are merely claims of information [about] a crime accompanied by his alibi." Moreover, the trial court explicitly found that Bryant's statements were only "*minimally* against his interest." (Emphasis added.) Neither this court nor the Appellate Court ever has held such innocuous statements to be admissible under the hearsay exception for statements against penal interest. In fact, the only Connecticut appellate decisions in which statements were held to qualify for admission under this hearsay exception are those in which the statements at issue somehow *directly* implicated the declarant in a crime. See, e.g., *State* v. *Smith*, supra, 289 Conn. 632 (declarant's statements were against his penal interest because they directly implicated him in unsolved murder and included chilling detail); *State* v. *Camacho*, 282 Conn. 328, 358–60, 924 A.2d 99 (declarant's dual inculpatory statement admitting that he had instructed defendant to kill two people and helped defendant flee after murders was admissible under Conn. Code Evid. § 8-6 [4]), cert. denied, 552 U.S. 96, 128 S. Ct. 388, 169 L. Ed. 2d 273 (2007); *State* v. *Pierre*, 277 Conn. 42, 68–69, 890 A.2d

474 (dual inculpatory statement in which declarant provided grisly details of both his own actions and accomplice's actions in murder was against declarant's penal interest because statement squarely implicated him in crime), cert. denied, 547 U.S. 1197, 126 S. Ct. 2873, 165 L. Ed. 2d 904 (2006); *State* v. *Rivera*, 268 Conn. 351, 368, 844 A.2d 191 (2004) (declarant's "statement was squarely against [his] penal interest . . . [because he] admitted his participation in a burglary that had given rise to a homicide"); *State* v. *Lopez*, supra, 254 Conn. 317 (declarant's confession to murder was against his penal interest); *State* v. *Schiappa*, 248 Conn. 132, 155, 728 A.2d 466 (declarant's dual inculpatory statement was squarely against his penal interest because he admitted his own participation in crime), cert. denied, 528 U.S. 862, 120 S. Ct. 152, 145 L. Ed. 2d 129 (1999); *State* v. *Bryant*, 202 Conn. 676, 696, 523 A.2d 451 (1987) (declarant's statement that he committed burglary but not sexual assault was "in a very real sense self-incriminatory and unquestionably against interest" [internal quotation marks omitted]); *State* v. *Gold*, supra, 180 Conn. 632, 639 (declarant's confession to murder held admissible as statement against penal interest); *State* v. *Savage*, supra, 34 Conn. App. 174 (declarant's statement that he was in possession of bag of heroin, "but it was purchased not by or from [the defendant]" was statement against declarant's penal interest [internal quotation marks omitted]); *State* v. *Lynch*, 21 Conn. App. 386, 389, 398, 574 A.2d 230 (declarant's dual inculpatory statement that "the only way that you're going to get this transaction through [the] town planning and zoning [commission] . . . is to cobroke this commission with [the defendant] . . . [who will], in turn . . . take care of [the declarant]," held admissible as statement against penal interest [internal quotation marks omitted]), cert. denied, 216 Conn. 806, 580 A.2d 63 (1990); cf. *State* v. *Rosado*, 218 Conn. 239, 243, 246–50,

588 A.2d 1066 (1991) (declarant's statements that drugs were hers and that defendant had nothing to do with it were against her penal interest, although not sufficiently trustworthy to be admitted).[4]

In the present case, none of Bryant's statements, when viewed in context, implicates *Bryant* in a crime. Therefore, there is no legal precedent for their admission. In addition, I conclude that the trial court's specu-

[4] The dissent fails to cite to a single case from our jurisdiction, or any other, for that matter, in which a statement was held to be against the declarant's penal interest when that statement did not actually implicate the declarant in a crime. Indeed, no such case exists in Connecticut. Rather, the dissent relies heavily on certain broad statements contained in *State* v. *Bryant*, supra, 202 Conn. 676, while completely ignoring the facts in *Bryant* that gave rise to those statements. Specifically, in *Bryant*, the declarant's statements were held to be against his penal interest *because he admitted to committing felony burglary*. See id., 696. Similarly, the dissent relies on the Iowa Supreme Court's decision in *State* v. *Paredes*, 775 N.W.2d 554 (Iowa 2009), for the proposition that a statement may be admissible under the hearsay exception for statements against penal interest even though the declarant explicitly denies responsibility for the crime. Again, however, the dissent has failed to disclose the factual basis for the court's ruling. In *Paredes*, the defendant was convicted of child endangerment after his infant child was diagnosed with shaken baby syndrome. Id., 557. On appeal, the Iowa Supreme Court held that the trial court abused its discretion in declining to admit various statements that were made by the infant's mother as statements against penal interest. Id., 570. In particular, the court held that, although the mother denied hurting the infant, she previously had admitted that she and the defendant were the infant's only caregivers; id., 568–69; and stated that the defendant "did not do it . . . ." (Internal quotation marks omitted.) Id., 568. Accordingly, the court concluded that, "by making statements tending to exculpate [the defendant], [the mother] was indirectly implicating herself as the person who caused the injuries." Id., 569. In the present case, there are no comparable admissions to anything remotely criminal. It is undisputed that the hearsay exception for statements against penal interest includes "not only confessions" but also statements that are "*exceedingly inculpatory*, but [fall] short of being a confession . . . ." (Emphasis added.) *State* v. *Gold*, supra, 180 Conn. 642–43. It is disputed, however, whether the statements at issue in the present case are sufficiently inculpatory to qualify for admission under that standard. The dissent fails to cite to any legal authority supporting the admission of statements, like Bryant's, that are, as the trial court accurately described, "*minimally* against his interest."(Emphasis added.)

lation as to Bryant's alleged consciousness of guilt regarding "the possibility that his fingerprints might be found on the murder weapon" is not supported by the record. I further conclude that the trial court's characterization of Bryant's statements as "discussing assaulting [the victim] with Hasbrouck and Tinsley" inaccurately and unfairly suggests that Bryant made self-inculpatory statements during those discussions, when, in fact, the record reveals the opposite. Accordingly, I conclude that the trial court's conclusion that the Bryant evidence would have been admissible was not reasonable in view of the legal landscape and factual circumstances of the present case. I therefore conclude that the trial court abused its discretion.

First, Bryant's statement that he was in Belle Haven on the night of the murder is not against his penal interest within the meaning of Conn. Code Evid. § 8-6 (4) because (1) his presence, alone, does not so far tend to subject him to criminal liability for the victim's murder, especially in light of the fact that Bryant states, and the record reflects, that *many* people were in Belle Haven that night,[5] and (2) Bryant specifically states that he took a train back to Manhattan, New York, from the town of Greenwich, which departed around 9:35 p.m., before the victim was murdered. Thus, when viewed in context, the totality of circumstances indicates that, although Bryant may have been in Belle Haven on the evening of the murder, Bryant places himself either on a train or in Manhattan at the *time* of the murder,

---

[5] Bryant stated that there could have been ten to fifteen teenagers socializing in the meadow around 9 p.m. on the night of the murder. In addition, Andrew Pugh, a witness that the state called at the petitioner's criminal trial, testified that, between approximately 6 and 7:30 p.m., he was behind the Skakels' house with "ten or twelve" neighborhood children. Maria Coomaraswamy-Falkenstein, another witness, also testified at the hearing on the petition for a new trial that she had observed "a large group" of people near the Skakels' house, and that the group split up and reassembled within the neighborhood throughout the night.

thereby completely ruling out the possibility of his participation in the crime.

In my view, it was illogical for the trial court to conclude that Bryant's statement that he was in Belle Haven on the night of the murder was against his penal interest. Taken to the extreme, the trial court's logic would dictate that every out-of-court statement made by an eyewitness to a crime would constitute a statement against penal interest simply because the eyewitness was present at the scene of the crime, without regard to any temporal considerations. Further, under this scheme, all such statements would be admissible under the hearsay exception for statements against penal interest if the witness is unavailable to testify. This, of course, is illogical and not the law.

Second, I conclude that Bryant's statement that he picked up one of the Skakels' golf clubs, "swung it," and "[slung] it back to where the bag . . . was" also does not constitute a statement against his penal interest. Notably, Bryant does not state that he touched *the* golf club used in the murder. Indeed, if Bryant's statements are to be believed, it would not have been possible for him to have made such a statement because he claimed not even to know how the victim was murdered.[6] Thus, at the time of his statement, Bryant would not have known that handling one of the Skakels' golf clubs could be against his penal interest.[7] This fact

[6] Specifically, Bryant stated: "I never wanted to know. . . . To this day, I have never looked at any autopsy reports. I have never read any books, any magazine articles. I don't want to know."

[7] The dissent states that "it is perfectly clear that [Bryant], like virtually everyone else with any connection to this high profile case, generally was aware that the victim had been beaten to death." Footnote 47 of the dissenting opinion. Even if Bryant was so aware, it does not change the fact that he claimed to be unaware of the *instrumentality* used to commit the murder. Many objects can be used to bludgeon, such as a baseball bat or a hammer. If Bryant is to be believed, he could not have known that handling one of the Skakels' golf clubs could be any more against his penal interest than handling one of the Skakels' tools or other household items. Thus, the rationale for admitting the statement as a statement against penal interest

alone undercuts the trial court's speculation concerning Bryant's alleged consciousness of guilt regarding "the possibility that his fingerprints might be found on the murder weapon," and the rationale on which Conn. Code Evid. § 8-6 (4) is founded. See *State* v. *Bryant*, supra, 202 Conn. 696 ("it is not the fact that the declaration is against interest but the awareness of that fact by the declarant [that] gives the statement significance" [internal quotation marks omitted]); see also *State* v. *Rivera*, supra, 268 Conn. 368–69 (fact that declarant drove witness to remote location before making statement, told witness that he and defendant had done something wrong and admonished witness not to repeat statement clearly established that declarant "reasonably could have foreseen" that statement was against his penal interest).

In addition, even if Bryant knew how the victim was murdered, his statements regarding the Skakels' golf clubs, when viewed in context, demonstrate that those statements are insufficiently against his penal interest to be admitted pursuant to Conn. Code Evid. § 8-6 (4). Specifically, Bryant stated that "[e]*verybody* in Belle Haven touched those clubs," and that "those clubs went through *tons of people's hands.*" (Emphasis added.) Accordingly, Bryant's statements no more implicate Bryant in the victim's murder than "[e]verybody in Belle Haven . . . ." This is insufficient to qualify as a statement against penal interest, especially in light of the fact that Bryant states that he was not in Belle Haven at the time of the murder.

Finally, I disagree with the trial court's characterization of Bryant's statements as an admission that Bryant "discuss[ed] assaulting [the victim] with Hasbrouck and

does not apply. If, however, the dissent is suggesting that Bryant knew that one of the Skakels' golf clubs was, in fact, the murder weapon, then Bryant's conflicting statements reveal that he is untruthful and, as such, his statements are not trustworthy.

Tinsley" because it inaccurately and unfairly implies that Bryant made *self*-inculpatory statements during those discussions, when, in fact, he did not. Quite the opposite, Bryant makes it clear that it was Hasbrouck who was "obsessed" with the victim and who "talked about her, and that was [Hasbrouck's] main focus." Moreover, Bryant stated that Hasbrouck's and Tinsley's alleged comments on the night of the murder made him "uncomfortable," made his decision to go home "a lot easier" and that he "didn't want any part of it." Bryant further distances himself from Hasbrouck and Tinsley by stating that he "didn't goad anybody into doing anything," and, in contrast, often discouraged Hasbrouck by telling him "[y]ou need to think about something else. You need to think about somebody else that is more obtainable, because it is not going to happen [with her]. She's not even interested in you." In sum, the totality of Bryant's statements reveals that, although Hasbrouck and Tinsley allegedly talked about going "caveman style," Bryant never had any interest in or participated in Hasbrouck's or Tinsley's fantasy.

The problem with the trial court's characterization of Bryant's statements is that the court failed to consider Bryant's *role* in the discussions and what Bryant *actually said*. It is evident that the determination of whether a statement is against a declarant's penal interest requires an examination of the declarant's *actual statement*, and not just its context. In the present case, however, the trial court apparently leaped to the conclusion that Bryant's statements regarding the discussions were against *his* penal interest simply because he was present while Hasbrouck and Tinsley were making statements against *their* penal interests. This was unreasonable and improper.[8]

---

[8] The dissent mischaracterizes my analysis of Bryant's statements by incorrectly stating that I examine each of Bryant's disserving statements "in isolation" and "out of the context in which they actually were spoken . . . ." If I had analyzed Bryant's statements in this simplistic manner, then my analysis may have proceeded in the following manner: Bryant states he was

In concluding that the trial court abused its discretion in admitting the Bryant evidence, I also note that cases in this jurisdiction and various federal jurisdictions have held that statements that were far more inculpatory than Bryant's statements were not sufficiently against the declarant's penal interest to be admissible. See, e.g., *United States* v. *Bonty*, 383 F.3d 575, 579–80 (7th Cir. 2004) (declarant's statement that codefendant "had nothing to do with the [sexual assault]" was not against declarant's penal interest because declarant denied sex-

---

in Belle Haven on the night of the murder. Simply being present in Belle Haven is not a crime. Thus, the statement was not against Bryant's penal interest. Clearly, my analysis does not proceed in the crude fashion that the dissent suggests. Rather, as the foregoing analysis reveals, I have given due deference to the context of Bryant's statements, and that context renders the statements insufficiently against Bryant's penal interest to be admissible under Conn. Code Evid. § 8-6 (4). Specifically, Bryant qualified his statements with assertions that he was not in Belle Haven at the time of the murder, that many people were in Belle Haven on the night of the murder, that *everybody* in Belle Haven touched the Skakels' golf clubs, that he did not know how the victim was murdered, and that he "didn't want any part of" Hasbrouck and Tinsley's alleged plan. All of these assertions provide context for Bryant's statements and expose them for what the trial court recognized as being "[mere] claims of information [about] a crime accompanied by [Bryant's] alibi."

The dissent ignores this *actual* context and, instead, relies on an inaccurate and hyperbolic summary of the "context" of Bryant's statements. Specifically, the dissent describes the context as follows: "Bryant places himself at the scene of the crime, in the company of the victim, shortly before the murder, holding the possible murder weapon, and discussing an attack on the victim with the two persons—both of whom Bryant had introduced and brought to Belle Haven—who, shortly after the victim's murder, boasted about having committed the crime." What is most disturbing about this characterization is that the dissent, in its zeal to find the Bryant evidence admissible, has stretched the "facts" to the point where they are no longer supported by the evidence. The *actual* facts contained in the record reveal that Hasbrouck and Tinsley *never* "boasted about having committed *the crime*," that is, the victim's murder. (Emphasis added.) To the contrary, Bryant explicitly stated that Hasbrouck and Tinsley *never* confessed to murdering the victim and *never* disclosed any details about their alleged involvement in her murder. Indeed, Hasbrouck's and Tinsley's alleged comments *never* contained any mention of the victim by name and were always couched in vague terms, such as, "I got mine," "[w]e did it," and "[w]e achieved our fantasy."

ually assaulting victim, even though he admitted to picking up victim at shopping mall and taking her to his home, where assault occurred); *United States* v. *Butler,* supra, 71 F.3d 243, 252–53 (declarant's statement that he was in room when police arrived and found guns was not against declarant's penal interest because declarant "did not admit to anything remotely criminal"); *State* v. *Snelgrove,* 288 Conn. 742, 769, 954 A.2d 165 (2008) (declarant's statement that victim "got what she deserved" was not against penal interest because it did not imply that declarant was responsible for victim's death, even though declarant subsequently confessed to murder [internal quotation marks omitted]); *State* v. *Bryant,* 61 Conn. App. 565, 574, 767 A.2d 166 (2001) (declarant's admission that he shot victim was not against his penal interest because he claimed that it was in self-defense and declarant "must have known that people at the scene had seen him fire a gun at [the victim]"); *State* v. *Jones,* 46 Conn. App. 640, 648, 700 A.2d 710 (declarant's statement that friend told declarant "[a third party] had shot [the victim] last night" was not against declarant's penal interest, even though declarant admitted involvement in murder [internal quotation marks omitted]), cert. denied, 243 Conn. 941, 704 A.2d 797 (1997); *State* v. *Watkins,* 14 Conn. App. 67, 74, 540 A.2d 76 (declarant's written statement that he owned car in which shotgun was found but did not know shotgun was there could not be considered against his penal interest), cert. denied, 208 Conn. 804, 545 A.2d 1102 (1988).

In the present case, Bryant does not admit to or intimate any involvement with any crime. Instead, Bryant merely points the finger at Hasbrouck and Tinsley while claiming that he, himself, is totally innocent. In addition, Bryant's statements do not strengthen the impression that he has an "insider's knowledge of the [crime]." *State* v. *Bryant,* supra, 202 Conn. 695. To the

contrary, Bryant specifically states that he was not present when the murder occurred and "never wanted to know" how the victim was murdered and "[t]o this day . . . [has] never looked at any autopsy reports . . . read any books . . . [or] magazine articles" that described the murder. Furthermore, Bryant states that Hasbrouck and Tinsley never confessed to murdering the victim and never disclosed any details about their alleged involvement in her murder. Indeed, Hasbrouck and Tinsley never mentioned the victim by name in their alleged comments to Bryant, and their comments always were couched in vague terms, such as, "[w]e did it," "[w]e achieved our fantasy," "[w]e achieved the caveman," and "[w]e got the girl caveman style." Thus, Bryant's statements reveal that he lacked not only an insider's knowledge of the crime but also knowledge of details of the crime that were publicly available. Under these circumstances, it was unreasonable for the trial court to conclude that the Bryant evidence would be admissible as statements against penal interest under Conn. Code Evid. § 8-6 (4). Accordingly, I conclude that the trial court abused its discretion in concluding that Bryant's statements would be admissible. Consequently, I also conclude that the petitioner is not entitled to a new trial because the Bryant evidence would not be admissible and, therefore, could not produce a different result at a new trial.

## II

In light of the dissent's conclusion that the Bryant evidence satisfies the definition of a statement against penal interest within the meaning of Conn. Code Evid. § 8-6 (4), I next address the trustworthiness factors enumerated in Conn. Code Evid. § 8-6 (4), which comprise step two of the two part test for determining the admissibility of declarations against penal interest. See, e.g., *State* v. *Savage*, supra, 34 Conn. App. 171–72. A review of Bryant's statements reveals that the trial court

abused its discretion in concluding that they were sufficiently trustworthy to be admitted under Conn. Code Evid. § 8-6 (4).

The first trustworthiness factor requires the court to consider "the time the statement was made and the person to whom the statement was made . . . ." Conn. Code Evid. § 8-6 (4). With regard to the timeliness prong, in general, a prompt declaration is considered to be indicative of trustworthiness, whereas delayed statements typically are deemed to be untrustworthy. See, e.g., *State* v. *Lopez*, supra, 254 Conn. 317. In the present case, the trial court found that, "[a]lthough Bryant acquired his information within days of the offense, he . . . kept it to himself for [more than one] quarter of a century . . . [and] [o]n finally disclosing [it], he insisted [on] anonymity [and] . . . did not come forward voluntarily . . . ."

Neither the trial court, the petitioner nor the dissent has identified any legal authority, from this jurisdiction or any other, that supports a finding of trustworthiness with respect to a statement that was made more than two years following the crime that is the subject of the statement, let alone one that was made more than *twenty-five years* later, such as the statements in the present case. Although the trial court identified various reasons for the delay, those reasons do not make Bryant's statements any more timely or trustworthy. Moreover, several of the reasons that the trial court and the dissent cite are speculative and presume facts not in evidence, or otherwise lack support. Specifically, both the trial court and the dissent refer to the fact that Bryant has a law degree and, therefore, *somehow* had knowledge that there was no statute of limitations for murder in Connecticut in 1975. In addition, both the trial court and the dissent rely on Bryant's conclusory statement to Vito Colucci, the petitioner's private investigator, that it would have been "easier" for the state

to have convicted Bryant than the petitioner. Neither of these reasons has merit; nor do they support a finding of trustworthiness.

First, just because Bryant obtained a law degree from the University of Tennessee Law School does not necessarily mean that he had any knowledge of whether Connecticut had a statute of limitations for murder in 1975. Indeed, Bryant never passed *any* state's bar examination, let alone Connecticut's. The trial court's and the dissent's conclusion is further flawed because, even if Bryant was well versed in Connecticut law when he made his statements in the early 2000s, he would have known that, in 1975, *Connecticut had a five year statute of limitations for murder.* See General Statutes (Rev. to 1975) § 54-193. Moreover, in making his statements, Bryant would have been further comforted by the fact that this court, in *State* v. *Paradise,* 189 Conn. 346, 350, 456 A.2d 305 (1983), held that the 1976 amendment to General Statutes (Rev. to 1975) § 54-193; Public Acts 1976, No. 76-35, § 1 (P.A. 76-35); "which excepted all class A felonies, including murder, from the purview of § 54-193, did not apply retroactively to offenses committed prior to April 6, 1976, the effective date of P.A. 76-35." *State* v. *Skakel,* 276 Conn. 633, 664, 888 A.2d 985, cert. denied, 549 U.S. 1030, 127 S. Ct. 578, 166 L. Ed. 2d 428 (2006). Our decision in *Paradise* remained the law in this state for twenty-three years, including during the time frame in which Bryant made his statements, and was not overruled until 2006 with respect to offenses for which the preamendment limitation period had not yet expired when P.A. 76-35 became effective. *State* v. *Skakel,* supra, 666, 693. Thus, unless Bryant was clairvoyant and foresaw our 2006 decision in *Skakel* when he made his statements, we must presume that Bryant believed that there was a five year statute of limitations that had long since expired with respect to the victim's murder.

The second prong of the first trustworthiness factor "require[s] that the witness testifying [about] the [declarant's] statement . . . be one in whom the declarant would naturally confide." (Internal quotation marks omitted.) *State* v. *Lopez*, supra, 254 Conn. 317–18. The rationale is that "[a]cknowledgment of criminal activity is generally made only to confidants or to persons in whom the declarant imposes trust." *United States* v. *Goins*, 593 F.2d 88, 91 (8th Cir.), cert. denied, 444 U.S. 827, 100 S. Ct. 52, 62 L. Ed. 2d 35 (1979).[9] Thus, "[t]here must be a relationship in which the two parties to the conversation had a close and confidential relationship." *State* v. *Rivera*, 221 Conn. 58, 70, 602 A.2d 571 (1992). "[T]he burden of establishing the requisite relationship rests on the proponent of the statement." *State* v. *Lopez*, supra, 254 Conn. 318.

In the present case, Bryant initially disclosed his story to Crawford Mills, Bryant's former classmate. Although the trial court initially described Mills as "a friend that [Bryant] trusted," the trial court later clarified that their relationship was one of mere "former junior high school classmates [who] . . . maintained only *casual* contact over the years." (Emphasis added.) In addition, Bryant had absolutely no relationship with the petitioner's cousin, Robert Kennedy, Jr., or Colucci, prior to making his subsequent revelations to them. Accordingly, because Bryant did not have a close and confidential relationship with the persons to whom he made his statements, it is unlikely that Bryant actually believed those statements were against his penal interest, and the evidence in the record does not support a finding that this factor weighs in favor of admissibility. See *State* v. *Lopez*, supra, 254 Conn. 318–19 (nine year rela-

---

[9] The converse of this rationale also is generally true, that is, if a declarant makes a statement to a person with whom he does not share a close and confidential relationship, then it is unlikely that the declarant's statement was against his penal interest.

tionship insufficient to satisfy trustworthiness factor because relationship was not close and confidential); see also *State* v. *Hernandez*, 204 Conn. 377, 393, 528 A.2d 794 (1987) (trustworthiness factor not satisfied when declarant's statement was made to stranger).

The second trustworthiness factor requires the court to examine "the existence of corroborating evidence in the case . . . ." Conn. Code Evid. § 8-6 (4). We repeatedly have emphasized that "[t]he corroboration requirement for the admission of a third party statement against penal interest is significant and *goes beyond minimal corroboration*." (Emphasis in original; internal quotation marks omitted.) *State* v. *Lopez*, supra, 254 Conn. 319; accord *State* v. *Rivera*, supra, 221 Conn. 71; *State* v. *Rosado*, supra, 218 Conn. 249; *State* v. *Bryant*, supra, 202 Conn. 700. Accordingly, "the statement must be accompanied by corroborating circumstances that *clearly indicate* the statement's trustworthiness." (Emphasis in original.) *State* v. *Lopez*, supra, 319.

It is clear from the trial court's treatment of this factor, and its failure to reference the foregoing legal standard, that this standard was neither applied nor satisfied. Rather than examining whether Bryant's accusations implicating Hasbrouck and Tinsley were corroborated, the trial court based its finding of corroboration on a host of peripheral findings that have no bearing on whether Hasbrouck and Tinsley committed the murder.[10] Moreover, the trial court explicitly found that "[t]he corroboration for Bryant's claim is *minimal*" and

---

[10] Specifically, the trial court relied on the following "corroborating evidence," much of which was not *independently* corroborated but, rather, corroborated by Bryant's own prior statements: "Bryant went to . . . Brunswick School . . . and was classmates with the children in the Belle Haven neighborhood.

"Several witnesses, including . . . Mills and [childhood friend] Neal Walker, confirm[ed] that Bryant socialized [in] Belle Haven.

"At the hearing [on the petition for a new trial], witnesses confirm[ed] that Bryant [previously had] indicated that he [had been] present in Belle Haven on the night of the murder.

"[t]he . . . Bryant [evidence] is *absent any genuine corroboration.*"[11] (Emphasis added.) These explicit

"One witness recall[ed] seeing . . . Hasbrouck and . . . Tinsley in Belle Haven with Bryant during the fall of 1975.

"Both Hasbrouck and Tinsley admitted to [Kennedy] that they had been in Belle Haven with Bryant on several occasions.

"Bryant also provide[d] detailed descriptions of the layout of Belle Haven, including accurate recitations of where people in the neighborhood lived.

"According to Bryant, Hasbrouck was [six feet, two inches tall], at least 200 pounds on the date of the homicide, and 'very strong.'

"Bryant stated that . . . Hasbrouck was obsessed with [the victim] . . . and [that he] 'wanted to go caveman on her,' meaning that he would club her, drag her away by the hair and sexually assault her.

"On the night of the murder, Bryant stated that he, Hasbrouck and Tinsley walked around Belle Haven with golf clubs from the [Skakels'] residence, with Hasbrouck stating that he had his 'caveman club' and that he would not leave Belle Haven unsatisfied.

"The victim had suffered multiple and severe injuries to her head and stab wounds to her neck [that] were consistent with being caused by a piece of golf club shaft. Pieces of the golf club found near the victim's body were the same brand of golf club found at the [Skakels'] residence. Evidence presented at the petitioner's criminal trial shows that these clubs were commonly left about the [Skakels'] property."

[11] The trial court based these conclusions on the following findings of fact: "Of all the persons in Bryant's circle of Greenwich acquaintances at the time, none of them, other than [Neal] Walker and Mills, recalled [Hasbrouck and Tinsley]. Not even [the victim's] closest friends have any recollection of any association between [the victim] and Bryant, Hasbrouck and Tinsley. No one puts [the victim] in the company of Bryant and his companions on the night of [the murder]. There is no testimony that [Bryant, Hasbrouck or Tinsley] were in [the] company [of the victim] on any other occasion. Importantly, witnesses testify as to [the victim's] activities until 9:30 p.m. No one has any recall of ever seeing Bryant and [Hasbrouck and Tinsley] in Belle Haven on the night of the murder.

"The claim that Hasbrouck and Tinsley went 'caveman style' is not supported by the evidence. There was no evidence of the victim being dragged by [her] hair. Missing from Bryant's statement is anything concerning the breaking of the [golf] club or the stabbing of the victim."

The dissent, in contravention of this court's role as an appellate tribunal; see, e.g., *Saunders* v. *Firtel*, 293 Conn. 515, 535, 978 A.2d 487 (2009) ("[A]ppellate courts do not examine the record to determine whether the trier of fact could have reached a different conclusion. Instead, [they] examine the trial court's conclusion in order to determine whether it was legally correct and factually supported. . . . This distinction accords with [an appellate tribunal's] duty . . . to review, and not to retry, the proceedings of the trial court." [Internal quotation marks omitted.]); ignores these findings of fact that support the trial court's explicit conclusion that "[t]he . . . Bryant [evidence] is *absent any genuine corroboration.*" (Emphasis added.) These findings, of course, are dispositive of the admissibility of the Bryant evidence.

findings are wholly inconsistent with our legal standard that requires a level of corroboration that *"goes beyond minimal corroboration."* (Emphasis in original; internal quotation marks omitted.) *State* v. *Lopez,* supra, 254 Conn. 319. Accordingly, the trial court's conclusion that this requirement was satisfied was erroneous as a matter of law. See, e.g., *State* v. *Saucier,* supra, 283 Conn. 218 (plenary review applies to trial court's admission of evidence based on its interpretation of Code of Evidence).

The third and final trustworthiness factor requires the court to examine "the extent to which the statement was against the declarant's penal interest." Conn. Code Evid. § 8-6 (4). Although the trial court, prior to analyzing this factor, conclusorily stated that Bryant's statements were "clearly against his penal interest," the trial court later contradicted itself and concluded that, "[o]*n analysis,* [Bryant's statements] are merely claims of information of a crime accompanied by his alibi. The statements appear to be *minimally* against his interest." (Emphasis added.) As I discussed in part I of this opinion, for a statement to qualify as a declaration against penal interest within the meaning of Conn. Code Evid. § 8-6 (4), it must be *"exceedingly inculpatory"*; (emphasis added) *State* v. *Gold,* supra, 180 Conn. 644; such that it *"so far tended* to subject the declarant to criminal liability . . . ." (Emphasis added.) Conn. Code Evid. § 8-6 (4). Thus, on the basis of the trial court's own conclusion, and for the reasons set forth in part I

Rather than conceding this point and accepting these findings of fact, the dissent relies on its own selection of facts that it has culled from the case file and exhibits. In this regard, the dissent, as it aptly states, "violates the bedrock principle of appellate jurisprudence that the trial court, not this court, is the finder of fact, and, consequently, we are bound by those findings unless they are clearly erroneous." Footnote 52 of the dissenting opinion, citing *Key Air, Inc.* v. *Commissioner of Revenue Services,* 294 Conn. 225, 231, 983 A.2d 1 (2009) ("[t]o the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous" [internal quotation marks omitted]).

of this opinion, I conclude that the trial court abused its discretion in concluding that Bryant's statements were sufficiently against his penal interest to be admissible under Conn. Code Evid. § 8-6 (4).

### III

Even if I were to assume, arguendo, that the trial court did not abuse its discretion in determining that portions of the Bryant evidence were against Bryant's penal interest and satisfied the trustworthiness factors, I nonetheless would conclude that the trial court improperly concluded that *all* of the Bryant evidence, rather than only those portions that were against Bryant's penal interest, would have been admissible at a new trial. In concluding that the Bryant evidence would be admissible in its entirety, the trial court stated: "Bryant's statements against penal interest are [admissible], and his self-serving statements go to their weight and will not preclude their admissibility under [the hearsay] exception [for declarations against penal interest]." This ruling was premised on an erroneous interpretation of Conn. Code Evid. § 8-6 (4) and contravenes our decision in *State* v. *Bryant*, supra, 202 Conn. 676, and the United States Supreme Court's decision in *Williamson* v. *United States*, supra, 512 U.S. 594. "To the extent a trial court's admission of evidence is based on an interpretation of the Code of Evidence, our . . . review is plenary." *State* v. *Saucier*, supra, 283 Conn. 218.

### A

In *State* v. *Bryant*, supra, 202 Conn. 696–97, we addressed the issue of whether the hearsay exception for statements against penal interest permitted the admission of narratives that contain both self-inculpatory and self-serving statements. In *Bryant*, the defendant was convicted of burglarizing an apartment, sexually assaulting a woman therein and stealing her pocketbook. Id., 677–78. At trial, the defendant prof-

fered, under the hearsay exception for statements against penal interest, various statements that his brother had made for the purpose of showing that his brother was the actual perpetrator. Id., 689. Specifically, the defendant introduced evidence that his brother had confessed to several witnesses that he had burglarized the apartment and stole the victim's pocketbook. Id., 690. The defendant's brother did not, however, admit to sexually assaulting the victim. Id.

The trial court held that the statements of the defendant's brother were inadmissible because his admission regarding the burglary alone was a "selective declaration against penal interest . . . [that] casts doubt [on] the offense [of sexual assault] as to which there [was] no admission against penal interest." (Internal quotation marks omitted.) Id., 695. On appeal, we held that the trial court improperly precluded the defendant from offering the statements, stating: "In vacuo, one might contend that [the brother's] silence as to the latter charge after direct admissions to the former has self-interest connotations and thus any statement short of a complete confession to both crimes should not be admitted into evidence. Any such claim, however, lacks merit *in this case.* . . . Our view is that [when] the disserving parts of a statement are *intertwined* with self-serving parts, it is more prudential to admit the entire statement and let the trier of fact assess its evidentiary quality in the complete context."[12] (Emphasis added.) Id., 696–97.

---

[12] The dissent incorrectly advocates that we should give greater weight to the dictum in *Bryant* than to its unambiguous holding. In *Bryant*, we commented on the divide among commentators and some courts concerning the problem with statements that are both disserving and self-serving. See *State* v. *Bryant*, supra, 202 Conn. 696–97 n.18. We stated, as a matter of dictum, that we were "*inclined*" to agree—not that we actually agreed—with those commentators that "would admit the entire statement," rather than those who suggested "admitting only the disserving portion of the declaration and excluding the self-serving part where the two parts can be severed." (Emphasis added.) Id. Nevertheless, in the *text* of our opinion, we clearly *held* that it was "[o]ur view . . . that [when] the disserving parts

In the present case, the trial court concluded that the Bryant evidence was admissible in its entirety without discerning whether Bryant's self-inculpatory statements were intertwined with his self-serving statements. The trial court's mistake of law is understandable in light of the fact that, over the years, commentators have incorrectly omitted this requirement from their commentary. See C. Tait, Connecticut Evidence (3d Ed. 2001) § 8.43.2; see also Conn. Code Evid. § 8-6 (4), commentary.[13] Nevertheless, it remains part of the rule in *Bryant.*

Unlike the statements at issue in *Bryant,* in which it was not possible for the court to sever the brother's *silence* as to the sexual assault charge from his confession to the burglary, Bryant's purportedly self-inculpatory statements in the present case are severable from

of a statement are *intertwined* with self-serving parts, it is more prudential to admit the entire statement and let the trier of fact assess its evidentiary quality in the complete context." (Emphasis added.) Id., 696–97. Thus, in *Bryant,* although we mused about certain *inclinations* that we *possibly* could apply in a future case, our holding in that case was limited to a narrative in which the disserving and self-serving statements were intertwined, and it is that holding that is the law that must be applied. My conclusion in this case faithfully applies the holding in *Bryant.*

[13] The commentary to § 8-6 (4) of the Connecticut Code of Evidence provides in relevant part: "When a narrative contains both disserving statements and collateral, self serving or neutral statements, the Connecticut rule admits the entire narrative, letting the 'trier of fact assess its evidentiary quality in the complete context.' *State* v. *Bryant,* supra, 202 Conn. 697; accord *State* v. *Savage,* supra, 34 Conn. App. 173–74." The dissent argues that this commentary is dispositive with respect to how Conn. Code Evid. § 8-6 (4) is to be interpreted. This view, however, is incorrect because the stated purpose of the Code of Evidence was "to maintain *the status quo,* i.e., preserve the common-law rules of evidence *as they existed prior to the adoption of the* [c]ode, [and] its adoption [was] *not intended to modify any prior common-law interpretation of those rules.*" (Emphasis added.) Conn. Code Evid. § 1-2 (a), commentary. Thus, even though the commentary to Conn. Code Evid. § 8-6 (4) incorrectly contains dictum from *Bryant,* it neither binds this court nor abrogates our duty to apply the *actual* holding of *Bryant.* See *State* v. *DeJesus,* 288 Conn. 418, 421, 953 A.2d 45 (2008) (despite adoption of Code of Evidence, appellate courts retain authority to develop and change rules of evidence through case-by-case adjudication).

his self-serving statements. Therefore, only the former are admissible. According to the trial court, Bryant's self-inculpatory statements include the following: On the night of the murder, (1) Bryant was in Belle Haven, (2) Bryant picked up one of the Skakels' golf clubs, "swung it," and "[slung] it back to where the bag . . . was," and (3) at one point, Bryant and the victim were among ten to fifteen teenagers socializing in the meadow.[14] Notably, under the rule in *Bryant*, none of Bryant's statements concerning Hasbrouck and Tinsley[15] would be admissible because they are self-serving, have no bearing on Bryant's penal interest and, most importantly, are not "intertwined" with Bryant's self-inculpatory statements.[16] *State* v. *Bryant*, supra, 202 Conn. 697. Because these statements are the only statements that purportedly serve to exculpate the petitioner, their inadmissibility precludes the granting of a new trial.

B

The trial court's conclusion that the Bryant evidence is admissible in its entirety also is in contravention of

[14] Although I disagree with the trial court that *any* of these statements by Bryant satisfy the definition of against penal interest within the meaning of § 8-6 (4) of the Connecticut Code of Evidence; see part I of this opinion; I include this analysis to demonstrate that, regardless of whether one agrees with my conclusion in part I of this opinion, the portions of the Bryant evidence that exculpate the petitioner and Bryant would not be admissible in any event, and, therefore, the Bryant evidence could not affect the outcome of a new trial.

[15] Those statements include, but are not limited to, the following: (1) Hasbrouck was obsessed with the victim; (2) Hasbrouck and Tinsley discussed "going caveman" before, after and on the night of the murder; (3) Hasbrouck and Tinsley were in Belle Haven on the night of the murder and were carrying golf clubs; and (4) following the murder, Hasbrouck and Tinsley admitted to "achiev[ing] the caveman."

[16] Although the trial court lists among Bryant's self-inculpatory statements that, on the night of the murder, Bryant was "discussing assaulting [the victim] with Hasbrouck and Tinsley," this characterization of Bryant's statements is not supported by the record because it inaccurately and unfairly suggests that Bryant made self-inculpatory statements during those discussions, when, in fact, the record reveals the opposite. See part I of this opinion.

the Supreme Court's decision in *Williamson* v. *United States*, supra, 512 U.S. 594. In *Williamson*, the issue was whether the federal hearsay exception for statements against penal interest; Fed. R. Evid. 804 (b) (3); permits the admission of statements that are not self-inculpatory when they are made in the course of a narrative that also contains self-inculpatory statements. *Williamson* v. *United States*, supra, 599. Resolution of this issue required the court to determine the meaning of the word "statement" as used in the rule. Id. The court noted that the word "statement" could be defined either as "a report or narrative," which connotes an extended declaration, or as "a single declaration or remark." (Internal quotation marks omitted.) Id. Under the first definition, a declarant's entire narrative would be admissible, even if it contains parts that are self-inculpatory and parts that are not self-inculpatory, as "long as in the aggregate the confession sufficiently inculpates [the declarant]." Id. Under the second definition, however, the rule "would . . . cover only those declarations or remarks within [a larger narrative] that are individually self-inculpatory." Id.

The court held that "the principle behind the [r]ule . . . points clearly to the narrower reading. Rule 804 (b) (3) is founded on the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true. This notion simply does not extend to the broader definition of 'statement.' The fact that a person is making a broadly self-inculpatory confession does not make more credible the [parts of the confession that are not self-inculpatory]. One of the most effective ways to lie is to mix falsehood with truth, especially truth that seems particularly persuasive because of its self-inculpatory nature. . . .

"And when part of [a] confession is actually self-exculpatory, the generalization on which [r]ule 804 (b) (3) is founded becomes even less applicable. Self-exculpatory statements are exactly the ones [that] people are most likely to make even when they are false; and mere proximity to other, self-inculpatory, statements does not increase the plausibility of the self-exculpatory statements. . . .

"Nothing in the text of [r]ule 804 (b) (3) or the general theory of the hearsay [r]ules suggests that admissibility should turn on whether a statement is collateral to a self-inculpatory statement. The fact that a statement is self-inculpatory does make it more reliable; but the fact that a statement is collateral to a self-inculpatory statement says nothing at all about the collateral statement's reliability. We see no reason why collateral statements, even ones that are neutral as to interest . . . should be treated any differently from other hearsay statements that are generally excluded. . . .

"In [the court's] view, the most faithful reading of [r]ule 804 (b) (3) is that it does not allow admission of [statements that are not self-inculpatory], even if they are made within a broader narrative that is generally self-inculpatory. The [trial] court may not just assume for purposes of [r]ule 804 (b) (3) that a statement is self-inculpatory because it is part of a fuller confession, and *this is especially true when the statement implicates someone else*." (Citations omitted; emphasis added.) Id., 599–601.

Although rule 804 (b) (3) applies only to self-inculpatory statements, "whether a statement is self-inculpatory or not can . . . be determined [only] by viewing it in context. Even statements that are on their face neutral may actually be against the declarant's interest . . . in light of all the surrounding circumstances." (Internal quotation marks omitted.) Id., 603–604. Thus,

in determining whether a particular statement is admissible under rule 804 (b) (3), a judge must consider the *entire* narrative and other surrounding circumstances rather than analyze each statement in a vacuum.[17]

Although this court has not yet had occasion to formally give its imprimatur to the rule announced in *Williamson* v. *United States,* supra, 512 U.S. 600–601, our previous opinions indicate that the rule should be followed in Connecticut. Specifically, in *State* v. *DeFreitas,* supra, 179 Conn. 451–52, we explicitly stated that "the rule we adopt [with respect to third party statements against penal interest] is in accord with the Federal Rules of Evidence," and, in *State* v. *Gold,* supra, 180 Conn. 643, "we [took] a step further and adopt[ed] the definition of statement against penal interest contained in the Federal Rules of Evidence." It follows, therefore, that our rule should be interpreted in the same manner as the federal rule, especially when the United States Supreme Court in *Williamson* has interpreted the very definition that we formally adopted in *Gold.*[18]

---

[17] In *Williamson,* the court provided several examples of statements that are neutral on their face but that might be against the declarant's penal interest when viewed in context: " 'I hid the gun in Joe's apartment' may not be a confession of a crime; but if it is likely to help the police find the murder weapon, then it is certainly self-inculpatory. 'Sam and I went to Joe's house' might be against the declarant's interest if a reasonable person in the declarant's shoes would realize that being linked to Joe and Sam would implicate the declarant in Joe and Sam's conspiracy. And other statements that give the police significant details about the crime may also, depending on the situation, be against the declarant's interest." *Williamson* v. *United States,* supra, 512 U.S. 603.

[18] I am mindful that the rule in *Williamson* is contrary to the rule in *Bryant* with respect to the admissibility of statements that are not self-inculpatory. *Bryant,* however, predates *Williamson* by about seven years, and this court indicated in *Bryant* no less than four times that *Bryant* was based on the particular circumstances of that case. See *State* v. *Bryant,* supra, 202 Conn. 695–97. In addition, this court never has applied the rule in *Bryant* since it was announced, and the Appellate Court has applied it only once, in *State* v. *Savage,* supra, 34 Conn. App. 173–74, which also was decided before *Williamson.* Furthermore, the statement at issue in *Savage* "incorporate[d] disserving and contextual components, rather than disserving and self-serving components." Id., 173. Thus, the rule in *Bryant* never has been applied

In the present case, the bulk of Bryant's statements are not self-inculpatory and, thus, are inadmissible under the rule in *Williamson*. Of Bryant's many statements, including those contained in an hour long video recording, only three, when viewed in context, could

to a narrative that contains disserving and self-serving parts, which is the type of narrative with which we are presented in the present case. Finally, in *State* v. *Rivera*, supra, 268 Conn. 351, we implicitly called into question the continued viability of the rule in *Bryant*, post-*Williamson*, but determined that the declarant's entire statement therein was admissible under either rule because the "entire statement was self-inculpatory . . . ." Id., 371 n.18.

I note that the dissent has identified four sister state courts that have considered and declined to follow the rule in *Williamson* for purposes of their respective state's hearsay exception for declarations against penal interest. See *People* v. *Newton*, 966 P.2d 563, 578–79 (Colo. 1998); *State* v. *Hills*, 264 Kan. 437, 447, 957 P.2d 496 (1998); *State* v. *Sonthikoummane*, 145 N.H. 316, 320–21, 769 A.2d 330 (2000); *Chandler* v. *Commonwealth*, 249 Va. 270, 279, 455 S.E.2d 219, cert. denied, 516 U.S. 889, 116 S. Ct. 233, 133 L. Ed. 2d 162 (1995). These cases, however, are outliers and merely represent the views of a small minority of jurisdictions. The reality is that the overwhelming majority of states that have considered the rule of *Williamson* have adopted its analysis. See, e.g., *State* v. *Prasertphong*, 206 Ariz. 70, 81–82, 75 P.3d 675 (2003); *Smith* v. *State*, 647 A.2d 1083, 1088 (Del. 1994); *Franqui* v. *State*, 699 So. 2d 1312, 1320 (Fla. 1997), cert. denied, 523 U.S. 1040, 118 S. Ct. 1337, 140 L. Ed. 2d 499 (1998); *State* v. *Averett*, 142 Idaho 879, 890–91, 136 P.3d 350 (App. 2006); *State* v. *Lucky*, 755 So. 2d 845, 857 (La. 1999), cert. denied, 529 U.S. 1023, 120 S. Ct. 1429, 146 L. Ed. 2d 319 (2000); *State* v. *Mutusky*, 343 Md. 467, 490, 682 A.2d 694 (1996); *State* v. *Ford*, 539 N.W.2d 214, 227 (Minn. 1995), cert. denied, 517 U.S. 1125, 116 S. Ct. 1362, 134 L. Ed. 2d 529 (1996); *Williams* v. *State*, 667 So. 2d 15, 19 (Miss. 1996); *State* v. *Castle*, 285 Mont. 363, 372–73, 948 P.2d 688 (1997); *State* v. *Torres*, 126 N.M. 477, 482, 971 P.2d 1267 (1998), overruled in part on other grounds by *State* v. *Alvarez-Lopez*, 136 N.M. 309, 98 P.3d 699 (2004); *State* v. *Holmes*, 342 S.C. 113, 117–18, 536 S.E.2d 671 (2000), cert. denied, 532 U.S. 906, 121 S. Ct. 1230, 149 L. Ed. 2d 139 (2001); *State* v. *Dotson*, 254 S.W.3d 378, 392–93 (Tenn. 2008); *Cofield* v. *State*, 891 S.W.2d 952, 956 (Tex. Crim. App. 1994, pet. denied); *State* v. *Roberts*, 142 Wash. 2d 471, 494, 14 P.3d 713 (2000); *State* v. *Mason*, 194 W. Va. 221, 230, 460 S.E.2d 36 (1995), overruled in part on other grounds by *State* v. *Melching*, 219 W. Va. 366, 633 S.E.2d 311 (2006); *Johnson* v. *State*, 930 P.2d 358, 363 (Wyo. 1996); see also *People* v. *Leach*, 15 Cal. 3d 419, 439, 541 P.2d 296, 124 Cal. Rptr. 752 (1975) (applying similar rule to that in *Williamson* prior to its announcement by United States Supreme Court), cert. denied, 424 U.S. 926, 96 S. Ct. 1137, 47 L. Ed. 2d 335 (1976).

arguably qualify as statements against Bryant's penal interest: (1) Bryant was in Belle Haven on the night of the murder; (2) Bryant picked up one of the Skakels' golf clubs, "swung it," and "[slung] it back to where the bag . . . was"; and (3) at one point, Bryant and the victim were among the ten to fifteen teenagers socializing in the meadow. The remainder of Bryant's statements are neutral or contextual—e.g., Bryant attended Brunswick School in Greenwich—or are blatantly self-serving—e.g., Bryant's statements inculpating Hasbrouck and Tinsley. Under the rule of *Williamson, none* of these statements is admissible.[19] Because Bryant's self-serving statements are the only statements that exculpate the petitioner, their inadmissibility precludes the granting of a new trial.

PALMER, J., dissenting. Contrary to the determination of the trial court, I believe that the petitioner, Michael C. Skakel, is entitled to a new trial for the 1975 murder of Martha Moxley (victim) in the Belle Haven section of the town of Greenwich due to the discovery of significant new evidence that was not available at the time of his original trial. In particular, I am convinced that the trial court improperly denied the petitioner a new trial on the basis of information brought forward by Gitano "Tony" Bryant[1]—information that directly implicates two other suspects, Adolph Hasbrouck and Burton Tinsley, in the victim's murder—after failing to evaluate the significance of that newly discovered evidence in light of the nature and strength of the original trial evidence. I reach this conclusion because the evidence that Bryant provided during the

---

[19] I further note that Bryant's statements inculpating Hasbrouck and Tinsley are inherently unreliable and are precisely the type of statements that the hearsay rule is designed to bar. See, e.g., *Williamson* v. *United States,* supra, 512 U.S. 600 ("[s]elf-exculpatory statements are exactly the ones [that] people are most likely to make even when they are false").

[1] All references in this opinion to Bryant are to Gitano "Tony" Bryant.

course of his lengthy and detailed video-recorded interview satisfies all of the requirements necessary for a new trial. First, the Bryant evidence is highly relevant because it identifies Hasbrouck and Tinsley as the persons actually responsible for the victim's murder. Second, as the trial court expressly found, the Bryant evidence, although hearsay, would be admissible at a new trial under the declaration against penal interest exception to the hearsay rule because, inter alia, corroborating circumstances clearly indicate its trustworthiness.[2] I also conclude that the Bryant evidence is admissible under the residual exception to the hearsay rule.[3] Third, because the evidence is marked by substantial indicia of reliability, and because the record reveals nothing about Bryant or his background to suggest either that he is the kind of person who would provide testimony falsely implicating two innocent people in a brutal murder or that he had any reason or motive to do so, the trial court improperly failed to consider that evidence in the overall context of the original trial evidence.[4] Finally, at the very least, it is likely that this new evidence, when considered in light of the state's thin case against the petitioner, would give rise to a reasonable doubt about whether the petitioner was

[2] Bryant asserted his privilege against self-incrimination following his video-recorded interview, and, therefore, he is not available to testify at any subsequent trial. The trial court concluded, however, that his video-recorded statements would be admissible at a new trial as trustworthy declarations against penal interest.

[3] The trial court did not reach the issue of whether the Bryant evidence also would be admissible under the residual exception to the hearsay rule because of its determination that the evidence would be admissible under the hearsay exception for statements against penal interest.

[4] As I discuss more fully hereinafter, the trial court's credibility determination is fundamentally flawed for another, closely related, reason, namely, because it is predicated on a finding by the court that Bryant's statements lack any genuine corroboration. The trial court improperly relied on that finding because it directly contradicts the court's threshold finding that the statements are *significantly* corroborated and, therefore, admissible under the hearsay exception for declarations against penal interest.

involved in the victim's murder. The likelihood of an acquittal upon retrial is enhanced by other newly discovered evidence, namely, the relationship between the lead investigator in the case, Frank Garr, and Leonard Levitt, the author of a book about the victim's murder on which Garr collaborated, and the views expressed by Garr in that book reflecting, inter alia, his strong and long-standing feelings of antipathy toward the petitioner and the petitioner's family. I therefore dissent.

I

## LEGAL STANDARD GOVERNING NEW TRIAL PETITIONS

I begin my review of the petitioner's claim with a brief summary of the legal standard governing the petitioner's contention that he is entitled to a new trial on the basis of newly discovered evidence. As this court stated in *Asherman* v. *State*, 202 Conn. 429, 521 A.2d 578 (1987), to prevail on a petition for a new trial, "[t]he petitioner must demonstrate, by a preponderance of the evidence, that: (1) the proffered evidence is newly discovered, such that it could not have been discovered earlier by the exercise of due diligence; (2) it would be material on a new trial; (3) it is not merely cumulative; and (4) it is likely to produce a different result in a new trial." Id., 434. Because it is undisputed that the Bryant evidence satisfies the first three *Asherman* requirements, the primary issue raised by the petitioner's appeal implicates only the fourth and final requirement.

In *Shabazz* v. *State*, 259 Conn. 811, 792 A.2d 797 (2002), we elaborated on the fourth prong of the *Asherman* test, stating: "The trial court must always consider the newly discovered evidence in the context of the evidence presented in the original trial. In so doing, it must determine, first, that the evidence passes a minimum credibility threshold. That is, if, in the trial court's opinion, the newly discovered evidence simply is not

credible, it may legitimately determine that, even if presented to a new jury in a second trial, it probably would not yield a different result and may deny the petition on that basis. . . . If, however, the trial court determines that the evidence is sufficiently credible so that, if a second jury were to consider it together with all of the original trial evidence, it probably would yield a different result or otherwise avoid an injustice, the fourth element of the *Asherman* test would be satisfied." (Citation omitted.) Id., 827–28; accord *Adams* v. *State*, 259 Conn. 831, 838, 792 A.2d 809 (2002).

Thus, we apply a two part test for the purpose of determining whether the newly discovered evidence warrants a new trial under the final *Asherman* factor. First, the petitioner must demonstrate that the evidence is "not incredible"; *Adams* v. *State*, supra, 259 Conn. 844; because, if the evidence truly is incredible, the second jury would not credit it. See, e.g., *Smith* v. *State*, 141 Conn. 202, 208, 104 A.2d 761 (1954) (no injustice done in denying petition for new trial when newly discovered evidence reasonably is found to be "utterly unworthy of credence . . . since it should be presumed that no jury will believe an incredible story"). Because a new trial is required if the newly discovered evidence, when considered in the context of the original trial evidence, gives rise to a reasonable doubt concerning the petitioner's guilt, that evidence need not be so convincing or persuasive as to be compelling. Rather, the evidence must only meet a "minimum credibility threshold"; *Shabazz* v. *State*, supra, 259 Conn. 827; accord *Adams* v. *State*, supra, 838; a standard that requires the petitioner merely to establish that the evidence is not so lacking in credibility as to be wholly unworthy of belief.[5] See *Adams* v. *State*, supra, 844.

---

[5] As I explain in greater detail in part III G 1 of this opinion, it would be improper to impose a more stringent credibility standard because any such standard would run afoul of the principle that the petitioner must demonstrate only that the newly discovered evidence is credible *enough*—that is, it is *sufficiently* worthy of belief—to give rise to a reasonable doubt concern-

Upon satisfaction of that minimum requirement, the court then must proceed to the second step of the analytical process, which "require[s] [the court] to determine whether the newly discovered evidence is *sufficiently* credible [and of such a nature] that, if admitted in a new trial and reviewed by a second jury together with all of the evidence presented at the original trial, it is likely to produce a different result"; (emphasis added) id.; see also *Shabazz* v. *State*, supra, 827; that is, it is likely to give rise to a reasonable doubt about the petitioner's guilt, "or otherwise [to] avoid an injustice . . . ."[6] (Internal quotation marks omitted.)

ing the petitioner's guilt. This principle has special relevance when, as in the present case, the newly discovered evidence is completely exonerating in nature because, in such circumstances, a second jury would be required to find the petitioner not guilty on the basis of such evidence unless the state is able to establish beyond a reasonable doubt that the evidence is not credible. Thus, in the present case, if the Bryant evidence is deemed to be sufficiently credible to give rise to a *reasonable possibility* that Hasbrouck and Tinsley, rather than the petitioner, murdered the victim, then the petitioner would be entitled to a new trial on the basis of that evidence. Thus, the minimum credibility threshold that comprises the first step of the two step process mandated by *Shabazz* is satisfied if the newly discovered evidence is not completely lacking in credibility.

[6] As this court made clear in both *Adams* and *Shabazz*, the trial court always must consider the newly discovered evidence in light of the original trial evidence. *Adams* v. *State*, supra, 259 Conn. 838; *Shabazz* v. *State*, supra, 259 Conn. 827. In other words, the original trial evidence is relevant at both stages of the trial court's analysis. The evidence adduced at the original trial is relevant to the first step of the analytical process, pursuant to which the trial court must decide whether the newly discovered evidence satisfies a minimum credibility threshold, because the court cannot properly make that determination in a factual vacuum; the facts of the case necessarily will inform the court's evaluation of the newly discovered evidence. Put differently, the trial court cannot make an informed view of the credibility of newly discovered evidence without knowing at least *something* about the state's case against the petitioner as developed at the original trial. Of course, the original trial evidence is critical to the second stage of the analysis because, at that point, the issue is whether the newly discovered evidence is sufficiently credible and of such a nature that it is likely to produce a different outcome, a determination that would be impossible for the trial court to make without consideration of the nature and strength of the evidence presented at the original trial. Hereinafter, all references in this opinion to the trial court's responsibility to consider the newly discovered

*Adams* v. *State,* supra, 838; accord *Shabazz* v. *State,* supra, 828.

We review a trial court's decision with respect to a petition for a new trial under an abuse of discretion standard. *Shabazz* v. *State,* supra, 259 Conn. 820. When considering the newly discovered evidence in light of the evidence adduced at the petitioner's original trial, however, this court is no less capable than the trial court of assessing the strength of the original trial evidence if, as in the present case, the trial court did not preside over the petitioner's original trial. See, e.g., *Commonwealth* v. *Lykus,* 451 Mass. 310, 325, 885 N.E.2d 769 (2008) ("We defer to a judge's assessment of the credibility of witnesses at a hearing on the motion for a new trial. However, we regard ourselves in as good a position as a motion judge who was not the trial judge to assess the trial record."); *Commonwealth* v. *Grace,* 397 Mass. 303, 307, 491 N.E.2d 246 (1986) (same).

The petitioner first contends that the trial court improperly concluded that the newly discovered Bryant evidence was sufficiently trustworthy to be admissible as a declaration against penal interest but nevertheless so lacking in credibility as to justify the trial court's failure to consider that evidence in the light of the original trial evidence. Second, the petitioner claims that this court should reverse the trial court's denial of his new trial petition because the trial court improperly failed to consider his separate claim that a new trial is required to "avoid an injustice . . . ." With respect to the petitioner's first contention, the majority concludes that the evidence adduced at the hearing on the petition for a new trial supports the trial court's rejection of the petitioner's claim that he is entitled to a new trial, even though the trial court never considered the Bryant evi-

evidence in the context of the original trial evidence pertain to the court's role during the second stage of the analytical process.

dence in the context of the original trial evidence.[7] With respect to the petitioner's second claim, the majority concludes that the petitioner is incorrect in asserting that, under *Shabazz*, newly discovered evidence warrants a new trial, irrespective of whether the trial court finds that such evidence *likely* will produce a different result, if a second trial is necessary to avoid an injustice. In rejecting this contention, the majority interprets *Shabazz* as creating a unitary standard for purposes of the fourth prong of the *Asherman* test despite our express statement in *Shabazz* that a new trial is necessary when the newly discovered evidence "probably would yield a different result *or otherwise avoid an injustice.*" (Emphasis added.) *State* v. *Shabazz,* supra, 259 Conn. 828.

With respect to the petitioner's first claim, I conclude that the newly discovered Bryant evidence meets the minimum credibility threshold as a matter of law and, therefore, that the trial court improperly failed to consider that evidence in light of the original trial evidence.[8] I reach that conclusion because, under the particular circumstances of this case, the very same factors that led the trial court properly to conclude that Bryant's statements are admissible as trustworthy declarations against penal interest necessarily sufficed to satisfy the minimum credibility requirement contemplated under the first prong of the *Shabazz* formulation.[9] I further

[7] Although the majority never expressly says so, its affirmance of the trial court's judgment necessarily reflects its conclusion that the trial court did not abuse its discretion in rejecting the petitioner's claim without reaching the second step of the *Shabazz* analysis, that is, without considering the newly discovered Bryant evidence in light of the original trial evidence.

[8] As I explain more fully hereinafter; see part III G 1 of this opinion; the trial court's impropriety stems either from a misunderstanding of the *Shabazz* minimum credibility threshold or from an abuse of discretion in applying that standard, and from that court's inconsistent factual findings with respect to the degree to which Bryant's statements are corroborated.

[9] Of course, it is possible that, in a given case, a trial court reasonably could find that, although a newly discovered third party statement against penal interest is sufficiently trustworthy to be admissible at a second trial,

conclude that, on the basis of the undisputed facts, the newly discovered Bryant evidence requires a new trial because that evidence, when viewed in the light of the evidence adduced at the petitioner's original trial, is likely to give rise to a reasonable doubt as to whether the petitioner murdered the victim.

Although my determination in this regard makes it unnecessary for me to address the petitioner's second claim, namely, that a new trial is required to avoid an injustice, I do so because I disagree with the majority that avoiding an injustice constitutes an insufficient ground for granting a petition for a new trial in the present case or in any other case. In particular, I am unwilling to presume that our use of the disjunctive, both in *Shabazz* and *Adams*, when articulating the applicable test, coupled with the use of the word "otherwise" to underscore that the second prong of the test is different from the first prong, constituted merely loose language or surplusage. See *Adams* v. *State*, supra, 259 Conn. 838 (new trial required "[i]f . . . the trial court determines that the evidence is sufficiently credible so that, if a second jury were to consider it together with all of the original trial evidence, it probably would yield a different result *or otherwise avoid an injustice*" [emphasis added; internal quotation marks omitted]); *Shabazz* v. *State*, supra, 259 Conn. 827 ("there may be cases in which the trial court is justified in determining that the newly discovered evidence is sufficiently credible and of such a nature that, *in order*

the statement nevertheless is otherwise so unworthy of belief that it fails to meet even the minimum credibility threshold identified by this court in *Shabazz*, thereby obviating any need for the court to consider the statement in the context of the original trial evidence. For the reasons set forth in part III G 1 of this opinion, however, this is not such a case because there is nothing in the record that so undermines the reliability or trustworthiness of the Bryant evidence as to warrant the trial court's failure to consider that evidence in the context of the evidence adduced at the petitioner's original trial.

*to avoid an injustice,* a second jury, rather than the trial court itself, should make the ultimate assessment of its credibility" [emphasis added]). Indeed, this is precisely the position taken by our Appellate Court, which recently explained that, in *Shabazz,* this court "looked *beyond the traditional four-pronged test* for newly discovered evidence and [was] *guided by the general principle of whether an injustice was done.*" (Emphasis added.) *Joyce* v. *State's Attorney,* 84 Conn. App. 195, 203, 852 A.2d 841, cert. denied, 271 Conn. 923, 859 A.2d 578 (2004).[10]

Furthermore, such a test makes eminent good sense. I can think of no legitimate reason why a court should not grant a petitioner a new trial when the discovery of new evidence places the validity of the original conviction in such doubt, or so seriously undermines our confidence in the accuracy of the verdict, that it would be unjust to deny the petitioner a new trial. See, e.g., *Commonwealth* v. *Lykus,* supra, 451 Mass. 326 ("A defendant seeking a new trial on the ground of newly discovered evidence must show that the evidence is newly discovered, that it is material and credible, and that it casts real doubt on the justice of the conviction. Newly discovered evidence that is merely cumulative of evidence admitted at the trial will carry little weight. The task of the [trial court] is to decide whether the new evidence probably would have been a real factor

---

[10] In *Joyce,* the Appellate Court also noted that application of this somewhat less stringent standard—both by this court and other courts of this state—has been limited to cases of new trial petitions involving homicides and other similarly serious criminal offenses. *Joyce* v. *State's Attorney,* supra, 84 Conn. App. 203–204; see, e.g., *Adams* v. *State,* supra, 259 Conn. 832 (petition for new trial filed after petitioner's conviction for aiding and abetting first degree manslaughter); *Shabazz* v. *State,* supra, 259 Conn. 812 (petition for new trial filed after petitioner's murder conviction). Although I see no persuasive reason for that limitation, the present case, which involves a murder conviction for which the petitioner received a sentence of twenty years to life imprisonment, meets any such requirement.

in the jury's deliberations, and in that regard the [court] must consider the strength of the case against the defendant."). The state's interest in the finality of judgments cannot be so great as to deny a petitioner a new trial when the petitioner has satisfied such a standard.[11] See

[11] I recognize that, in most cases, the result of the trial court's inquiry will be the same under either of the two tests set forth in *Shabazz*. Nevertheless, in the unusual case in which the court, for whatever reason, is unable or unwilling to find that the newly discovered evidence likely would result in an acquittal but does conclude that a new trial is necessary to avoid an injustice, I see no legitimate basis for denying the petitioner a new trial.

The majority, by contrast, rejects this second prong of the *Shabazz* test, characterizing it as "contrary to our case law and common sense" and "amorphous . . . ." Footnote 42 of the majority opinion. None of these grounds for dismissing the alternative *Shabazz* standard is supportable. First, I fully agree with the Appellate Court that, far from rejecting the standard, this court expressly has adopted it. *Joyce* v. *State's Attorney*, supra, 84 Conn. App. 203–204. I also disagree with the majority's second assertion, namely, that common sense is offended by granting a petition for a new trial on the basis of newly discovered evidence when that evidence so seriously undermines the trial court's confidence in the verdict that justice requires a second trial. In fact, I reach precisely the opposite conclusion, that is, that common sense *compels* the conclusion that it would be fundamentally unfair to deprive the petitioner of a new trial in such circumstances. To conclude otherwise overlooks the grave risk that the first trial has resulted in a manifest injustice, namely, a wrongful conviction. Finally, the standard is not amorphous, as the majority claims. In fact, the very same principles that underlie the test are routinely applied by the trial and appellate courts of this state in a wide variety of contexts. See, e.g., *Bayer* v. *Showmotion, Inc.*, 292 Conn. 381, 389–90, 973 A.2d 1229 (2009) (applying legislative policy that no writ, pleading or proceeding shall be abated for circumstantial defect when to do so would work injustice); *State* v. *Millan*, 290 Conn. 816, 831, 966 A.2d 699 (2009) (ruling of trial court permitting introduction of uncharged misconduct evidence will not be disturbed on appeal unless court abused its discretion "or an injustice has occurred" [internal quotation marks omitted]); *Bryant* v. *Commissioner of Correction*, 290 Conn. 502, 522, 964 A.2d 1186 (to prevail on claim of ineffective assistance of counsel, defendant must establish that counsel's deficient performance undermined confidence in verdict), cert. denied sub nom. *Murphy* v. *Bryant*, 558 U.S. 938, 130 S. Ct. 259, 175 L. Ed. 2d 242 (2009); *State* v. *Johnson*, 289 Conn. 437, 463, 958 A.2d 713 (2008) (trial court's determination that probative value of evidence is not outweighed by its prejudicial effect will be reversed on appeal "only [when] an abuse of discretion is manifest or [when] injustice appears to have been done" [internal quotation marks omitted]); *Brown & Brown, Inc.* v. *Blumenthal*, 288 Conn. 646, 657, 954 A.2d 816 (2008) (doctrine of law of

*Gannon* v. *State*, 75 Conn. 576, 577, 54 A. 199 (1903) ("[t]he finality of a judgment does not preclude the court that rendered it from entertaining further proceedings in the same action, *when it is made apparent that injustice has been done*" [emphasis added]). In the present case, because the petitioner satisfies the first *Shabazz* criterion, he necessarily has met this alternative standard.

With these principles in mind, I now briefly summarize the trial court's decision and the majority opinion, both of which reject the petitioner's claims. I then turn to a more lengthy discussion of why I believe that the trial court and the majority are wrong in denying the petitioner a new trial.

case does not bar second trial judge from overruling first trial judge's ruling if ruling is clearly erroneous and following ruling would result in manifest injustice); *Monti* v. *Wenkert*, 287 Conn. 101, 118, 947 A.2d 261 (2008) (trial court may order new trial limited to certain issues if issues are separable, unless doing so would result in serious injustice); *State* v. *Davis*, 286 Conn. 17, 26–27 n.6, 942 A.2d 373 (2008) (denial of severance in criminal case will not warrant reversal unless defendant can establish that joinder resulted in substantial injustice); *State* v. *Ortiz*, 280 Conn. 686, 717, 911 A.2d 1055 (2006) (state's failure to disclose evidence favorable to defendant will not result in new trial unless, inter alia, that evidence casts case in such different light as to undermine confidence in verdict); *Jackson* v. *Water Pollution Control Authority*, 278 Conn. 692, 702, 900 A.2d 498 (2006) (trial court must set aside jury verdict when injustice of verdict is manifest); see also Practice Book § 1-8 (rules of practice shall be liberally construed to avoid injustice); Practice Book § 60-1 (rules of appellate procedure shall be liberally construed to avoid injustice). I therefore disagree with the majority's determination that it is appropriate to deny a petitioner a new trial despite the existence of newly discovered evidence when, in the trial court's view, that evidence casts such significant doubt on the legitimacy of a conviction that it would be unjust to deny the petitioner an opportunity to produce that evidence at a second trial. For obvious reasons, the unfairness engendered by the majority's decision is most acute in cases, like the present one, involving convictions for serious crimes, such as murder, that inevitably result in very lengthy prison terms. In sum, the majority's conclusion, which places finality over fairness, represents an unfortunate jurisprudential step backward, especially in light of the growing awareness of the fallibility of our criminal justice system. See part VI of this opinion.

## II

## SUMMARY OF THE TRIAL COURT'S DECISION AND THE MAJORITY OPINION

The petitioner raised several claims in his petition for a new trial, including the claim that he is entitled to a new trial on the basis of the newly discovered Bryant evidence and certain revelations about Garr, including Garr's apparent hostility toward the petitioner and the petitioner's family.[12] I first summarize the trial court's and the majority's treatment of the Bryant evidence.

At the hearing on the petition for a new trial, the trial court was informed that Bryant had invoked his privilege against self-incrimination at a deposition that had been noticed by the petitioner for the purpose of

---

[12] The petitioner also claimed that he is entitled to a new trial on the basis of (1) the statements of several witnesses directly contradicting the testimony of Gregory Coleman, a drug addict and key state witness who died of a drug overdose before the petitioner's trial but who asserted in his testimony at the petitioner's probable cause hearing, which was admitted at the petitioner's trial, that the petitioner had confessed to murdering the victim when he and the petitioner were residents at Elan School, a facility for troubled adolescents located in Poland, Maine, in the late 1970s, (2) a composite drawing of a person observed in Belle Haven on the night the victim was murdered that, the petitioner contends, bears a strong resemblance to Kenneth Littleton, the petitioner's former tutor and long-time suspect in the murder, who testified for the state under a grant of immunity from prosecution, and (3) police suspect profile reports of Littleton and Thomas Skakel, the petitioner's brother, who previously had been the prime suspect in the case, as well as certain information concerning Littleton's actions, including charged and uncharged criminal conduct, before, at the time of, and after the victim's murder. Although at least some of this evidence likely would have been extremely valuable to the petitioner—especially the testimony contradicting Coleman and, at least potentially, the composite drawing purportedly resembling Littleton—I generally agree with the majority that, for the reasons set forth in its opinion, the trial court did not abuse its discretion in concluding, with respect to the foregoing claims, that the petitioner had failed to satisfy one or more of the prongs of the test for determining whether a new trial is warranted due to the newly discovered evidence.

exploring Bryant's knowledge of certain information that he previously had provided, during a video-recorded interview, directly implicating Hasbrouck and Tinsley in the victim's murder. The petitioner also presented the court with that video-recorded interview, claiming that, because Bryant was unavailable as a witness, the statements contained therein, although hearsay, would be admissible at a new trial because they were against Bryant's penal interest and bore sufficient indicia of reliability.[13] The petitioner also claimed that Bryant's statements were admissible under the residual exception to the hearsay rule. The trial court agreed with the petitioner's first claim that the statements were admissible under the hearsay exception for trustworthy declarations against penal interest, and, therefore, the court did not address the petitioner's alternative ground of admissibility. The trial court also concluded, however, that Bryant's statements were not credible. That conclusion was based primarily on the court's predicate finding that Bryant's statements were supported by no more than minimal corroboration, and on certain evidence adduced at the hearing, including testimony establishing that Bryant did not come forward with the information for more than twenty-five years and that "[n]o one ha[d] any recall of ever seeing Bryant and his companions in Belle Haven on the night of the murder." Having concluded that Bryant's statements were not credible, the trial court did not consider those statements in the context of the evidence adduced at the petitioner's original trial.

In its review of the trial court's decision, the majority declines to decide whether the trial court properly determined that the Bryant evidence would be admissible at a new trial as trustworthy third party statements against penal interest. The majority explains that there

---

[13] The Bryant evidence also includes certain statements by Bryant, some of which were tape recorded. See part III A of this opinion.

is no need to do so because, in its view, the trial court did not abuse its discretion in concluding that Bryant's account of the relevant events, although sufficiently trustworthy to be admissible, is not credible.[14] In light of its determination that the trial court reasonably concluded that the Bryant evidence simply is not sufficiently believable to have a bearing on the jury's assessment of the state's case, the majority also does not engage in an evaluation of the strength of that case.

The petitioner also claimed that Garr's relationship with Levitt, the author of a book about the case that was published after the petitioner's criminal trial, and certain revelations about the publication and content of that book, constitute newly discovered evidence that warrants a new trial. In support of his claim, the petitioner relied in part on the fact that, at the discovery stage of his criminal case, he had sought the disclosure of evidence that any agent of the state had a "pecuniary or other interest in the development and/or outcome of [the] case, including, but not limited to, any contract, agreement, or ongoing negotiations, which relate to the preparation of any book . . . ." Although it is undisputed that the trial court's ruling regarding the petitioner's discovery request in his criminal case applied to Garr, the state never provided the petitioner with any information in response to that request. Despite undisputed evidence of a previously undisclosed private pact between Garr and Levitt that the two would "tell [their] story" when the case was over—a story that, when ultimately told, reveals how passionately they believed that the petitioner, aided in a cover-up by other members of his family, was responsible for the victim's

_____

[14] The concurrence does consider the admissibility of the Bryant evidence, concluding that the trial court abused its discretion in determining that the evidence would be admissible under the declaration against penal interest exception to the hearsay rule. I discuss the concurrence in part III E of this opinion.

death, how aggressively they pursued the case against the petitioner, and how intensely Garr disliked him and his family—the trial court in the present case concluded that the agreement was neither newly discovered nor "evidence that would have swayed the jury as to lead it to acquit." Finally, the trial court also rejected the petitioner's claim that a new trial was required because of the state's failure to disclose Garr's one-half financial interest in the net revenues from Levitt's book. The majority assumes without deciding that the evidence of Garr and Levitt's relationship was newly discovered but concludes that the trial court did not abuse its discretion in determining that the petitioner was not entitled to a new trial because the petitioner failed to prove that the evidence probably would result in an acquittal upon retrial.

## III

## THE NEWLY DISCOVERED BRYANT EVIDENCE

## A

## The Evidence

The following facts, all of which were adduced at the hearing on the petition for a new trial, are relevant to my conclusion that the newly discovered Bryant evidence[15] was sufficiently credible such that, under *Shabazz*, the trial court was required to consider it in light of the original trial evidence. Shortly after the petitioner was convicted, Robert F. Kennedy, Jr., the petitioner's first cousin, published an article, entitled "A Miscarriage of Justice," in the January-February, 2003 edition of The Atlantic magazine, in which he maintained that the petitioner had been wrongly convicted. After the article appeared, Kennedy was contacted by Crawford Mills,

---

[15] References to the Bryant evidence include all of the newly discovered evidence tending to indicate that Hasbrouck and Tinsley may have murdered the victim.

a former resident of Greenwich and a classmate of Bryant's at Brunswick School, a private preparatory school for boys located in the town of Greenwich that Bryant had attended from 1972 until 1975.[16] Mills, a trusted friend of Bryant's, informed Kennedy that, two years earlier, Bryant, who then was a businessman in Florida, had confided in him that he had been in Belle Haven on the night of the victim's murder and that two of Bryant's high school classmates from Manhattan, New York, namely, Hasbrouck and Tinsley, were responsible for the victim's death.[17] Mills told Kennedy

[16] Because Bryant's family did not live in Connecticut, Bryant resided at the Greenwich home of a Brunswick School faculty member and his wife while attending the school. The couple with whom Bryant resided had been friendly with Bryant's mother for some time.

[17] Mills explained that Bryant had called him two weeks after the September 11, 2001 attacks on the World Trade Center to see if Mills, who resided two blocks from that location, was all right. At the time, Mills owned a business that provided simultaneous interpreting services to various corporate clients, but business had dried up completely after September 11. Bryant asked Mills how he intended to make a living going forward and whether he still acted or wrote screenplays. According to Mills, all of his friends, including Bryant, had known "for years" that, in the late 1980s, Mills had written a screenplay about Greenwich and the victim's murder, and that the screenplay was completed in the early 1990s. Bryant told Mills that he might be able to help him with the screenplay because Bryant "had some experience in [the] industry" and had "written a couple of things that had made it to the air on television." Mills stated that he "dusted" the screenplay off and "sent [Bryant] a copy of [his] latest version, which was probably about the [twentieth] . . . version . . . ." According to Mills, he wrote the screenplay "to make a statement about the town in which [he] had grown up and used the [victim's] murder . . . as sort of a vehicle to paint that picture . . . ." Although Mills did not identify any of the characters by their real names, the script "pointed the finger [at] a group of people" through the use of "composite characters" whom everyone knew to be "the Skakel brothers, [Thomas Skakel] and [the petitioner], and [Kenneth] Littleton . . . ." Mills further testified that he "had sent [Bryant] the script with the hopes that he would read it and sort of edit it . . . but that didn't happen." According to Mills, although Bryant apparently read the script, he offered no assistance. When Mills and Bryant finally spoke about the screenplay a few months later, Bryant told him "that none of the Skakels could have been involved in [the victim's] killing" because he had been there and knew that Hasbrouck and Tinsley killed the victim. Mills testified that, at the time of their conversation, the petitioner's arrest and pending trial had received

that, for a number of reasons, Bryant was extremely reluctant to come forward but that, after the petitioner's arrest, he had consented to allow Mills to communicate the information about Hasbrouck and Tinsley to the authorities on the condition that Mills not disclose Bryant's name. Mills did contact the authorities, including the prosecutor in the case, but Mills was told that, unless the person providing the information was willing to come forward, the authorities could not act on the allegations. After the petitioner was convicted and Bryant still refused to come forward, Mills decided that he no longer would protect Bryant's identity and gave Bryant's name to Kennedy.

Shortly after his conversation with Mills, Kennedy contacted Bryant by telephone. Kennedy recorded the telephone call and all subsequent calls that he made to Bryant and to other potential witnesses in the case. The recordings of the telephone calls were entered into evidence at the hearing on the petition for a new trial

much media attention. Mills stated that Bryant understood that Mills would take the information about Hasbrouck and Tinsley to the authorities, but Bryant implored Mills not to identify him as the source of the information. According to Mills, the first thing he did after learning about Hasbrouck and Tinsley was to call his father for advice. After speaking to his father, Mills then "called the cops . . . the prosecutor, and . . . the defense attorneys." Mills stated that he spoke to Bryant several times to update him on how the various authorities had reacted to the information and told him that it was quite clear that he was going to have to come forward himself. According to Mills, Bryant "refused to come forward [at that time] and tried to make [him] understand how important it was to keep his name out of this story. It seemed to [Mills that Bryant] was endeavoring to do the right thing but only to the point where his name was left out of it." Mills also stated that, once Bryant told him about Hasbrouck and Tinsley, any possibility of working with Bryant on the screenplay "was over . . . ." Mills further noted that he made some "very simple" changes to the script to incorporate the information that Bryant had given him about the murder but that he never showed those changes to Bryant. As it turned out, Mills made no further efforts to sell the screenplay.

and played for the court.[18] In his first telephone call to Bryant, which was brief, Bryant told Kennedy only that he had known the petitioner when the two of them were students at Brunswick School but that he and the petitioner never had been friends. Bryant agreed to speak with Kennedy again the next day, when Bryant had more time. In his next conversation with Kennedy, Bryant explained that one of the reasons that he had been so reluctant to come forward was that he was worried about the repercussions for his family. According to Bryant, a few members of his family were quite prominent in the community and would not appreciate any publicity linking Bryant to a murder case. In particular, Bryant's mother, Barbara Bryant, is an Academy Award winning producer of educational films and a cofounder and executive vice president of the Phoenix Learning Group, Inc., and one of his cousins is the professional basketball player Kobe Bryant. Bryant also expressed concern that he could be accused of having been involved in the murder and that his business might be adversely affected if he were to become embroiled in the case.

Bryant then related to Kennedy that, after he left Brunswick School prior to the ninth grade,[19] he briefly attended Charles Evans Hughes High School (Hughes High School),[20] a public high school in Manhattan, before transferring to a private preparatory school in Texas. Bryant met Hasbrouck and Tinsley while attending Hughes High School. According to Bryant, Hasbrouck and Tinsley were "wild" and "[t]hey spurred

[18] Kennedy participated in approximately ten recorded telephone conversations that were introduced into evidence at the hearing on the petition for a new trial. I refer only to those conversations that bear directly on the petitioner's claims.

[19] Bryant was fourteen years old when the victim was murdered. Hasbrouck and Tinsley were one year older but also in the ninth grade.

[20] Charles Evans Hughes High School was later renamed H.S. 440 Bayard Rustin High School for the Humanities.

each other on. They fed off each other big time." Bryant explained that, although he then resided with his mother in Manhattan, all of his friends were still in Greenwich, and he often took a train there to visit them. Bryant also explained that, on several occasions, Hasbrouck and Tinsley went with him. According to Bryant, Greenwich was a different world from New York City, and, for Hasbrouck and Tinsley, it was "forbidden fruit . . . ." Bryant stated: "[I]magine coming from the inner city into Greenwich in the . . . mid [1970s]; [it was] the difference between Beirut [Lebanon] and Cape Cod [Massachusetts]. . . . It's the difference between [the] have and have-nots . . . ."

On the evening of the murder, Bryant, Tinsley and Hasbrouck went to Belle Haven to participate in "hell night," also known as "mischief night," the night before Halloween when neighborhood children traditionally would engage in pranks and other mischief. According to Bryant, Hasbrouck had met the victim on a previous visit to Greenwich and he "had this thing for her" and "would just say things that were just really, looking back, you would just be, oh my God, why didn't I say something, and it just, it bothers me." Bryant told Kennedy that, after they arrived in Belle Haven from the train station, he, Hasbrouck and Tinsley spent the evening pulling pranks, drinking, and smoking cigarettes and marijuana with another boy from the neighborhood, Geoffrey Byrne.[21] According to Bryant, he left Belle Haven at around 9:15 p.m. to catch a train back to Manhattan, while Hasbrouck and Tinsley decided to stay the night with Byrne. Before Bryant left, Hasbrouck told him that he was going to "[g]et caveman tonight" on a girl.

---

[21] Byrne, who was only eleven years old at the time, subsequently died of an apparent suicide involving a drug overdose when he was seventeen. All references in this opinion to Byrne are to Geoffrey Byrne.

When Bryant next saw Hasbrouck and Tinsley at school the following Monday, Hasbrouck "said some very . . . damaging" things that left no doubt in Bryant's mind that Hasbrouck and Tinsley had killed the victim. According to Bryant, over the next several months, Hasbrouck and Tinsley showed no remorse for what they had done and, in fact, joked and bragged about it. Bryant also told Kennedy that he immediately told his mother about what had happened, and she told him that he must distance himself from Hasbrouck and Tinsley, explaining that they could be dangerous not only to him but to Bryant's entire family. Bryant further stated that, on the basis of what Byrne had said to him after the murder, he was reasonably certain that Byrne was present when the murder occurred. In a subsequent conversation, Kennedy asked Bryant why, if Hasbrouck was so dangerous, he had associated with him. Bryant responded that, at that point in his life—he was only fourteen—it was precisely that aspect of Hasbrouck's persona that had attracted him.

Bryant subsequently agreed to an interview with Vito Colucci, a private investigator that the petitioner had retained. In that interview, which was video recorded at a hotel near Bryant's home in Miami, Florida, Bryant repeated much of what he had told Kennedy on the telephone but in considerably more detail. A copy of the video recording was admitted into evidence and played at the hearing on the petition for a new trial. In the interview, Bryant stated that, "[a]nything you dared [Hasbrouck] to do, he would do." Bryant further stated that it was easy to tell that "[t]here was something wrong with him. All you had to do was look at him to know it. . . . [A] lot of kids were afraid of him because he was big and . . . explosive."[22] According to Bryant,

---

[22] When Bryant was asked whether Hasbrouck participated in any sports, Bryant responded that Hasbrouck was involved in wrestling. Bryant further explained that the wrestling coach at Hughes High School had "wanted to develop a wrestling team . . . . And [Hasbrouck] was one of the guys that [the coach] really had pegged as being aggressive enough, having the

Tinsley was the "gasoline" and Hasbrouck was the "engine . . . ." Tinsley would incite Hasbrouck to do things, like throw bricks at passing cars, burglarize, anything Tinsley "put him up to." "It was always the dare between [them]. . . . [T]hey were always trying to outdo each other. And they would just push each other . . . ." According to Bryant, both Hasbrouck and Tinsley were both about six feet, two inches tall and "eas[ily]" weighed 200 pounds.

Bryant told Colucci that Hasbrouck first met the victim at a Greenwich street festival in September, 1975, and became infatuated with her. He also saw her at a couple of dances, one or both of which were hosted by a local church or parochial school. Bryant explained that Hasbrouck was "very immature" and lacked the confidence to approach the victim but that he would talk about her constantly in a very sexually explicit manner. "[F]rom the time he met her . . . until the murder, that's what he would talk about." Bryant claims that he told Hasbrouck, "[y]ou need to think about something else. You need to think about somebody else that is more obtainable, because it is not going to happen [with her]." According to Bryant, Hasbrouck's obsession with the victim "built up with[in] him, [i]t built up tremendous[ly]."

On Thursday, October 30, 1975, the night of the murder, Bryant, Hasbrouck and Tinsley traveled from Manhattan to Greenwich to participate in hell night. As Bryant explained, on hell night, older children in the

demeanor, and having the killer instinct to be a good wrestler." Although, at the time, Bryant was big and considered himself to be a very good athlete, he explained that Hasbrouck "could pin [him with] no problem." According to Bryant, Hughes High School was a "tough school . . . . [T]his was a city school in New York. We are not talking about Greenwich . . . . There's no Boy Scouts at this school. And if there were, I didn't know where they met." Nevertheless, according to Bryant, Hasbrouck had "developed . . . a reputation not to be someone to mess with."

neighborhood would vandalize property, spray shaving cream and smash pumpkins, among other things. Bryant, Hasbrouck and Tinsley arrived by train at around 5:30 p.m. and went to Neal Walker's house, but Walker, a former schoolmate of Bryant's, could not come out with them. They then went across the street to see Byrne, with whom Hasbrouck and Tinsley previously had become acquainted. According to Bryant, he, Tinsley and Hasbrouck stole beer from a neighbor's refrigerator and walked around the neighborhood with Byrne "playing pranks" with shaving cream and toilet paper. At approximately 8:30 p.m., they met up with a group of kids in the meadow behind the house of the petitioner's family,[23] the Skakels, where the group smoked marijuana and cigarettes and drank some more beer. Bryant recalled that the victim was part of the group for a short period of time. Around this time, Bryant, Hasbrouck and Tinsley picked up golf clubs that were lying around the Skakels' property and started fooling around with them.[24] Hasbrouck and Tinsley stated, "I'm going to get

[23] Several houses in the Belle Haven section of Greenwich are built around a central, undeveloped space, consisting of trees and grass. It is this area that Bryant refers to as the meadow. At least six houses back up to the meadow, including Byrne's home and the Skakels' home. Bryant explained to Colucci that the meadow was a "collection place [for kids] to sit and smoke cigarettes, smoke some marijuana and drink beer" because "the parents couldn't see" anyone who was back there. According to Bryant, "it was a big enough space so . . . if someone did come a bit close, you could scatter and run, and no one could catch you . . . ." On the night of the murder, there were just a few people there when Bryant arrived, but, after a while, the group grew in size to between ten and fifteen teenagers.

[24] Bryant previously had told Kennedy that he was "surprised [that] they didn't get [his] prints off those [golf] clubs. Everybody touched those clubs." According to Bryant, there were always golf clubs lying around the Skakels' yard or porch. In his interview with Colucci, Bryant elaborated that the clubs generally were found on the Skakels' back porch. Bryant further explained that "[e]verybody in Belle Haven touched those clubs. We used to hit balls behind the house. And we also used to hit balls at cars." On the night of the murder, Bryant claims that he "picked up one. [Tinsley] picked up one. [Hasbrouck] picked up one. . . . Byrne picked up one. And we were . . . goofing around. . . . [Hasbrouck and Tinsley] were using [their clubs] as . . . walking sticks."

me a girl." Hasbrouck had indicated throughout the night that he wanted to "go caveman" on a girl and joked, "I've got my caveman club . . . ." According to Bryant, the concept of going caveman derived from a cartoon, and signified grabbing a woman by the hair, dragging her off and presumably sexually assaulting her. Bryant claims that, at approximately 9:15 p.m., he told Hasbrouck and Tinsley that he needed to go home. Bryant stated that he left because he sensed that things were getting out of control but that he also had to go home because of his curfew. Hasbrouck said something to the effect that, "I'm not going out of here unsatisfied." Bryant stated that, by the time he departed, he, Hasbrouck and Tinsley had consumed a significant amount of alcohol and that things were "at a fever pitch. . . . [T]hey were sort of ready to blow up." According to Bryant, the next time that he saw Hasbrouck and Tinsley at school, the following Monday, they told him, "[w]e did it. We achieved the caveman."

Colucci asked Bryant how he knew that Hasbrouck and Tinsley had stayed the night with Byrne. Bryant responded that they had told him that they stayed there and that Byrne had told him the same thing. In his telephone conversation with Kennedy, Bryant had explained that Byrne's house offered "the perfect place" for Hasbrouck and Tinsley to clean up after the murder because "[t]here was hardly anybody home. There [were] a billion rooms in that house and, at most, there were three people there at any given time, [Byrne], his brother and [the] housekeeper. [His] parents were never there." Bryant also told Colucci that he first found out about the murder from his mother, who showed him an article in the New York Times about it one or two days after the murder, and asked him whether he knew the victim. Bryant told Colucci that he did not come forward sooner because he was afraid that he would be "pinned . . . as a suspect" and because he never

imagined that the petitioner would be convicted. Bryant observed, "[i]f they [could] convict [the petitioner] on circumstantial evidence, I think I would [have been] an easier conviction . . . ." Bryant explained that, in contrast to the petitioner, he "didn't have the resources to defend [him]self." Bryant also stated that "[o]ne of the parties . . . has passed away. . . . So that made [him] . . . run to the hills even worse, because [he] knew [Byrne] knew as much if not more than [he did]."[25] When asked, Bryant consistently provided the same explanation as to why he did not come forward sooner. For example, Walker, Bryant's childhood friend from Brunswick School, testified at the hearing on the new trial petition that he learned about Bryant's allegations against Hasbrouck and Tinsley from Mills sometime in 2002. Mills had asked Walker to call Bryant to try to convince him to come forward. At that time, Walker did contact Bryant and asked him why he never had said anything about Hasbrouck and Tinsley. According to Walker, Bryant responded that "his mother had told him not to because he would be implicated [by] putting himself at the scene of the crime." Walker asked him why, if that was a concern, he was bringing it up now.

[25] In addition to seeking information about Hasbrouck and Tinsley, Kennedy also asked Bryant about Byrne. Bryant responded that, after the murder, Byrne was "freaked out" to the point that he became "a different person . . . ." Byrne sometimes took the train into Manhattan to talk to Bryant and expressed dismay and anger over what had happened. Bryant stated that Byrne blamed him for getting him mixed up with Hasbrouck and Tinsley. According to Bryant, Byrne told him that Hasbrouck and Tinsley once went to his house and let themselves in even though no one was at home. They were sitting in Byrne's bedroom when he walked in, and Byrne thought for a moment that they were going to "jump" him. Bryant said to Kennedy: "I am telling you [that Byrne] is a guy who is a couple years younger than me [and he was] coming to the city just to talk, and his parents had no idea. His parents didn't keep track of him very good, and he had an older brother who . . . pretty much looked . . . after him [because his] mom and dad were always going on some type of trip or something. He lived in a huge house by himself [with just] a maid and his brother, and this is just the way it was. He was always out there looking for affection."

According to Walker, Bryant answered that he had never been friends with the petitioner but that he felt that it "was an injustice seeing [the petitioner] being tried for [a] murder that [Bryant] knew [the petitioner] didn't commit." Walker further testified that Bryant asked him to give the information to investigators but to try "not to reveal his name . . . ." Like Mills, Walker contacted the authorities during the trial but was told that, unless Bryant himself was willing to come forward, the information was useless. Mills similarly testified that, when he asked Bryant why he had not come forward sooner, Bryant replied that he had told his mother at the time what had happened and that she had told him to "keep his mouth shut." Bryant subsequently invoked his privilege against self-incrimination when subpoenaed to testify at a deposition noticed by the petitioner.

Finally, when first contacted and interviewed by Colucci, both Hasbrouck and Tinsley told Colucci and his associate, Kris Steele, that they had been in Belle Haven on the date of the victim's murder. Although both men subsequently retracted that representation in follow-up conversations with Colucci, they each invoked their privilege against self-incrimination and refused to answer any questions posed by the petitioner at depositions conducted in connection with the petitioner's case.

## B

### Hearsay Exception for Statements Against Penal Interest

"The hearsay rule . . . is premised on the theory that out-of-court statements are subject to particular hazards. The declarant might be lying; he might have misperceived the events [that] he relates; he might have faulty memory; his words might be misunderstood or taken out of context by the listener. And the ways in

which these dangers are minimized for in-court statements—the oath, the witness' awareness of the gravity of the proceedings, the jury's ability to observe the witness' demeanor, and, most importantly, the right of the opponent to cross-examine—are generally absent for things said out of court.

"Nonetheless, the . . . [r]ules of [e]vidence also recognize that some kinds of out-of-court statements are less subject to these hearsay dangers, and therefore except them from the general rule that hearsay is inadmissible. One such category covers statements that are against the declarant's [penal] interest . . . . *Williamson* v. *United States*, 512 U.S. 594, 598–99, 114 S. Ct. 2431, 129 L. Ed. 2d 476 (1994)." (Internal quotation marks omitted.) *State* v. *Schiappa*, 248 Conn. 132, 146, 728 A.2d 466, cert. denied, 528 U.S. 862, 120 S. Ct. 152, 145 L. Ed. 2d 129 (1999).

"Our present rule allowing the admission of trustworthy third party statements against penal interest has its genesis in *Chambers* v. *Mississippi*, 410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973)"; (internal quotation marks omitted) *State* v. *Lopez*, 239 Conn. 56, 71, 681 A.2d 950 (1996); which held that an accused's constitutional right to a fair trial prevented the exclusion of such statements. See *Chambers* v. *Mississippi*, supra, 302–303. As the United States Supreme Court stated in *Chambers*, "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense. . . . In the exercise of this right, the accused, as is required of the [s]tate, must comply with established rules of procedure and evidence designed to [en]sure both fairness and reliability in the ascertainment of guilt and innocence. Although perhaps no rule of evidence has been more respected or more frequently applied in jury trials than that applicable to the exclusion of hearsay, exceptions tailored to allow the introduction of evidence which in fact is likely to be trustworthy have long existed." (Citations omitted.) Id.,

302. Thus, when a statement against penal interest bears significant assurances of trustworthiness and is crucial to the defendant's theory of defense, the due process clause bars exclusion of the statement. See id., 285, 302–303. In other words, as the court in *Chambers* explained, "[i]n [such] circumstances, [in which] constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." Id., 302.

Before *Chambers*, however, in this state, "such third party statements were per se inadmissible as hearsay. . . . In *State* v. *DeFreitas*, [179 Conn. 431, 449, 426 A.2d 799 (1980)], we interpreted *Chambers* as forbidding . . . application of the hearsay rule to exclude all third party statements against penal interest exculpatory of an accused. We [nevertheless] concluded . . . that *Chambers* did not mandate the admission of every such statement but required the admission only of those statements that, *after a careful examination*, were determined in the sound discretion of the trial court to be *trustworthy. State* v. *DeFreitas*, supra, 451–52." (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Lopez*, supra, 239 Conn. 71. As we explained in *DeFreitas*, "courts have recognized that the unrestricted admission of declarations against penal interest would be to invite perjury of a kind that is most difficult to ascertain. To circumscribe fabrication and [to] ensure the reliability of declarations against penal interest, there must exist circumstances . . . [that] clearly tend to support the facts asserted in the declarations." *State* v. *DeFreitas*, supra, 452 n.9. Thus, under our case law and § 8-6 (4) of the Connecticut Code of Evidence,[26] which represents a codification of

---

[26] Section 8-6 of the Connecticut Code of Evidence provides in relevant part: "The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

\* \* \*

"(4) Statement against penal interest. A trustworthy statement against penal interest that, at the time of its making, so far tended to subject the

that case law, a statement against penal interest by an unavailable declarant is admissible only if the statement is trustworthy and, "at the time of its making, so far tended to subject the declarant to criminal liability that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true."[27] Conn. Code Evid. § 8-6 (4); see also, e.g., *State* v. *Lopez*, 254 Conn. 309, 315, 757 A.2d 542 (2000). "In allowing this exception to the hearsay rule, *we are primarily concerned that under the particular circumstances, the statement is trustworthy*, that is, that safeguards reasonably equivalent to the oath and the test of cross-examination exist." (Emphasis added; internal quotation marks omitted.) *State* v. *Lopez*, supra, 254 Conn. 316. The court must consider three primary factors in determining whether the statement is suffi-

---

declarant to criminal liability that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true. In determining the trustworthiness of a statement against penal interest, the court shall consider (A) the time the statement was made and the person to whom the statement was made, (B) the existence of corroborating evidence in the case, and (C) the extent to which the statement was against the declarant's penal interest. . . ."

Although § 8-6 of the Connecticut Code of Evidence has been amended recently, subdivision (4) has not been amended since the inception of the code in 2000. Hereinafter, all references and citations to Conn. Code Evid. § 8-6 (4) are to the current edition.

[27] Our rule governing the admissibility of declarations against penal interest is modeled generally after rule 804 (b) (3) of the Federal Rules of Evidence. Rule 804 (b) of the Federal Rules of Evidence provides in relevant part: "Hearsay exceptions.—The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

* * *

"(3) Statement against interest.—A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement. . . ."

ciently trustworthy to render it admissible: (1) the time the statement was made and the person or persons to whom the statement was made; (2) the existence of corroborating evidence in the case; and (3) the extent to which the statement was against the penal interest of the declarant. Conn. Code Evid. § 8-6 (4); see also *State* v. *Lopez*, supra, 254 Conn. 316.

"We previously have emphasized, however, that no single factor in the test . . . for determining the trustworthiness of third party declarations against penal interest is necessarily conclusive . . . . Thus, it is not necessary that the trial court find that all of the factors support the trustworthiness of the statement. The trial court should consider all of the factors and determine whether the totality of the circumstances supports the trustworthiness of the statement."[28] (Citations omitted; internal quotation marks omitted.) *State* v. *Lopez*, supra, 254 Conn. 316.

With respect to the timeliness element of the first prong of the trustworthiness test, "[w]e afford the trial court broad discretion in deciding whether the timeliness of a statement indicates that it is trustworthy. In general, declarations made soon after the crime suggest more reliability than those made after a lapse of time [during which] a declarant has a more ample opportunity for reflection and contrivance. . . . A statement's

---

[28] Of course, "[i]n determining whether the threshold level of trustworthiness [is] satisfied . . . the trial court does not have to find it to be absolutely trustworthy because if this were so, the province of the jury as the finder of fact and weigher of credibility would be entirely invaded." (Citation omitted; internal quotation marks omitted.) *State* v. *Bryant*, 202 Conn. 676, 693, 523 A.2d 451 (1987). Indeed, imposing a stricter standard would be "utterly unrealistic." (Internal quotation marks omitted.) *State* v. *Gold*, 180 Conn. 619, 632, 431 A.2d 501, cert. denied, 449 U.S. 920, 101 S. Ct. 320, 66 L. Ed. 2d 148 (1980). Furthermore, "[w]hen viewing this issue through an evidentiary lens, we examine whether the trial court properly exercised its discretion." (Internal quotation marks omitted.) *State* v. *Smith*, 289 Conn. 598, 631, 960 A.2d 993 (2008).

timeliness, however, is not necessarily dispositive of the trustworthiness determination." (Citation omitted; internal quotation marks omitted.) Id., 317. Thus, this court has upheld the admission of third party statements against penal interest even though the timing of those statements afforded the declarant abundant opportunity for contrivance. See, e.g., *State* v. *Rivera*, 268 Conn. 351, 370–71, 844 A.2d 191 (2004) (statement against penal interest made "within five months" of commission of crime deemed sufficiently trustworthy to be admissible); *State* v. *Gold*, 180 Conn. 619, 634, 431 A.2d 501 (statement made within three months of crime deemed sufficiently trustworthy), cert. denied, 449 U.S. 920, 101 S. Ct. 320, 66 L. Ed. 2d 148 (1980). We also have upheld the exclusion of a statement against penal interest as untrustworthy when the statement was made so soon after the crime that the declarant had little or no time for reflection or fabrication. See, e.g., *State* v. *Lopez*, supra, 254 Conn. 317–21 (statement made one and one-half days after crime was nevertheless untrustworthy because it was not sufficiently corroborated); *State* v. *Hernandez*, 204 Conn. 377, 392–93, 528 A.2d 794 (1987) (statement made one day after crime was nevertheless untrustworthy because, inter alia, it was not sufficiently corroborated). Indeed, in certain circumstances, statements against penal interest have been deemed to be particularly reliable because a significant amount of time had elapsed from the date of the crime to the date of the declaration. See, e.g., *Stevens* v. *People*, 29 P.3d 305, 316 (Colo. 2001) (statement against penal interest more reliable when two years had passed since events at issue and investigation of declarant appeared to be inactive), cert. denied, 535 U.S. 975, 122 S. Ct. 1448, 152 L. Ed. 2d 390 (2002). It therefore may be said that "the passage of time makes a statement more reliable in one case and less reliable in another." *State* v. *Mizenko*, 330 Mont. 299, 375, 127 P.3d 458 (War-

ner, J., concurring), cert. denied, 549 U.S. 810, 127 S. Ct. 43, 166 L. Ed. 2d 19 (2006).

As for the second part of the first prong of the trustworthiness test, "we require that the witness testifying [about] the statement must be one in whom the declarant would naturally confide." (Internal quotation marks omitted.) *State* v. *Lopez*, supra, 254 Conn. 317–18. Thus, the relationship between the declarant and the person in whom the declarant confided must be close and confidential. *State* v. *Rivera*, 221 Conn. 58, 70, 602 A.2d 571 (1992). "[T]he focus on the party to whom the statement was made is consistent with the requirement that the declarant be aware of the disserving quality of the statement." *Laumer* v. *United States*, 409 A.2d 190, 201 n.15 (D.C. 1979).

With respect to the second trustworthiness factor, namely, the existence of corroborating circumstances, this court repeatedly has emphasized that "[t]he corroboration requirement for the admission of a third party statement against penal interest is significant and *goes beyond minimal corroboration.*" (Emphasis in original; internal quotation marks omitted.) *State* v. *Lopez*, supra, 254 Conn. 319; accord *State* v. *Rivera*, supra, 221 Conn. 71. "Therefore, the statement must be accompanied by corroborating circumstances that *clearly indicate* the statement's trustworthiness." (Emphasis in original.) *State* v. *Lopez*, supra, 254 Conn. 319. In determining whether a statement is corroborated, "all evidence bearing on the trustworthiness of the underlying statement may be considered. . . . No one criterion [is] determinative, but the [trial] court [should] consider a wide variety of facts and circumstances in making the ultimate determination of admissibility." (Citations omitted.) *State* v. *Paredes*, 775 N.W.2d 554, 567 (Iowa 2009).

Finally, the statement also must be against the declarant's penal interest. In determining whether a statement

satisfies this requirement, this court has rejected a "narrow and inflexible definition of a statement against penal interest in favor of a definition [that] includes not only confessions . . . but other remarks [that] would tend to incriminate the declarant were he or she the individual charged with the crime." (Internal quotation marks omitted.) *State* v. *Bryant*, 202 Conn. 676, 695, 523 A.2d 451 (1987). Thus, "[t]he against interest exception is not limited to a defendant's direct confession of guilt. . . . It applies as well to statements that tend to subject the speaker to criminal liability. . . . [Consequently, the] rule encompasses disserving statements [made] by a declarant that would have probative value in a trial against the declarant. . . . [Our rule therefore] reaches . . . remarks that strengthen the impression that the declarant had an insider's knowledge of the crimes. . . . As to what is against penal interest, quite obviously the essential characteristic is exposure to risk of punishment for a crime. . . . Moreover, it is not the fact that the declaration is against interest but the awareness of that fact by the declarant [that] gives the statement significance." (Citations omitted; internal quotation marks omitted.) Id., 695–96.

C

Admissibility of the Bryant Evidence as
Statements Against Penal Interest

After carefully reviewing the Bryant evidence, the trial court concluded that the evidence was admissible as trustworthy declarations against penal interest. Although a statement against penal interest may be admissible even when not all of the trustworthiness factors have been satisfied, in the present case, the trial court expressly found that *each and every one* of those considerations had been satisfied. Specifically, the trial court stated: "In the present case, full consideration of the totality of the circumstances supports the admissi-

bility of . . . Bryant's statements. . . . Bryant's statements were made under circumstances [that] support admission, are corroborated by sufficient evidence, and are clearly against his penal interest."[29]

Before reviewing the analytical underpinnings of the trial court's ruling, it first must be noted that the newly discovered Bryant evidence is highly relevant, and, therefore, the evidence would be admissible at a second trial if the petitioner is able to establish that Bryant's statements fall within an exception to the rule against hearsay. The standards governing the admissibility of third party culpability evidence are well established. "[A] defendant has a right to introduce evidence that indicates that someone other than the defendant committed the crime with which [he] has been charged. . . . The defendant must, however, present evidence that directly connects a third party to the crime. . . . It is not enough to show that another [person] had the motive to commit the crime . . . nor is it enough to raise a bare suspicion that some other person may have committed the crime of which the defendant is accused. . . .

"The admissibility of evidence of third party culpability is governed by the rules relating to relevancy. . . . Relevant evidence is evidence having any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence. . . . Accordingly, in explaining the requirement that the proffered evidence establish a direct connection to a third party, rather than raise merely a bare suspicion regarding a third party, we have stated . . . [that] [s]uch evidence is relevant, exculpatory evidence,

---

[29] There is no dispute that Bryant's invocation of his privilege against self-incrimination renders him unavailable as a witness for purposes of the statement against penal interest exception to the hearsay rule.

rather than merely tenuous evidence of third party culpability [introduced by a defendant] in an attempt to divert from himself the evidence of guilt. . . . In other words, evidence that establishes a direct connection between a third party and the charged offense is relevant to the central question before the jury, namely, *whether a reasonable doubt exists as to whether the defendant committed the offense.* Evidence that would raise only a bare suspicion that a third party, rather than the defendant, committed the charged offense would not be relevant to the jury's determination. A trial court's decision, therefore, that third party culpability evidence proffered by the defendant is admissible . . . necessarily entails a determination that the proffered evidence is relevant to the jury's determination *of whether a reasonable doubt exists as to the defendant's guilt.*" (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Arroyo*, 284 Conn. 597, 609–10, 935 A.2d 975 (2007). Because the Bryant evidence implicates Hasbrouck and Tinsley as the parties responsible for the victim's murder, thereby exonerating the petitioner, it is inarguable that the Bryant evidence would be highly relevant at a second trial. Indeed, the evidence bears directly on the central issue of whether the state has established beyond a reasonable doubt that the petitioner, and not some other person or persons, murdered the victim. Consequently, the admissibility of the evidence depends solely on whether it consists of trustworthy statements against penal interest.

I also note, as a preliminary matter, the standard of review that governs this court's consideration of the trial court's determination that the Bryant evidence does satisfy the requirements of the declaration against penal interest exception to the hearsay rule. "To the extent [that the] trial court's admission of evidence is based on an interpretation of the Code of Evidence,

our standard of review is plenary. For example, whether a challenged statement properly may be classified as hearsay and whether a hearsay exception properly is identified are legal questions demanding plenary review. They require determinations about which reasonable minds may not differ; there is no 'judgment call' by the trial court, and the trial court has no discretion to admit hearsay in the absence of a provision providing for its admissibility." *State* v. *Saucier*, 283 Conn. 207, 218, 926 A.2d 633 (2007). When the trial court's ruling, however, is premised on a correct view of the law, that is, when, as in the present case, the trial court properly has determined "that a particular statement is or is not hearsay, or is subject to a hearsay exception"; id., 219; this court affords "the utmost deference to the trial court's determination [of admissibility]."[30] Id. In the present case, therefore, we must "make every reasonable presumption in favor of upholding the trial court's ruling . . . and . . . upset it [only] for a manifest abuse of discretion." (Internal quotation marks omitted.) *State* v. *Bonner*, 290 Conn. 468, 496, 964 A.2d 73 (2009). Accordingly, "the question is not whether [the reviewing court], had [it] been sitting as the trial judge, would have exercised [its] discretion differently. Our role as an appellate court is not to substitute our judgment for that of a trial court that has chosen one of

---

[30] The state nevertheless suggests that the trial court's ruling is not entitled to such deference, asserting that, under *State* v. *Saucier*, supra, 283 Conn. 218, "[w]hether a challenged statement . . . [is] admissible as an exception to the hearsay rule is a legal question demanding plenary review." The state misconstrues this court's holding in *Saucier*. As we explained in *Saucier*, the propriety of the trial court's application of the proper evidentiary rule is subject to an abuse of discretion standard of review. See id., 218–19. In other words, whether a statement constitutes hearsay is a legal question that is subject to plenary appellate review. Id., 218. Whether a statement satisfies the relevant requirements of a hearsay exception, however, is a determination that is reviewed for an abuse of discretion. See id., 218–19. Because the issue raised by the present case falls squarely into the latter category, the trial court's determination must stand unless it is manifestly unreasonable.

many reasonable alternatives." (Internal quotation marks omitted.) *State* v. *Day*, 233 Conn. 813, 842, 661 A.2d 539 (1995). Thus, the party seeking to overturn a discretionary evidentiary ruling has the "heavy burden"; *State* v. *Ross*, 230 Conn. 183, 226, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995); of establishing that the trial court rationally could not have decided as it did. E.g., *State* v. *Orr*, 291 Conn. 642, 667, 969 A.2d 750 (2009) ("[i]n determining whether there has been an abuse of discretion, the ultimate issue is whether the court could reasonably conclude as it did"); *State* v. *Reynolds*, 264 Conn. 1, 224–25 n.192, 836 A.2d 224 (reviewing court will not find abuse of discretion if trial court "rationally could have decided as it did"), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004).

I now turn to the trial court's findings with respect to the three part test for evaluating the trustworthiness of a statement against penal interest. As for the timing of Bryant's statements, the court recognized that "there [were] actually two sets of disclosures relevant to this factor; first, the disclosure from Hasbrouck and Tinsley to Bryant and, second, from Bryant to [Mills, Kennedy and Colucci]. . . . [T]he statements by Hasbrouck and Tinsley were made immediately following the commission of the crime, which fits well within the traditional view of a time frame indicative of trustworthiness." The trial court also observed, however, that, "[b]eyond the initial disclosure of Hasbrouck and Tinsley to Bryant . . . the timeline of the present case is far from typical." That is, Bryant's failure to disclose the information known to him about Hasbrouck's and Tinsley's involvement in the victim's murder for more than twenty-five years is unusual and, ordinarily, would render his infor-

mation highly suspect.[31] The trial court explained, however, why that delay was understandable in the wholly atypical circumstances of the present case. The court stated: "The context of the longer time span in the present case is tied into the twenty-five year delay in reopening the investigation of [the victim's] murder. This unique circumstance, rather then a twenty-five year opportunity for reflection and contrivance, is the central factor that distinguishes it from typical cases [in which] investigation and prosecution of the defendant [do] not even approach the length of time present here. . . .

"Because of the length of the state's investigation, [Bryant] had an incentive to keep himself out of a case that he reasonably thought would never be solved. . . . Bryant indicates that even after the petitioner was arrested and brought to trial, he still refused to come forward because he thought there was no way that [the petitioner] would be convicted. . . . [Moreover] [a]t the time of the murder in 1975, [Bryant] was a fourteen year old black male who was suddenly faced with information that, by his own admission, was clearly against his penal interest . . . ." The court further observed that Bryant had not come forward immediately after the murder because, as he had told Colucci, he "was afraid of being automatically pinned . . . as a suspect." (Internal quotation marks omitted.) The court also underscored the fact that Bryant had told Colucci that it would have been "easier" for the state to have convicted Bryant than the petitioner and, further, that Bryant's family had far fewer resources than the petitioner's family to provide for Bryant's defense if Bryant had become a suspect. The trial court concluded, on the

---

[31] As the trial court aptly noted, however, "Bryant's late disclosure, prompted by the petitioner's criminal case, is similar to the delayed disclosure that occurred with many of the witnesses [that] the state relied [on] at the petitioner's criminal trial."

basis of the foregoing considerations, and in light of the fact that Bryant, who has a law degree, had knowledge that there is no statute of limitations on prosecuting the crime of murder in Connecticut, that "his reluctance to tell his story [was] reasonable."

With respect to the second part of the first prong of the test, that is, the person or persons to whom the declarant made the inculpatory statement and the nature of the declarant's relationship with that person or persons, the trial court concluded that "[c]onsideration of the individuals to whom . . . Bryant made his statements supports their trustworthiness." The court found: "[T]he fact that . . . Bryant's first disclosure regarding the details of his whereabouts on October 30, 1975, was to . . . Mills [a friend whom he trusted] supports the trustworthiness of his statement. Bryant and Mills shared a connection to the facts of this case, dating back to their shared experiences [in] Belle Haven during the time leading up to the murder. Following this disclosure to [Mills], Bryant repeated the events of October 30, 1975, to [Kennedy] and [the petitioner's] investigator, which further confirm[s] its trustworthiness." With respect to the petitioner's investigator, namely, Colucci, the trial court underscored that Colucci "explicitly informed Bryant that [Bryant] was being sought out in connection with a court proceeding. Bryant was further aware that his statements were being [video-recorded] and that the recording was clearly being made in anticipation of being presented in court. Bryant graduated from the University of Tennessee Law School. Bryant's knowledge of [Colucci's] official role provides a greater indication of trustworthiness than the normal individual with whom the declarant does not have a close relationship."

The trial court then considered the second factor, namely, the extent to which Bryant's statements were corroborated, and found that the existence of corrobo-

rating circumstances supported the conclusion that those statements were trustworthy. The court identified the following corroborating circumstances in its memorandum of decision: (1) "Bryant went to . . . Brunswick School and was classmates with the children in the Belle Haven neighborhood"; (2) "[s]everal witnesses, including . . . Mills and . . . Walker, confirm[ed] that Bryant socialized [in] Belle Haven"; (3) "witnesses confirm[ed] that Bryant [previously had] indicated that he [had been] present in Belle Haven on the night of the murder";[32] (4) "[o]ne witness recall[ed] seeing . . . Hasbrouck and . . . Tinsley in Belle Haven with Bryant during the fall of 1975"; (5) "[b]oth Hasbrouck and Tinsley admitted to [Kennedy] that they had been in Belle Haven with Bryant on several occasions"; (6) "Bryant also provide[d] detailed descriptions of the layout of Belle Haven, including accurate recitations of where people in the neighborhood lived"; (7) "[a]ccording to Bryant, Hasbrouck was [six feet, two inches tall], at least 200 pounds on the date of the [murder], and 'very strong' "; (8) "Bryant stated that . . . Hasbrouck was obsessed with [the victim], and 'wanted to go caveman on her,' meaning that he would club her, drag her away by the hair and sexually assault her"; (9) "[o]n the night of the murder, Bryant stated that he, Hasbrouck and Tinsley walked around Belle Haven with golf clubs from

---

[32] According to these witnesses, namely, Barbara Bryant (Bryant's mother) and Esme Ingledew Dick (a friend of Bryant's mother), Bryant told them shortly after the victim had been murdered that he was in Belle Haven on the night of the murder. In fact, Barbara Bryant recalled that, according to her son, both Hasbrouck and Tinsley also were in Belle Haven that night and, in addition, that Hasbrouck and Tinsley had spent the entire night there. The testimony of Barbara Bryant and Dick is particularly significant because it contained Bryant's contemporaneous account of his whereabouts that night, an account that, because it was given shortly after the murder when Bryant was only fourteen years old, strongly corroborates his statements, made many years later, that he, along with Hasbrouck and Tinsley, had been in Belle Haven on the night of the murder. See part III G 3 of this opinion.

the [Skakels'] residence, with Hasbrouck stating that he had his 'caveman club' and that he would not leave Belle Haven unsatisfied"; (10) "[t]he victim had suffered multiple and severe injuries to her head and stab wounds to her neck, which were consistent with being caused by a piece of golf club shaft"; (11) "[p]ieces of the golf club found near the victim's body were the same brand of golf club found at the [Skakels'] residence"; and (12) "[e]vidence presented at the petitioner's criminal trial show[ed] that these clubs were commonly left about the [Skakels'] property."

The trial court further stated: "Corroboration of Bryant's statements [also] can be found in the very reason that he is unavailable to testify. In the present case, Bryant, Hasbrouck and Tinsley have all invoked their [privilege against self-incrimination] after being served with subpoenas to testify at a deposition." In concluding that Bryant's, Hasbrouck's and Tinsley's invocation of their privilege against self-incrimination supports the reliability of Bryant's incriminating statements, the trial court necessarily also concluded that the three men had asserted their privilege because to do otherwise would expose them to possible criminal prosecution on the basis of the truth of Bryant's statements.[33]

---

[33] I note that the trial court found that Bryant's, Hasbrouck's and Tinsley's invocation of their privilege against self-incrimination corroborated Bryant's statements even though the court was not required to draw such an inference. Cf. *Rhode* v. *Milla*, 287 Conn. 731, 738, 949 A.2d 1227 (2008) (whether nonparty witness' invocation of privilege against self-incrimination may be considered by fact finder is determination to be made by trial court, on case-by-case basis, in exercise of court's sound discretion). Furthermore, as the majority has noted, the state explained in oral argument before this court that it did not seek to grant Bryant immunity from prosecution for the purpose of compelling his testimony because it is not the state's practice to grant immunity to persons who, in the state's view, are not telling the truth. Although Hasbrouck and Tinsley also invoked their privilege against self-incrimination, the state elected not to grant them immunity even though it credited the statements that they had made denying any involvement in the victim's murder.

With respect to the third and final factor, the trial court found that Bryant's statements were *"clearly against his penal interest."* (Emphasis added.) Although not a confession to the victim's murder, Bryant's statements place him at or near the scene of the murder, with Hasbrouck and Tinsley, immediately before the victim was murdered. Bryant also acknowledged possessing a golf club, the instrumentality used to kill the victim, that he had obtained from the Skakels' property. The information that Bryant provided demonstrates an insider's knowledge of the crime and would constitute highly incriminating evidence of guilt if Bryant were to be the target of a prosecution for an offense or offenses relating to the death of the victim. Indeed, Bryant's mother had urged him not to come forward "because he would be implicated [in the murder by] putting himself at the scene of the crime." Furthermore, when he finally did come forward, Bryant, a law school graduate, was acutely aware of the incriminating nature of his information. The trial court also observed that Bryant's "[e]fforts to explain away possible physical evidence indicate a consciousness of guilt. [Bryant's statements concerning his presence in Belle Haven on the day of the murder and his possession of a golf club at that time represent an attempt] to explain away the possibility that his fingerprints might be found on the murder weapon or another golf club nearby."[34] Finally, although Bryant eventually disclosed the information that he had been so wary of revealing, he subsequently invoked his privilege against self-incrimination, further demonstrating his understanding of the incriminating nature of his statements.

I fully agree with the trial court's conclusion that the Bryant evidence, although hearsay, would be admissible at a second trial under the exception to the hearsay

---

[34] In fact, Bryant had told Kennedy that he was "surprised [that the authorities] didn't get [his] prints off those clubs."

rule for trustworthy declarations against penal interest. Indeed, because, as the trial court found, the Bryant evidence satisfies each of the three factors to be considered in determining the admissibility of such declarations, including the requirement that the reliability of the statements must be clearly demonstrated by corroborating circumstances, a contrary conclusion would deny the petitioner "a trial in accord with traditional and fundamental standards of due process." *Chambers* v. *Mississippi,* supra, 410 U.S. 302. For the reasons set forth in part III G of this opinion, the trial court, having properly recognized the trustworthiness of Bryant's statements, improperly failed to consider that evidence in the context of the original trial evidence. Before turning to that issue, however, it is necessary, first, to identify certain additional facts in the record that support the trial court's trustworthiness determination; see part III D of this opinion; second, to address the view expressed by the concurrence that the trial court improperly concluded that the Bryant evidence would be admissible at a new trial as trustworthy statements against penal interest; see part III E of this opinion; and, third, to explain why the Bryant evidence would be admissible under the residual exception to the hearsay rule *even if* that evidence did not satisfy the declaration against penal interest exception to the hearsay rule. See part III F of this opinion.

## D

### Additional Facts and Circumstances That Render the Bryant Evidence Trustworthy

The trial court reasonably could have relied on certain other evidence adduced at the hearing on the petition for a new trial because that evidence supports the court's finding that Bryant's statements are admissible as trustworthy third party declarations against penal interest. This same evidence, moreover, also supports

the conclusion that those statements meet the *Shabazz* credibility threshold as a matter of law. In particular, the Bryant evidence is corroborated to varying degrees by the statements and testimony of numerous witnesses, the state has proffered no plausible explanation why Bryant, about whom there is nothing adverse in the record, would falsely implicate two innocent people in a high profile murder and, at the same time, place himself, his reputation and his family's reputation at severe risk, and there is physical evidence that corroborates Bryant's statements.

Perhaps the most significant additional corroboration comes from Hasbrouck and Tinsley themselves, both of whom, before invoking their privilege against self-incrimination, spoke on several occasions to Kennedy and others and acknowledged that they were in Belle Haven on the day of the murder and that they previously had visited Byrne's house on a number of occasions. That corroborative evidence came to light in the following manner. After his initial conversations with Bryant, Kennedy attempted to verify some of the information that Bryant had provided to him. He first located and called Hasbrouck at his residence in Bridgeport. When Hasbrouck answered, Kennedy identified himself and his relationship to the petitioner. Kennedy asked Hasbrouck whether he knew "Tony Bryant." Hasbrouck confirmed that he did and volunteered that he and Bryant used to "run around" with Byrne and Walker in Greenwich. Kennedy then asked Hasbrouck whether he was in Greenwich on the night of the murder. Hasbrouck responded that, "unfortunately," he was not there. He also claimed that he only recently had learned about the murder. Hasbrouck told Kennedy that Tinsley was living in Oregon and that, although he spoke with Tinsley occasionally, he had not been in touch with Byrne, Walker or Bryant since the 1970s. Before hanging

up, Hasbrouck asked Kennedy for Bryant's telephone number.

Kennedy was able to locate Tinsley in Oregon, and, a few days after speaking to Hasbrouck, Kennedy telephoned Tinsley. Tinsley told Kennedy that Hasbrouck had mentioned that Kennedy might call him. In response to the same general questions that Kennedy asked Hasbrouck, Tinsley explained that he had met Bryant at Hughes High School and that he and Hasbrouck had gone with Bryant to Greenwich on several occasions. According to Tinsley, going to Greenwich "was sort of fun . . . new people to meet . . . rich community." Tinsley went to Greenwich about "a half dozen times" and remembered the Walker family "real well." When asked whether he knew Byrne, Tinsley responded that he had gone to his house "probably . . . three times." Kennedy asked him whether he had gone to Greenwich on the night before Halloween. Tinsley responded, "Halloween, it seems to me we were going up there. I have a hard time remembering . . . ." Kennedy then asked him whether he knew that Byrne had committed suicide a few years after the murder. Tinsley responded that he was not aware of that fact and that, "after the murder . . . we never went up there . . . ."

Unlike Hasbrouck, however, who initially claimed not to have learned about the murder until around the time of the petitioner's arrest, Tinsley told Kennedy that he had read about the murder in the New York Times after it happened and that he had discussed it with his brother. Tinsley further stated that he thought that they had gone to a party in Greenwich sometime during the week leading up to Halloween. He then recalled, without prompting, that Byrne's "house was really huge. They had two different kitchens, and it was an old, historical house. There was a servant's kitchen, if I'm not mistaken . . . . It was just huge . . . . [The] refrigerator had no handle . . . . [Y]ou push[ed] the

button and electronically the door popped open . . . ." According to Tinsley, Byrne had made fun of him because he did not know how to open it at first. He also recalled that Byrne had lots of "toys and stuff . . . to mess around with" and that they once sprayed so much shaving cream inside the house that it "looked like hell . . . ." Tinsley told Kennedy that he, Hasbrouck and Bryant had attended a dance in Greenwich during that period. As I previously indicated, in his interview with Colucci, Bryant also recalled attending a dance in Greenwich with Hasbrouck and Tinsley, noting that Hasbrouck had been fixated on the victim for the entire evening. The victim herself wrote about a dance in her diary, stating that two strangers had approached her as soon as she walked in. She also recalled seeing Walker, Bryant's good friend, and many other people from the neighborhood that night.

Finally, Tinsley volunteered to Kennedy that, sometime around the time of the murder, Bryant's girlfriend, who lived in Greenwich, ran away with another friend to Philadelphia, and that he, Hasbrouck and Bryant met up with them while they were in New York and tried to convince them to go home. According to Tinsley, someone had called him on the telephone at his apartment looking for the girls. Tinsley claimed that, after Bryant spoke to the caller on the telephone, the girls went home.

Kennedy asked Tinsley whether he ever had seen the Skakels' house or eaten there. Tinsley responded: "[T]he only time that I ever heard or thought of [the petitioner], and I never met any of them, [was when] [Bryant] pointed these guys out [and] [Byrne] . . . said that . . . one of them was nuts, and I said, what do you mean nuts? He said, you know, it was [the petitioner], and he said [he was in a] pretty serious fight at . . . Brunswick School [and was expelled]."

Kennedy turned over all of the information that he had gathered to Colucci. On September 2, 2003, Colucci and his associate, Steele, made an unannounced visit to Hasbrouck at his home in Bridgeport. Colucci testified that the purpose of the visit was to get a sense of Hasbrouck as a person, to see how he reacted to Bryant's accusations and to inquire whether he would agree to a video-recorded interview as Bryant had. According to Colucci, Hasbrouck started talking immediately and, over the course of approximately seventy minutes, changed his story three times with respect to his whereabouts on the day of the murder. First, he told Colucci and Steele that he was in Belle Haven on the morning of the murder but left around noontime because "nothing much was going on . . . ." Next, he stated that he, Tinsley and Bryant arrived in the morning but went home between 6 and 6:30 p.m., "before it got dark." Finally, at the conclusion of the interview, he stated that the group got there in the morning and left around 9 or 9:30 p.m.

After speaking to Hasbrouck, Colucci contacted Tinsley by telephone in Oregon. During the conversation, Tinsley stated that he was in Belle Haven on the day of the murder but did not remember anything more than that. Not long thereafter, however, both Hasbrouck and Tinsley notified Colucci that, after consulting their calendars, they had realized that they were not in Belle Haven that day. Colucci testified that Hasbrouck admitted that he had spoken to Tinsley and that they had consulted each other for the purpose of reconciling their stories. Both Hasbrouck and Tinsley, like Bryant, subsequently invoked their privilege against self-incrimination when subpoenaed to testify at a deposition noticed by the petitioner.[35]

[35] The state suggests that, because Colucci's interviews with Hasbrouck and Tinsley were not recorded, and because one of the written interview reports mistakenly failed to reflect certain of Tinsley's statements, Colucci's testimony concerning Hasbrouck's and Tinsley's acknowledgment that they were in Belle Haven on October 30, 1975, is not necessarily reliable. There

Other witnesses also corroborated various aspects of Bryant's statements, including Bryant's close ties to Belle Haven and Hasbrouck's and Tinsley's presence in Belle Haven at or around the time of the murder. For example, Walker, who lived across the street from Byrne and attended Brunswick School with Bryant, testified that Bryant visited his home "on many occasions" and that, after Bryant had moved to Manhattan, he had brought Hasbrouck and Tinsley with him to Greenwich "a few times . . . ." Walker also recalled that, on one occasion, Byrne's mother called his house to complain that either Hasbrouck or Tinsley, he could not remember which one, was sitting on the wall outside her house, "purportedly waiting for [Byrne] to come home . . . . And she was uncomfortable with him being there, and asked [Walker] if [he] could find a way to tell him to stop doing that." Walker stated that, by the time he got outside, whoever it was had left, "so [he] called [Bryant] and asked him if he could tell [Hasbrouck] or [Tinsley] to stop hanging around at [Byrne's] house." He did not recall, however, whether Hasbrouck, Tinsley or Bryant had come by his house on the night of the murder, which was a school night for him, and he did not remember Hasbrouck ever saying anything about the victim in his presence.

Marjorie Walker Hauer, Neal Walker's sister and the victim's best friend, testified, that although she remembered Bryant well, she did not recall whether she ever had met Tinsley or Hasbrouck. She did recall, however, the same incident that Tinsley had related to Kennedy involving the Greenwich girls who ran away and ended up in New York City. Hauer wrote about the incident

does not appear to be any dispute, however, that, as Colucci testified, both men changed their story about being in Belle Haven on the day of the victim's murder after checking their calendars. Because the state does not challenge Colucci's testimony that the two men subsequently changed their stories, there also can be no dispute that they previously had indicated that they were in Belle Haven on that date.

in her diary on October 26, 1975, four days before the murder, and the diary entry was read into the record at the hearing on the petition for a new trial. Hauer wrote: "I called . . . Bryant, my brother's friend, and [the] boyfriend [of one of the girls] and he said he saw them, and that they were [in New York City]. . . . I told him to try to convince the . . . other three to come home. Two of them are ninth graders, and one [is] in eighth grade . . . ." Although Hauer's diary entry bears no direct relation to Bryant's assertions that Hasbrouck and Tinsley, and not the petitioner, were responsible for the victim's murder, it nevertheless confirms Tinsley's ties to people in Belle Haven just days before the murder.

There also is considerable corroboration of Bryant's statements regarding Byrne's house and how, because of its size, Hasbrouck and Tinsley easily could have been there and not been seen by any adults.[36] Hauer, who grew up across the street, described the house as a "huge Tudor style stone" mansion with "lot[s] of rooms." Hauer testified that her brother, Walker, spent a lot of time at Byrne's house because it was "a little freer there," "[t]here wasn't as much supervision" and "[Byrne] had a lot of fun toys to play with, like go carts and things like that." She also recalled a secret tunnel that ran beneath the house that was accessible through an outside door. Garr, one of the state's investigators, testified that the house was "enormous" and that if you were in one area of the house, it would be possible to be unaware that another person was in a different area. According to Byrne's older brother, the house had twenty-eight rooms.

---

[36] Byrne's brother testified at his deposition that, although he did not live in Belle Haven at the time of the murder, he did not recall seeing Hasbrouck and Tinsley at his parents' house on the morning after the murder, when he arrived to work in a basement office that he used there.

Wholly apart from the foregoing corroborating evidence, however, Bryant's testimony is credible because of the complete absence of *any* apparent motive for him to lie. See, e.g., *State* v. *Gold*, supra, 180 Conn. 634–35 (declarant's lack of motive to lie is corroborating circumstance that indicates reliability of third party statement against penal interest). Indeed, the state has adduced no evidence suggesting that Bryant had anything to gain by coming forward with false information exonerating the petitioner and implicating Hasbrouck and Tinsley in the victim's murder. Moreover, every single witness who knew about Bryant's allegations before Bryant agreed to his video-recorded interview with Colucci testified that Bryant was extremely reluctant to come forward and did so only after the petitioner had been convicted—wrongly, on the basis of the evidence known to Bryant—and only after Bryant's identity already had been disclosed publicly. The undisputed evidence clearly demonstrates, therefore, that Bryant never sought any publicity or recognition on account of what he knew about Hasbrouck and Tinsley; rather, he repeatedly failed or refused to return telephone calls or otherwise cooperate with those who, on behalf of the petitioner, sought to interview him about his information.[37]

Furthermore, and significantly, there is nothing in the record concerning Bryant's background or character that would cast genuine doubt on his credibility or trustworthiness as a witness. In particular, the record

---

[37] The state suggests that Bryant might have made up his story merely "to get into the act," perhaps to gain the attention of his former classmates. This theory, like the similar theory hypothesized by the majority; see part III G of this opinion; is highly implausible because it is absolutely clear from the record that Bryant did everything possible to *avoid* any publicity or attention on account of what he purported to know about the victim's murder. Indeed, he did not confide in Mills until more than twenty-five years after the murder, following the arrest of a person who, on the basis of Bryant's knowledge of the facts, is innocent.

is devoid of evidence establishing that Bryant has a reputation for untruthfulness[38] or that he otherwise has demonstrated that he has a tendency to be dishonest. It therefore is especially hard to believe that he would concoct a story falsely accusing two former classmates of a murder with which they had nothing to do. In fact, Mills, who has known Bryant since they attended the sixth grade together, testified that Bryant is "a very friendly, easy going, kind person," and that he could not recall a single instance of Bryant "ever saying a mean word about anybody." Moreover, there is no indication that Bryant suffers from any mental illness or instability that might call into question his judgment or ability to appreciate fully the significance of the information that he has provided. Simply put, there is no reason to think that Bryant is the kind of person who would do what the trial court necessarily believes that he has done—that is, falsely implicate two people in a murder—in rejecting his statements as incredible.

On the contrary, the state has failed to adduce any probative evidence demonstrating that Bryant is any more likely to provide false testimony than any other citizen with knowledge about a crime. Bryant comes from a prominent family, graduated from a private preparatory school in Texas, obtained his college degree from the University of Houston,[39] and attained his law degree from the University of Tennessee. He is married with four children and apparently owned his own business at the time of his video-recorded interview with Colucci. In that interview, Bryant is highly articulate and appears extremely rational, thoughtful and forth-

---

[38] See Conn. Code Evid. § 6-6 (a) ("The credibility of a witness may be impeached or supported by evidence of character for truthfulness or untruthfulness in the form of opinion or reputation. Evidence of truthful character is admissible only after the character of the witness for truthfulness has been impeached.").

[39] The evidence also indicates that Bryant was a standout athlete in both high school and college.

coming. I can think of no plausible explanation—and neither the state nor the majority has proffered one— why someone in Bryant's position would accuse two childhood friends of a heinous crime if he knew that they did not commit it.[40]

Nevertheless, there are several powerful reasons why someone in Bryant's shoes might elect to keep his information to himself. First and foremost is the potential criminal exposure that he might face by coming forward; as the trial court expressly found, "one of the reasons [that] Bryant's testimony is trustworthy is because Bryant places himself in Belle Haven, on the night of the murder, in the company of [the victim], discussing assaulting [her] with Hasbrouck and Tinsley and in possession of golf clubs belonging to the Skakel

[40] Of course, I do not vouch for Bryant's credibility. The state, however, has presented no evidence to establish that Bryant is not an honest or credible person. In the absence of such evidence, and in light of what we do know about him and his background, it would be improper, and entirely unfair to the petitioner, to surmise that Bryant is not a trustworthy person. Undoubtedly for those reasons, neither the state nor the trial court has sought to discredit Bryant on the basis of any aspect of his personal, academic or professional background.

The majority, by contrast, suggests that Bryant may have "lied to or misled" his friends, a possibility that the majority also suggests might reflect adversely on the credibility of Bryant's statements to Mills and Walker. In support of this assertion, the majority relies on the fact that Mills and Walker understood that Bryant was a sports or entertainment lawyer even though Bryant, a law school graduate, was not licensed to practice law. In fact, the evidence indicates that Bryant, who, as I previously noted, comes from a family that truly has distinguished itself in the sports and entertainment world, has written several screenplays and otherwise been involved in the law and entertainment business. Furthermore, there is nothing in Mills' or Walker's testimony to suggest that either of them believed that Bryant had misled them in any way. Indeed, the record reflects that, when asked, Bryant did not hesitate to reveal that he was not a member of the bar. In the absence of any evidence to suggest that Bryant intentionally had misled his friends—or anyone else—with respect to his professional endeavors, it is improper for the majority to speculate otherwise. This is particularly true in light of the fact that the state has failed to adduce any evidence casting doubt on the veracity of Bryant's own statements concerning the nature of his professional activities.

family."[41] Second, few people would wish to become embroiled in so public a controversy, especially when the alleged perpetrator already has been convicted. Third, because Bryant refused for more than twenty-five years after the murder to come forward with his incriminating information about Hasbrouck and Tinsley, which, if credited, would result in the petitioner's exoneration, he risked both the scorn of his family and friends, and the disapprobation of the investigating and prosecuting authorities as well as the general public. Finally, it is highly doubtful that Bryant would falsely implicate two boyhood friends in a crime that occurred nearly thirty-five years ago by providing information that many, including the state, would seek to discredit.

In my view, only a sociopath, an inveterate liar or a calculating perjurer with something significant to gain would provide information, like the information at issue in the present case, exonerating the guilty and incriminating the innocent.[42] There is absolutely no indication that Bryant is such a person. Although it is true, of course, that the state was unable to cross-examine Bryant because he invoked his privilege against self-incrim-

---

[41] Indeed, Bryant stated to Kennedy in their first conversation that anyone who had come forward with information in the case "has either become a whacko or a suspect," and that "[he did not] want to go through that." Bryant presumably was referring to Gregory Coleman and Kenneth Littleton, two of the state's key witnesses at the petitioner's criminal trial. As I previously noted, Coleman died of a drug overdose before the petitioner's criminal trial, and his probable cause hearing testimony was read to the jury. Littleton, who, for years, was himself a suspect in the victim's murder, suffered from serious mental problems, including bizarre delusions about himself and the petitioner's extended family.

[42] The state has not asserted, and I do not believe, that there is any reasonable possibility that Bryant simply is mistaken in his assertions with respect to the incriminatory conduct and statements of Hasbrouck and Tinsley. Although it certainly is possible that Bryant may be confused or that his recollection is faulty with respect to some of the details he recounted, the information that he has provided is not such that he could be confused or mistaken about its essential nature. It would appear, therefore, that, if Bryant is not lying, he is telling the truth.

ination at his deposition, the state was free to provide the trial court with information or evidence demonstrating that Bryant is not a person who can be trusted to tell the truth. Because the state did not do so, one cannot attribute a motive or reason for Bryant to lie without engaging in the rankest kind of speculation and guesswork. Indeed, the majority itself purports to "decline to speculate as to why Bryant invoked his . . . right not to testify," presumably because the evidence provides nary a hint of any such reason other than the self-incriminatory nature of his statements.[43] In the absence of even the slightest suggestion of a motivation for Bryant to lie, the trial court and the majority reject the only plausible reason for Bryant to come forward, a reason that *is* supported by the evidence, namely, a desire to convey the truth, albeit belatedly, to avoid further injustice.

Thus, even though what we know about Bryant and his background indicates that he is *not* a person who would provide knowingly false testimony, and despite the fact that the record is completely devoid of any evidence of a motive to do so, the trial court and the majority have determined that Bryant is so lacking in credibility that there is no reason to consider his video-recorded interview, together with the other corroborative evidence, in relation to the evidence adduced at the petitioner's criminal trial. This determination, which is based almost exclusively on the fact that no witness recalls seeing Bryant, Hasbrouck or Tinsley on the evening of the murder—a fact that, as I explain more fully

---

[43] This is equally true for Hasbrouck and Tinsley. If they were *not even in Belle Haven* on the night of the murder, it is difficult to understand why they would have invoked their privilege against self-incrimination, especially in view of the fact that someone else already has been convicted of the victim's murder—the legitimacy of which remains unquestioned by the prosecuting authorities—and because of the adverse effect on one's reputation that such an invocation inevitably has, particularly in a high profile murder case such as this one.

in part III G of this opinion, may be explained by a variety of considerations—is simply untenable in view of the various factors that militate strongly in favor of a contrary conclusion. Indeed, as this court recently has stated, "in circumstances that largely involve a credibility contest, [as the petitioner's criminal trial did], the testimony of neutral, disinterested witnesses is exceedingly important." (Internal quotation marks omitted.) *Bryant* v. *Commissioner of Correction*, 290 Conn. 502, 518, 964 A.2d 1186, cert. denied sub nom. *Murphy* v. *Bryant*, 558 U.S. 938, 130 S. Ct. 259, 175 L. Ed. 2d 242 (2009).

Furthermore, although there was no physical evidence of any kind connecting the petitioner to the murder, there is physical evidence corroborating Bryant's version of the facts. As I explain in greater detail in part IV B of this opinion, the victim was ambushed on her way home from the Skakels' house, clubbed over the head with at least one golf club and dragged or carried approximately 100 feet, where she was discovered partially naked under a tree. The likely sexual nature of the crime is reflected in the fact that the victim's pants and underwear were pulled down below her knees. Moreover, evidence also led investigators to believe that the perpetrator was disoriented or unfamiliar with the area. The number and direction of the victim's injuries appear to be fully consistent with having been inflicted by more than one golf club, and the fact that the victim was dragged or carried approximately 100 feet also suggests that the attack may have been carried out by more than one assailant.[44] In addi-

---

[44] Thomas G. Keegan, the Greenwich detective originally assigned to perform the investigation of the victim's murder, conducted a review of the crime scene that gives rise to inferences about how the murder was committed that differ in some respects from the conclusions drawn by Henry Lee, formerly the state's chief criminalist. Only Lee testified at trial as to how the crime likely unfolded. Keegan, however, took meticulous notes, documenting the location and condition of the physical evidence at the crime scene, including obvious paths through the leaves connecting blood and

tion, because the petitioner's trial strategy was predicated almost exclusively on his alibi, the defense did not challenge any part of the state's theory as to how the crime was committed or whether someone of the petitioner's size would have been capable of committing such a brutal crime without the assistance of an accomplice.[45] In any event, for the reasons set forth more fully in part IV B of this opinion, I believe that the crime scene lends support to the credibility of Bryant's statements about the murder.

Finally, the trial court reasonably could have relied on other important physical evidence that corroborates

other physical evidence, and reached somewhat different conclusions regarding, among other things, where the assault began and the manner in which some of the evidence came to be located in certain areas of the crime scene. As I explain more fully in part IV of this opinion, Keegan's theory of how the murder occurred is more consistent with an assault carried out by two assailants rather than one, particularly if the lone assailant was someone the size of the petitioner; see footnote 45 of this opinion; because, in Keegan's view, the killer or killers moved the victim's body over a considerable distance.

[45] Although one childhood friend described the petitioner as strong and athletic, photographs of the victim and the petitioner taken around the time of the murder reveal that the petitioner, who had just turned fifteen, was no taller than the victim and appeared to have been even smaller. In one such photograph, for example, the petitioner is standing with his freshmen soccer team and, in relation to the other boys on the team, is only of average size. Most of the boys in the photograph, including the petitioner, appear not to have experienced any significant growth spurt. For the reasons set forth in part IV of this opinion, the petitioner's size at the time of the murder is relevant to my conclusion that the newly discovered evidence warrants a new trial. Because the defense relied so heavily on the petitioner's alibi, and because the issue of whether the crime had been committed by one assailant or two was relatively unimportant to the defense as long as the state could point to another member of the Skakel household, such as Thomas Skakel, as the possible second perpetrator, the defense apparently saw no need to challenge any aspect of the state's reconstruction of the crime. Indeed, the central thesis of the state's case was that the petitioner's family had conspired to cover up the crime. Consequently, the defense did not question, among other things, whether someone of the petitioner's size would have been physically capable of committing the crime alone. Significantly, the Greenwich police department's original crime scene investigation, the results of which were not introduced into evidence, appears to support

the information that Bryant had supplied. That evidence consists of two human hairs recovered from the sheets that were used to wrap the victim's body, one of which was identified by the forensic crime laboratory (lab) of the Federal Bureau of Investigation (FBI) as "possessing Negroid characteristics . . . ." Technicians conducting microscopic analysis of certain hair samples concluded that the hair was dissimilar to the only two African-American males known to be in the area at the time, a Greenwich police officer and the son of the Skakel family's cook. Subsequent testing on the second hair revealed that it possessed Asian characteristics. Significantly, Hasbrouck and Bryant are of African-American descent, and Tinsley, according to Bryant, is of mixed race origin, possibly of Asian descent.

E

The Concurrence

The concurrence contends that the trial court abused its discretion in concluding that the Bryant evidence would be admissible at a second trial under the hearsay exception for statements against penal interest because, according to the concurrence, the trial court reasonably could not have concluded that Bryant's statements are, in fact, against his penal interest. For the reasons that follow, I disagree.

The conclusion of the concurrence that Bryant's statements are not against his penal interest is predicated on three separate but related claims. First, the concurrence breaks down the Bryant evidence into discrete statements, analyzes each such statement separately, and then concludes that, when so viewed, none of the various statements is sufficiently disserving so as to expose Bryant to criminal liability. The concurrence

the conclusion that the murder was committed by two assailants or, possibly, by a single assailant who was much bigger and stronger than the petitioner.

next suggests that, in this state, the hearsay exception for statements against penal interest applies only to those statements that directly implicate the declarant in a crime, and, because, in the view of the concurrence, Bryant's statements do not satisfy that requirement, they do not fall within that hearsay exception. Finally, the concurrence maintains that, even if the trial court reasonably concluded that some of Bryant's statements were sufficiently against his penal interest, those particular statements do not implicate Hasbrouck and Tinsley and, therefore, do not advance the petitioner's third party culpability defense. The concurrence further contends, along these same lines, that, because the statements that Bryant attributes to Hasbrouck and Tinsley are self-serving, that is, they tend to exonerate Bryant, those statements are not admissible at all. Although the concurrence concedes that a declarant's self-serving statements may be admitted when those statements are inextricably linked with the declarant's self-inculpatory statements, it asserts that that is not the case here. None of these arguments is persuasive.

The concurrence's analysis of the trial court's ruling concerning the admissibility of the Bryant evidence begins with an examination of each disserving statement in isolation, divorced from the rest of Bryant's narrative. Upon viewing Bryant's remarks in this manner, the concurrence asserts, first, that "Bryant's statement that he was in Belle Haven on the night of the murder is not against his penal interest . . . because (1) his presence, alone, does not so far tend to subject him to criminal liability for the victim's murder, especially in light of the fact that Bryant states, and the record reflects, that *many* people were in Belle Haven that night, and (2) Bryant specifically states that he took a train back to Manhattan . . . from . . . Greenwich . . . before the victim was murdered." (Emphasis in original.) The concurrence also contends that Bry-

ant's acknowledgment that he possessed one of the Skakels' golf clubs on the night of the murder is not incriminating because Bryant never stated that he held the *specific* club that was used in the murder, and because he later claimed, in the same interview, "not even to know how the victim was murdered." The concurrence reasons, therefore, that, "at the time of his statement [to Colucci], Bryant would not have known that handling one of the Skakels' golf clubs could be against his penal interest." The concurrence further contends that, even if Bryant knew how the victim had been killed, his statements concerning the golf clubs are not against his penal interest because he also stated that "[e]verybody in Belle Haven touched those clubs," thus implicating himself in the murder to no greater degree than anyone else in Belle Haven. Lastly, the concurrence asserts that the record does not support the trial court's determination that Bryant discussed assaulting the victim with Hasbrouck and Tinsley because that determination suggests that Bryant made disserving statements during those discussions when, in fact, only Hasbrouck and Tinsley expressed an intent to abduct and to assault the victim sexually.

In isolating each of Bryant's statements in this manner and considering them out of the context in which they actually were spoken, the concurrence employs an analytical model that is incompatible with this court's mandate that the determination of whether a statement is sufficiently disserving to be considered against penal interest shall be made by examining the entire statement in context. See *State* v. *Bryant*, supra, 202 Conn. 696–97. In contrast to the trial court's analysis, the approach that the concurrence uses represents precisely the kind of narrow and inflexible approach that this court expressly has rejected for purposes of determining whether a statement is against penal interest. See id., 695. In fact, because all language is contex-

tual, it is impossible to discern the fundamental import of virtually *any* statement by viewing it in a linguistic or factual vacuum. This is what the concurrence has done, however, in parsing Bryant's remarks and reviewing them separately from one another and from the totality of the surrounding circumstances. This approach leads the concurrence to the wrong result, for as the United States Supreme Court has explained in construing rule 804 (b) (3) of the Federal Rules of Evidence,[46] "*whether a statement is self-inculpatory or not can . . . be determined [only] by viewing it in context.* Even statements that are on their face neutral may actually be against the declarant's interest. 'I hid the gun in Joe's apartment' may not be a confession of a crime; but if it is likely to help the police find the murder weapon, then it is certainly self-inculpatory. 'Sam and I went to Joe's house' might be against the declarant's interest if a reasonable person in the declarant's shoes would realize that being linked to Joe and Sam would implicate the declarant in Joe and Sam's conspiracy. And other statements that give the police significant details about the crime may also, depending on the situation, be against the declarant's interest. The question . . . is always whether the statement was sufficiently against the declarant's penal interest 'that a reasonable person in the declarant's position would not have made the statement unless believing it to be true,' and *this question can . . . be answered [only] in light of all the surrounding circumstances.*" (Emphasis added.) *Williamson* v. *United States,* supra, 512 U.S. 603–604.

An examination of the entirety of Bryant's statements reveals that Bryant places himself at the scene of the crime, in the company of the victim, shortly before

---

[46] See footnote 27 of this opinion.

the murder, holding the possible murder weapon,[47] and

[47] The concurrence contends that Bryant's statement to Colucci that he "picked up one of the Skakels' golf clubs, 'swung it,' and '[slung] it back to where the bag . . . was' . . . does not constitute a statement against his penal interest" because "Bryant does not state that he touched *the* golf club used in the murder." (Emphasis in original.) The mere fact that Bryant did not know whether the golf club that he handled was, in fact, the club that was used to kill the victim does not mean that his statement was not against his penal interest. First, Bryant's acknowledgment that he was in possession of what may have been the murder weapon certainly constitutes evidence that "would tend to incriminate [him] were he . . . the individual charged with the crime." (Internal quotation marks omitted.) *State* v. *Bryant*, supra, 202 Conn. 695. Second, Bryant understood that his statement was disserving, and it is that fact that gives the statement significance as a declaration against penal interest. Finally, as the trial court expressly found, Bryant's statements concerning his possession of a golf club on the day of the murder, including his statement to Kennedy that he was "surprised" that the authorities "didn't get [his] prints off those [golf] clubs," demonstrate that he knew that the golf clubs would be dusted for fingerprints and reflect his attempt "to explain away possible physical evidence," thereby "indicat[ing] a consciousness of guilt." For all of these reasons, it is incorrect to assert that Bryant's remarks about the golf clubs were not disserving.

The concurrence further contends that Bryant's statements about handling the golf clubs on the night of the murder cannot reasonably be construed as statements against penal interest because, later in the interview, Bryant "claimed not even to know how the victim was murdered." The concurrence takes this statement out of context. Although Bryant apparently never sought to ascertain a detailed account of exactly how the murder was committed, it is perfectly clear that he, like virtually everyone else with any connection to this high profile case, generally was aware that the victim had been beaten to death. In fact, as he explained, he had understood that Hasbrouck and Tinsley intended to abduct and then to "club" the victim, "caveman style . . . ."

The concurrence also states that, "even if Bryant knew how the victim was murdered, his statements regarding the Skakels' golf clubs, when viewed in context, demonstrate that they are insufficiently against his penal interest to be admitted pursuant to Conn. Code Evid. § 8-6 (4). Specifically, Bryant stated that '[e]verybody in Belle Haven touched those clubs,' and that 'those clubs went through *tons of people's hands*.' Accordingly, Bryant's statements no more implicate Bryant in the victim's murder than 'everybody in Belle Haven . . . .' This is insufficient to qualify as a statement against penal interest, especially in light of the fact that Bryant states that he was not in Belle Haven at the time of the murder." (Emphasis in original.) Once again, this assertion misses the point because the concurrence views Bryant's statements about the golf clubs in isolation from his other self-inculpatory remarks. Of course, not everyone in Belle Haven handled the golf clubs on

discussing an attack on the victim with the two persons—both of whom Bryant had introduced and brought to Belle Haven—who, shortly after the victim's murder, boasted about having committed the crime.[48] As this court previously has stated, the exception for declarations against penal interest "encompasses disserving statements [made] by a declarant that would have probative value in a trial against the declarant." (Internal quotation marks omitted.) *State* v. *Bryant*, supra, 202 Conn. 695. Thus, contrary to the assertion of the concurrence, in this state, the hearsay exception for declarations against penal interest includes "not only confessions" or direct admissions of guilt, "but [also] other remarks [that] would tend to incriminate the declarant [if] he or she [was] the individual charged with the crime."[49] (Internal quotation marks omitted.)

the night of the murder, in the vicinity of the victim, accompanied by the two men who, according to Bryant, discussed "going caveman" and, shortly thereafter, acknowledged doing so on the victim. When these facts are considered in this context, it is clear that the trial court properly found that Bryant's comments about the golf clubs were self-inculpatory.

[48] The concurrence contends that the trial court's characterization of Bryant's statements as "discuss[ing] assaulting [the victim] with Hasbrouck and Tinsley . . . inaccurately and unfairly implies that Bryant made *self*-inculpatory statements during those discussions, when, in fact, he did not." (Emphasis in original.) As a result, according to the concurrence, "the trial court apparently leaped to the conclusion that Bryant's statements regarding the discussions were against *his* penal interest simply because he was present while Hasbrouck and Tinsley were making statements against *their* penal interests." (Emphasis in original.) In contrast to the trial court, the concurrence views Bryant's statements in isolation from what transpired both before and after the conversations in which Hasbrouck and Tinsley expressed their intention to "go caveman . . . ." Considering Bryant's presence at those discussions in that broader context, it is evident that the trial court reasonably found that Bryant's statements concerning those conversations revealed a close and confidential association with Hasbrouck and Tinsley, and that that involvement, when viewed in light of Bryant's other statements placing him at or near the scene of the crime, in possession of a golf club and in the company of Hasbrouck and Tinsley on the evening of the murder, supported the conclusion that Bryant's narrative was sufficiently disserving to warrant its admissibility as a statement against penal interest.

[49] Indeed, in *State* v. *Bryant*, supra, 202 Conn. 691–92, 694–95, this court concluded that the trial court in that case had abused its discretion in

Id. Bryant's statements most certainly meet that standard, for if he were being tried for the victim's murder, the statements would be highly relevant and, indeed, highly prejudicial to his case. Far from representing an irrational or arbitrary exercise of discretion, as the concurrence claims, the trial court's determination that the Bryant evidence consisted of trustworthy declarations against penal interest represents a perfectly reasonable application of that hearsay exception to the factual scenario presented by this case.[50]

Certainly, a reasonable person in Bryant's position would not have made the statements that he did without believing them to be true. Indeed, by acknowledging his close involvement with Hasbrouck and Tinsley on the day and evening of the murder and for some time thereafter, Bryant knew that he was likely to become a suspect in that murder, the prosecution of which, as Bryant also knew, was not subject to any limitation period. As this court has observed, a statement has

*prohibiting* the defendant from introducing into evidence, under the declaration against penal interest exception to the hearsay rule, *statements by the declarant in which the declarant did not acknowledge committing the most serious of the crimes with which the defendant had been charged (sexual assault) but in which the declarant nevertheless acknowledged committing one of the lesser crimes (burglary). In rejecting the state's contention that that omission rendered the statement insufficiently reliable for admissibility purposes, we explained that, when viewed in the broader context of the facts of the case and the entirety of the declarant's statements, those statements were sufficiently disserving such that the defendant was *entitled* to introduce them into evidence. Id., 696–702.

[50] The concurrence asserts that my agreement with the trial court that Bryant's statements are against his penal interest is founded "on an inaccurate and hyperbolic summary of the 'context' of Bryant's statements." Footnote 8 of the concurring opinion. On the contrary, my analysis, in contrast to that of the concurrence, is predicated on the facts that the trial court reasonably had found. For example, the trial court expressly found that "one of the reasons [that] Bryant's testimony is trustworthy is because Bryant places himself in Belle Haven, on the night of the murder, in the company of [the victim], discussing assaulting [the victim] with Hasbrouck and Tinsley and in possession of golf clubs belonging to the Skakel family."

significance as one against penal interest only to the extent that the declarant is aware that the statement is self-inculpatory. Id., 696 ("it is not the fact that the declaration is against penal interest but the awareness of that fact by the declarant which gives the statement significance" [internal quotation marks omitted]). Applying that principle to the present case, I conclude that both Bryant and his mother made it perfectly clear that Bryant's refusal to come forward for more than two decades prior to the petitioner's arrest, and his extreme reluctance to do so even after the petitioner's arrest, stemmed from an overriding concern that to do so would result in Bryant's becoming a suspect in the victim's murder.[51]

---

[51] The concurrence claims that my analysis and the trial court's analysis are unfaithful to our case law concerning the hearsay exception for statements against penal interest because other cases of this court, including *State* v. *Bryant*, supra, 202 Conn. 676, involve statements against penal interest that are more inculpatory than Bryant's statements. The concurrence misconstrues *Bryant* and our other precedent interpreting that hearsay exception. It is axiomatic, of course, that each case must be decided on its particular facts, and, for the reasons that I have set forth in this opinion, the trial court in the present case properly concluded that the statements at issue meet *all* of the requirements for admissibility under the hearsay exception for statements against penal interest. Indeed, as this court made crystal clear in *Bryant*, a statement need not constitute a confession or other direct acknowledgment of guilt to be admissible; id., 695; rather, the declarant must be aware that the statement exposes him to a risk of prosecution, such that the statement would have probative value at a trial against him. Id. In light of this standard, the fact that the declarant denies responsibility for the crime is not a bar to admissibility of a statement that otherwise is incriminating for purposes of our test. Thus, for example, in *State* v. *Paredes*, supra, 775 N.W.2d 554, the Iowa Supreme Court recently undertook a thorough analysis of its state's hearsay exception for statements against penal interest. Under the Iowa exception, the test for admissibility is identical to our exception in all material respects. Compare Iowa R. Evid. 5.804 (b) (3) with Conn. Code Evid. § 8-6 (4). The court concluded that, although the declarant in that case expressly had denied involvement in the offense; *State* v. *Paredes*, supra, 569; the trial court nevertheless had abused its discretion in barring the defendant from introducing the statement under that hearsay exception. See id. In particular, the court determined that other statements made by the declarant were sufficiently incriminating to satisfy the "threshold adversity requirement . . . ." Id., 565. Explaining that this requirement "poses a question of degree"; id.; the court concluded that the statement at issue was both sufficiently incriminating and sufficiently corroborated that the trial court was required to admit it as a matter of law. See id., 570.

Finally, the concurrence contends that, to the extent that any of Bryant's statements may be deemed to be self-inculpatory,[52] only those statements, and not Bryant's entire narrative—including the portion of that narrative that inculpates Hasbrouck and Tinsley—are

The analysis and conclusion of the Iowa Supreme Court in *Paredes* is no less applicable to the present case. Moreover, even if it is assumed, arguendo, that the trial court in the present case was not required to reach the conclusion that it did concerning the incriminating nature of Bryant's statements, it certainly cannot be said that the court's decision constituted a manifest abuse of discretion. See, e.g., *State* v. *Ritrovato*, 280 Conn. 36, 50, 905 A.2d 1079 (2006) ("[w]e will make every reasonable presumption in favor of upholding the trial court's [evidentiary] ruling, and only upset it for a manifest abuse of discretion" [internal quotation marks omitted]).

Finally, the incriminatory nature of Bryant's statements is further evidenced by the fact that Bryant has asserted his privilege against self-incrimination, thereby opting not to repeat those statements under oath at a deposition or at a trial. Of course, if his sworn testimony regarding those statements was not likely to incriminate him, he would have had no reason for refusing to testify because his sworn testimony denying the truthfulness of his prior statements also would not expose him to any criminal liability.

[52] The concurrence also maintains that, even if Bryant's statements are against his penal interest, they nevertheless fail to satisfy the three trustworthiness factors enumerated in Conn. Code Evid. § 8-6 (4). I disagree with this contention for all of the reasons previously set forth in parts III C and D of this opinion. I note, moreover, that, in reaching its conclusion, the concurrence rejects the reasonable inferences and findings of the trial court and improperly substitutes its different view of the facts. For example, the concurrence asserts that the record does not support the conclusion that Hasbrouck and Tinsley boasted about having committed the victim's murder. The concurrence argues, rather, that, "Bryant explicitly stated that Hasbrouck and Tinsley *never* confessed to murdering the victim and *never* disclosed any details about their alleged involvement in her murder. Indeed, Hasbrouck's and Tinsley's alleged comments *never* contained any mention of the victim by name and were always couched in vague terms, such as, 'I got mine,' '[w]e did it,' and '[w]e achieved our fantasy.'" (Emphasis in original.) Footnote 8 of the concurring opinion. As the record reveals, however, although Bryant stated that Hasbrouck and Tinsley never identified the victim by name, Bryant expressly stated that, "I knew who they were implying. It was so obvious because, I mean, [one or two days after the murder, the news of the victim's murder] was all over. I mean, it was everywhere." Bryant further stated, "I knew exactly who they were talking about. . . . They were talking about [the victim]." In view of the facts that (1) Hasbrouck and Tinsley had discussed going "caveman" on a girl on the evening of the victim's murder, (2) they told Bryant shortly after the victim's murder that they had "achieved the caveman," and (3) the victim was the only person who was assaulted and killed in Greenwich around the time that Hasbrouck and Tinsley had told Bryant that they intended to go "caveman," it would have been manifestly *unreasonable* for the trial court to conclude

admissible under the hearsay exception for declarations against penal interest. Although the concurrence concedes that Bryant's statements implicating Hasbrouck and Tinsley would be admissible if they are inextricably linked to Bryant's self-inculpatory statements, the concurrence asserts that those two sets of statements are not so intertwined. The concurrence's contention is belied by this court's well established case law.

that Bryant had not identified the victim as the person about whom Hasbrouck and Tinsley had been speaking.

The concurrence also improperly second-guesses the trial court's finding that Bryant's reluctance to tell his story, and thus his twenty-six year delay in coming forward with it, was reasonable and, under the unique circumstances presented, did not detract from the trustworthiness of Bryant's statements. In particular, the concurrence attacks the trial court's finding that Bryant had knowledge that there was no statute of limitations for murder in Connecticut in 1975, asserting that this finding was not supported by the record, and, further, that, even if this finding was supported by the record, it would not make Bryant's statements any more timely or trustworthy. Bryant explicitly stated, however, that one of the reasons why he did not come forward sooner was because he was afraid that he would be identified immediately as a suspect. Indeed, the fact that the petitioner was tried more than twenty-five years after the victim's murder, suggests, at the very least, that the *state* believed that there was no applicable statute of limitations for murder. Consequently, the trial court's finding that Bryant believed that he, too, could be prosecuted for the murder is hardly unreasonable.

Similarly, the concurrence rejects the trial court's conclusion that Bryant's statements to Mills and Colucci are trustworthy because, among other reasons, Mills, whom Bryant has known since childhood, was someone Bryant trusted and with whom he shared a close connection to the case, and because Bryant was aware that his statements to Colucci were being recorded for later use in a court of law. Even though these findings are firmly rooted in the evidence, the concurrence simply refuses to credit them. As the foregoing examples demonstrate, the concurrence refuses to accept the inferences fairly and reasonably drawn by the trial court, relying, instead, on its own contrary conception of the facts. In doing so, the concurrence violates the bedrock principle of appellate jurisprudence that the trial court, not this court, is the finder of fact, and, consequently, we are bound by those findings unless they are clearly erroneous. See, e.g., *Key Air, Inc.* v. *Commissioner of Revenue Services*, 294 Conn. 225, 231, 983 A.2d 1 (2009) ("[t]o the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous" [internal quotation marks omitted]).

Finally, the concurrence mistakenly asserts that I have "ignore[d]" certain facts that the trial court highlighted when it concluded, for purposes of its credibility determination rather than for its determination of admissibility, that Bryant's statements are "absent any genuine corroboration." (Internal quotation marks omitted.) Footnote 10 of the concurring opinion. I address these facts and the issues relevant thereto in part III G of this opinion.

In *State* v. *Bryant*, supra, 202 Conn. 676, this court concluded that, when "the disserving parts of a statement are intertwined with self-serving parts, it is more prudential to admit the entire statement and let the trier of fact assess its evidentiary quality in the complete context." Id., 696–97. We also explained, however, that "[t]he problem of statements that are both disserving and self-serving to a declarant has divided commentators and some courts." Id., 696 n.18. After acknowledging that "[o]ne view . . . would admit the entire statement," whereas a second, "somewhat different view suggests admitting only the disserving portion of the declaration and excluding the self-serving part [when] the two parts can be severed"; id., 696–97 n.18; we expressed our agreement with the first view, pursuant to which the *entire statement* is admitted. Id. The fact that this has been the law of this state at least since our decision in *Bryant* is reflected in the relevant commentary to the Connecticut Code of Evidence, which provides: "When a narrative contains both disserving statements and collateral, self serving or neutral statements, the Connecticut rule admits the entire narrative, letting the trier of fact assess its evidentiary quality in the complete context."[53] (Internal quotation marks omitted.) Conn. Code Evid. § 8-6 (4), commen-

---

[53] Notably, this court recently has underscored the importance of the commentary to the Code of Evidence, explaining that the code "cannot be properly understood without reference to the accompanying [c]ommentary. The [c]ommentary provides the necessary context for the text of the [c]ode, and the text of the [c]ode expresses in general terms the rules of evidence that the cases cited in the [c]ommentary have established. . . . Additionally, the [j]udges took an unusual step when they formally adopted the [c]ode. Unlike other situations, in which the [j]udges, when voting on rules, are guided by but do not formally adopt the commentary submitted by the [r]ules [c]ommittee that normally accompanies proposed rule changes, in adopting the [c]ode the [j]udges formally adopted the [c]ommentary as well. This is the first time that the [j]udges have done so. Thus, the [c]ode must be read together with its [c]ommentary in order for it to be fully and properly understood." (Internal quotation marks omitted.) *State* v. *DeJesus*, 288 Conn. 418, 442 n.16, 953 A.2d 45 (2008).

tary. Other courts have adopted the same approach. See, e.g., *People* v. *Newton*, 966 P.2d 563, 578–79 (Colo. 1998); *State* v. *Sonthikoummane*, 145 N.H. 316, 321–22, 769 A.2d 330 (2000).

Notwithstanding the clarity of our law, the concurrence asserts that only Bryant's self-inculpatory statements, and not his purportedly self-serving statements implicating Hasbrouck and Tinsley in the victim's murder, are admissible. As the foregoing discussion demonstrates, this assertion fails in light of *Bryant* and the commentary to the Code of Evidence.[54] Even if the

---

[54] The concurrence relies on *Williamson* v. *United States*, supra, 512 U.S. 600–601, which was decided approximately seven years after our decision in *Bryant*, to support its contention that this court should adopt the approach—expressly considered and rejected in *Bryant*—under which the declarant's self-serving statements are not admissible as part of the declarant's broader narrative even when they are intertwined with the declarant's disserving statements. In *Williamson*, the court adopted that approach for purposes of rule 804 (b) (3) of the Federal Rules of Evidence; id.; which is similar but not identical to this state's hearsay exception for declarations against penal interest. See Conn. Code Evid. § 8-6 (4). As I have explained, in *Bryant*, this court carefully considered the two competing modes of analysis and, in contrast to *Williamson*, elected to follow the less restrictive approach pursuant to which the fact finder is permitted to consider both the declarant's disserving *and* self-serving statements. See *State* v. *Bryant*, supra, 202 Conn. 696–97 and n.18. In accordance with *Bryant*, the trial court properly proceeded in that manner, and neither the state nor the petitioner has suggested that this court should overrule *Bryant* and adopt the *Williamson* methodology. Significantly, although an apparent majority of sister state courts that have considered the issue after *Williamson* have followed the rule of that case for purposes of their states' hearsay exceptions for declarations against penal interest—perhaps, because those states' exceptions contain language that is identical to the language of their federal counterpart—other states have declined to do so. See *People* v. *Newton*, supra, 966 P.2d 578–79 (declining to follow *Williamson*); *State* v. *Sonthikoummane*, supra, 145 N.H. 320–21 (same); see also *State* v. *Hills*, 264 Kan. 437, 447, 957 P.2d 496 (1998) (noting that *Williamson* is not binding on state court's interpretation of its own evidentiary rules); *Chandler* v. *Commonwealth*, 249 Va. 270, 279, 455 S.E.2d 219 (same), cert. denied, 516 U.S. 889, 116 S. Ct. 233, 133 L. Ed. 2d 162 (1995). In any event, the fundamental point is that, in the absence of a request from the parties that we revisit our decision in *Bryant*, the present case does not present an appropriate opportunity to decide whether the reasoning of *Williamson* is sufficiently persuasive to warrant overruling the portion of *Bryant* that is inconsistent with *Williamson*. Indeed, to do so would violate the well established rule that an appellate court "may not

concurrence were correct, however, that the portions of Bryant's narrative that inculpate Hasbrouck and Tinsley are admissible only to the extent that they cannot be severed from Bryant's disserving statements, Bryant's narrative satisfies that standard. The concurrence contends that, if any of Bryant's statements may be viewed as inculpatory, it is only those statements indicating that, on the night of the murder, (1) Bryant was in Belle Haven, (2) Bryant "picked up one of the Skakels' golf clubs, 'swung it,' and '[slung] it back to where the bag . . . was,' " and (3) that, "at one point, Bryant and the victim were among the ten to fifteen teenagers socializing in the meadow [behind the Skakels' residence]." The concurrence further maintains that only these statements properly could have been deemed to be admissible by the trial court, and not Bryant's self-serving statements implicating Hasbrouck and Tinsley in the victim's murder. Bryant's disserving statements, though severable from a linguistic standpoint, are so intertwined with Bryant's statements about Hasbrouck and Tinsley that the self-inculpatory nature of the former cannot be appreciated unless those statements are considered in the context of the latter. In other words, severing the two sets of statements would make it impossible for a fact finder to understand why Bryant's self-inculpatory statements are, in fact, self-inculpatory. Thus, as we expressly observed in *Bryant*, "[t]here are cases . . . [in which] allowing such latitude to contextual statements may give real meaning to the declaration that is disserving."[55] *State* v. *Bryant*, supra, 202 Conn. 697. The present case is clearly one of them.

reach out and decide a case before it on a basis that the parties never have raised or briefed. . . . To do otherwise would deprive the parties of an opportunity to present arguments regarding those issues." (Citations omitted.) *Sabrowski* v. *Sabrowski*, 282 Conn. 556, 560, 923 A.2d 686 (2007).

[55] Despite our long-standing precedent supporting the trial court's conclusion that the Bryant evidence would be admissible as trustworthy declarations against penal interest, the concurrence, in defending its contrary view, asserts that "cases in this jurisdiction and various federal jurisdictions have held that statements that were far more inculpatory than Bryant's statements

For all the foregoing reasons, neither the state nor the concurrence can demonstrate that the trial court abused its broad discretion in concluding that the Bryant evidence would be admissible at a new trial under the declaration against penal interest exception to the hearsay rule. Indeed, far from representing an abuse of discretion, the trial court's determination was the product of a reasoned analysis predicated on a perfectly proper application of settled principles to the facts presented. Indeed, because the Bryant evidence bears persuasive assurances of trustworthiness and is critical to the petitioner's defense, excluding the evidence would implicate the petitioner's constitutional right to present a defense. See, e.g., *Chambers* v. *Mississippi*, supra, 410 U.S. 302; see also *People* v. *Oxley*, 64 App. Div. 3d 1078, 1084, 883 N.Y.S.2d 385 (2009) ("[S]upported by the relevant [nonhearsay] evidence, the hearsay testimony proffered by [the] defendant bore persuasive assurances of trustworthiness and was critical to his defense . . . . In these circumstances, [in which] constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice . . . . Indeed . . . [when] a statement is exculpatory as to [a] defen-

---

were not sufficiently against the declarant's penal interest to be admissible." The concurrence neglects to note, however, that, in each and every one of those cases, the reviewing court concluded that the trial court *had not abused its discretion* in determining that the statement at issue was not against the declarant's penal interest. See, e.g., *State* v. *Snelgrove*, 288 Conn. 742, 769–70, 954 A.2d 165 (2008) (reviewing for abuse of discretion); *State* v. *Bryant*, 61 Conn. App. 565, 573–76, 767 A.2d 166 (2001) (same); *State* v. *Jones*, 46 Conn. App. 640, 649, 700 A.2d 710 (same), cert. denied, 243 Conn. 941, 704 A.2d 797 (1997); see also *United States* v. *Bonty*, 383 F.3d 575, 579–80 (7th Cir. 2004) (reviewing District Court's ruling for abuse of discretion); *United States* v. *Butler*, 71 F.3d 243, 250–52 (7th Cir. 1995) (same). In light of the extremely wide latitude accorded trial courts with respect to the admission of evidence generally and the admission of evidence under hearsay exceptions specifically, it is hardly surprising that the concurrence has found cases in which the trial court's ruling on the admissibility or inadmissibility of a statement against penal interest has been sustained on appeal.

dant, a less exacting standard [than that applicable to an inculpatory statement proffered by the government] applies in determining whether statements against penal interest are admissible, and [when] the statement forms a critical part of the defense, due process concerns may tip the scales in favor of admission . . . ." [Citations omitted; internal quotation marks omitted.]). As I previously noted, however, even if it could be established that the trial court had abused its discretion in concluding that the Bryant statements would be admissible as trustworthy declarations against penal interest, for the reasons that follow, the court reasonably could have concluded that those statements would be admissible under the residual exception to the hearsay rule. I therefore turn to that hearsay exception.

F

Admissibility of Bryant's Statements Under
the Residual Hearsay Exception

At trial, the petitioner also claimed that the Bryant evidence would be admissible under the residual exception to the hearsay rule. In light of its conclusion that the evidence would have been admissible as trustworthy declarations against penal interest, however, the trial court not did reach the petitioner's alternative claim of admissibility. The trial court, however, would have been well within its discretion to conclude that the Bryant evidence would be admissible under the residual exception.[56]

---

[56] In applying an abuse of discretion standard to determine whether the trial court properly could have determined that Bryant's statements would be admissible under the residual hearsay exception, I am mindful of this court's statement in *State* v. *Saucier*, supra, 283 Conn. 207, that "the question of whether the trial court properly could have admitted [a hearsay] statement under the residual exception if the admission of that type of statement *expressly was barred* under another hearsay exception would present a question of law over which the appellate courts exercise plenary review." (Emphasis in original.) Id., 219. This admonition in *Saucier* bears no relevance to the issue in the present case, however, because, even if Bryant's statements were not admissible under the declaration against penal interest exception to the hearsay rule, that exception does not expressly bar the

The following principles guide my analysis. "A statement that is not admissible under any of the [hearsay] exceptions [enumerated in the Connecticut Code of Evidence] is admissible if the court determines that (1) there is a reasonable necessity for the admission of the statement, and (2) the statement is supported by equivalent guarantees of trustworthiness and reliability that are essential to other evidence admitted under traditional exceptions to the hearsay rule." (Internal quotation marks omitted.) *State* v. *Merriam*, 264 Conn. 617, 633 n.22, 835 A.2d 895 (2003), quoting Conn. Code Evid. § 8-9. "Reasonable necessity may be established by showing that unless the hearsay statement is admitted, the facts it contains may be lost, either because the declarant is dead or otherwise unavailable, or because the assertion is of such a nature that evidence of the same value cannot be obtained from the same or other sources." (Internal quotation marks omitted.) *State* v. *Merriam*, supra, 633 n.21. "[T]he second prong, reliability, is met in a variety of situations . . . . At minimum, the statement must independently bear adequate indicia of reliability to afford the trier of fact a satisfactory basis for evaluating [its] truth . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Hines*, 243 Conn. 796, 810, 709 A.2d 522 (1998). "We previously have identified several factors that bear [on] the trustworthiness and reliability of an out-of-court statement, including: (1) whether the circumstances are such that a sincere and accurate statement would naturally be uttered, and no plan of falsification [could] be formed . . . (2) the closeness of the relationship between the declarant and recipient . . . (3) whether

admission of those statements; if that hearsay exception bars the admission of Bryant's statements at all, it is because the statements do not meet the requirements of that exception, not because of any express or categorical prohibition against the admissibility of such statements. Accordingly, the issue is whether the trial court reasonably could have concluded that Bryant's statements would be admissible under the residual hearsay exception.

the statement was made spontaneously and in confidence or obtained in response to government questioning conducted in anticipation of litigation . . . (4) the temporal proximity between the alleged statement and the events to which the statement refers . . . and (5) whether the declarant testifies at trial and is subject to cross-examination." (Citations omitted; internal quotation marks omitted.) *State* v. *Skakel*, 276 Conn. 633, 728–29, 888 A.2d 985, cert. denied, 549 U.S. 1030, 127 S. Ct. 578, 166 L. Ed. 2d 428 (2006). In addition, a review of cases from this court and the Appellate Court reveals other factors that have been deemed relevant to this analysis. These include whether the declarant had a reason to lie; see id., 729; whether the statement is corroborated or contradicted by other evidence; see *State* v. *McClendon*, 248 Conn. 572, 584, 730 A.2d 1107 (1999); whether the statement was made under oath; *State* v. *Faison*, 112 Conn. App. 373, 384, 962 A.2d 860, cert. denied, 291 Conn. 903, 967 A.2d 507 (2009); whether the declarant's perception was impaired at the time he made the statement; *State* v. *Rodriguez*, 39 Conn. App. 579, 604–605, 665 A.2d 1357 (1995), rev'd on other grounds, 239 Conn. 235, 684 A.2d 1165 (1996); and whether the declarant has recanted or consistently reaffirmed the statement. See *Morant* v. *State*, 68 Conn. App. 137, 171, 173, 802 A.2d 93, cert. denied, 260 Conn. 914, 796 A.2d 558 (2002). In addition, other courts have concluded that the fact that an unavailable declarant's statement was video recorded militates in favor of admissibility because the jury can assess the declarant's demeanor at the time the declarant made the statement. See, e.g., *United States* v. *Sanchez-Lima*, 161 F.3d 545, 547 (9th Cir. 1998). Finally, the trial court's fact-finding and analysis for purposes of determining the trustworthiness of a statement under the hearsay exception for declarations against penal interest is equally applicable to the same determination under the residual hearsay exception. See *Morant* v. *State*, supra, 172–73 (relying

on same trustworthiness factors in reviewing trial court's rulings under hearsay exception for declarations against penal interest and residual hearsay exception).

The first prong of the analysis, necessity, is readily satisfied in the present case. Because Bryant has invoked his fifth amendment privilege against self-incrimination, he is not available to testify for the petitioner. Furthermore, the information that Bryant provided is not available from any other source. Finally, Bryant's statements, if believed, exonerate the petitioner. The petitioner, therefore, has demonstrated the necessity of admitting Bryant's hearsay statements.

The Bryant evidence also satisfies the second requirement for admissibility under the residual hearsay exception, namely, that it is supported by indicia of trustworthiness and reliability that are equivalent to those required for admissibility under other hearsay exceptions. Because those circumstantial guarantees of trustworthiness that substantiate the truthfulness of Bryant's statements are set forth in detail in part III C and D of this opinion, I need not repeat them here. It bears emphasis, however, that, in addition to the fact that Bryant's statements are strongly corroborated, no plausible explanation ever has been advanced as to why Bryant would falsely implicate Hasbrouck and Tinsley in the victim's murder.[57] Indeed, the majority correctly

---

[57] The majority suggests that Bryant might have fabricated a story about Hasbrouck and Tinsley as an outgrowth of his offer to assist Mills in the development of a screenplay regarding the victim's murder. In essence, the majority raises the specter that Bryant's desire to become involved in that undertaking was so strong that he lied to Mills about Hasbrouck and Tinsley, and then repeated his imaginary and detailed story, with considerable embellishment, to several others, including the petitioner's investigator, Colucci. As I discuss in part III G 3 of this opinion, there is nothing in the record to support an inference that Bryant had any particular interest in participating in the screenplay aside from assisting his good friend, Mills. Because the majority's purely speculative hypothesis has no foundation in the facts, it hardly can be deemed a plausible explanation for why Bryant would falsely and repeatedly report that his two former classmates were responsible for the victim's brutal and tragic death.

observes that Bryant "had nothing personally to gain by coming forward," and the record indicates that, although Bryant was reluctant to come forward, he did so solely because he was convinced, on the basis of what he knew, that the petitioner's conviction constituted a grave injustice. Furthermore, there is nothing in the record that casts doubt on Bryant's credibility. The record does reflect, however, that Bryant is a law school graduate from a prominent family who, at the time of his interview with Colucci, owned his own business and was married with four children.[58] In addition, because Bryant's lengthy statement to Colucci was video recorded, the fact finder at a new trial will be able to evaluate Bryant's demeanor, temperament and affect as he gave the statement. It also is highly significant that physical evidence found at the scene of the crime, in particular, the two hairs found on the victim's body, support Bryant's version of the events. Finally, Bryant first confided in Mills, an old and trusted friend, and, as the trial court found, Bryant's failure to come forward sooner is readily explainable by his reasonable fear that doing so would have resulted in his being a suspect in the victim's murder. For all the foregoing reasons, the trial court properly could have found that the Bryant evidence would be admissible under the residual exception to the hearsay rule because in no event would such a ruling have constituted an abuse of discretion.[59]

---

[58] See part III D of this opinion.

[59] I note that the commentary to § 8-9 of the Connecticut Code of Evidence provides that "[§] 8-9 takes no position on whether a statement that comes close but fails to satisfy a hearsay exception enumerated in the Code nevertheless can be admitted under the residual exception. Connecticut courts have not addressed definitively the 'near miss' problem, although some cases would seem to sanction the practice of applying the residual exception to near misses." Conn. Code Evid. § 8-9, commentary. As I have explained, the Bryant evidence falls within the purview of the residual exception to the hearsay rule because it "is supported by equivalent guarantees of trustworthiness and reliability that are essential to other evidence admitted under traditional exceptions to the hearsay rule." (Internal quotation marks omitted.) *State* v. *Merriam*, supra, 264 Conn. 633. I see no principled reason

It is apparent, therefore, that the trial court properly concluded that the Bryant evidence would be admissible at a new trial. For the reasons that follow, the trial court was required to consider that evidence in the context of the original trial evidence.

G

The Bryant Evidence and the *Shabazz* Minimum Credibility Threshold

Notwithstanding its finding that the Bryant evidence was sufficiently trustworthy to be admissible at a new trial, the trial court further concluded that the evidence was not sufficiently believable for purposes of the test adopted by this court in *Shabazz* v. *State*, supra, 259 Conn. 811, to warrant a second trial. Although purporting to apply the test mandated under *Shabazz* for analyzing a petition for a new trial, the trial court never considered the newly discovered Bryant evidence in light of the original trial evidence, presumably because, in the court's view, Bryant's statements were not credible enough to require that second level of review.[60] I

---

why a statement that satisfies that requirement should be excluded from admission under the residual exception solely because it comes close to being admissible under another hearsay exception. Indeed, a contrary conclusion, that is, one that bars admission of a statement that is equivalent in trustworthiness to that of a statement that falls within another exception, might well run afoul of a defendant's constitutional right to present a defense. See, e.g., *State* v. *Cerreta*, 260 Conn. 251, 260–61, 796 A.2d 1176 (2002) ("The federal constitution require[s] that criminal defendants be afforded a meaningful opportunity to present a complete defense. . . . The sixth amendment right to compulsory process includes the right to offer the testimony of witnesses, and to compel their attendance, if necessary, [and] is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so that it may decide where the truth lies." [Citations omitted; internal quotation marks omitted.]); see also *Washington* v. *Texas*, 388 U.S. 14, 19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967) (right to present defense in criminal case is "a fundamental element of due process of law").

[60] The trial court did comment on the strength of the state's evidence, however, in connection with its analysis of the petitioner's claim concerning the witnesses whose testimony contradicted Gregory Coleman's testimony that the petitioner had confessed to him. Although acknowledging the limited impeachment value of one such witness, the trial court nevertheless con-

disagree with the trial court that Bryant's statements were not sufficiently credible to require a review of that evidence in the context of the original trial evidence. In particular, I believe that, because the Bryant evidence was admissible as trustworthy declarations against penal interest, that evidence, under the specific circumstances of this case, necessarily satisfied the minimum credibility threshold that comprises the first prong of the two part *Shabazz* test.[61] Thus, the trial court's failure to view the newly discovered evidence in the context of the evidence adduced at the petitioner's criminal trial was improper. Moreover, as I explain more fully hereinafter, the trial court's findings with respect to the admissibility of the Bryant evidence and its findings with respect to the credibility of that evidence are irreconcilably in conflict, a problem that irretrievably taints both the court's analysis under *Shabazz* and its ultimate determination that a new trial is not warranted.

1

I begin my discussion of these issues by noting, preliminarily, that, in many cases involving new trial petitions based on newly discovered evidence, that evi-

cluded that that testimony "would not lead to an acquittal on retrial" when "considered in view of the *strong evidence of guilt presented at trial* . . . ." (Emphasis added.) For the reasons set forth in part IV of this opinion, I disagree with the trial court's characterization of the strength of the state's case. To the extent that the trial court may have relied on its view that the state's case was "strong" in concluding that the Bryant evidence does not warrant a new trial, albeit without expressly stating that it was doing so, any such reliance was, in my view, seriously misplaced and would provide an independent basis for reversing the trial court's ruling.

[61] Because the trial court concluded that the Bryant evidence was admissible under the declaration against penal interest exception to the hearsay rule, I refer to that exception in the following analysis. Because the trial court properly could have found that that evidence was admissible under the residual hearsay exception, however, and because the admissibility of the evidence under that exception requires that evidence to be no less trustworthy and reliable than it would be to be admissible under the exception for declarations against penal interest, the analysis that follows applies to the former as well as to the latter.

dence will prove to be so inherently incredible or unworthy of belief that it will be unnecessary for the court to consider it in light of the evidence presented at the original trial. In most such cases, the trial judge, who generally will have had the opportunity to observe the in-court testimony of the witness proffering the newly discovered evidence, will be able to assess that witness' veracity on the basis of the witness' conduct, demeanor and attitude on the stand. Indeed, "[t]he trial court . . . is obliged to make such a credibility determination . . . on the basis of [any such] live testimony." *Adams* v. *State*, supra, 259 Conn. 842. If, on the basis of that assessment, the court reasonably concludes that the witness is so lacking in credibility that he or she simply would not be believed by a second jury, there is no reason for the court to consider the witness' testimony in the context of the original trial evidence. In cases involving newly discovered evidence that is *not* proffered through live testimony—in such circumstances, the court is unable to assess the witness' credibility on the basis of his or her demeanor and conduct at the hearing—the court nevertheless reasonably may conclude that the new evidence is unworthy of belief and, consequently, that a second jury would not credit it, either because the evidence bears insufficient indicia of reliability, because it is clearly refuted by other undisputed or highly credible evidence, or because it derives from a source that itself is inherently unreliable or untrustworthy.

The newly discovered evidence at issue in the present case does not fall into any of these general categories. It is true that, although the trial court could not evaluate Bryant's credibility firsthand, the court was able to view his video-recorded interview with Colucci. Thus, unlike documentary or other unrecorded hearsay testimony, the video recording afforded the court the opportunity, albeit somewhat limited by the witness' absence from

the courtroom, to assess Bryant's conduct, demeanor and attitude as he responded to Colucci's questions during the interview. There is nothing in the trial court's memorandum of decision or anywhere else in the record, however, to suggest that the court relied on any aspect of Bryant's demeanor in that video recording in concluding that a jury would not credit his version of the facts. In fact, the court expressly states that, because Bryant did not testify at the hearing on the petition for a new trial, the court was *unable* to evaluate his "demeanor and manner . . . ."[62] Instead, the court relied solely on certain objective, undisputed facts in reaching its conclusion that Bryant was so lacking in credibility that evaluating his testimony in the context of the original trial evidence was unnecessary. In the absence of any indication that the court's credibility determination was predicated on Bryant's conduct in the video recording, as opposed to the substance of his statements, it is apparent that Bryant's demeanor, mannerisms or appearance had no bearing on the court's determination.[63] Thus, to the extent that the trial court's assessment of Bryant's credibility would have been entitled to deference *if* that assessment had been based, in whole or in part, on the court's evaluation of Bryant's conduct during his video-recorded interview

---

[62] The trial court stated in its memorandum of decision: "The trier of fact may consider whether a witness is worthy of belief by considering the [witness'] intelligence, motive, state of mind, demeanor and manner while on the stand. These items were missing from this hearing since the court was . . . given [only] a transcript and a video presentation. There was no in-person testimony."

[63] I note that, to the extremely limited extent that the facts on which the trial court relied in reaching its credibility finding were adduced through in-person testimony at the hearing on the new trial petition, none of that testimony is disputed. Because the truth of that testimony is unchallenged, the court's reliance on it also is not subject to challenge. As I discuss more fully in the text of this opinion, for present purposes, the only issue is whether those undisputed facts are legally sufficient to justify the trial court's failure to consider Bryant's statements in the context of the original trial evidence.

with Colucci, there is no occasion for such deference because the record is devoid of any indication that the court's credibility determination was predicated, to any degree, on Bryant's demeanor during that interview.

Furthermore, the court's conclusion that a second jury would discredit Bryant was not founded on any evidence that Bryant, because of his character or background, is a person unworthy of belief. Indeed, there is nothing in the record to suggest that he is the kind of person who would falsely implicate two former classmates in a gruesome and high profile murder. Finally, the court's credibility determination was based entirely on its evaluation of the substance of Bryant's statements viewed in the light of the same objective facts that led the court correctly to conclude that those statements were marked by indicia of reliability sufficient to ensure their trustworthiness for purposes of admissibility. In such circumstances, the trial court was required to consider those statements in the context of the original trial evidence.

This is so because of the requirement in this state that only *trustworthy* declarations against penal interest may be admitted into evidence. See Conn. Code Evid. § 8-6 (4). As this court repeatedly has emphasized, and as I previously explained; see part III B of this opinion; this prerequisite to admissibility is essential and requires the court to engage in a "careful examination" of the statement to ensure its trustworthiness. *State* v. *Rosado*, 218 Conn. 239, 244, 588 A.2d 1066 (1991), citing *State* v. *DeFreitas*, supra, 179 Conn. 451–52. Consequently, a statement against penal interest will be excluded from evidence—notwithstanding that it would fully exonerate a defendant if believed—unless "circumstances [exist that] . . . *clearly tend to support the facts* asserted in the [declaration]." (Emphasis added.) *State* v. *DeFreitas*, supra, 452 n.9. Thus, there must exist facts that strongly corroborate the state-

ment. See, e.g., *State* v. *Lopez*, supra, 254 Conn. 319 (explaining that corroboration requirement for hearsay exception for statements against penal interest is "significant" and *"goes beyond minimal corroboration"* [emphasis in original; internal quotation marks omitted]). In other words, the statement must be supported by corroborating facts that *"clearly indicate* the statement's trustworthiness." (Emphasis in original.) Id.

Only a statement against penal interest that meets these stringent requirements will be deemed sufficiently trustworthy to be admissible under that exception to the hearsay rule. Because a statement cannot be characterized as trustworthy unless it is, in fact, reliable or worthy of confidence,[64] it stands to reason that when, as in the present case, the trial court properly has found that the newly discovered evidence would be admissible at a new trial as trustworthy statements against penal interest, the court must have a sufficiently compelling justification to reject that evidence as so *unreliable* or *unworthy* of confidence that it need not be considered in the context of the original trial evidence. In other words, once the court has determined that a statement against penal interest bears substantial indicia of reliability, such that, at a minimum, a jury reasonably could credit it,[65] the court would need strong reason also to conclude that that *same* evidence is so devoid of credibility that a jury simply would not believe it. Without such a reason, the court is obligated to view the statement in the context of the original trial evidence. To conclude otherwise would unduly diminish the significance of the newly discovered evidence and its potential effect on the jury in light of the relative strength or weakness of the state's original case. Indeed,

---

[64] "Trustworthy" is defined as "worthy of confidence: dependable . . . ." Webster's Third New International Dictionary. Its designated synonym is "reliable." Id.

[65] Of course, if the jury reasonably could *not* credit the statement, then it would be *inadmissible* as *lacking* sufficient indicia of reliability.

it would be manifestly unfair for a court to forgo considering a *trustworthy* statement against penal interest in the context of the original trial evidence without a truly sound basis for concluding that the statement, despite its reliability, is entirely lacking in credibility. As I explain hereinafter, the trial court in the present case was not justified in rejecting as wholly incredible Bryant's trustworthy statements against penal interest.

Before providing that explanation, however, it is important to identify a second critical, albeit related, reason why it was improper for the trial court not to consider the Bryant evidence in the context of the original trial evidence. This reason stems from the fact that a new trial is required upon the discovery of evidence following the petitioner's original trial if that evidence is sufficiently credible and of such a nature to raise a *reasonable doubt* at a second trial. In the present case, that newly discovered evidence is third party culpability evidence, which, by its very nature, is always "relevant to the jury's determination of whether a reasonable doubt exists as to the defendant's guilt"; *State* v. *Arroyo*, supra, 284 Conn. 610; as long as that evidence "establishes a direct connection between a third party and the charged offense . . . ." Id., 609–10. It is undisputed, of course, that the Bryant evidence satisfies this relevancy requirement because Bryant's statements directly implicate Hasbrouck and Tinsley in the victim's murder and exonerate the petitioner. Consequently, for a second jury to find the petitioner not guilty of the victim's murder, that jury need not be firmly convinced that Bryant is telling the truth about Hasbrouck's and Tinsley's involvement in the murder; indeed, the jury need not even find that it is more likely than not that Bryant's story is truthful. Rather, the jury must find only that the newly discovered evidence, along with the other evidence tending to undermine the state's case,[66] gives

---

[66] See part IV of this opinion.

rise to a reasonable doubt that the petitioner committed the offense. Because juries are instructed that "[p]roof beyond a reasonable doubt is proof that precludes every reasonable hypothesis except guilt and *is inconsistent with any other rational conclusion*"; (emphasis added; internal quotation marks omitted) *State* v. *Johnson*, 288 Conn. 236, 289 n.49, 951 A.2d 1257 (2008); a second jury would find the petitioner not guilty upon determining that it is reasonably possible that Bryant is telling the truth. Thus, only if the trial court reasonably were to determine that the jury would find the Bryant evidence "utterly unworthy of credence"; *Smith* v. *State*, supra, 141 Conn. 208;[67] that is, so lacking in credibility that a jury rationally would not find it credible enough even to raise a reasonable doubt about the petitioner's guilt, *no matter how weak the state's case against the petitioner*, would it be proper for the court to reject the petitioner's claim without reviewing the newly discovered Bryant evidence in the broader context of the original trial evidence. Indeed, it is in recognition of this relationship between the state's demanding burden of proof in criminal cases and the petitioner's burden of establishing a right to a new trial that this court has explained that, in considering the newly discovered evidence in light of the original trial evidence, the court must determine not whether that new evidence is absolutely credible but, rather, whether it is *"sufficiently"* credible to warrant a new trial. (Emphasis added.) *Adams* v. *State*, supra, 259 Conn. 844; accord *Shabazz* v. *State*, supra, 259 Conn. 827. Because Bryant's statements against penal interest bore significant indicia of trustworthiness, and because, as I explain hereinafter, there is nothing in the record to justify a finding that

[67] In *Smith*, this court concluded that the trial court in that case reasonably had denied a petition for a new trial upon finding that the version of the facts offered by a third party, who claimed that he, rather than the petitioner, had participated in the murder of the victim, was wholly unworthy of belief. *Smith* v. *State*, supra, 141 Conn. 208, 214.

the Bryant evidence, despite its trustworthiness, is nevertheless wholly lacking in credibility, the trial court's failure to proceed to the next step of the analysis, that is, consideration of that evidence in the context of the original trial evidence, was contrary to the procedure that this court established in *Shabazz* for evaluating new trial petitions.[68]

The trial court based its determination that Bryant's statements were not credible, first, on its finding that the statements were only minimally corroborated and, second, on four undisputed facts. I turn first to the court's first reason for finding Bryant's statements lacking in credibility, namely, that they were only minimally corroborated.

2

As I explained in part III B of this opinion, a third party statement against penal interest is inadmissible unless supported by significant corroborating evidence that clearly establishes the statement's trustworthiness. E.g., *State* v. *Lopez*, supra, 254 Conn. 319. Consequently, a trial court may not admit such a statement unless it determines, after carefully examining the statement and the surrounding circumstances; *State* v. *DeFreitas*, supra, 179 Conn. 451–52; that the statement is supported by "a significant level of corroboration"; *State* v. *Lopez*, supra, 254 Conn. 321; a threshold that the trial court in

---

[68] The majority attempts to avoid this conclusion, contending that, because a trial court reasonably may find that a witness who is "under oath and subject to cross-examination" lacks "even a modicum of credibility," there was no reason why the trial court in the present case could not have made such a finding with respect to the Bryant evidence. As I have explained, however, in the present case, Bryant did *not* testify in court, the trial court made no finding that Bryant's performance during the video recording rendered him incredible, and the court expressly found that Bryant's statements bore significant indicia of trustworthiness and reliability. In such circumstances, the court reasonably could not have concluded that the newly discovered evidence was wholly incredible. Consequently, the trial court was required to consider that evidence in light of the original trial evidence.

the present case necessarily found had been met by the petitioner. Indeed, the court expressly identified various facts and circumstances that it determined were sufficient to satisfy that requirement. Notwithstanding this finding, the trial court thereafter concluded that Bryant's statements were "not credible" and, therefore, would not be believed by a jury, because "[t]he corroboration for Bryant's claim is minimal" and "[t]he testimony of Bryant is absent any genuine corroboration." There simply is no way that the trial court's first finding, that is, that Bryant's statements are trustworthy because they are supported by significant, rather than minimal, corroborating facts, can be reconciled with its second finding, that is, that those same statements are not credible because the facts supporting them are minimal and not genuinely corroborative.

This flaw in the trial court's analysis is critical. Unless the trial court correctly concluded that Bryant's statements were sufficiently trustworthy to be admissible— a determination that the trial court was entitled to make only if its predicate finding of significant corroboration also was correct—Bryant's statements would be inadmissible, and, consequently, there would be no reason for the court even to analyze the petitioner's claim under *Shabazz*. Because, however, the trial court *correctly* concluded that Bryant's statements were sufficiently corroborated to be admissible under the hearsay exception for declarations against penal interest, the court was required to proceed to the *Shabazz* test, the first prong of which mandates that the court decide whether the statements satisfy a minimum credibility threshold. A crucial component of that determination was an evaluation of the extent to which Bryant's statements were corroborated; common sense dictates that a hearsay statement—indeed, any statement—that is supported by significant corroborating evidence necessarily will be far more credible than a statement that lacks any

real corroboration. Because the trial court improperly relied on its finding that Bryant's statements were *not* corroborated—a finding that flatly contradicted its earlier determination with respect to the *very same* statements and the *very same* corroborative evidence—its analysis was fundamentally flawed, and, therefore, its conclusion is clearly incorrect.

The trial court's analytical error is compounded by the fact that, as I have explained, a third party statement against penal interest that is found to be admissible—in other words, one that is sufficiently corroborated to be deemed trustworthy—also will be credible enough to surmount the *Shabazz* minimum credibility threshold in the absence of sufficiently strong countervailing evidence to justify a contrary conclusion. This is so because, as I also have explained, under *Shabazz*, the newly discovered evidence need not be fully credible or believable; rather, it need be only *sufficiently* credible to give rise to a reasonable doubt that otherwise did not exist. In rejecting the evidence supporting Bryant's statements—evidence that the trial court already had found, quite properly, to be strongly corroborative of those statements—the trial court improperly failed to give due weight to that evidence for the purpose of determining whether the petitioner had satisfied the minimum credibility threshold under *Shabazz*. Moreover, although the court identified certain other evidence that, in its view, supported the conclusion that Bryant's statements were so lacking in credibility that they failed to meet even that low threshold,[69] the court's express reliance on the purported lack of corroborating

---

[69] For the reasons set forth hereinafter, even if the trial court properly had considered the corroborating facts and circumstances in connection with its analysis under *Shabazz*, the other evidence on which the trial court relied or reasonably could have relied in finding that Bryant's statements did not meet the minimum credibility threshold under *Shabazz* is inadequate to support that finding.

evidence[70] skewed the court's analysis, resulting in a credibility determination that is unfaithful to the principles underlying *Shabazz*. Consequently, the trial court's conclusion that Bryant's statements, notwithstanding their trustworthiness, fail under the first prong of *Shabazz*, cannot stand.[71] These flaws in the trial court's analysis are alone sufficient reason to reverse the trial court's judgment.

3

In dismissing the petitioner's claim without considering the nature and strength of the state's case, the trial court also relied on the facts that none of the victim's closest friends had "any recollection of any association between [the victim] and Bryant, Hasbrouck and Tinsley," that Bryant did not come forward with his version of the facts for many years, that none of the witnesses who testified at the new trial hearing had "any recall of ever seeing Bryant and his companions in Belle

---

[70] The importance of that reliance to the court's decision is reflected in the court's repeated reference to the absence of corroboration.

[71] Although the majority acknowledges that the finding of the trial court that Bryant's statements lack any genuine corroboration "appears to fall short of the standard for admission of a statement against penal interest"; footnote 23 of the majority opinion; the majority states that it "need not examine . . . the court's admissibility determination" because of the majority's conclusion that the trial court properly determined "that the petitioner had failed to persuade it that Bryant's statement[s] probably would result in a different verdict at a new trial . . . ." Id. The majority's attempt to avoid the problem created by the trial court's inconsistent findings is unavailing. To the extent that the trial court's finding that Bryant's statements are *uncorroborated* is a proper one, as the majority has determined, it *necessarily* follows that the trial court abused its discretion in concluding that those statements are trustworthy and, therefore, that they would be admissible, because, as I have explained, under settled law, only trustworthy third party statements against penal interest are admissible, and only those statements that are significantly corroborated may be deemed trustworthy. E.g., *State* v. *Lopez*, supra, 254 Conn. 319; *State* v. *Bryant*, supra, 202 Conn. 700. Thus, the majority's endorsement of the trial court's finding that the statements lack corroboration leads inexorably to the conclusion that the trial court abused its discretion in concluding that Bryant's statements were sufficiently trustworthy to be admissible. For whatever reason, the majority elects not to acknowledge that unavoidable fact.

Haven on the night of the murder," and that "[t]he claim that Hasbrouck and Tinsley went 'caveman style' [was] not supported by the evidence." For the reasons that follow, these facts are insufficient to justify the trial court's failure to consider Bryant's trustworthy statements against penal interest in the context of the original trial evidence as the second prong of *Shabazz* requires.

With respect to the first reason that the trial court advances, it is not at all surprising that none of the victim's closest friends had any recollection of Hasbrouck and Tinsley thirty years after the murder because Bryant never suggested the existence of any relationship between the victim, on the one hand, and him, Hasbrouck and Tinsley, on the other, such that that association likely would have made much of an impression, if any at all, on the victim. To the contrary, Bryant indicated that Hasbrouck, despite his fixation on the victim, was too insecure even to approach her. Bryant himself knew the victim only through his acquaintance with people who lived in her neighborhood, and he and the victim never attended school together. Moreover, at the time of her death, the victim had resided in Greenwich for only one year. In sum, there is nothing in the record to indicate either that Hasbrouck's interest in the victim was anything but one-sided or, more importantly, that Hasbrouck, Tinsley and Bryant ever spent any significant amount of time with the victim prior to her murder.[72] In fact, it appears

---

[72] As I previously indicated, Bryant stated in his video-recorded interview with Colucci that Hasbrouck first may have seen the victim at an annual street festival in Greenwich. According to Neal Walker, the festival was attended by the whole town. An article in a Greenwich newspaper that was published in September, 1975, stated that "more than 12,000 residents took part in the fourth annual Block Party." B. Young, "Block Party Proves Massive Success," Greenwich Time, September 22, 1975, p. 1. The other two events that Bryant claims Hasbrouck and Tinsley attended and that the victim also attended were two local dances.

quite clear that Hasbrouck and Tinsley were generally unknown in Belle Haven except to those people with whom they actually had spent some time, namely, Byrne and Walker. Notably, Walker remembers both Hasbrouck and Tinsley well and, although Byrne is not alive to testify, Tinsley and Hasbrouck recall Byrne surprisingly well in view of the relatively limited contact that they had had with him more than thirty years ago.

I turn next to the trial court's finding that the Bryant evidence cannot be credited because of the considerable time that had elapsed before he came forward. The trial court stated: "Although Bryant acquired his information within days of the offense, he, as a trained lawyer, kept it to himself for over one quarter of a century. On finally disclosing, he insisted [on] anonymity. He did not come forward voluntarily; rather, it only happened when . . . Mills informed [Kennedy] of this information." As I previously explained, Bryant has been very consistent in his reason for not coming forward, namely, that he and his mother feared that he could be subject to criminal liability for his involvement with Hasbrouck and Tinsley on the night of the murder. Indeed, in finding that Bryant's statements are sufficiently trustworthy so as to render them admissible as against his penal interest, the trial court found: "At the time of the murder in 1975 . . . Bryant was a fourteen year old black male who was suddenly faced with information that, by his own admission, was clearly against his penal interest . . . .

"Combined with . . . Bryant's knowledge that there is no statute of limitations on murder, his reluctance to tell his story is reasonable." I can discern no reason why the same rationale should not apply to a determination of Bryant's credibility for purposes of the test that this court adopted in *Shabazz.*

The majority seeks to bolster this particular aspect of the trial court's analysis by hypothesizing a reason

why Bryant did not come forward with his version of the facts until years after the victim's murder. Specifically, the majority speculates that Bryant fabricated Hasbrouck's and Tinsley's involvement in the murder simply in the hopes of being involved in the sale of a screenplay. The majority's theory is purely conjectural—indeed, the trial court itself did not attempt to ascribe this or any other motive to Bryant—and the majority is incorrect in asserting that the theory finds support in the evidence. On the contrary, the majority's postulation rests on a mischaracterization of the facts concerning that screenplay as those facts were related by Mills, the screenplay's author, whose rendition of the facts makes it perfectly clear that Bryant had nothing at all to do with the screenplay, and never sought to have anything to do with it, after he read it and informed Mills of Hasbrouck's and Tinsley's involvement in the murder. See footnote 17 of this opinion. Moreover, the record is perfectly clear that Bryant went to great lengths to *avoid* any publicity or attention with respect to his knowledge about the events on the night of the murder, and he assiduously resisted any and all efforts by Mills and Walker to persuade him to come forward and to speak to the authorities. Finally, as I previously explained, Bryant consistently expressed wholly understandable reasons for not wanting to make his story public, including the fact that, by doing so, he might have placed himself in jeopardy of becoming a subject or even a target of the police investigation into the victim's murder.

It is worth noting, moreover, that, when Colucci asked Bryant whether, by coming forward, he was seeking "the limelight," Bryant reminded Colucci that he had not come forward willingly, stating: "I'm not interested in any publicity. I don't want to be involved in this at all. I'm not interested in fifteen minutes or fifteen years of fame. I'm interested in the preservation of my

family . . . ." Bryant continued, however, that he knew that "the wrong person is in jail for this" and that Hasbrouck or Tinsley "should be serving time for this [murder]." When Colucci asked Bryant why he should believe him, Bryant responded: "There is no reason for you to believe me. All I have is a story to tell. I was there. I knew all the parties." Bryant further stated: "And when you have suspects that have been described by other people [as having been] in Belle Haven and police not following up and prosecutors not following up, it sort of makes you kind of [wary].[73] . . . They just beamed in on that one family [the Skakels]. And unfortunately for [the petitioner], [they] had a bull's eye on him. Based on the evidence that they had, they were able to convict [him]. But he's not guilty. He may be guilty of a lot of things, but he's not guilty of this. . . . But, you know, I'm not his judge [or] his jury. So why should you believe me? I was there. I know who was there. I know what the atmosphere was. People still don't understand what was going on in Greenwich at the time. There [were] a lot of drugs, a lot of drinking by underage[d] minors. And you had outsiders coming in that were volatile. And you mix those things together, and there is no supervision . . . something's going to happen. . . . And do I feel responsible? Yes and no. I feel responsible [such] that I need to come forth and

---

[73] Bryant is referring to the fact that, after the petitioner's arrest, he had authorized Mills and Crawford to convey to the police the information about Hasbrouck and Tinsley that Bryant himself already had provided to Mills and Crawford. Garr, the state's lead investigator, testified that, although he had, in fact, been given that information in advance of the petitioner's criminal trial, he never followed up on it. Indeed, although Mills honored Bryant's request not to reveal his name to the prosecuting authorities and to the defense, Mills did tell the prosecuting authorities, but apparently not the defense, that Bryant was African-American. Because only one other African-American attended Brunswick School with Bryant and because there were no more than fifty students in Bryant's class, it would have been extremely easy for the state to have ascertained Bryant's identity and then to have interviewed him prior to the petitioner's criminal trial. For whatever reason, however, the state elected not to do so.

give my statement. I didn't goad anybody into doing anything. My mistake in judgment is not—I mean, I sat on this story the whole time during the [petitioner's criminal] trial, because there was no way, there was no way [I] ever thought that [the petitioner] would get convicted. No way."[74] Thus, the explanation that the majority advances as to why Bryant might have been motivated to come forward with his information about the murder is completely lacking in factual support.

In sum, I see no reason to disbelieve, or even to doubt, Bryant's explanation for refusing to come forward sooner. Although he certainly deserves no praise for failing to make himself available to the state and to the petitioner in a much more timely manner, the fact that he did not do so is insufficient reason to reject out-of-hand his version of the facts.

With respect to the trial court's next reason for discrediting Bryant, I do agree that the court reasonably concluded that Bryant's credibility is undermined by the fact that no one recalls seeing him, or Hasbrouck or Tinsley, in Belle Haven on the night of the murder, even though Bryant recalls seeing several people there that night. I do not agree, however, that this renders his version of the facts incredible. It may be that Bryant is not telling the whole truth about the murder because of a desire to minimize his own involvement in the

---

[74] It is also noteworthy that, in his video-recorded interview with Colucci, Bryant candidly acknowledged that he "[does not] like" the petitioner. Bryant explained, however, that, "just because I don't like him doesn't mean he should be incarcerated" for a crime he did not commit. In a tape-recorded telephone conversation with Kennedy, Bryant alluded to one of the possible reasons why he and the petitioner did not get along, suggesting that it may have been an issue of race. Bryant states: "[The petitioner] is innocent. . . . I am not a very loving or caring person, but I feel very bad for [the petitioner's] situation because I wouldn't wish that on anybody. . . . And he is not my enemy. I don't dislike [the petitioner], you have to understand that. It was kind of a difficult situation, being the only black kid living in Greenwich for a couple years. So I, you can imagine, it wasn't easy. It wasn't the worst thing in the world, but it wasn't easy."

events leading up to it. He also may be embellishing, either intentionally or unintentionally, some of his memories regarding whom he saw, or he may be conflating memories of that night with memories of other visits to Belle Haven. As I explain in greater detail in part IV of this opinion, Bryant would not be the first witness in this case to have a mistaken recollection, or no recollection at all, with respect to events that occurred more than three decades ago.[75]

We know, moreover, that many people were outside in Belle Haven on the night of the victim's murder but were never identified by the police. For example, Andrew Pugh, who the state called as a witness at the petitioner's criminal trial, testified that, sometime before 8 p.m., he ended up behind the Skakels' house with "ten or twelve of the neighborhood kids . . .

---

[75] Although there are many examples of witnesses with similar memory problems, one such witness is Jacqueline Wetenhall, who was one of the victim's closest friends and was with the victim for much of the evening on the night of the murder. At the hearing on the petition for a new trial, Wetenhall testified for the state that she had no recollection of seeing Bryant that night or of ever having met Hasbrouck or Tinsley. When asked whether she recalled being at the Greenwich street festival where Bryant claims Hasbrouck saw the victim for the first time, Wetenhall responded that she had no memory of having attended the event. A copy of the victim's diary, however, reveals that the victim wrote about attending the event with Wetenhall, recounting that she and Wetenhall walked home after the festival and that she then slept at Wetenhall's house. Of course, if Wetenhall cannot remember attending the event herself, she hardly can be expected to remember others who attended. Another person who suffered a lapse of memory is Dorothy Moxley, the victim's mother, who testified at the petitioner's criminal trial that she could not recall whether she had heard dogs barking on the night of the victim's murder even though she told police on the day following the murder that she had heard such barking, and notwithstanding that the time of the barking had played a very significant part in determining the time of the victim's death. Dorothy Moxley also could not remember what time she expected her daughter home on the night of the murder.

I note that the state, in closing argument during the petitioner's criminal trial, focused on the inability of some members of the petitioner's family to remember similar details about the night of the murder as evidence of their deceit. Specifically, the state argued that it simply was unbelievable that they would not remember such details about the night in light of the shocking and painful nature of the crime that occurred at that time.

causing a ruckus" with "shaving cream and toilet paper
. . . ." Pugh was not asked to identify these children,
however, and there is no indication that the police ever
identified them. Indeed, there is considerable evidence
that groups of children congregated at various places
in the neighborhood throughout the night. One of the
children, Maria Coomaraswamy-Falkenstein, testified
at the hearing on the petition for a new trial that she
had observed "a large group" of people near the Skakels'
residence and that the group would split up and reas-
semble within the neighborhood throughout the night.
Charles Morganti, a special police officer who was on
duty in Belle Haven on the night of the murder, saw a
group comprised of at least five or six "young teenag-
ers" in and around the Skakels' property early in the
evening and then later on. Because of the darkness,
however, he was not able to identify any of them. Evi-
dence adduced at the hearing on the petition for a new
trial indicated that there were no street lights in Belle
Haven, thereby making it especially difficult to see and
identify people at night.

Indeed, the fact that no one remembers seeing Bryant,
Hasbrouck and Tinsley in Belle Haven very well could
be attributable both to the darkness and to the cold.
According to police records, temperatures on the night
of the murder were anywhere between thirty-five and
forty-five degrees Fahrenheit; anyone who was out,
therefore, likely was covered up. Furthermore,
according to Morganti, the group of teenagers that he
saw near the Skakels' property "scattered" when he
approached them. When asked whether he was able to
identify any of them, Morganti responded: "There was
no light in that area. It was totally pitch black. There
is no way I could have recognized anyone over there."
Steven Hartig, another Belle Haven resident, saw a
group of teenagers near the Skakels' property while he
was out walking but claims not to have recognized any

of them. Finally, there also was substantial evidence presented at the petitioner's criminal trial that some of the teenagers were consuming drugs and alcohol that night. In short, there is ample reason to believe that people were out in Belle Haven on the night of the murder who never have been identified, either because it was too dark to see them, because they did not want to be seen or for reasons of inattention due to drugs and alcohol. There is no reason necessarily to exclude Bryant, Hasbrouck and Tinsley from that category of persons.[76]

I note, in addition, that Julie Skakel, the petitioner's sister, and Andrea Shakespeare, her close friend, observed the silhouette of a person run past the kitchen window of the Skakels' house at approximately the same time that the victim was sitting in a car in the Skakels' driveway with Byrne, Helen Ix, Thomas Skakel and the petitioner. A short time later, as Julie Skakel was getting into her car to drive Shakespeare home, she observed another figure dart across the driveway in a crouched position and run into the woods. Shakespeare heard the footsteps of the second person but did not see him. Because of the darkness, neither Julie

---

[76] The majority states that Bryant, Hasbrouck and Tinsley "did not look like the average fourteen or fifteen year olds who would have blended into the crowd, particularly not in an area that was described by one witness as 'a fairly lily-white community.' " The witness to whom the majority refers, however, namely, Morganti, was working in Belle Haven for the first time on the night of the murder, and, therefore, it cannot be presumed that he had sufficient familiarity with that community or its residents to be able to assess reliably the extent to which a person's race or nationality would make him or her more recognizable, particularly on mischief night, when those outside were dressed for the cold weather and seeking to ensure that they would not be apprehended for their pranks. More importantly, as Morganti himself repeatedly acknowledged in his testimony, *it simply was too dark to see anyone that night,* irrespective of skin color. We know, moreover, that at least one African-American family lived in Belle Haven with their teenaged child next door to the Skakels at the time of the murder and that Bryant, who also is African-American, regularly visited the neighborhood during the three years preceding the murder.

Skakel nor Shakespeare was able to provide a description of the person or to determine whether it was the same person whom they had seen run past the kitchen window. In light of the newly discovered Bryant evidence, it is not implausible that the figures Julie Skakel and Shakespeare had observed prowling about the Skakels' property shortly before the victim was killed were those of Hasbrouck and Tinsley, both of whom could have stalked the victim and waited for Byrne to return. Indeed, according to Ix, Byrne appeared on the street, alone, as she and the victim were walking to the Skakels' residence around 9:10 p.m. Ix told the police that she had left the Skakels' house approximately fifteen minutes later because she had to be home for a 9:30 p.m. curfew, and that Byrne walked with her to her house and then disappeared. Ix assumed that Byrne went home after he left her but did not see which way he actually went.[77]

The majority asserts that, "[i]n his police interviews, Byrne never stated that Bryant, Hasbrouck or Tinsley had been with him" on the night of the murder and that, "[s]everal witnesses . . . placed Byrne with the victim and other friends at various times that night . . . ." I agree with the majority that Byrne's whereabouts on the night of the murder are highly relevant to any assessment of Bryant's credibility because Bryant claims not only that Byrne was with him for much of the evening but also that Byrne was with Hasbrouck and Tinsley after Bryant left. Contrary to the suggestion of the majority, however, to the extent that there is credible evidence documenting Byrne's movements, it tends to support Bryant's claims. In Bryant's video-recorded interview with Colucci, Bryant states that, after going to the Walkers' residence at approximately

---

[77] In an interview with Ix conducted shortly after the murder, the police asked her whether she had seen which way Byrne went after he left her. Ix responded that she had not observed which way Byrne went.

648

6:30 or 6:40 p.m., he, Hasbrouck, and Tinsley went to the home of the Walkers' neighbor and took some beer from that neighbor's refrigerator. They then met up with Byrne, and the four of them proceeded to walk around the neighborhood playing pranks. Bryant places the group in the meadow behind the Skakels' house at between 8:30 and 8:45 p.m. Bryant never indicates that Byrne has left the group, so, presumably, he was with them until Bryant departed for the train station at approximately 9:15 p.m. According to Ix, Byrne met up with the victim and Ix right about this time, at approximately 9:10 p.m., as the victim and Ix were walking to the Skakels' house. At the hearing on the petition for a new trial, the state sought to establish that Byrne had been with Ix all night by introducing part of a statement that Ix had given to the police on the day after the murder. In that statement, Ix indicates that she met up with Byrne "shortly after" meeting up with the victim, sometime around 7 p.m. In the course of further examination of Ix, however, the petitioner's counsel introduced another portion of that 1975 statement indicating that Byrne did not stay with Ix and the victim but, rather, left them to go home to get eggs. Ix told police that, after Byrne left, she and the victim "never really saw [him] again" until he appeared two hours later.[78]

---

[78] Several hours after the victim's body was discovered, Detective Theodore J. Brosko of the Greenwich police department interviewed Ix, who related that she and the victim "left the Mouakad residence and while in [the] process of walking on Otter Rock Drive to the [Skakels'] [r]esidence, they met [Byrne] . . . .

"[T]he three of them then walked to the [Skakels'] residence arriving at about 9:10 p.m."

When Byrne was interviewed the next day by a different detective, however, he indicated that he, too, had been at the Mouakad residence with Ix and the victim until about 9:10 p.m. In another interview one day later, however, Byrne told a different story to yet a different detective, namely, that he was the person that Willie Jones, the husband of the Skakels' cook, saw "dart" in front of Jones' car at approximately 9:05 p.m. as Jones was pulling out of his driveway on Walsh Lane. Byrne's statements, at least as memorialized by the police, conflict insofar as he places himself at two different locations at or around the same time. Unlike Byrne, however, Ix was very clear and consistent in her statements to the police that Byrne

Coomaraswamy-Falkenstein testified at the hearing on the petition for a new trial that, between about 8 and 8:30 p.m. on the night of the murder, she was at the house of the Mouakad family, which lived down the street from the Skakels on Otter Rock Drive, with the victim and some other neighborhood children, and that she did not recall Byrne being with the group.

There is, therefore, no firm accounting of Byrne's whereabouts for the two hour period corresponding to the general time frame that Bryant claims Byrne was with him, Hasbrouck and Tinsley. Indeed, Byrne's sudden appearance around the time that Bryant claims to have left for the train station offers a highly plausible explanation as to where he might have been most of the evening. If Byrne had gone to his house to get eggs, as Ix told police that he had done, and bumped into Bryant along the way, as Bryant claims, that would explain why Ix never saw Byrne again until much later in the evening. Indeed, given that Byrne simply showed up alone while the victim and Ix were walking to the Skakels' residence, it is not farfetched to believe that Hasbrouck and Tinsley sent Byrne to try to isolate the victim or to draw her away from Ix. As I explain in part IV of this opinion, much of the evidence that was used to convict the petitioner required the jury to draw precisely this manner of inference. In any event, Byrne's whereabouts are pivotal in terms of assessing Bryant's credibility, and the fact that his whereabouts for most of the evening remain unaccounted for supports Bryant's version of the facts.[79]

had left her early in the evening and met up with her and the victim again in the street about two hours later as the victim and Ix were walking to the Skakels' residence.

[79] I note that, in 2003, Kennedy telephoned Byrne's sister, Daryl Fleuren, in an attempt to verify the information that Bryant had given Kennedy concerning Byrne. Fleuren told Kennedy that she did not know much about the murder "because [she] was married and out of the house by then and [she and her family] weren't allowed to talk about it." She remembered being told by her parents that her father was on the front porch when Byrne returned home at 9:30 p.m. on the night of the murder, and that her mother

Finally, and perhaps most importantly, the trial court expressly found, at the hearing on the petition for a new trial, that "witnesses confirm[ed] that Bryant [previously had] indicated that he [had been] present in Belle Haven on the night of the murder." Because the testimony of those witnesses, namely, Barbara Bryant and Esme Ingledew Dick, strongly corroborates Bryant's claim that he was in Belle Haven with Hasbrouck

had seen Byrne in bed at around 10 p.m. This information, however, based as it is on Fleuren's recollection of what she had been told by others about events that had occurred nearly thirty years earlier, is suspect because there is nothing else in the record even to indicate that Byrne's parents were home that night. Indeed, Byrne's parents were never interviewed by the police, and Byrne's older brother, rather than Byrne's parents, accompanied Byrne when he was interviewed by the police immediately after the murder. Fleuren also checked with her mother to see if she had any recollection of Bryant, Hasbrouck or Tinsley, and Fleuren reported back to Kennedy that her mother never had met or seen the three boys and, further, that "[Byrne] never had any black friends." This latter observation, however, is belied by the fact that both Hasbrouck and Tinsley acknowledged that they and Bryant had socialized with Byrne when they went to Greenwich, and both Tinsley and Bryant recalled that they had been to Byrne's home on several occasions. See part III D of this opinion. Indeed, one of Bryant's best friends, namely, Walker, lived directly across the street from Byrne, and both Bryant and Walker explained that they and Byrne socialized together often.

Although there is no indication that the trial court relied on or even credited Fleuren's second-hand account of her deceased brother's activities, and notwithstanding that Fleuren's statements to Kennedy regarding her parents' alleged memories likely would be inadmissible at a new trial, the majority places great weight on those statements, asserting that they support the trial court's credibility determination because they contradict "Bryant's account of the location of the principal parties to the events of that evening." Specifically, the majority states: "Significantly, Byrne's sister [Fleuren] stated in a tape-recorded interview that [her] father had been on the porch when Byrne came home at 9:30 p.m., and that [her] mother had told her that she had seen Byrne *in his bed at 10 p.m. that night.* Thus, at the very point in time when the petitioner claims the victim was murdered, a murder to which Bryant claims Byrne bore witness, Byrne's mother saw him in his bed." (Emphasis in original.) As I previously indicated, however, in the thousands of pages of police notes and interview transcripts entered into evidence at the hearing on the petition for a new trial, there is no indication that Byrne's parents were home on the night of the murder, and there also is no indication that they were interviewed by the police regarding Byrne's whereabouts that night. In contrast, police records indicate that virtually all of the other parents living in the vicinity of the murder were interviewed by the police, along with their children.

and Tinsley that night, that testimony necessarily minimizes the import of the fact that no witnesses recall seeing Bryant, Hasbrouck or Tinsley there at that time.

First, with respect to the information provided by Barbara Bryant, the petitioner retained private investigators Michael Udvardy and Catherine Harkness in September, 2006, to locate and interview her. In early November, 2006, Udvardy and Harkness set up a surveillance outside Barbara Bryant's apartment building in New York City. When Barbara Bryant exited the building in the late morning, Udvardy and Harkness introduced themselves and asked her if she would be willing to answer a few questions. She agreed to do so and spoke to the investigators for approximately fifteen minutes. According to Udvardy, Barbara Bryant "expressed frustration with [her son] for coming out with the story" and indicated that "she didn't know why he was discussing it at all." When asked whether her son was in Belle Haven on the day of the murder, Barbara Bryant responded that he had gone there with Hasbrouck and Tinsley but had returned home *that night.* (Emphasis added.) She also stated that, at that time, her son had told her that *Hasbrouck and Tinsley had spent the night in Belle Haven.* Barbara Bryant also spoke to Udvardy about the New York Times article of November 1, 1975, that her son had alluded to in his video-recorded interview with Colucci. Barbara Bryant specifically recalled discussing the article with her son at the time of its publication. Udvardy's testimony was confirmed in all respects by Harkness, who also was present for Barbara Bryant's interview with Udvardy.

On February 21, 2007, Barbara Bryant was deposed by the petitioner. Her deposition was video recorded and later admitted into evidence at the hearing on the petition for a new trial. At her deposition, Barbara Bryant changed her story somewhat from what she had

told Udvardy and Harkness.[80] Barbara Bryant stated that she then recalled that her son had returned home from Belle Haven while it was still light out, not at night as she had told the investigators. Barbara Bryant also indicated that she no longer was sure if she or someone else in her apartment had brought the New York Times article to her son's attention; she simply remembered that it was discussed in the house shortly after the murder and that a girl who was visiting had said to her son, "aren't you glad you had your black butt home because you certainly would have been accused of this." She also did not recall telling her son that Hasbrouck and Tinsley were dangerous and that he should distance himself from them, although she conceded that it was "possible" that she had had such a conversation with her son. Barbara Bryant stressed that she had no independent knowledge of whether Hasbrouck and Tinsley killed the victim, and that she remembered them as well mannered and attractive young men.[81] Finally, Barbara

---

[80] At her deposition, Barbara Bryant stated that Udvardy and Harkness initially had "accosted" her, "[s]cared the hell out of [her]" and that she was "full of [prescription] drugs" when they conducted their unannounced interview. Udvardy and Harkness testified, however, that they introduced themselves to Barbara Bryant before proceeding and informed her that it was a voluntary interview and that she could walk away at any time. One of the investigators, Udvardy, testified that, in his opinion, Barbara Bryant appeared "more vague" and "out of it" during the video-recorded deposition than when he encountered her on the street. Moreover, Barbara Bryant conceded at her deposition that, when she met with Udvardy and Harkness, she voluntarily had given them her telephone number in the event that they had any additional questions to ask her.

[81] The majority attempts to minimize the significance of Barbara Bryant's statements to Udvardy and Harkness, emphasizing that, in her deposition, she gave an account of her son's whereabouts on the night of the murder and of other surrounding events that was different from the one that she had given to Udvardy and Harkness. See footnote 35 of the majority opinion. The majority also underscores that Barbara Bryant claimed in her deposition to have been heavily medicated when Udvardy and Harkness approached her. Id. The fact remains, however, that Barbara Bryant consistently has acknowledged, first to Udvardy and Harkness, and subsequently in her deposition testimony, that Bryant was in Belle Haven on the day of the murder; she simply changed the time that she claims that he returned home. It is noteworthy that she changed her story in this regard only after Bryant

Bryant noted that the publicity surrounding her son's disclosures had made her "ill" and that she was taking several medications.

Dick, with whom Bryant lived while he was attending Brunswick School, also corroborated Bryant's claim of having been in Belle Haven on the night of the murder. Dick testified at the hearing on the new trial petition that, in the 1970s, her husband was chairman of the languages department at Brunswick School. Through her work as the executive director of the Educational Film Library Association, Dick had met Barbara Bryant, a producer of children's films; see part III A of this opinion; and the two women became good friends. In 1972, Dick and her husband invited Bryant to live with them in Greenwich so that he could attend Brunswick School. Dick testified that Bryant lived with them for three years, until the summer of 1975, at which time he left to reside with his mother in Manhattan. According to Dick, shortly after the murder, Bryant visited her home and disclosed to her that *he had been in Belle Haven on the night of the murder.* Dick also testified that Bryant was very upset after the petitioner's trial and told her that the petitioner had been "wrongly convicted," although he did not explain why he believed that to be the case. Thus, this testimony, like the evidence that Barbara Bryant provided, seriously undermines any contention that Bryant's story is merely a recent fabrication. It also belies the majority's speculative suggestion that Bryant may have been prompted to tell his story because of a desire to collaborate with Mills on Mills' screenplay. Indeed, the testimony of Barbara Bryant and Dick—testimony that the trial court

had asserted his privilege against self-incrimination at his own deposition. In light of all the relevant facts and circumstances, including Barbara Bryant's own statements and deposition testimony, it is clear both that she disapproved of her son's willingness to come forward with information about the victim's murder and that she wished to downplay any possible involvement that he may have had with respect to it.

expressly credited—negates the possibility that Bryant had *any* reason or motive to lie about his whereabouts on the night of the victim's murder because it defies credulity to think that, at age fourteen, Bryant was planting the seeds for a false story not to be revealed until more than one quarter of a century later.

Finally, the trial court also concluded that the evidence did not support Bryant's statements concerning the "caveman style" of attack that Hasbrouck and Tinsley allegedly contemplated because "[t]here was no evidence of the victim being dragged by the hair." The majority posits a second reason why Hasbrouck's and Tinsley's planned "caveman" assault is unsupported by the evidence, namely, the alleged sexual nature of the assault was not corroborated by the existence of semen on the victim's body. Neither of these reasons provides any reasonable basis for rejecting Bryant's statements as lacking in credibility. First, the victim was dragged a considerable distance—at least seventy-eight feet—and it simply is not clear what part of her body her assailant or assailants used to move her that distance. Even if it assumed that she was not dragged by her hair, however, it is clear that Hasbrouck and Tinsley used the term "caveman style" to describe generally what they intended to do, that is, to abduct, to subdue and then presumably to assault their victim sexually. Moreover, because the victim likely struggled when confronted by her assailants, it is reasonable to presume that Hasbrouck and Tinsley sought to accomplish their goal, including avoiding detection, in whatever way they thought was most likely to succeed under the circumstances, irrespective of whether that approach involved dragging the victim by her hair or by some other part of her body.

With respect to the majority's contention that the evidence does not support the conclusion that the victim was the subject of a sexual assault or an attempted

sexual assault, the majority is simply mistaken. The victim was found with her pants and underwear pulled down below her knees. Furthermore, the state elicited testimony at the petitioner's criminal trial from Lee, the former chief state criminalist, that semen could have been wiped away from the victim's body, as well as testimony from Harold Wayne Carver II, the state's chief medical examiner, that certain parts of the victim's body were not tested for the presence of semen. In light of the efforts of the victim's assailant or assailants to remove her pants and underwear, it appears highly likely that the purpose of the assault against the victim was sexual in nature; indeed, it is difficult to discern any other reason or motive for the brutal and shocking attack on the very popular fifteen year old victim.[82]

4

Thus, the record of the proceedings with respect to the petition for a new trial does not support the trial court's failure to consider Bryant's statements—statements that the court properly found were admissible because they were accompanied by corroborating circumstances clearly indicating their trustworthiness—in the context of the evidence adduced and the arguments raised at the petitioner's criminal trial. Indeed, to the extent that the trial court rejected Bryant's statements as lacking in credibility because they were only minimally corroborated, that conclusion directly contradicts the court's threshold finding that the statements

---

[82] As further reason for discrediting Bryant, the trial court also notes that "[m]issing from Bryant's statement is anything concerning the breaking of the [golf] club or the stabbing of the victim." On the contrary, it is clear from Bryant's statements that he knew that the victim had been beaten and stabbed to death by one or more golf clubs; in fact, the trial court observed that Bryant's explanation that he had been in possession of golf clubs belonging to the Skakel family on the night of the murder "indicate[s] a consciousness of guilt" that reflects Bryant's "[e]fforts to explain away the possibility that his fingerprints might be found on the murder weapon or another golf club nearby."

were strongly corroborated, a finding that is fully supported by the evidence. Under the circumstances presented, therefore, the significant indicia of reliability that mark Bryant's statements are sufficient, as a matter of law, to surmount the minimum credibility threshold that, under *Shabazz*, triggers consideration of that newly discovered evidence in the context of the original trial evidence.[83] I therefore turn to an examination of the original trial evidence.[84]

---

[83] Although the trial court expressly identified the evidence that it had relied on in rejecting the petitioner's claim without considering Bryant's statements in the context of the original trial evidence, the majority identifies certain other evidence on which, the majority asserts, the trial court reasonably could have relied to support that conclusion. None of that additional evidence, however, renders Bryant's statements materially less reliable or trustworthy than the evidence on which the trial court did rely, and, moreover, some of the evidence to which the majority refers simply has no bearing on Bryant's credibility. For example, the majority makes much of Bryant's statement that, on the day of the victim's murder, he, Hasbrouck and Tinsley had "picked up" golf clubs at the Skakels' residence. (Internal quotation marks omitted.) The majority then asserts that, according to Bryant, he had obtained those golf clubs from the Skakels' yard, even though other testimony indicates that no golf clubs were seen lying around the yard that day. Although it is undisputed that golf clubs frequently were left outside the Skakels' home, a careful review of Bryant's statement indicates that he obtained the golf clubs from somewhere on the Skakels' property, perhaps from inside the back porch, where they generally were located. In any event, contrary to the majority's assertion, there is nothing in that portion of Bryant's statement in which he speaks about the golf clubs—a portion of Bryant's statement that the trial court expressly concluded was *supported* by corroborative evidence—that in any way contradicts the statements of others that no golf clubs were known to be lying around the Skakels' property on the day of the murder. In fact, Bryant's testimony is consistent with the findings of police investigators that the Skakel family owned numerous sets of golf clubs that were stored in different locations in their house.

[84] As I previously noted, a trial court's evaluation of the strength of the evidence adduced at the petitioner's original trial is not entitled to deference when, as in the present case, the trial court did not preside over that original trial, because, in such circumstances, this court is no less able to perform that function, which entails a review of the record of the original trial. Because our review of the strength of the state's case is de novo, we are not hampered in our resolution of the petitioner's claim by the fact that the trial court failed to undertake that review. Indeed, to the extent that the trial court did engage in such a review, I believe that its conclusory characterization of the state's case as "strong" is not supported by the original trial record. See footnote 60 of this opinion. Furthermore, although the parties

## IV

## STATE'S CASE AGAINST THE PETITIONER

Because the petitioner did not raise a sufficiency of the evidence claim in his direct appeal to this court following his criminal conviction, this is the first time that this court has had occasion to consider the strength of the state's case.[85] See generally *State* v. *Skakel*, supra, 276 Conn. 639–40. On the basis of my review of the state's evidence, I conclude that it was not strong and required the jury to draw every possible inference in favor of the state's theory of the case.[86] Although at least four witnesses placed the petitioner twenty minutes away from the scene of the murder when it occurred, the state argued that each and every one of those witnesses was lying. The evidence to support this argument, however, was weak at best, especially when viewed in light of the testimony that was used to convict the petitioner, which consisted almost entirely of equivocal admissions by the petitioner and one dubious confession that he allegedly had made while he was a student at Elan School, an alcohol and drug rehabilita-

adduced certain testimony relating to the petitioner's claim concerning the newly discovered Bryant evidence, that testimony is unchallenged and, therefore, did not give rise to any credibility findings by the trial court. See footnote 63 of this opinion. Consequently, there is no impediment to resolving this second and final prong of the *Shabazz* test at this stage of the proceedings.

[85] In addition, in that original appeal, this court rejected all of the petitioner's claims of impropriety which, if meritorious, would have required us to engage in harmless error analysis. Of course, that analysis, if necessary, would have required us to consider the strength of the state's evidence against the petitioner.

[86] The evidence also was tainted by more than twenty years of sensationalistic media coverage, which included two true crime books, a novel and a television mini-series in which the petitioner's family was vilified as utterly lacking in moral conscience. The theme of a family cover-up was pounded by the prosecution at trial but supported only by the very questionable testimony of Kenneth Littleton, whose long-standing mental illness and delusional thought patterns caused him to believe that the Skakel family had tried to kill him and that he himself was a member of the Kennedy family.

tion facility for troubled adolescents located in Poland, Maine. Moreover, there was no physical evidence connecting the petitioner to the crime and no eyewitnesses. In light of the relatively weak evidence adduced by the state and the comparative strength of the newly discovered third party culpability evidence, I am convinced that that new evidence, at an absolute minimum, gives rise to a reasonable doubt about whether the petitioner had murdered the victim. I therefore am persuaded that, if the jury had considered the Bryant evidence together with the original trial evidence that it did consider, it is very likely that the verdict would have been different.

## A

### Events Leading Up to the Murder

The following facts, many of which are set forth in this court's opinion rejecting the petitioner's direct appeal; see generally id., 639–53; are relevant to the issue of whether the Bryant evidence warrants a new trial. On the evening of October 30, 1975, the victim left her home in the Belle Haven section of Greenwich sometime around 7 p.m. to "hack around" the neighborhood with her friend, Helen Ix. Shortly after 7 p.m., the victim and Ix went by the Skakels' house to see if the petitioner and his brother, Thomas Skakel (Tommy Skakel), were home. All of the Skakel children, however, Rushton Skakel, Jr., age 19, Julie Skakel, age 18, Tommy Skakel, age 17, John Skakel, age 16, the petitioner, age 15, David Skakel, age 12, and Stephen Skakel, age 9, together with their tutor, Kenneth Littleton, age 23, their cousin, James Terrien,[87] age 17, and Julie Skakel's friend, Andrea Shakespeare, age 16, were having dinner at the nearby Belle Haven Club. Rushton Skakel,

---

[87] James Terrien now uses the name James Dowdle. At the time of the victim's murder, he used the last name Terrien. I refer to him as Terrien throughout this opinion.

Sr., the father of the Skakel children, was away on a trip and would not return until the following evening.[88] All of the teenagers were drinking that night, some quite heavily. There also was evidence indicating that some of them had been smoking marijuana. The evidence further established that there was virtually no parental supervision at the Skakel household and that Rushton Skakel, Sr., was an alcoholic. The house was managed by an assortment of personnel, including a cook, a housekeeper, a gardener and the children's tutor, Littleton.[89]

At approximately 9 p.m., the Skakels and their guests returned home from dinner. Shortly thereafter, at approximately 9:10 p.m., the victim, Ix and Geoffrey Byrne arrived at the residence and were let inside by the petitioner. The four of them immediately went outside to listen to music in a family car that was parked in the driveway. The victim and the petitioner sat in the front seat while Ix and Byrne sat in the backseat. At approximately 9:15 p.m., Tommy Skakel joined them, climbing into the front seat with the victim and the petitioner.[90] After a few minutes, Rushton Skakel, Jr., John Skakel and Terrien came out and told them that they needed to use the car to take Terrien back to his home, which was approximately twenty minutes away and where they all planned to watch "Monty Python's Flying Circus," a television show, at 10 p.m. The petitioner asked the victim if she wanted to go with them,

---

[88] Anne Reynolds Skakel, the wife of Rushton Skakel, Sr., and mother of the Skakel children, had passed away in 1973.

[89] This was the first evening that Littleton would be spending the night at the Skakel residence, as he only recently had accepted the position of tutor.

[90] The victim's diary entries revealed that she, the petitioner, Tommy Skakel and several other teenagers from the Belle Haven neighborhood enjoyed a close friendship, often socializing together at each other's homes and in a motor home that usually was parked in the Skakels' driveway. There also was evidence that the victim and Tommy Skakel had developed a crush on each other. When the victim's body was discovered, the shoe that she was wearing had the name "Tom" written on it.

but she said that she had to go home. According to statements that Ix gave to the police in the immediate aftermath of the murder, she, Tommy Skakel, Byrne and the victim got out of the car and Rushton Skakel, Jr., John Skakel, and Terrien got into the car with the petitioner. Ix told the police that, when she got out of the car, she went home to meet her 9:30 p.m. curfew but also because she felt like a "third wheel" to the victim and Tommy Skakel, who were behaving in a flirtatious manner. When Ix told the victim that she was leaving, the victim responded that she also was going home in a few minutes. Ix, accompanied by Byrne, left Tommy Skakel and the victim at the car and walked toward the rear of the Skakels' house in the direction of Ix' house. Ix' residence abutted the Skakels' property but faced Walsh Lane, directly across the street from the victim's house. The victim was standing in the driveway alone with Tommy Skakel the last time Ix saw her alive. Ix arrived home at approximately 9:30 p.m. in accordance with her curfew.

Two weeks after the murder, the police interviewed Ix and asked her to recall again exactly what she and the victim had done after arriving at the Skakels' residence. Ix responded that, initially, she, the victim, Byrne and the petitioner had gone outside to listen to music in a car. After a short time, they were joined by Tommy Skakel and then by John Skakel, Rushton Skakel, Jr., and Terrien. When the police asked Ix if "everybody . . . got out of the car" when Rushton Skakel, Jr., said he needed it to take Terrien home, she responded, "[n]ot everyone. Just Tom[my] [Skakel], and me, and [the victim]." When asked if anyone else got out, Ix responded, "and [Byrne]." At the petitioner's criminal trial, Ix testified that the car carrying Rushton Skakel, Jr., John Skakel, the petitioner and Terrien was pulling out of the driveway as she and Byrne started to leave.

The victim's body was discovered at approximately 12:30 p.m. on October 31, 1975, under a tree on her family's property. In the hours following the discovery of the body, Greenwich police canvassed the Belle Haven neighborhood looking for anyone who might have been out the night before. At approximately 3 p.m., Detective James Lunney went to the Skakels' home and interviewed all of the Skakel children except for Rushton Skakel, Jr., regarding their activities the night before and was informed at that time that Rushton Skakel, Jr., John Skakel and the petitioner all had gone to Terrien's home and that Tommy Skakel was the last person in the family to see the victim before she left to return home.

Julie Skakel was again interviewed by the police approximately two weeks after the murder. At that time, she stated that, at approximately 9:30 p.m. on the evening of the murder, after her brothers had left for Terrien's residence, she left to take Shakespeare home. Both Shakespeare and Julie Skakel testified at the petitioner's criminal trial that the car going to Terrien's home already had departed by the time that she and Shakespeare left because Julie Skakel's car was the only car in the driveway.[91] When they got outside, Julie Skakel realized that she had forgotten her car keys and asked Shakespeare to run back inside to get them. The front door was locked, so Shakespeare rang the doorbell. Tommy Skakel, who had just entered the house through the side door where he had been talking to the victim, met Shakespeare at the front door and gave her the keys. Julie Skakel testified that, as she sat in the car waiting for Shakespeare, she saw the victim standing in the driveway and Tommy Skakel at the front door

[91] Shakespeare, a crucial witness for the state with respect to the petitioner's alibi defense, was the only person to testify that the petitioner did not go with his brothers to Terrien's house. When pressed to explain the basis for her testimony, however, Shakespeare stated that it simply was her "impression."

speaking to Shakespeare. Both Julie Skakel and Shakespeare reported to the police that, before leaving the Skakels' house, they had seen an unidentified person run past the kitchen window. Julie Skakel also told the police that, while waiting in the car for Shakespeare to return with the keys, she saw a silhouette of a person running in front of her house. She stated the figure ran in a crouched position across the driveway and disappeared into the woods adjacent to the driveway. Although it was too dark to see who it was, she later told police that she assumed, without any real basis for doing so, that it was one of her brothers, and proceeded to yell, "Michael, come back here . . . ." Although Shakespeare did not see the second person, she told the police that she had heard footsteps on the driveway as she was walking back to the house to get the keys.

Julie Skakel returned home from dropping Shakespeare off at approximately 9:50 p.m. Upon exiting the car, another person ran past Julie Skakel carrying what appeared to be an object in his hands. She could not identify the person, however, because of the darkness.

The evidence established to a high degree of likelihood that the victim was killed between 9:35 and 10 p.m. Dorothy Moxley, the victim's mother, was painting in the master bedroom of her home when, sometime between 9:30 and 10 p.m., she heard a loud "commotion" in the yard, on the side of the house, where the victim's body was later discovered. Dorothy Moxley told police that the commotion consisted of "excited voices," incessant barking and what she thought was her daughter's scream. The commotion was so strange that she stopped what she was doing and went to the window to look outside. Because it was so dark, however, she was unable to see anything and turned on an outside porch light. After a few seconds, however, she turned the light off because she was afraid that whoever was there might see the victim's bike on the porch

and steal it. Dorothy Moxley then put away her paint, showered and went downstairs to watch television.

John Moxley, the victim's seventeen year old brother, arrived home at approximately 11 p.m. and was informed by his mother, Dorothy Moxley, that the victim had not come home and that she was "a little worried about her." John Moxley told his mother that it was mischief night, that the victim probably was out having fun and that she would be home soon. After watching the evening news, John Moxley went upstairs to bed, while Dorothy Moxley fell asleep on the sofa in front of the television. At approximately 1:30 a.m., Dorothy Moxley woke up and realized that the victim still was not home. At that point, she woke her son and asked him to go out and look for her. She also began calling the victim's friends to see if someone might know where she was. At approximately 3:45 a.m., she called the Greenwich police to report the victim missing. According to police records, Dorothy Moxley stated that her daughter had been due home "at 9:30 p.m." and "had never been late like this before."

The strongest evidence of the time of death was offered through the victim's friend, Ix. She testified that, after arriving home at 9:30 p.m., she telephoned a couple of friends. During one of the calls, at approximately 9:45 p.m., her Australian Shepherd began to bark incessantly.[92] The barking became so loud and annoying that she put down the telephone receiver and went outside to bring the dog in. When she got there, she could see the dog at the end of her driveway, "frozen" by the edge of the road, barking in the direction of the Moxleys' driveway. Ix testified that she never had seen her dog in such an agitated state and that he was "scared" and barking "violently." Ix further testified that, although

[92] Three days after the murder, Ix told police that the dog began to bark between approximately 10 and 10:15 p.m.

the dog always came to her when she called him, on this occasion, he refused. After a while, she gave up and went back inside. According to Ix, the dog barked continuously for about twenty-five minutes, until the family's housekeeper went out and forced the dog to come inside.

Other neighbors, in addition to the victim's mother, reported hearing Ix' dog at around 10 p.m. David Skakel testified that the barking was so "distressed and prolonged" that he got out of bed and opened a window to see what was going on. His bedroom overlooked his family's backyard with views of both Ix' property and the Moxleys' property. Because of the darkness, he could not see the dog, but he could tell from the direction of the barking that the dog was standing near the road at the end of Ix' driveway. At trial, Joseph A. Jachimczyk, the forensic pathologist who assisted the police early on in the investigation, placed the time of death at approximately 10 p.m. on the basis of the contents of the victim's stomach, the fact that rigor mortis had set in by the time her body was discovered and the frantic barking of Ix' dog at the edge of the crime scene.

In the days and weeks following the murder, the police interviewed the Skakel children, as well as their cousins, Terrien and Terrien's sister, Georgeann Terrien, on several occasions. Rushton Skakel, Jr., John Skakel and James Terrien all told police that they and the petitioner had left the Skakels' house at approximately 9:30 p.m. to go to the Terrien residence to watch "Monty Python's Flying Circus." All of them reported that, as they were leaving the house, they saw the victim standing in the driveway with Tommy Skakel. After the show ended at 10:30 p.m., Rushton Skakel, Jr., and John Skakel stayed at the Terrien residence for about twenty minutes and then returned home to Belle Haven, arriving at approximately 11:15 p.m. Georgeann Terrien told

the police that she was home when Rushton Skakel, Jr., John Skakel, the petitioner and James Terrien arrived there to watch television. At the petitioner's criminal trial, Rushton Skakel, Jr., John Skakel, James Terrien and Georgeann Terrien gave the same account of their activities on the night of the murder that they had given to police in 1975. Specifically, Rushton Skakel, Jr., John Skakel and James Terrien all testified that they, along with the petitioner, had gone to the Terrien residence at around 9:30 p.m. to watch television and that Rushton Skakel, Jr., John Skakel and the petitioner had returned home at approximately 11:15 p.m.

B

Relationship Between the Crime Scene
Evidence and the Bryant Evidence

Photographs of the Skakels' property and the Moxleys' property reveal a densely wooded landscape, with trees, tall hedges and bushes running along the diagonal path that the victim would have taken to walk home after leaving the Skakels' residence. The physical evidence at the crime scene indicated that the victim initially was assaulted near the top of her driveway, just after she crossed Walsh Lane. The Moxleys' driveway was horseshoe shaped, with two entrances, one to the east and one to the west. The west entrance was opposite the southeast corner of the Skakels' property. Inside the horseshoe driveway was a large lawn that extended from the street toward the northwest corner of the Moxleys' house. The house was not centered on the driveway but, rather, was situated to the southeast of it, or to the left of the horseshoe driveway, if one were standing in the street facing the house.[93] According to

---

[93] Given the layout of the driveway in relation to the house, if the victim had been walking in a straight line from the Skakels' backyard to her front door, it would have been more convenient and direct to walk across the lawn rather than to walk down the western leg of the driveway. Blood and bloodstained pieces of a broken golf club were found on the lawn within the horseshoe driveway. The state maintained at trial that no aspect of the

police reports, at the intersection of the west entrance to the driveway and Walsh Lane, "approximately [four] feet south of the roadway, a compressed grass area existed, indicating the prior presence of a body."[94] On the lawn in the middle of the horseshoe driveway, a bloodstained Toney Penna six iron golf club was found; the club later was determined to have belonged to the petitioner's mother.[95] Three feet west of the golf club was a patch of blood that measured twelve inches in circumference. Thomas G. Keegan, the Greenwich detective originally in charge of the investigation, believed that the victim either was killed or knocked unconscious at this location. In a letter to Joseph A. Jachimczyk, a forensic pathologist who aided the police in the initial investigation, Keegan wrote: "Approximately eight feet west of the point of attack an eight inch section of stainless steel tubular golf club shaft was found, and this piece of metal, as well as the broken

---

assault against the victim had occurred in this area. Thomas G. Keegan, the detective in charge of the original investigation, concluded, however, that the assault *began* in this area, and that the victim was then dragged or carried approximately 100 feet to a more secluded area west of the driveway, in the opposite direction from the house, where she was beaten to death. The victim apparently then was dragged another seventy-eight feet to a large pine tree, under which her body ultimately was found. Keegan's reconstruction of the crime is significant insofar as it posits that the victim was dragged or carried over a much larger area and, as I explain hereinafter, raises the question, which neither party posed or addressed at the petitioner's criminal trial, as to whether someone of the petitioner's slight stature would have been capable of dragging or carrying the victim the distance that Keegan believed that she had been moved. There can be no doubt, however, that two teenagers the size of Hasbrouck and Tinsley easily could have done so.

[94] A photograph of the rather large compression just off the road along the Moxleys' driveway was admitted into evidence at the petitioner's criminal trial and at the hearing on the petition for a new trial. The grass appears to have been flattened either by a body or perhaps by two persons kneeling or standing side by side. On the basis of its appearance, it is perfectly plausible that the compression was made by a person or persons lying in wait for the victim as she made her way across the street from the Skakels' yard, or even by the victim herself if she had been forced to the ground in that location by her assailant or assailants.

[95] The police determined that golf clubs routinely were left scattered about the Skakels' property.

end of the club head, indicated that they were both intentionally broken, apparently by bending back and forth. The victim was then apparently carried or semi-dragged for a distance of fifty-eight feet to the west of the driveway." According to Keegan's crime scene notes, the path through the leaves from the lawn inside of the horseshoe driveway to the west side of the drive-way "was obvious . . . ." A small amount of blood was found on the surface of the driveway along the path. "The victim was then apparently carried or dragged for another fifty feet" to a point where "two [more] patches of blood approx[imately] [eighteen] inches in circum-ference" were found. Keegan concluded that "the victim was repeatedly assaulted at this location" and sustained "at least four stab wounds from the broken end of the [golf] club and multiple blows to the head."

"About eight feet from [the two patches of blood] another seven inch section of tubular stainless steel golf club shaft was found, again apparently intentionally broken. The victim was then dragged for a distance of approximately seventy-eight feet and placed under [a] pine tree . . . [leaving] a clear and visible drag-pattern measuring thirteen and five-[eighths] inches wide. The victim suffered one [nonfatal] blow where there is a clear impression of the golf club head on her left arm and shoulder. All other blows [were] fatal. . . . A black abrasion on the right side of her nose indicates that her nose came into contact with the driveway." Finally, at some point during the attack, the victim's pants and underwear were pulled down below her knees. According to Lee, a forensic scientist who recon-structed the crime for the state sixteen years after the murder,[96] blood splatter inside the victim's underwear and pants indicated that her pants and underwear were

---

[96] Lee testified that his reconstruction was based on photographs of the crime scene, police reports, the autopsy report and any evidence that was collected at the crime scene.

down when some or all of the blows were inflicted. In certain respects, however, Lee's reconstruction of the crime differed significantly from that of Keegan's.[97] Lee theorized that the assault had occurred in the area where the two larger patches of blood were found, on the west side of the driveway, and that, during the assault, the golf club broke from the force of one of the blows, sending the head and a piece of the shaft approximately 100 feet through the air to where they were discovered on the lawn in the middle of the horseshoe driveway. According to Lee, the blood that was found on the driveway and the twelve inch patch of blood on the lawn in the middle of the horseshoe driveway were deposited in those locations from the golf club head and shaft as they flew by.[98] Lee also theorized, and the state maintained during closing argument, that, after the initial assault, the victim ran into the wooded area west of the driveway. Specifically, the state's attorney argued to the jury that "[the victim] was first assaulted somewhere by the driveway . . . . She wasn't knocked unconscious there because we learned that she was somehow able to travel from here to . . . the major blood scene, and there is no drag trail between those two points." As I previously mentioned, however, Keegan had observed an "obvious" path from the lawn inside the horseshoe driveway to the major blood area west of the driveway on the afternoon that the body was discovered. Because defense counsel did not cross-examine Lee about any of his conclusions,

---

[97] Keegan was called by the state to lay a foundation for the various crime scene photographs that were admitted into evidence, but he was not questioned by either party about the conclusions that he had drawn regarding the manner in which the murder had been committed, which had been based on his own observations and collection of evidence from the crime scene itself.

[98] Lee also posited, however, in the alternative, that the blood on the driveway could have been deposited there by the victim if the assault had been initiated at that location.

he never explained how his reconstruction comported with Keegan's crime scene notes.

In light of Bryant's statements that two teenagers, both of whom were wielding golf clubs, are responsible for the victim's murder, Keegan's description of the crime scene and his theory on the manner in which the victim's murder occurred would merit serious consideration at a new trial.[99] As I discussed previously, Keegan believed that the victim was first assaulted on the lawn in the middle of the horseshoe driveway, where a golf club broke or was intentionally broken. The victim then was carried or partially dragged to the more secluded wooded area west of the driveway, where the attack resumed. If Keegan is correct, and a golf club broke or was intentionally broken on the lawn in the middle of the horseshoe driveway, there would have to have been more than one golf club involved in the attack because, according to Lee's reconstruction and Keegan's crime scene notes, the victim sustained multiple blunt force injuries in the area west of the driveway, where the two large patches of blood were found. Furthermore, on the basis of the nature of the drag marks, John Solomon, the state's chief investigator in the 1980s and early 1990s, concluded that the perpetrator was disoriented, if not unfamiliar, with the location of the neighborhood houses in relation to each another.

The autopsy report is in no way inconsistent with a two assailant theory and, in some respects, appears to

---

[99] The petitioner presumably did not challenge the state's reconstruction or otherwise suggest the possibility that the murder had been committed by two people rather than by a lone assailant because his alibi defense was not dependent on either theory. Indeed, even if the petitioner had asserted that the evidence indicated that two people were involved in the murder, the state likely would have maintained that, notwithstanding any such claim, the evidence still pointed to the petitioner as one of those people. The Bryant evidence, however, places Keegan's testimony in an important new light because it supports the third party culpability defense, predicated on the newly discovered Bryant evidence, that the victim was murdered by Hasbrouck and Tinsley.

support it. Harold Wayne Carver II, the state's chief medical examiner who testified at the petitioner's criminal trial regarding the findings of the original autopsy report, stated that the victim had sustained at least eight blunt force injuries to her head. All of those injuries were consistent with having been caused by the head of a golf club. Three such injuries were inflicted to the front of the victim's head, three were inflicted to the back of her head and two were inflicted to the left side of her head. Each of the blows, according to Carver, could have been fatal, and the victim likely would have lost consciousness relatively quickly. The victim also sustained a broken nose,[100] blunt force trauma to her left shoulder and at least four stab wounds to the neck and head, consistent with having been caused by the broken shaft of a golf club. When the state asked Carver to explain the order in which the injuries were inflicted, he emphasized that his answer was predicated on the "assumption" that only one golf club had been used in the murder. He explained that, "[provided] only one golf club [was] involved," all of the blunt force injuries to the head would have to have been inflicted before the head broke away from the club's shaft. Just as with Lee, however, the defense did not cross-examine Carver, and, consequently, he was not queried as to whether so many potentially fatal blows to the front, side and back of the victim's head were consistent with the state's theory of a lone assailant or whether they were as or more likely to have been inflicted by two assailants, wielding golf clubs from different directions.

Furthermore, despite Keegan's conclusion that the attack was initiated where the club head was found, neither Lee nor Carver was asked whether the petitioner, who, by all indications was no bigger than the

---

[100] Gravel embedded in the victim's face led both Carver and Lee to conclude that, at some point, the victim's nose had come into contact with the surface of a driveway or roadway.

victim; see footnote 45 of this opinion; would have been physically capable of carrying or dragging the victim's body from the lawn inside the horseshoe driveway to the second assault area approximately 100 feet away. Hasbrouck and Tinsley, however, each of whom Bryant described as weighing at least 200 pounds and standing approximately six feet, two inches in height, clearly would have been capable of doing so.

Indeed, in my view, the most troubling aspect of the state's theory of the crime stems from the fact that it is predicated on the assumption that the victim fled to the more secluded area west of the driveway, where the major assault occurred. Thus, the state maintained during closing argument that, after the initial assault, the victim "somehow" was able to get away from her killer and run to that location. It is counterintuitive, however, that the victim, seizing on the opportunity to flee, would have opted to run in a direction that would leave her more vulnerable and isolated than she already was. As between the two possible escape routes, one being the wooded area west of the driveway and the other being the safety of her house to the southeast, common sense strongly suggests that she would have tried to run toward her house, which would have taken her across the lawn in between the horseshoe driveway, directly over the area where Keegan theorized that the assault had begun. If that were the case, and the victim had been subdued or knocked unconscious at that location, as Keegan believed that she had been, then someone would have had to have carried or dragged her body more than 100 feet to the other side of the driveway. It is hard to imagine, and the state's experts were not asked to explain, how the petitioner could have managed such a feat in the dark, carrying not only the victim but also a golf club or pieces thereof in his hands.

Finally, as I indicated previously, two hairs that were recovered from the sheet that was used to wrap the

victim's body where it was discovered provide additional corroboration of Bryant's statements. One of the hairs was identified by the FBI forensic crime lab as "possessing Negroid characteristics," and subsequent testing on the other hair revealed that it possessed Asian characteristics. Hasbrouck and Bryant are of African-American descent and Tinsley, according to Bryant, is of mixed race origin, possibly of Asian descent.

## C

### History of the Investigation

At this point, a short history of the investigation is necessary to a fuller understanding of the original trial evidence and to my conclusion that that evidence was neither particularly trustworthy nor particularly strong. The Greenwich police followed numerous leads in the weeks, months and years following the murder. In 1976, the police prepared an arrest warrant charging Tommy Skakel with the murder based, in part, on misleading statements that he had given to the police on the day after the murder, and because he was the last person known to have seen the victim alive. The arrest warrant, however, never was executed. The police then focused their suspicions on Littleton, the tutor whose first night in residence at the Skakels' house was the night of the murder. Littleton's bizarre and erratic behavior in the months and years following the murder, certain allegedly incriminating statements that he had made to his wife and others, and multiple run-ins with the law, convinced Solomon, the state's chief investigator through the early 1990s, that Littleton was the killer. Solomon also believed that Littleton, an alcoholic, was responsible for a series of unsolved murders involving the bludgeoning deaths of young women in and around places Littleton had lived or visited before and after the victim's murder. Like Tommy Skakel, however, Littleton

never was charged, and the case went cold for many years.

In the early 1990s, several events caused the revival of the investigation and eventually led to the petitioner's arrest and conviction. In 1991, a rumor circulated that William Kennedy Smith, who then was facing sexual assault charges in Florida, was in Belle Haven on the night of the murder. Like the Skakels, Smith was related to the family of Robert F. Kennedy and Ethel Skakel Kennedy. Although there was no truth to the rumor, it renewed public interest in the case and put pressure on the police to solve it. In 1993, "A Season in Purgatory," which was authored by Dominick Dunne, was published. The book was a best-selling fictionalized account of the victim's murder in which Dunne effectively accused Tommy Skakel of the murder and the entire Skakel family of conspiring to cover it up. Because of the renewed scrutiny on his family, Rushton Skakel, Sr., hired a private investigation firm, Sutton Associates (Sutton), to investigate the murder with the hope of exonerating his family. According to Leonard Levitt, another author who wrote about the victim's murder, before Sutton agreed to take the case, Rushton Skakel, Sr., assured Sutton that they could pursue the investigation wherever it led, and that, if it turned out that a member of his family had committed the crime, the family would publicly acknowledge it.

As part of its investigation, Sutton interviewed Tommy Skakel and the petitioner. Both Tommy Skakel and the petitioner disclosed that they had not been truthful with the police in 1975. Tommy Skakel told Sutton that, after Julie Skakel had left to take Shakespeare home, he went back outside and spent another twenty minutes with the victim in his backyard, where they engaged in heavy petting and mutual masturbation. The petitioner told investigators that, after he returned home from the Terrien residence, he, too, went back

out, at around midnight, to peep in the window of a woman who lived on Walsh Lane. On the way home, he stopped at the victim's house, climbed into a tree to look in her window and masturbated. The petitioner later told the same story to Richard Hoffman, a ghost writer with whom the petitioner briefly collaborated in 1997 on a book about the petitioner's life. Hoffman testified at the petitioner's criminal trial regarding his conversations with the petitioner, which he had tape recorded. According to Hoffman, the petitioner told him that, "like . . . all the other boys in the neighborhood, he had [had] a crush on [the victim]." The petitioner also disclosed that, by the age of thirteen, he had developed a serious alcohol problem.

In 1994, an employee of Sutton stole the firm's files on the case, including detailed suspect profiles, and gave them to Levitt and Dunne. On November 26, 1995, Levitt published the first part of a four part series of newspaper articles in which he disclosed that the petitioner and Tommy Skakel had changed their stories with respect to their activities on the night of the murder. Dunne later gave the information that Sutton had obtained to Mark Fuhrman, a detective formerly employed by the Los Angeles police department who testified at the O.J. Simpson murder trial. In 1998, Fuhrman published a book in which he accused the petitioner of the victim's murder. Fuhrman's conclusion was based in part on the petitioner's statements to Sutton that he had gone back out on the night of the murder, peeped in a neighbor's window and masturbated in a tree in the Moxleys' yard.[101]

Following publication of the Levitt article in 1995, the television show "Unsolved Mysteries" dedicated a segment to the victim's murder. After the program aired,

---

[101] Several of the state's key witnesses, including Gregory Coleman, Elizabeth Arnold and Shakespeare, testified that they had read Fuhrman's book or seen television shows about the book prior to testifying.

police received numerous tips from around the country. Some of them were from people who were fellow residents of the petitioner at Elan School (Elan), the alcohol and drug rehabilitation facility that the petitioner had attended as a teenager. A number of them recalled that the petitioner, who attended Elan from 1978 to 1980, appeared to have had some involvement in or knowledge of the victim's murder.

## D

### The Petitioner's Statements at Elan

Most if not all of the evidence that was used to convict the petitioner consisted of statements that he allegedly had made at Elan and to Hoffman. According to the evidence adduced at the petitioner's criminal trial, Elan employed an extremely controversial behavior modification program that was based on confrontation, humiliation and public beatings. Of all the former Elan students who testified against the petitioner, however, only one, Gregory Coleman, claimed to have actually heard the petitioner confess to the victim's murder. Coleman contacted a television station in 1998, after watching a tabloid news show about Fuhrman's book and after a sizeable reward in the case had been advertised in People Magazine. Coleman, a twenty-five bag a day heroin addict, testified before the grand jury that had investigated the victim's murder and at the petitioner's probable cause hearing that he met the petitioner for the first time when he was assigned to "guard" him at Elan, following the petitioner's attempt to escape from the school. According to Coleman, the first thing that the petitioner ever said to him was, "I am going to get away with murder; I am a Kennedy . . . ." Coleman also stated that the petitioner had told him that he had beaten a girl's head in with a golf club and, two days later, had gone back to the body and "masturbated on [it]." Coleman died of a heroin overdose before the

petitioner's criminal trial, but his probable cause hearing testimony was admitted into evidence and read to the jury at that trial.[102] Part of the reward money that Coleman had sought ultimately was awarded to Coleman's estate.

Other former Elan students who testified, however, told a very different story about the petitioner, insisting that the petitioner never confessed to the victim's murder. Rather, as they recalled, Joseph Ricci, the executive director of Elan, often taunted the petitioner about the victim's murder, accusing him either of having committed the crime or of knowing who did. At one point, after the petitioner had run away from the school, a general meeting[103] was convened at which the petitioner

[102] According to Coleman, three former Elan residents likely were present when the petitioner allegedly made his incriminating statements to Coleman. Each of those former residents testified at the hearing on the petition for a new trial, however, that they never had heard the petitioner confess to the murder. In fact, one such witness, Clifford Grubin, recalled that Coleman once had bragged about being "a very good liar." Another witness, John Simpson, remembered the incident in question and recalled that Coleman had turned to him while he and Coleman were guarding the petitioner and said that the petitioner "just admitted that he killed this girl." Simpson testified that he had not heard the petitioner make any such confession, and, therefore, he immediately asked the petitioner whether he had confessed to Coleman. The petitioner, according to Simpson, denied having done so. Simpson then turned to Coleman and said, "[the petitioner] just said that he didn't say that he killed [the] girl," to which Coleman replied, "[w]ell, he didn't answer yes or no, but he gave one of those . . . shit-eating grin[s]." According to Simpson, Coleman also stated, "[w]ell, it was his reaction, the fact that he didn't say no." The trial court in the present case concluded that the testimony of the three former Elan residents was not newly discovered because, in the exercise of due diligence, the defense could have located the witnesses prior to the petitioner's criminal trial. I agree with the conclusion of the trial court in this regard, but I underscore that the testimony of those witnesses would be extremely important if the petitioner were to receive a new trial.

[103] One witness described the nature of a general meeting at Elan as follows: " '[A] general meeting was probably the scariest word that you would hear when you were at Elan.' A typical general meeting, which was attended by 100 or more Elan residents and staff, focused on one or two residents who were singled out for violating Elan rules. . . . [T]he [petitioner] was the subject of a general meeting as a result of his failed attempt to run away from the facility." *State* v. *Skakel*, supra, 276 Conn. 647 n.12.

was brutalized for several hours in a boxing ring in front of the entire school. All of the witnesses gave similar accounts of the incident. Alice Dunn, a former student, testified at the petitioner's criminal trial that, for three days before the general meeting, the petitioner had been forced to stand in the corner of the school dining room without any sleep. On the third day, he was placed against the wall, and at least 150 students confronted him by yelling and spitting in his face. After a while, the petitioner was placed in a boxing ring and questioned by Ricci about a variety of matters, including the victim's murder. According to Dunn, this was the first time that anyone at Elan ever had heard about the victim's murder. Ricci, who appeared to be reading from the petitioner's file, tried to get the petitioner to confess, but the petitioner insisted over and over that he "didn't do it." Each time the petitioner denied involvement in the crime, Ricci put him in the boxing ring, and students would "pummel" him until he was "physically . . . wiped out . . . ." The objective of the general meeting was to make the petitioner feel abandoned by his family so that he would think that he had no alternative but to submit to the Elan program.

According to Sarah Petersen, another former Elan student, the petitioner cried "uncontrollably" during the beatings. She said that Ricci often "liked to pull [the petitioner] out [of the crowd at general meetings and] emotionally pound on him," saying things like, "we know you did this . . . ." When Ricci did not get the response that he was seeking, he would put the petitioner in the boxing ring or spank him with a paddle. Petersen testified that the petitioner always denied any involvement in the murder, but, after "long hours of torture," he would say that he did not remember just

to "get them to lay off him for a little while."[104] Another former student, Michael Wiggins, remembered the general meetings as pure "mayhem," with students hitting the petitioner as hard as they could while others screamed "hit him, hit him hard, hit him harder . . . ." Wiggins recalled that the petitioner always denied any involvement in the victim's murder until he was beaten down and extremely fatigued, at which point he would say, "I don't remember . . . ." The beatings would stop as soon as the petitioner expressed some doubt. Wiggins himself was beaten so severely at Elan that, twenty-five years later, he still had scars on his body from those beatings. According to Wiggins, the beatings would stop for everyone as soon as they told Ricci what Ricci wanted to hear, even if it was not true. Elizabeth Arnold, another former Elan student, testified that, two days after the petitioner's first boxing ring incident, Ricci tried to reassure the petitioner at a group therapy session that Ricci did not really think that the petitioner had killed the victim, only that the petitioner knew who did and that he probably was covering up for Tommy Skakel. The petitioner responded that "he didn't know" and "didn't remember" anything about the night of the victim's murder.[105]

---

[104] Petersen stated that she was enrolled at Elan by order of the Maryland Juvenile Court because she had run away from home several times. Even though she was fifteen years old and a virgin, Ricci repeatedly accused her, at general meetings and in front of the entire school, of being a "slut," and would not relent until she confessed that she was "a whore." According to Petersen, even though it was not true, she would tell Ricci that she was a "slut" just so that he would stop.

[105] "Charles Seigen, who was enrolled at Elan with the [petitioner] from 1978 to 1979, testified [at the petitioner's criminal trial] that he recalled attending two or three group therapy sessions, supervised by a staff member and typically attended by eight residents, during which the [petitioner] was confronted about the victim's murder. According to Seigen, the [petitioner] sometimes responded to such probing with annoyance. On other occasions, however, the [petitioner] became very upset, cried and stated that he did not know if he had done it. The [petitioner] also stated in these group sessions that, on the night of the victim's murder, he was 'blind drunk' and 'stumbling.' " *State* v. *Skakel*, supra, 276 Conn. 647.

By all accounts, the petitioner's rumored involvement in the victim's murder became his identity at Elan. For weeks on end, he was forced to wear a sign around his neck that stated, "I am a spoiled brat, please confront me on the murder of my friend, Martha Moxley . . . ." Dunn testified that she approached the petitioner after the first general meeting and asked him about the victim's murder. She thought that, if she talked to him, it might "jar" his memory, and that she might be the one who would be able to get him to make "some sort of confession . . . ." He responded that "he just didn't know," that he had been "drinking" that night and that he was not in his normal state of mind. Nine months later, after the petitioner had graduated from Elan and both he and Dunn became staff members there, they had dinner at a local restaurant, and she asked him again if he "really ha[d] no memory of what [had] happened . . . ." When the trial court presiding over the petitioner's criminal trial asked Dunn to recall exactly how she had put the question to him, she responded: "To the best of my recollection, I put it to him like, you know, you know, what about that whole thing with your family and, you know, with the murder of that girl in Greenwich and, you know, do you, you know, you know, what do you think, you know, I mean, what do you think happened, really, back there." According to Dunn, the petitioner answered in the same way that he always had answered, that is, "I don't know what happened, you know. I don't know if it was me. I don't know if it was my brother, you know. I don't know because I don't remember anything. I just don't know."

John Higgins testified that, on one occasion, when he and the petitioner were on "night owl" duty at Elan, which consisted of guarding the dormitory door to ensure that none of the students escaped, the petitioner talked with him for hours. According to Higgins, the petitioner told him "about a murder that he was some-

how involved in" and that "he remembered that there was a party going on . . . at his house." He also remembered "going through some golf clubs" and "running through some woods." According to Higgins, the petitioner "was sobbing and crying," just "releasing emotions" and "bleeding out." "[T]hrough a progression of statements, he said that he didn't know whether he did it, that he may have done it, [that] he didn't know what happened, [and that] eventually, he came to the point that he [thought he] did do it, [that] he must have done it . . . ."

The import of Higgins' testimony is questionable, however, because, on cross-examination, he acknowledged that he had failed to tell the state's investigator about the petitioner's alleged admissions in the first few conversations that Higgins had had with the investigator. Higgins also claimed that approximately twenty-five to thirty people were with him and the petitioner when the petitioner made his admissions, but none of these alleged witnesses testified at trial. Higgins claimed, moreover, that his conversation with the petitioner was the first and only time that he ever had heard about the victim's murder, and that he later read about it in People Magazine in the 1990s. Every other Elan witness, however, testified that the murder was a regular topic of conversation at general meetings, which were mandatory for all the students to attend. Indeed, one witness, Petersen, testified at the petitioner's criminal trial that Higgins had been the petitioner's "personal overseer" for at least six weeks after the petitioner attempted to run away.[106] Finally, Higgins admitted that

[106] Petersen testified that, in Higgins' capacity as the petitioner's "overseer," Higgins regularly tormented the petitioner and, in Petersen's opinion, would have been the last person in the world in whom the petitioner would have confided. Petersen also explained that Elan's "protocol" was predicated on a system of rewards and privileges such that students were rewarded for turning one another in for the smallest of offenses, such as not making a bed properly, as well as for more serious infractions, such as having sexual relations. According to Petersen, if Higgins actually had heard the petitioner make any sort of admission, he would have told Ricci about it because it

he was aware of the reward money when he came forward and that Garr had advised Higgins that the reward had been increased to $100,000.[107]

These statements at Elan constitute the state's strongest evidence of the petitioner's guilt. A careful review of the statements, however, reveals that, although they may have been sufficient to sustain a conviction, they reasonably cannot be characterized as particularly powerful or convincing because the exclusive source of the single, unequivocal admission attributed to the petitioner was the probable cause hearing testimony of Coleman, who, for reasons that I previously have explained, was among the least credible of the witnesses that the state produced. Indeed, it is not unfair to say that it would be difficult to find a witness more lacking in credibility.[108] The other statements that the petitioner made to Elan students—none of whom came forward until many years after the alleged statements were made—all were equivocal and very well could have been the product of an emotionally troubled adolescent who had been hounded about the matter during his entire tenure at Elan.

During closing argument, the state's attorney argued forcefully that the petitioner's statements at Elan constituted powerful evidence of consciousness of guilt. The state's attorney maintained, moreover, that the only way that Ricci would have known about the victim's murder is if the petitioner's family had told him about

would have improved his status tremendously and yielded significant rewards for him, as it would have for any Elan resident.

[107] I note that another former Elan student, Dorothy Rogers, testified that the petitioner had told her that his family had sent him to Elan because they were afraid that he might have killed the victim.

[108] As I have noted, Coleman's credibility would be further undermined at a new trial because of the three witnesses identified by the petitioner following his conviction whose testimony directly contradicts Coleman's assertion that the petitioner had confessed to him. See footnote 102 of this opinion.

it when they enrolled him at Elan. The state's attorney also argued that the only explanation for the petitioner's presence at Elan was that his family must have sent him there because they thought that he was guilty of the victim's murder and, further, that sending the petitioner to Elan would assist in the cover-up of the petitioner's guilt. Specifically, the state's attorney asserted: "One thing every client of Elan who was there during that particular era recalls vividly is . . . Ricci referring to a file and telling the [petitioner] that he wasn't getting out of [the boxing] ring until he explained why he killed [the victim], and then being forced to wear a sign [that says]: 'Confront me on the murder of my neighbor.'

"Where did Ricci get that information? Clearly, he didn't get it from the police.[109] Why did Ricci have that information? Why did Ricci confront the [petitioner] with that information? The answer, the only one that makes sense, lies in why the [petitioner] was there in the first place, lies in why his family felt a need to put him in that awful place. Why? Because that's what they decided that they had to do with the killer living under their roof."[110] The state's attorney also maintained: "One thing that I submit helps tie all this together, particularly on the subject of Elan . . . is the [petitioner's] very presence at that place. The defense scoffs at the idea despite . . . such clear evidence of a cover-up. Why was the [petitioner] at Elan? This is really not a matter of seeing the forest from the trees. It is genuinely transparent.

"Clearly, the [petitioner] had a major problem. Already he was an alcoholic, a substance abuser. Already he was beyond the control of his family. He

---

[109] Police records indicate that Ricci did, indeed, get the information from the Greenwich police. See footnote 111 of this opinion.

[110] In fact, this was not true. The petitioner had been sent to Elan as part of a plea agreement in New York arising out of a serious drunken driving incident there. See footnote 111 of this opinion.

was becoming suicidal. I doubt his family was even aware of the sexual turmoil he was going through. Elan was a last resort but why exactly so drastic a resort."

Although the state's attorney's argument was sufficiently rooted in the evidence to defeat a claim of prosecutorial impropriety; see *State* v. *Skakel*, supra, 276 Conn. 755–59; the theory—a centerpiece of the state's case against the petitioner—verged on the speculative. Because it called for an inference that was so attenuated from the facts—namely, that the petitioner's father had sent him to Elan because he thought that the petitioner had killed the victim—the theory falls well short of convincing. Indeed, in my view, the relative weakness of the state's case is reflected in this very argument by the state's attorney, which requires the fact finder to reject other equally plausible scenarios without any convincing reason to do so.[111]

---

[111] Although it does not factor into my conclusion that a new trial is required, I note that evidence presented at the hearing on the petition for a new trial reveals that, contrary to the state's attorney's argument at the petitioner's criminal trial that the Greenwich police did not tell Ricci about the murder, the Greenwich police were, in fact, in contact with Elan during the petitioner's stay there. Moreover, the police were aware that the petitioner had been sent to Elan as part of a plea agreement arising out of an incident in Windham, New York, in which the petitioner had been arrested for operating his vehicle while under the influence. A suspect profile of the petitioner that Garr, the state's lead investigator, prepared in the 1990s, indicates that James Scarey, the chief of police in Windham, contacted the Greenwich police in April, 1978, and informed them that the petitioner had pleaded guilty to a number of charges stemming from his arrest in March, 1978. According to the suspect profile, the petitioner had driven at high speeds, attempted to evade police and crashed his vehicle into a telephone pole. Scarey told the Greenwich police that the petitioner had pleaded guilty to all of the charges except the charge of driving while under the influence and that, after the plea hearing, "an airplane arrived at the local airport, occupied by two . . . attendants . . . and a doctor, at which time [the petitioner] was handcuffed and taken to a hospital in . . . Maine. . . . Scarey reported that he was very familiar with the Skakel family and that recently [the petitioner] had been causing numerous problems for his family." In May, 1978, the Greenwich police learned that the petitioner was residing at Elan. According to the suspect profile, "[d]uring this phase of the investigation [the petitioner's attorney] Thomas Sheridan became aware of inquiries [that the Greenwich police had] made at Elan, and . . . subse-

The defense, evidently unimpressed with the strength of the state's case, offered no real rebuttal to the state's attorney's argument that only someone who had committed murder would say some of the things that the petitioner had said at Elan, or that the petitioner must have been sent to Elan because his family believed that he was responsible for the victim's murder. The defense also offered no explanation as to how an innocent person, particularly one as emotionally troubled as the petitioner, could convince himself that he may have killed someone in a drunken stupor but had no recollection of doing so. Indeed, during closing argument, defense counsel boasted to the jury that, because of the weakness of the state's case, he had not deemed it necessary to call a single expert witness to provide an alternative explanation for the petitioner's statements. "The nature of our defense—we didn't have the high tech delivery. . . . You don't see the big fancy jury expert sitting at our table. It's somewhat low key. It is me and three kids, as you can see. . . . We didn't bring in one expert. There is no memory expert. There is no this expert, there is no dog expert, nothing. We didn't give you any fancy theories. We didn't give you a twinkie

---

quently . . . contact[ed] . . . the . . . department." Sheridan informed the police at that time that the petitioner was making some progress at Elan, that he was going to be there for ten months, and that Sheridan feared that the petitioner would suffer a relapse if he was interviewed at that time. Police records further indicate that, "[o]n November 15, 1978, information was received that [the petitioner] had escaped from Elan. He had left by himself, and had not been adjusting to the facility." On November 16, 1978, the petitioner's father informed the police that the petitioner had been located and returned to Elan by his older brother, Rushton Skakel, Jr. In short, notwithstanding the state's argument to the contrary, it appears that the Greenwich police were given regular updates about the petitioner's placement and progress at Elan, that they were fully informed of the reason why he had been sent there and that they had attempted to arrange an interview with him while he was a resident at Elan. Thus, there was very little or no factual basis for the argument of the state's attorney that Ricci could not have learned about the murder from the Greenwich police, or that there was no other explanation for the petitioner's presence at Elan except that his family must have believed that he had killed the victim.

defense." Defense counsel noted, however, that the petitioner was not the only suspect in the case who had made incriminating statements over the years and that Littleton, like the petitioner, had expressed doubt on several occasions as to whether he, too, could have committed the crime. Indeed, it is remarkable that at least three people have, to varying degrees, made self-incriminatory statements with respect to the victim's murder, namely, Littleton, Bryant and the petitioner. Significantly, of the three, only Bryant has no known history of emotional disturbance, addiction or acting out. In fact, it is precisely because Bryant is so much more credible than practically every other witness in the case that I am persuaded that, if a jury were to consider his statements together with the original evidence, it likely would find the petitioner not guilty of the victim's murder.

### E

### The State's Theory Concerning the Petitioner's Masturbation Story

During closing argument, the state's attorney also argued that the reason the petitioner told people that he had gone back outside on the night of the murder and masturbated in a tree next to the victim's house was that he feared that "his semen might one day be identified in a crime lab, or even that, one day, someone might surface who had actually seen him [in the victim's yard]." The state's attorney further asserted that, by the early 1990s, "every criminal investigator on the planet was totally attuned to this miraculous new [DNA] technology, and, of course, that would include the [private investigators] that the Skakel family had hired to assist them in the defense, [namely] Sutton Associates." According to the state's attorney, "the word 'masturbation' . . . [did not] come up until 1992 or thereabouts . . . . You didn't have to be a fly on the wall when

[Sutton] came into the picture in 1992 to understand why the defendant soon was serving up his bizarre tale of masturbation in a tree to his friend, [Andrew] Pugh, and later to . . . Hoffman."[112]

As with the arguments of the state's attorney about Elan, the evidence adduced at trial was not all consistent with the arguments of the state's attorney about the masturbation story, and some of the evidence directly contradicted it. For example, Michael Meredith, another former Elan student, testified that, in the summer of 1987, he resided at the Skakels' house while working with the petitioner on a class action lawsuit against Elan. Meredith learned about the victim's murder for the first time that summer in a conversation with the petitioner. According to Meredith, the petitioner "instigated" the conversation, stating that, "I presume you know about [the victim] and her murder. And I want you to know, unequivocally, that I am innocent of that. If you are curious about the details, I want to tell you what happened so you know from me." In the course of the ensuing conversation, the petitioner told Meredith that, on the night of the murder, he had climbed a tree outside the victim's house and masturbated. Meredith testified that his sense was that this was not the first time that the petitioner had done such a thing.

---

[112] The state's attorney further articulated the state's theory to the jury as follows: "Looking at the evidence, the beating started again in the driveway. [The victim's] pants certainly weren't below her knees at that point because she couldn't have gotten five feet, let alone a near fifty feet, to get over toward that bloody major assault scene. And, of course, it only took one good swing over at the bloody major assault scene to render her permanently beyond help.

"This, as you review the evidence, is where the absolutely weird masturbation story acquires significance. It's incorrect to say this is not a forensic case. It is a forensic case, not for the forensic evidence that was produced but, rather, for the forensic evidence that wasn't produced . . . ." The state's attorney also suggested that the petitioner must have pulled the victim's pants down after he killed her and masturbated and ejaculated on her.

In light of Meredith's testimony, which the state never discredited, the state's theory with respect to why the petitioner claimed to have masturbated outside the victim's home on the night of the murder lacked persuasive force. Because the petitioner had recounted his story to Meredith several years before the petitioner's family hired Sutton, and many years before the advent of DNA technology in criminal investigations became popularly known, the state's claim that the petitioner had invented the story has little, if any, weight. Thus, this theory, no less than the state's attorney's argument that personnel at Elan had been informed by the Skakel family that the petitioner was involved in the victim's murder, reflects the relative weakness of the state's case against the petitioner.

## F

### The Petitioner's Alibi Defense

I am persuaded that the Bryant evidence likely would result in an acquittal at a new trial not only because the evidence adduced by the state against the petitioner at his criminal trial was not strong, but also because of the strength of the petitioner's alibi. As I previously indicated, several witnesses, including the victim's close friend, Ix, testified that the petitioner, along with several others, left Belle Haven in a car at around 9:30 p.m. to go to the home of the petitioner's cousin, Terrien, twenty minutes away. Because the time of death was so firmly established, the success of the state's case rested on the state's ability to convince the jury that all of the alibi witnesses were lying. To this end, the state's attorney argued to the jury that the petitioner's alibi was a construct, invented by the petitioner's father, and practiced by its main proponents on a trip that they had taken to the family vacation house in Windham, New York, shortly after the victim's murder. The state's attorney also argued that the family likely

used the trip as an opportunity to "dispose of the evidence."

The state's attorney argued to the jury: "Let's stay with the alibi. Why is it so suspect. How was it produced. What did the Skakel family do . . . to put this together. Someone seeing the police all over the place decided, had the sense to get the players out of the area. The oldest brother [Rushton Skakel, Jr.] had already gone off to [Washington] D.C., so the first thing the next morning, Littleton was ordered to take the four players, [the petitioner], John [Skakel], [Tommy Skakel] and . . . Terrien, out of the way for awhile, for a short trip . . . . The importance of that sudden, brief, one night trip is that the alibi didn't begin to take shape until some time after the return from Windham."

The state's attorney further asserted that the conspiracy was not limited to just the alibi witnesses but also included virtually the entire Skakel family. Thus, he asserted, in closing argument, for example, that "Julie Skakel is the best example of a family support group continuing to this day to do whatever it takes to keep the wraps on [the petitioner]." With respect to David Skakel, the state's attorney stated: "In tune with the alibi witnesses was younger brother David [Skakel]. Not really any useful information came from him, but I guess he felt a need to do his bit for the family. So he testified that, from a distance of 100 to 150 yards away on a cold night . . . over a hill and beyond the trees, [he] could tell which way [Ix' dog's] snout was pointing as he was barking . . . ."

Apart from the trip to Windham itself, however, and the fact that the petitioner's principal alibi witnesses were all related to him, the state presented no credible evidence to support its theory of a cover-up. As I previously indicated, evidence adduced at the petitioner's criminal trial established that all of the Skakel children

who went to Windham were interviewed by police *before* they had departed for Windham, and the police were told at that time that the petitioner had gone to the house of his cousin, Terrien, on the night of the murder. Indeed, Tommy Skakel was interrogated for hours at police headquarters immediately following the discovery of the victim's body, the day before he went to Windham. In the petitioner's direct appeal to this court from his criminal conviction, he claimed that the state's attorney improperly had argued that the Skakel family had gone to Windham for the purpose of manufacturing an alibi.[113] *State* v. *Skakel*, supra, 276 Conn. 752. We rejected that claim, stating that "the evidence adduced at trial indicated that, on the day that the victim's body was discovered, several unidentified persons, whom Littleton described as 'suits,' came to the Skakel residence to help take control of the situation. While they were there, it was decided that Littleton would take the [petitioner], his brothers [Tommy] Skakel and John Skakel [and] their cousin . . . Terrien to the family's hunting lodge in Windham. The defendant's father also testified that Littleton would not have had the authority to take his children anywhere without his permission. Accordingly, we conclude[d] that the state's [attorney's] argument that Littleton was directed to take

---

[113] Specifically, the petitioner maintained on direct appeal from his criminal conviction that, "without a shred of evidence to support it, the state fabricated an elaborate story about a Skakel family 'conspiracy' to falsify evidence that would supply an alibi for [the petitioner]. This devastating 'cover-up' theme not only conveyed a familial verdict of guilt, it also gutted the credibility of all alibi witnesses in one argumentative thrust, and appealed to the jury's sense of outrage that a wealthy family thought it was able to trick the police by concocting a false alibi. The state's conduct was grossly egregious because it was deliberate and false." The petitioner further contended that "[t]his story of a family 'alibi' conspiracy has no evidentiary support; in fact, the evidence was all to the contrary." In support of this contention, the petitioner referred to Julie Skakel's testimony that her brothers were interviewed by police before the trip to Windham, and to the testimony of the Greenwich police officers that the Skakel family was fully cooperative with the investigation from the moment the police arrived at the scene on October 31, 1975.

the four boys out to Windham on the basis of '[s]omeone seeing the police all over the place' was not improper because it was founded on reasonable inferences drawn from the testimony of Littleton and the [petitioner's] father. Moreover, because the only family members to go to Windham were the chief proponents of the [petitioner's] alibi—the [petitioner's] other siblings were left behind—it also was proper for the state's attorney to argue that the trip had been arranged for the purpose of placing these crucial witnesses temporarily out of reach of the authorities in order to give them time to prepare a unified account of the events that occurred on the night of the [victim's] murder." Id., 754–55.

Although the state's attorney's argument concerning the allegedly concocted alibi was not so completely lacking in evidentiary support as to be improper, it is abundantly clear that his explanation concerning the manner in which the Skakel family allegedly manufactured the petitioner's alibi was extremely weak. The following evidence adduced at the petitioner's criminal trial demonstrates how factually attenuated the state's attorney's claim actually was. Littleton testified that, on the day the victim's body was discovered, he left the Skakels' house in the morning to go to Brunswick School, where he worked as a teacher and a coach. Upon returning to the house in the late afternoon, he encountered what he described to be a scene of "mayhem." According to Littleton, police cars were all over the street, and several unidentified cars were parked in the Skakels' driveway. Littleton stated that, when he went inside the house, he was confronted by ten to fifteen men in "suits" in the living room, who directed him to take the Skakel children to Windham the next morning. On cross-examination, Littleton further stated that the men in suits, whom he believed to be attorneys from Rushton Skakel, Sr.'s, company, Great Lakes Carbon Corporation, "were in a great hubbub, talking

amongst themselves." Littleton acknowledged that, on previous occasions, he had told investigators that, when he arrived at the Skakels' house, he was "swept into a vortex" of twenty attorneys who were there to orchestrate a "cover-up." When defense counsel asked Littleton whose idea it was to take the Skakel children to Windham, Littleton replied: "When I walked into the living room to the . . . twenty suits, we ended up in a discussion. And in that discussion, we discussed the best ways to handle the situation."

The testimony of the other witnesses who were at the Skakels' house on the afternoon in question indicates that Littleton's recollection of being swept into a vortex of attorneys bordered on delusional.[114] Lunney, the officer who interviewed the Skakel children, testified that there were no attorneys at the Skakels' house while he was there that afternoon or the following day. Julie Skakel testified that, after the victim's body was discovered, a woman in her neighborhood, who knew that her father, Rushton Skakel, Sr., was away and observed the police going in and out of the Skakels' house, advised her to call her father's office to inform them of what was going on. James McKenzie, the president of Great Lakes Carbon Corporation, testified at the petitioner's criminal trial that, in 1975, he was an associate attorney at the company's New York City office. On the afternoon of October 31, 1975, at approximately 3 p.m., he was called into the office of the general counsel and told that "there had been a murder of a neighbor next to . . . the Skakels and that the family was basically unsupervised as the father was out of town." McKenzie was asked if "[he] would go up and

---

[114] As I noted previously, Littleton was known to have suffered from such delusional thinking. Indeed, on cross-examination, Littleton acknowledged that he once told the police, after an arrest in Florida, that he was "Kenny Kennedy, a black sheep of the Kennedy family," and that he previously had told a friend that the Skakel and Kennedy families were trying to "blow [his] heart out with an intravenous dosage of cocaine."

stay with the family until the father arrived." McKenzie took a train to Greenwich and arrived at the house at approximately 5 p.m. McKenzie stated that the scene he encountered when he arrived "was chaotic." According to McKenzie, there were a number of reporters, "some neighbors, [children of] neighbors [and] police and kids running in and out of the house . . . ." When asked what he did first, McKenzie responded: "I asked the press to leave, number one, and tried to bring a little order to the family, asked the kids to be respectful of the situation, and I just tried to keep things a little more under control."

In an attempt to bolster Littleton's testimony, the state's attorney asked McKenzie whether there were any "male neighbors or anything of that nature" at the house when he got there. McKenzie responded that there were mostly children and one woman from the neighborhood who "was trying to maintain control of the situation as well." When asked whether any of the people were "wearing suits," McKenzie responded, "I guess a couple members of the press were and certainly the police, but [that was] about it." The state's attorney then asked McKenzie whether he and Littleton had "discuss[ed] anything about [the] safety of the children, where the children should go . . . ." McKenzie responded that he had no such conversation, although he did recall meeting Littleton, who told him that he was the tutor and that it was his first day on the job.

On cross-examination, defense counsel asked McKenzie whether he had been sent to the Skakels' house to give legal advice to the family. McKenzie responded that he was not a criminal attorney and that his only purpose in going to the Skakels' residence was to "try to . . . maintain a little order and wait for the father to return." McKenzie further stated that, by the time he arrived, the police already had interviewed the Skakel children. Defense counsel asked McKenzie, "by

the way, you didn't take the train with nineteen other Great Lakes Carbon lawyers, did you?" McKenzie responded that he had not, that he was the only attorney at the house and that he had not given any legal advice to anyone the entire time he was there. According to McKenzie, Rushton Skakel, Sr., returned at approximately 9 p.m. that evening. At that time, McKenzie explained to Rushton Skakel, Sr., what he knew about the situation and then went home.

It is clear that, at some point after Rushton Skakel, Sr., returned home, he decided that the older boys in the house would go to Windham the next day, a Saturday, and that Littleton would accompany them there. Apart from Littleton's highly dubious testimony, however, there is no evidence as to how or why the decision was made. Julie Skakel testified that, during that period, her brothers went to Windham almost every weekend in the fall and winter to hunt or ski. Indeed, Littleton himself testified that he had observed nothing unusual on the trip and that he never was asked by anyone in the Skakel family to participate in a cover-up. Certain Greenwich police officers testified that they were given unfettered access to the Skakel children, as well as their home and property, in the hours following the murder, and for several months thereafter, and that the family was fully cooperative.

It may be, as the state argued at trial, that Rushton Skakel, Sr., sent his sons to Windham to get them away from police. It may also be that he sent them there simply to get them out of the house, for, as McKenzie stated, the murder had caused quite an uproar in the neighborhood, and some of the children, including the petitioner, were extremely shaken. I am fully persuaded, however, that the evidence of a cover-up was sufficiently weak, and the strength of the petitioner's alibi sufficiently strong, that, if a jury were to reconsider the alibi evidence in the context of credible evidence

that one or more other persons had the means, motive and opportunity to commit the murder, that jury likely would find the petitioner not guilty of the victim's murder.

Indeed, it bears emphasis that the state was required, at the petitioner's criminal trial, to disprove his alibi defense beyond a reasonable doubt. See, e.g, *State* v. *Butler*, 207 Conn. 619, 631, 543 A.2d 270 (1988) ("[a] defendant asserting an alibi and relying [on] it as a defense is entitled to have the jury charged that the evidence offered by him on that subject is to be considered by [the jury] in connection with all the rest of the evidence in ascertaining whether [the defendant] was present, and that if a reasonable doubt on that point exists, it is the jury's duty to acquit him"). At the petitioner's criminal trial, the state undertook to prove beyond a reasonable doubt that his alibi was constructed on a trip to Windham and orchestrated by the petitioner's father, that the several young witnesses who gave statements in support of the alibi immediately following the discovery of the victim's body all lied to the police about the petitioner's true whereabouts on the night of the murder, that those witnesses continued to lie about that fact for many years thereafter, and that they then perjured themselves as adults when they testified at the petitioner's criminal trial. Evidence to support this scenario, however, is essentially nonexistent. Indeed, it is striking that, despite the notoriety of the case and the relative youth of the petitioner's alibi witnesses at the time of the murder, all of those witnesses have been unwavering in their testimony, and not a single person ever has come forward with information to suggest that any one of them ever has been untruthful.

## G

### Summary

In sum, the state's thin case against the petitioner was predicated primarily on statements that he had made while a resident at Elan. At the time these statements were made, both the petitioner and those to whom he made the statements were young, impressionable and, in most if not all cases, emotionally unstable, which may explain why they were enrolled at Elan. The petitioner presented an alibi defense, the credibility of which was challenged by the state on grounds that find only marginal support in the record. Although each of the persons who testified in connection with that alibi defense is related to the petitioner, no evidence ever has been adduced to demonstrate that any one of them was lying. Indeed, it is difficult to see how those alibi witnesses, who were quite young at the time of the victim's murder, could have concocted a false story immediately after the murder, placing the petitioner twenty minutes away from the crime scene when the victim was murdered, and have stuck to that story, without deviation, for decades. Furthermore, the state acknowledged the existence of at least two other significant potential suspects, including Tommy Skakel, the last person to be seen with the victim and for whom the police had sought an arrest warrant in connection with the victim's murder, and Littleton, a violent and mentally unstable person whose first night as a resident of the Skakels' home was marked by the victim's death. In light of the relatively weak evidence implicating the petitioner in the victim's murder, as well as the long-standing existence of other suspects and the petitioner's alibi defense, it is apparent that the newly discovered Bryant evidence—evidence that the trial court itself concluded was trustworthy because it bore significant indicia of reliability—is more than "sufficiently credible," when viewed in the context of the state's case, to give rise to the likelihood that a second jury would find a reasonable doubt about whether the petitioner

murdered the victim.[115] In such circumstances, a new trial is required.[116]

[115] The majority asserts that my analysis is "unprecedented," that I advocate what the majority characterizes as essentially de novo review of the trial court's findings, and that I view the evidence "in the light least favorable" to sustaining the trial court's decision. Footnote 25 of the majority opinion. These contentions are without merit.

My analysis is not predicated on a de novo review of the trial court's factual findings. With respect to the threshold issue of the admissibility of Bryant's statements, I conclude that the trial court properly exercised its discretion in concluding that those statements are admissible as trustworthy statements against penal interest. With respect to the trial court's failure to consider those statements in the context of the original trial evidence, the court did not elaborate on its rationale for not doing so, stating only that the statements, while admissible, are not credible. For the reasons that I previously have set forth in this opinion, I believe that the trial court was required to conduct such a review because, under the particular circumstances of the present case, *Shabazz*, if properly applied, requires that review. I cannot discern from the trial court's memorandum of decision, however, whether the court failed to consider Bryant's statements in light of the original trial evidence because the court did not give due consideration to the fact that the first prong of the *Shabazz* test erects a truly *minimal* credibility hurdle or, instead, because the court's fact-based finding that the petitioner had not met that low credibility threshold was unreasonable. If the court's decision to reject the petitioner's claim without proceeding to the second prong of the *Shabazz* test was predicated on a misunderstanding of the petitioner's minimal burden under the first prong of *Shabazz*, then the court's decision is the product of an error of law. Indeed, that may well be the case in view of the fact that the majority itself does not agree with my conclusion that the first prong of *Shabazz* is satisfied unless the court reasonably finds that the newly discovered evidence lacks all credibility. If, however, the court's decision not to consider Bryant's statements in the context of the original trial evidence was based on the conclusion that, as a factual matter, those statements were so utterly lacking in credibility that it was unnecessary to engage in such a review, then, in my view, the court's finding constituted an abuse of discretion. Thus, contrary to the majority's assertion, I do not engage in a de novo review of the trial court's factual findings.

Furthermore, contrary to the majority's contention, there is nothing in this opinion to support the conclusion that I view the evidence in the light least favorable to sustaining the trial court's decision. To the extent that the impropriety of the trial court's decision, in particular, its decision to reject the petitioner's claim under the first prong of *Shabazz*, is the product of unreasonable fact finding, rather than a misunderstanding of the minimum credibility threshold, I have explained why I reach that conclusion, that is, because the court's finding in that regard is unsupported by the facts and the inferences reasonably drawn therefrom. Moreover, as I also have explained, that determination cannot stand because of the court's inconsistent findings with respect to the extent to which Bryant's statements are corroborated.

[116] In light of the trial court's factual findings and the undisputed nature of the evidence underlying this case, the inherent reliability of the newly

## V

## THE RELATIONSHIP OF GARR AND LEVITT
## AND GARR'S ALLEGED BIAS

In support of his petition for a new trial, the petitioner also claims that Frank Garr, the state's lead investigator, and Leonard Levitt, an author, joined in a secret "pact" to write a book about the case, a pact that was motivated by their desire to prove that they were correct in identifying—and, in Garr's case, pursuing—the petitioner as the person who killed the victim. The petitioner claims that this agreement resulted in the 2004 publication of a book, entitled "Conviction: Solving the Moxley Murder," on which Levitt and Garr had collaborated, that reveals Garr's "particularly unique bias" against the petitioner and his family. The petitioner further claims that this bias so "undermine[d] Garr's credibility in his selection, investigation and use of . . . witnesses and . . . dilute[d] the already tenuous probative value . . . of the circumstantial evidence" on which the petitioner was convicted that a new trial is warranted. The trial court concluded that the evidence relating to the book deal between Levitt and Garr was not newly discovered and that, in any event, it would not have had a bearing on the outcome of the petitioner's criminal trial. I disagree with the trial court that the evidence was not newly discovered. As to whether that evidence would have affected the outcome of the petitioner's criminal trial, I need not resolve that issue in view of my determination that the petitioner is entitled to a

discovered evidence and the state's failure to rebut it, and the weakness of the state's original trial evidence, I see no reason to remand the case to the trial court for another hearing. In other words, under the particular facts and circumstances presented, in my view, the only proper resolution of the petitioner's claim is to direct a new trial. I therefore disagree with the majority that the appropriate remedy for the trial court's failure to weigh the newly discovered evidence against the original trial evidence is another hearing on the petitioner's claim for a new trial. See footnote 25 of the majority opinion. Although that would be the proper remedy in some cases, for the foregoing reasons, it is not the proper remedy in the present case.

new trial on the basis of the newly discovered Bryant evidence. At a minimum, however, the evidence of Garr's bias toward the petitioner and his family bolsters my conclusion that the petitioner is entitled to a new trial.

As the majority has explained, in May, 2001, the petitioner filed a motion for discovery and inspection in his criminal case seeking, inter alia, disclosure of any evidence that any agent of the state had "a pecuniary or other interest in the development and/or outcome of this case, including, but not limited to, any contract, agreement, or on-going negotiations, which relate to the preparation of any book . . . ." The court, *Kavanewsky, J.*, granted the request limited to witnesses called by the state. During the petitioner's criminal trial, defense counsel asked Garr on cross-examination whether he had a book deal. When the state objected on relevancy grounds, defense counsel did not pursue his inquiry concerning a book deal.

Levitt and Garr both testified at the hearing on the petition for a new trial. Their testimony revealed that they had become friendly in 1995 after Levitt published an article in New York Newsday about the victim's murder. Following the petitioner's trial and conviction, Levitt published his book about the case. According to Garr, his own contribution to the book consisted of proofreading drafts to ensure accuracy. For Garr's assistance with the book, Levitt paid Garr 50 percent of the "net revenues" from the book.

Focusing on the petitioner's claim concerning the existence of a book deal between Levitt and Garr, the trial court rejected the petitioner's claim that any such deal or arrangement was newly discovered. In essence, the trial court found that the petitioner had not pursued the issue with due diligence, and, in any event, the two men had no book deal prior to the petitioner's criminal

trial, and Garr had no expectation of any financial interest in any book that Levitt may have planned to write about the case in the future.

In my view, the trial court viewed the petitioner's claim too narrowly by limiting its consideration to the issue of the existence of a formal business relationship between Levitt and Garr. As the petitioner notes, the book itself refers to a "pact" that the men made to "tell [their] story." L. Levitt, Conviction: Solving the Moxley Murder (ReganBooks 2004), p. x. As Levitt testified, he and Garr had entered into this "pact" shortly after the 1998 publication of a book about the victim's murder by Mark Fuhrman—a point in time that Levitt candidly described as his and Garr's "lowest ebb"—because Fuhrman was highly critical of the investigation of the murder by the Greenwich police department. There is nothing in the record to indicate that the petitioner could have learned of the "pact" between Levitt and Garr anytime prior to the publication of the book, which, so far as we know, contained the first public revelation of that agreement. Furthermore, there was no way for the petitioner to have known about Garr's animosity toward him and his family prior to the publication of the book, which contains comments, directly attributable to Garr, that reflect such feelings. The record clearly establishes, therefore, that the pact between Levitt and Garr to tell their story, and Garr's alleged bias toward the petitioner as reflected in the book that resulted from that agreement, constitutes newly discovered evidence.[117]

---

[117] As an alternative ground for affirming the trial court's judgment, the state contends that the court should have barred the petitioner from proceeding on his claim concerning Levitt and Garr. In light of the following procedural history, I disagree with the state's contention. In October, 2005, the state filed a request to revise in the present case, claiming, among other things, that the petitioner should be required to delete count nine of his complaint, which alleged, inter alia, that he was "entitled to a new trial based [on] newly discovered evidence, including but not limited to the information previously alleged in" the first eight counts of the complaint. The trial court denied the state's motion, and the state sought no further

The petitioner further contends that this evidence would place the state's case in a new and disturbing light, thereby warranting a new trial. In fact, the book contains potentially troubling revelations about the exceedingly close relationship between Levitt and Garr—a relationship that Levitt himself characterizes as "unnatural"[118]—and about their passionate commitment to establishing that the petitioner was responsible for the victim's murder. For example, in the introduction to the book, Levitt writes: "People say I'm like a dog with my teeth in someone's ankle when I'm on a story. But pursuing the [victim's] murder required more than tenacity or even courage. It required stealth, guile, and, most important[ly], patience.

relief at that time. In particular, the state did not file a motion to strike that portion of count nine containing the broadly worded allegation that the petitioner was entitled to a new trial on the basis of newly discovered evidence "including *but not limited to*" the allegations contained in the other counts of the complaint. (Emphasis added.) During the hearing on the petition for a new trial, the state moved to bar the petitioner from proceeding on his claim concerning Levitt and Garr. In support of its motion, the state maintained that count nine did not afford it adequate notice of the claim and that it was too late for the petitioner to amend that count due to the three year limitation period applicable to petitions for a new trial under General Statutes § 52-582. The trial court rejected the state's contention that it had not been afforded adequate notice of the claim because the state was well aware of the claim on the basis of certain submissions by the petitioner during the pretrial discovery phase of the case. The trial court also explained that the state's request to revise had sought only to delete count nine, not to "flush it out." Because the state never sought a more specific statement or articulation of the petitioner's claim, and because the state had actual notice of that claim, the trial court denied the state's motion to preclude the petitioner from proceeding on the claim. Although the state undoubtedly would have been entitled to more specificity from the petitioner with respect to the broad allegation contained in count nine, the state did not seek it, and, as the court found, the state had ample notice of the claim. I therefore see no reason to disturb the trial court's decision to deny the state's motion to preclude the petitioner from proceeding on his claim involving Levitt and Garr.

[118] Levitt writes: "Here we were, two grown men with wives and children, now spending an increasing amount of time together. At each meeting, we'd talk for hours.

"Our coming together—a reporter and a detective—seemed so unnatural I said to [Garr], 'Jesus, if anyone noticed what was going on between us, they might think we're gay.' " L. Levitt, supra, p. 164.

"I did not solve [the victim's] murder. What I did was prevent the Skakel family from getting away with it. I was that unexpected force that created enough of a stir to keep the case alive until someone smarter than me appeared and put it all together.

"No, that person was not the notorious former Los Angeles detective Mark Fuhrman, whose claim of solving the murder was trumpeted by the national media. Nor was it the celebrity writer Dominick Dunne, whose claims the media also accepted. Rather, the person who solved the [victim's] murder was an unheralded local detective named Frank Garr, who pursued his investigation for eleven years and whose work and life became intertwined with mine. . . .

"Both of us found ourselves underdogs and outcasts and naturally formed a bond. We were an odd couple, a detective and a newspaper reporter. It was like the lion lying down not with a lamb but with a crocodile. Except that as we grew closer, I wasn't sure which of us was which." Id., p. xiv.

The book also documents in considerable detail Garr's hostility toward the petitioner and his family. Levitt writes: "[Garr] also knows the Skakel family. Despite the image of forthrightness and generosity they present to the world, [Garr] says they have no morals or conscience. He calls them habitual liars and says their loyalty is only to each other.

"[Garr] has no more regard for their friends, neighbors, and attorneys—even their family priest." Id., p. 4.

Levitt later quotes Garr as saying, " 'I never hid the fact that these people were despicable.' . . .

" 'Liars. Liars and drunks. They refuse to take responsibility for anything they do. They actually see themselves as victims.' " Id., p. 163. The factual basis for Garr's belief that the petitioner's family members are

all liars, however, is no more apparent in Levitt's book than it was in the evidence adduced by the state at the petitioner's criminal trial, during which the state argued that the Skakel family had engaged in a decades-long cover-up.[119] Furthermore, with respect to the petitioner's appeal from the judgment of conviction, which was pending in this court when Levitt's book was published, Levitt writes: "The Skakels [will] . . . never let it die. They [are] like the forces of evil . . . [who] just kept coming." Id., p. 285. Levitt concludes by quoting Garr as follows: "For the Skakels, it is over. They just don't know it.

"And remember this. If I am wrong and their appeal is somehow granted, and even if [the petitioner] gets a new trial, you and I will still be there. We'll be there to stop them. Sometimes I think that's what we are meant to do in this world." (Internal quotation marks omitted.) Id.

Apparently, Garr's motivation was fueled not only by a deep antipathy toward the petitioner and his family, but also by a desire for recognition that he had been right about the petitioner all along. Thus, Levitt writes that Garr was exceedingly upset by Fuhrman's book not simply because of its criticism of Garr's handling of the investigation, but also because Fuhrman claimed to be the first person to suspect that the petitioner had committed the crime. According to Levitt's book, which

---

[119] According to Levitt, friends and colleagues of Rushton Skakel, Sr., the alleged mastermind of the Skakel family cover-up, praised him as an extremely generous person whose "unspoken directive" in life was "[m]y house is your house . . . ." (Internal quotation marks omitted.) L. Levitt, supra, p. 24. According to Levitt, Rushton Skakel, Sr., volunteered at a local nursing home, opened his family's swimming pool in the summertime to a camp for mentally disadvantaged children and, according to one person who worked closely with him for thirty years, he was "the most loyal person in the world . . . [t]he person I'd most want to be stranded with on a desert island" because "[h]e'd never take advantage of you . . . ." (Internal quotation marks omitted.) Id.

Garr proofread for accuracy: "[Garr] was so upset [after reading Fuhrman's book] he called me. I drove over to his house. While I sat at his kitchen table, [Garr] paced the room. '[Fuhrman] is such a liar.' . . .

"With that he flicked on the television. There on . . . one of the network talk shows was Fuhrman. He was crowing over how he'd solved the [victim's] murder.

"[Garr] and I turned and looked at each other. I didn't know whether to laugh or scream. [Garr] opened his mouth but no words came. If ever I saw a man crushed, this was it.

"[Garr had] fought with his superiors for nearly a decade over [his suspicions about the petitioner]. He'd been ostracized by his colleagues and ridiculed by his bosses yet had virtually singled-handedly gotten a grand jury impaneled. And here was Fuhrman, with barely a connection to the case, taking the credit. . . .

"I wanted to reach over and hug him, or at least touch his arm in commiseration. I didn't, though. Instead, all I could think to say was . . . 'I'm so very sorry.'

"But I made a promise to myself, and to him. When the case was over, I promised that no matter which way it went, no matter how the grand jury ruled, I would tell the story, his and mine.

"[Garr] shook his head. 'I pray that you do,' he said. 'And I'll try to help you. But you're only jerking yourself off. Nobody will listen. Nobody will believe you.' " Id., pp. 213–14.

I agree with the petitioner that evidence contained in the book would be highly relevant to demonstrate Garr's strong feelings of antipathy toward the petitioner and his family. The petitioner maintains, and I agree, that "[t]he state presented and relied heavily on a variety of questionable witnesses who offered circumstantial evidence of the petitioner's guilt," such as Coleman,

the convicted felon and heroin addict.[120] At a minimum, the contents of Levitt's book would tend to undermine Garr's credibility and judgment in his selection, investigation and use of such witnesses. This is particularly so in light of Garr's testimony at the hearing on the petition for a new trial that, even though he spoke to Crawford Mills and Neal Walker "several times" about Bryant's allegations, he never once bothered to interview Hasbrouck despite the fact that Garr worked in the same city in which Hasbrouck resided. Finally, if a jury were to be presented with information that an investigator believed that he had been put on earth to thwart any effort on the part of a criminal defendant to demonstrate his innocence, it might well be inclined to view the evidence marshaled by that investigator with a heavy dose of skepticism.

As I have indicated, however, in view of my conclusion that the petitioner is entitled to a new trial on the basis of the Bryant evidence alone, I need not determine the extent to which the revelations about Garr's involvement with Levitt and his intense negative feelings about the petitioner and the petitioner's family would have affected the jury's verdict. It suffices to say that, because that evidence raises questions about the objectivity of the state's investigation of the case, such evidence would make an acquittal at a new trial even more likely.

## VI

## CONCLUSION

A petition for a new trial is not to be granted lightly, for the state and the public have a strong interest in

---

[120] The petitioner contends that "[Levitt's] book also provides remarkable insight into Garr's conduct with regard to . . . Coleman. Coleman first spoke to Garr on June 7, 1998, after a reward for the case had been advertised in People Magazine. . . . While aware that Coleman was a serious drug user and also that . . . numerous individuals . . . considered him a liar, Garr [told Levitt] that he 'really liked' Coleman and [thought] that he was 'one of the most believable guys' he had ever talked to."

finality once a criminal defendant has been convicted and that conviction has been affirmed on appeal. There are occasions, however, when the discovery of new evidence following the original trial casts such doubt on the accuracy of a conviction that justice demands a second trial. The present case is such a case. The evidence brought forward by Bryant—a witness at least as credible as the state's key witnesses, without any apparent motive to lie, and whose account of the facts has been corroborated in important respects—is sufficiently compelling to give rise to a reasonable doubt, or even a *serious* doubt, as to whether the petitioner had any involvement in the victim's murder. In such circumstances, the legitimate desire for finality cannot trump the petitioner's right to a new trial. This is especially true in light of the emerging "reality of wrongful convictions"; *McKithen* v. *Brown*, 481 F.3d 89, 92 (2d Cir. 2007), cert. denied, 552 U.S. 1179, 128 S. Ct. 1218, 170 L. Ed. 2d 59 (2008); see also *Kansas* v. *Marsh*, 548 U.S. 163, 210, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006) (Souter, J., dissenting) ("[m]ost . . . wrongful convictions . . . [result] from eyewitness misidentification, false confession, and (most frequently) perjury . . . and . . . among all prosecutions homicide cases suffer an unusually high incidence of false conviction . . . probably owing to the combined difficulty of investigating without help from the victim, intense pressure to get convictions in homicide cases, and the corresponding incentive for the guilty to frame the innocent" [citations omitted]); a reality from which this state's criminal justice system is not immune, as recent events have made all too clear. See, e.g., *Miller* v. *Commissioner of Correction*, 242 Conn. 745, 747–48, 806–807, 700 A.2d 1108 (1997) (habeas court properly granted habeas petition when petitioner, after serving more than ten years of thirty-two year sentence following his conviction on two counts of first degree assault, established by clear and convincing evidence, unavailable at time of trial,

that he was innocent of those crimes and that no reasonable fact finder would find him guilty of those offenses); *Taylor* v. *Commissioner of Correction*, Superior Court, judicial district of Tolland, geographical area number nineteen at Rockville, Docket No. TSR-CV05-4000409-S (March 17, 2010) (granting habeas petition filed by Ronald Taylor, who, along with George M. Gould, had been incarcerated for more than sixteen years following their conviction of felony murder, among other crimes, upon finding that both men did not commit crimes of which they had been convicted); *Gould* v. *Commissioner of Correction*, Superior Court, judicial district of Tolland, geographical area number nineteen at Rockville, Docket No. TSR-CV03-0004219-S (March 17, 2010) (granting Gould's habeas petition); see also C. Nolan, "Freeing Inmates, Changing Laws," Conn. L. Trib., August 17, 2009, pp. 1, 9 (more than 240 inmates across country have been exonerated due to DNA evidence, including three in this state, namely, James Tillman, released from prison after serving seventeen years for robbery and sexual assault that he did not commit, Miguel Roman, released after serving approximately nineteen years following his wrongful conviction of murder, and Kenneth Ireland, Jr., released after serving twenty-one years following his exoneration for crimes of sexual assault and murder). In the present case, the trial court misapplied the test adopted by this court in *Shabazz* for determining whether a new trial is required due to newly discovered evidence. Proper application of that test and the principles of fundamental fairness that underlie it dictate that the petitioner be awarded a new trial.

Accordingly, I dissent.